# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

UNITED STATES OF AMERICA *ex rel.*
DEREK LEWIS and JOEY NEIMAN,

                          Plaintiffs,

v.

COMMUNITY HEALTH SYSTEMS, INC.;
CHSPSC, LLC; ALLIANCE HEALTH
PARTNERS, LLC D/B/A MERIT HEALTH
BATESVILLE; AMORY HMA LLC D/B/A
MERIT HEALTH GILMORE MEMORIAL;
ANNA HOSPITAL CORPORATION D/B/A
UNION COUNTY HOSPITAL; ARMC LP
D/B/A ABILENE REGIONAL MEDICAL
CENTER; AUGUSTA HOSPITAL LLC
D/B/A TRINITY HOSPITAL OF AUGUSTA;
BANNER HEALTH D/B/A BANNER
PAYSON MEDICAL CENTER; BARTOW
HMA LLC D/B/A BARTOW REGIONAL
MEDICAL CENTER; BERWICK
HOSPITAL COMPANY LLC D/B/A
BERWICK HOSPITAL CENTER; BIG
BEND HOSPITAL CORPORATION D/B/A
BIG BEND REGIONAL MEDICAL
CENTER; BIG SPRING HOSPITAL
CORPORATION D/B/A SCENIC
MOUNTAIN MEDICAL CENTER; BILOXI
HMA LLC D/B/A MERIT HEALTH
BILOXI; BLACKWELL HMA LLC D/B/A
ALLIANCEHEALTH BLACKWELL; BLUE
RIDGE GEORGIA HOSPITAL COMPANY
LLC D/B/A FANNIN REGIONAL
HOSPITAL; BLUEFIELD HOSPITAL
COMPANY LLC D/B/A BLUEFIELD
REGIONAL MEDICAL CENTER;
BRANDON HMA LLC D/B/A MERIT
HEALTH RANKIN; BROWNWOOD
HOSPITAL LP D/B/A BROWNWOOD

Case No.  18-20394-CIV-Scola/Torres

**FIRST AMENDED COMPLAINT FOR
VIOLATION OF THE FALSE CLAIMS
ACT [31 U.S.C. §§ 3729 *et seq.*]**

**JURY TRIAL DEMANDED**

REGIONAL MEDICAL CENTER;
BULLHEAD CITY HOSPITAL
CORPORATION D/B/A WESTERN
ARIZONA REGIONAL MEDICAL
CENTER; CARLISLE HMA, LLC D/B/A
CARLISLE REGIONAL MEDICAL
CENTER; CARLSBAD MEDICAL CENTER
LLC D/B/A CARLSBAD MEDICAL
CENTER; CEDAR PARK HEALTH
SYSTEM LP D/B/A CEDAR PARK
REGIONAL MEDICAL CENTER; CENTRE
HOSPITAL CORPORATION D/B/A
CHEROKEE MEDICAL CENTER;
CHESTER HMA LLC D/B/A CHESTER
REGIONAL MEDICAL CENTER;
CHESTERFIELD MARLBORO LP D/B/A
CHESTERFIELD GENERAL HOSPITAL;
CITRUS HMA INC D/B/A SEVEN RIVERS
REGIONAL MEDICAL CENTER;
CLARKSDALE HMA LLC D/B/A MERIT
HEALTH NORTHWEST MISSISSIPPI;
CLINTON HMA, LLC D/B/A
ALLIANCEHEALTH CLINTON; CLINTON
HOSPITAL CORPORATION D/B/A LOCK
HAVEN HOSPITAL; COLLEGE STATION
HOSPITAL LP D/B/A COLLEGE STATION
MEDICAL CENTER; CRESTVIEW
HOSPITAL CORPORATION D/B/A NORTH
OKALOOSA MEDICAL CENTER;
CRESTWOOD HEALTHCARE LP D/B/A
CRESTWOOD MEDICAL CENTER;
DEACONESS HEALTH SYSTEM LLC
D/B/A ALLIANCEHEALTH DEACONESS;
DEMING HOSPITAL CORPORATION
D/B/A MIMBRES MEMORIAL HOSPITAL;
DURANT HMA LLC D/B/A
ALLIANCEHEALTH DURANT;
DYERSBURG HOSPITAL COMPANY LLC
D/B/A TENNOVA HEALTHCARE-
DYERSBURG REGIONAL; EAST
GEORGIA REGIONAL MEDICAL
CENTER, LLC; EMPORIA HOSPITAL
CORPORATION D/B/A SOUTHERN
VIRGINIA REGIONAL MEDICAL
CENTER; EVANSTON HOSPITAL
CORPORATION D/B/A EVANSTON

REGIONAL HOSPITAL; FOLEY
HOSPITAL CORPORATION D/B/A SOUTH
BALDWIN REGIONAL MEDICAL
CENTER; FORREST CITY ARKANSAS
HOSPITAL COMPANY LLC D/B/A
FORREST CITY MEDICAL CENTER;
FORT PAYNE HOSPITAL CORPORATION
D/B/A DEKALB REGIONAL MEDICAL
CENTER; FRANKLIN HOSPITAL
CORPORATION D/B/A SOUTHAMPTON
MEMORIAL HOSPITAL; GAFFNEY HMA
LLC; GALESBURG HOSPITAL
CORPORATION D/B/A GALESBURG
COTTAGE HOSPITAL; GRANBURY
HOSPITAL CORPORATION; GRANITE
CITY ILLINOIS HOSPITAL COMPANY
LLC D/B/A GATEWAY REGIONAL
MEDICAL CENTER; GREENBRIER VMC
LLC D/B/A GREENBRIER VALLEY
MEDICAL CENTER; GREENVILLE
HOSPITAL CORPORATION D/B/A LV
STABLER MEMORIAL HOSPITAL;
HAINES CITY HMA LLC D/B/A HEART
OF FLORIDA REGIONAL MEDICAL
CENTER; HAMLET HMA LLC D/B/A
SANDHILLS REGIONAL MEDICAL
CENTER; HARTSVILLE, LLC D/B/A
CAROLINA PINES REGIONAL MEDICAL
CENTER; HERNANDO HMA LLC; HMA
FENTRESS COUNTY GENERAL
HOSPITAL LLC; HMA SANTA ROSA
MEDICAL CENTER LLC; HOSPITAL OF
BARSTOW INC D/B/A BARSTOW
COMMUNITY HOSPITAL; HOSPITAL OF
LOUISA, INC. D/B/A THREE RIVERS
MEDICAL CENTER; HOSPITAL OF
MORRISTOWN LLC D/B/A LAKEWAY
REGIONAL HOSPITAL; JACKSON HMA
LLC; JACKSON HOSPITAL
CORPORATION D/B/A KENTUCKY
RIVER MEDICAL CENTER; JACKSON
TENNESSEE HOSPITAL COMPANY LLC;
JOURDANTON HOSPITAL
CORPORATION D/B/A SOUTH TEXAS
REGIONAL MEDICAL CENTER;
KENNETT HMA LLC; KEY WEST HMA

LLC; KIRKSVILLE MISSOURI HOSPITAL
COMPANY, LLC; LAKE SHORE HMA,
LLC; LAKE WALES HOSPITAL
CORPORATION; LANCASTER HMA LLC
D/B/A HEART OF LANCASTER
REGIONAL MEDICAL CENTER; LAS
CRUCES MEDICAL CENTER LLC; LEA
REGIONAL HOSPITAL LLC; LEBANON
HMA LLC; LEHIGH HMA LLC D/B/A
LEHIGH REGIONAL MEDICAL CENTER;
LEXINGTON HOSPITAL CORPORATION
D/B/A HENDERSON COUNTY
COMMUNITY HOSPITAL; LONGVIEW
MEDICAL CENTER LP D/B/A LONGVIEW
REGIONAL MEDICAL CENTER;
MADISON HMA LLC; MARION
HOSPITAL CORPORATION D/B/A
HEARTLAND REGIONAL MEDICAL
CENTER; MARSHALL COUNTY HMA,
LLC; MARTIN HOSPITAL COMPANY LLC
D/B/A TENNOVA HEALTHCARE-
VOLUNTEER MARTIN; MARY BLACK
HEALTH SYSTEM LLC D/B/A MARY
BLACK HEALTH SYSTEM
SPARTANBURG; MAT-SU VALLEY
MEDICAL CENTER LLC D/B/A MAT-SU
REGIONAL MEDICAL CENTER; MAYES
COUNTY HMA, LLC D/B/A
ALLIANCEHEALTH PRYOR; MCKENZIE
TENNESSEE HOSPITAL COMPANY LLC
D/B/A MCKENZIE REGIONAL HOSPITAL;
MCKENZIE WILLAMETTE REGIONAL
MEDICAL CENTER ASSOCIATES LLC
D/B/A MCKENZIE-WILLAMETTE
MEDICAL CENTER; MCSA LLC D/B/A
MEDICAL CENTER OF SOUTH
ARKANSAS; MELBOURNE HMA, LLC
D/B/A WUESTHOFF MEDICAL CENTER -
MELBOURNE; MIDWEST REGIONAL
MEDICAL CENTER, LLC D/B/A
MIDWEST REGIONAL MEDICAL
CENTER; MMC OF NEVADA LLC D/B/A
MESA VIEW REGIONAL HOSPITAL;
MOBERLY HOSPITAL COMPANY LLC
D/B/A MOBERLY REGIONAL MEDICAL
CENTER; MONROE HMA, LLC D/B/A

CLEARVIEW REGIONAL MEDICAL
CENTER; MOORESVILLE HOSPITAL
MANAGEMENT ASSOCIATES LLC D/B/A
LAKE NORMAN REGIONAL MEDICAL
CENTER; NAPLES HMA LLC D/B/A
PHYSICIANS REGIONAL MEDICAL
CENTER; NATCHEZ COMMUNITY
HOSPITAL LLC D/B/A NATCHEZ
COMMUNITY HOSPITAL; NATIONAL
HEALTHCARE OF LEESVILLE, INC.
D/B/A BYRD REGIONAL HOSPITAL;
NATIONAL HEALTHCARE OF MT
VERNON INC D/B/A CROSSROADS
COMMUNITY HOSPITAL; NAVARRO
HOSPITAL LP D/B/A NAVARRO
REGIONAL HOSPITAL; NHCI OF
HILLSBORO INC D/B/A HILL REGIONAL
HOSPITAL; OAK HILL HOSPITAL
CORPORATION D/B/A PLATEAU
MEDICAL CENTER; OSCEOLASC LLC;
PAINTSVILLE HOSPITAL COMPANY,
LLC D/B/A PAUL B HALL REGIONAL
MEDICAL CENTER; PASCO REGIONAL
MEDICAL CENTER, LLC; PHILLIPS
HOSPITAL CORPORATION D/B/A
HELENA REGIONAL MEDICAL CENTER;
PINEY WOODS HEALTHCARE SYSTEM,
L.P. D/B/A WOODLAND HEIGHTS
MEDICAL CENTER; POPLAR BLUFF
REGIONAL MEDICAL CENTER LLC;
PORT CHARLOTTE HMA LLC D/B/A
BAYFRONT HEALTH PORT
CHARLOTTE; PRIME HEALTHCARE
SERVICES MESQUITE LLC; PUNTA
GORDA HMA LLC; QHG OF ENTERPRISE
INC D/B/A MEDICAL CENTER
ENTERPRISE; QHG OF SOUTH
CAROLINA INC D/B/A CAROLINAS
HOSPITAL SYSTEM MARION; RED BUD
ILLINOIS HOSPITAL COMPANY LLC
D/B/A RED BUD REGIONAL HOSPITAL;
RIVER OAKS HOSPITAL LLC D/B/A
MERIT HEALTH RIVER OAKS;
ROCKLEDGE HMA, LLC D/B/A
WUESTHOFF MEDICAL CENTER -
ROCKLEDGE; ROH LLC; ROSE CITY

HMA LLC D/B/A LANCASTER
REGIONAL MEDICAL CENTER; RUSTON
LOUISIANA HOSPITAL COMPANY LLC
D/B/A NORTHERN LOUISIANA
MEDICAL CENTER; SALEM HOSPITAL
CORPORATION D/B/A THE MEMORIAL
HOSPITAL OF SALEM COUNTY; SAN
ANGELO HOSPITAL LP D/B/A SAN
ANGELO COMMUNITY MEDICAL
CENTER; SAN MIGUEL HOSPITAL
CORPORATION D/B/A ALTA VISTA
REGIONAL HOSPITAL; SEBASTIAN
HOSPITAL LLC D/B/A SEBASTIAN
RIVER MEDICAL CENTER; SEBRING
HOSPITAL MANAGEMENT ASSOCIATES
LLC D/B/A HIGHLANDS REGIONAL
MEDICAL CENTER; SEMINOLE HMA,
LLC D/B/A ALLIANCEHEALTH
SEMINOLE; SHELBYVILLE HOSPITAL
COMPANY LLC D/B/A TENNOVA
HEALTHCARE-SHELBYVILLE; SILOAM
SPRINGS ARKANSAS HOSPITAL
COMPANY LLC D/B/A SILOAM SPRINGS
REGIONAL HOSPITAL; STARKE HMA,
LLC D/B/A SHANDS STARKE REGIONAL
MEDICAL CENTER; STATESVILLE HMA
LLC D/B/A DAVIS REGIONAL MEDICAL
CENTER; SUNBURY HOSPITAL
COMPANY LLC D/B/A SUNBURY
COMMUNITY HOSPITAL; THE HEALTH
CARE AUTHORITY OF THE CITY OF
ANNISTON D/B/A STRINGFELLOW
MEMORIAL HOSPITAL; TOOELE
HOSPITAL CORPORATION D/B/A
MOUNTAIN WEST MEDICAL CENTER;
TULLAHOMA HMA LLC D/B/A
TENNOVA HEALTHCARE-HARTON;
TUNKHANNOCK HOSPITAL COMPANY
LLC D/B/A TYLER MEMORIAL
HOSPITAL; VAN BUREN HMA LLC D/B/A
SPARKS MEDICAL CENTER- VAN
BUREN; VENICE HMA LLC D/B/A
VENICE REGIONAL BAYFRONT
HEALTH; VICTORIA OF TEXAS LP D/B/A
DETAR HOSPITAL NAVARRO;
WATSONVILLE HOSPITAL

CORPORATION D/B/A WATSONVILLE
COMMUNITY HOSPITAL; WEST GROVE
HOSPITAL COMPANY LLC D/B/A
JENNERSVILLE REGIONAL HOSPITAL;
WHITE COUNTY MEDICAL CENTER
D/B/A UNITY HEALTH HARRIS
MEDICAL CENTER; WILLIAMSON
MEMORIAL HOSPITAL LLC D/B/A
WILLIAMSON MEMORIAL HOSPITAL;
WILLIAMSTON HOSPITAL
CORPORATION D/B/A MARTIN
GENERAL HOSPITAL; WINDER HMA
LLC D/B/A BARROW REGIONAL
MEDICAL CENTER; WOMEN &
CHILDRENS HOSPITAL LLC D/B/A LAKE
AREA MEDICAL CENTER; WOODWARD
HEALTH SYSTEM LLC D/B/A
ALLIANCEHEALTH WOODWARD;
YAKIMA HMA LLC D/B/A TOPPENISH
COMMUNITY HOSPTIAL; YAKIMA HMA
LLC D/B/A YAKIMA REGIONAL
MEDICAL AND CARDIAC CENTER; and
MEDHOST, INC.,

                                        Defendants.

Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com


Colette G. Matzzie (admitted *pro hac vice*)
Luke J. Diamond (*pro hac vice* anticipated)
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com


Edward H. Arens (admitted *pro hac vice*)
PHILLIPS & COHEN LLP

100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

David J. Chizewer (*pro hac vice* anticipated)
David E. Morrison (admitted *pro hac vice*)
Harleen Kaur (*pro hac vice* anticipated)
Danielle K. Johnson (*pro hac vice* anticipated)
Juan C. Arguello (*pro hac vice* anticipated)
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 201-4000
Fax: (312) 863-7472

David.chizewer@goldbergkohn.com
David.morrison@goldbergkohn.com
Harleen.kaur@goldbergkohn.com
Danielle.johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com

598038.3

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................................... 1

II.  PARTIES ....................................................................................................... 8

    A.   Plaintiffs ................................................................................................ 8

    B.   Defendants ............................................................................................. 9

        1.   Community Health Systems, Inc. ................................................. 9

        2.   CHSPSC, LLC ........................................................................ 10

        3.   CHS Hospitals ......................................................................... 10

        4.   Medhost, Inc. .......................................................................... 10

III. JURISDICTION AND VENUE .................................................................... 11

IV.  STATUTORY AND REGULATORY BACKGROUND .................................. 12

    A.   The False Claims Act .......................................................................... 12

    B.   The Anti-Kickback Statute .................................................................. 13

    C.   HITECH Act ........................................................................................ 14

    D.   Medicare and Medicaid Electronic Health Records "Meaningful Use" Incentive Programs ............................................................................. 15

        1.   2011 Edition Rule and Stage 1 Meaningful Use Criteria .......... 16

        2.   2014 Edition Rule and Stage 2 Meaningful Use Criteria .......... 17

        3.   2015 Edition Rule and Stage 3 Meaningful Use Criteria .......... 19

        4.   Incentives Available Under the Meaningful Use Program .......... 20

        5.   Certified EHR Technology and the IQR Program ...................... 21

    E.   ONC's Role in the Surveillance and Decertification Process .............. 22

V.   ALLEGATIONS ............................................................................................ 25

    A.   Background .......................................................................................... 27

        1.   Medhost's Certified EHR Technology ....................................... 27

        2.   CHS's Implementation of Medhost EHR Technology for MU Stage 2 ................................................................................... 28

    B.   Medhost's EHR Technology Lacked Functionality Required for Certification and for Users to Attest to Meaningful Use ..................... 32

        1.   Medhost EDIS and Enterprise Modules Did Not Provide for Electronic Communication Between Emergency Department and Inpatient Units Within CHS Hospitals .............................. 33

i

(a)    Requirements for Attesting to Meaningful Use on the Basis of Multiple EHR "Modules" ........................................................ 33

(b)    EDIS and Enterprise Could Not Be Integrated Properly to Perform the Functions Required for Meaningful Use .................. 35

    (i)    Medhost's Software Did Not Enable Users to Perform Drug-Drug and Drug-Allergy Checks on Medication Orders Because It Could Not Reliably Communicate Information Between EDIS and Enterprise ........................................................................ 36

    (ii)    Medhost's Software Did Not Meet Requirements to Maintain Problem List, Medication List, Medication Allergy List, and Perform Clinical Information Reconciliation ................................................................. 43

2.    Medhost EDIS and Enterprise Systems Did Not Consistently Enable Providers to Perform "Computerized Provider Order Entry" (CPOE) ................................................................................................. 48

(a)    Medhost's Software Failed to Enable Users to Create Medication Orders Accurately ...................................................... 50

    (i)    Medhost Software Miscalculates IV Drip Rates in Orders for Medications Dosed Based on the Patient's Weight ............................................................... 51

    (ii)    Medhost Software Miscalculates Weight-Based Doses Using Incorrect Medication Information .............. 51

    (iii)    Medhost's Software Records Incorrect Medication Administration Instructions When Users Select Its "Send Dose Now" Function ............................................... 52

    (iv)    Medhost Software Miscalculates Weight-Based Medication Doses Using Static Clinical History Profile Data ........................................................................ 53

    (v)    Medhost's Software Is Incapable of Creating Accurate PRN Medication Orders ...................................... 55

    (vi)    Medhost's Software Creates Inaccurate Medication Orders If Physicians Use Medhost's "Physician's Favorites" Feature to Create Orders ................................. 56

    (vii)    Medhost's Software Does Not Enable Users to Verify That the Medications they Administer Accurately Reflect the Medication Order for the Patient .............................................................................. 58

    (viii)    Medhost's EHR Fails to Run Drug Interaction Checks on Medications Ordered at Discharge .................. 59

ii

                (ix)     Additional Issues With Medhost's CPOE Function That Posed Serious Patient Harm ..................................... 60

      3.     To Increase Its Meaningful Use Measures, CHS Developed Flawed Order Sets That Prevented Users From Recording Medication Orders Accurately and Reliably Using CPOE ........................................... 61

   C.    Medhost Enterprise Software Did Not Enable Users to Perform Clinical Decision Support.................................................................................................... 65

      1.     Medhost's Enterprise Software Cannot Reliably Perform CDS or Track When and Whether CDS Rules Have Been Enabled .................... 66

      2.     CHS Falsely Attested That It Met Meaningful Use Requirements for Clinical Decision Support ................................................................ 69

          (a)     CHS's Use of the Fall Risk Assessment Failed to Meet the CDS Objective in MU Stage 1 ...................................................... 70

          (b)     CHS's Use of Static Order Sets Failed to Meet the CDS Objective in MU Stage 2................................................................. 73

   D.    Medhost Enterprise Failed to Meet Certification Requirements for e-Prescribing ................................................................................................................ 75

   E.    Medhost Falsely Certified Its Software As to the Meaningful Use "Auditable Events and Tamper-Resistance" Objective ......................................... 78

   F.    CHS Falsely Attested That Its HMA Hospitals Met Meaningful Use Requirements .............................................................................................................. 79

      1.     HMA Hospitals Attested That They Met Meaningful Use ...................... 80

      2.     CHS Falsely Attested That Its HMA Hospitals Met the Meaningful Use Interoperability Requirements for Modular EHRs ........................... 80

          (a)     HMA Hospitals' Emergency Department Software Did Not Interface With the Hospitals' Inpatient Software ........................ 81

          (b)     HMA Hospitals' Inpatient Software Did Not Provide a Medication Order Interface With the Hospitals' CPOE Application.................................................................................................. 82

          (c)     HMA Hospitals' CPOE Application Did Not Interface With Its Pharmacy Management System ..................................... 83

      3.     CHS Falsely Attested That Its HMA Hospitals Met Meaningful Use Medication Reconciliation Requirements........................................... 83

      4.     CHS Knew That the HMA Hospitals Would Not Be Able to Truthfully Attest to Meaningful Use....................................................... 85

   G.    Medhost Illegally Provided Free Software to Induce CHS to Purchase Medhost's EHR Software .......................................................................................... 88

VI.   Defendants Violated the False Claims Act ........................................................................ 91

iii

## COMPLAINT

Plaintiff-Relators Derek Lewis and Joey Neiman, through their attorneys, on behalf of the United States of America (the "Government"), for their First Amended Complaint against Defendants Community Health Systems, Inc. ("CHSI"), CHSPSC, LLC, the Defendant Hospitals identified in Exhibit A and incorporated by reference herein (collectively, with CHSI and CHSPSC, "CHS"), and Medhost, Inc. ("Medhost") (collectively, "Defendants"), allege based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.   INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made and caused to be made by Defendants and/or their agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. ("the FCA").

2.      This action alleges that Defendants submitted or caused to be submitted hundreds of millions of dollars in false claims to the Department of Health and Human Services ("HHS") for federal incentive payments through the Electronic Health Record ("EHR") Incentive Programs.

3.      In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act") to "improve health care quality, safety, and efficiency of health IT and electronic health technology exchange."

4.      To that end, the HITECH Act established the Office of the National Coordinator for Health Information Technology ("ONC") charged with the responsibility of creating a voluntary certification program for electronic health record vendors and a program for accreditation of testing laboratories and certifying bodies.  Over a series of five years, ONC adopted mandatory certification criteria for "certified health information technology."  The

1

certification program is intended to develop criteria to ensure that electronic health record systems would: (1) maintain patient health information in structured data; (2) require electronic ordering of labs, medication and radiology; (3) protect patient safety through drug-drug and drug-allergy interaction checks; (4) implement successive steps toward data portability and access to information for patients; and (5) protect patient health information through audit and security.

5.      Electronic health records vendors, including Medhost, eagerly sought certification of electronic health record technology.  As part of the certification program, EHR vendors attest to ONC authorized certification bodies ("ACB") and accredited testing laboratories ("ATL") that their software meets the certification requirements established by ONC.  The EHR market is valued at over $20 billion, with some estimates predicting it to grow to over $38 billion. Competition among vendors is fierce with over 1,100 EHR vendors offering EHR systems.

6.      The HITECH Act also established the Medicare and Medicaid Incentive Programs for Meaningful Use of Certified EHR Technology. Cognizant that hospitals and physicians might be hesitant to transition to electronic systems, the incentive programs were intended to induce providers to purchase certified EHR technologies and to implement them within their hospitals or medical practices to ensure that the systems were used for recordkeeping, ordering and other clinical decision support, safely and efficiently.  Beginning in 2011, Eligible Providers (hospitals, physicians and managed care organizations) could apply for federal subsidies if they could demonstrate meaningful use of certified EHRs.  After 2015, Eligible Providers that had failed to adopt and implement EHR technology could be subject to downward adjustment of Medicaid and Medicaid program payments.

2

7.      Congress authorized the Centers for Medicare and Medicaid Services ("CMS") to promulgate criteria for incentive payments to Eligible Providers to ensure that they used certified technology in a "meaningful way."  Over three successive steps (Stage 1, 2 and 3), CMS raised the bar for Eligible Providers to demonstrate that they were using EHR technology meaningfully within their hospital, physician practice, or managed care organization and, therefore, were entitled to claim incentive payments.  As of October 2018, CMS has disbursed over $38 billion dollars to subsidize purchase and use of certified EHR technologies in hospitals and physician practices.

8.      From the beginning, regulations under the HITECH Act have emphasized to vendors and providers alike that the purpose of the federal certification and subsidy program is to ensure that EHR systems perform functions that are intended to improve clinical practices and protect patients against medical error.  ONC has emphasized that the rules are not intended simply for a vendor to demonstrate compliance with technical standards or specifications but "to promote the adoption and meaningful use of health information technology." The 2010 Final Rule published by ONC "focuses heavily on establishing functionalities" in heath information technology from "the onset of the program." "[A]ll of the functionalities" proposed by the HITECH Act "are considered crucial to maximize the value to the health care system." This helps to ensure the rules can create certain functions in clinical practice "that improve patient care, the efficiency of the healthcare system and public and population health."  75 Fed. Reg. 44314, 44321 (July 28, 2010), 42 C.F.R. §495.2 (2010).

9.      This case concerns EHR technologies developed and sold by Defendant Medhost to hospitals nationwide, including numerous hospitals owned and operated by Defendant CHS. It also concerns an EHR technology that CHS developed itself and used in many of its hospitals.

3

10.     The Defendants' EHR technologies did not meet the requirements for certification as Certified EHR Technology.  The Government requires Certified EHR Technology to enable users to perform certain functions using the EHR.  Medhost's and CHS's technologies lacked the ability to perform required functions in accordance with ONC's requirements.  For some functionality required for certification, Medhost's and CHS's software could not perform the functions at all.  Medhost's software, for example, was required to provide "clinical decision support" to providers but the function was often broken and unavailable to users.  For other required functionality, Medhost's and CHS's software was unable to perform required functions accurately and reliably.  Medhost's software promised to enable users to create medication orders electronically, for example, but contained numerous flaws that meant that many of the orders that users created were recorded incorrectly.  The incorrect orders were often dangerous: for example, users could use Medhost's software to set the dose based on the patient's weight, but the dose it calculated would not reflect that weight, creating dangerous conditions for pediatric and other patients.

11.     Medhost knew that its software failed to provide required functionality but sought certification of the software nonetheless.  Medhost marketed its software to health care providers based on the certifications it received, causing those providers to claim incentive payments from the Government that the providers were ineligible to receive.

12.     CHS was one of Medhost's largest customers.  Starting in 2013, CHS undertook a company-wide effort to implement certified EHR technology in its hospitals with the goal of obtaining Meaningful Use incentive payments.  CHS projected over $800 million in Meaningful Use ("MU") incentive payments as an anticipated revenue stream and devoted considerable

4

resources at the corporate level to implement the EHR systems in its many hospitals as quickly as possible to obtain hundreds of millions of dollars in MU funding.

13.     CHS knew that Medhost's software lacked functionality required for certification and its own ability to attest to Meaningful Use.  In particular, prior to attesting to Meaningful Use of Medhost's software, CHS knew that Medhost's software lacked the following functionality required for the software to be eligible for certification and thus a basis for seeking incentive payments:

    i.     Failure to integrate patient information between emergency room and inpatient hospital EHR modules affecting clinical care and documentation of patient medications, allergies and problems during a hospital stay;

    ii.    Failure with placement of medication orders including a dangerous weight-based dosing application that did not function consistently;

    iii.   Failure to provide Clinical Decision Support as required;

    iv.    Failure to create and transmit electronic prescriptions as required; and

    v.     Failure to meet IT security requirements, including auditability and tamper resistance.

14.     Each of these issues were well known during the relevant time period by CHS officers and employees responsible for implementing Medhost's software at its hospitals.  From 2013 until at least 2016, CHS regularly communicated with Medhost about the inadequate functionality.

15.     Furthermore, CHS and Medhost knew that the Medhost products that CHS had chosen for its hospitals could not be integrated properly, preventing data from crossing from the emergency department to the inpatient department when a patient was admitted.  CHS and

5

Medhost knew that the lack of integration prevented it from being able to perform the functions required of a certified EHR technology.

16.     Each of CHS's hospitals attested to Meaningful Use notwithstanding its knowledge that the software did not contain the functionality required to be eligible for incentive payments.

17.     CHS disregarded the inadequate functionality because it was unwilling to delay claiming funds under the Meaningful Use program.  CHS implemented Medhost's software at a rapid pace to be able to submit attestations for Meaningful Use incentive payments.

18.     CHS's rushed implementation of the software compounded the problems with the software and made the Medhost technology at its hospitals even more unreliable and, at times, dangerous.  Among other things, because CHS and Medhost discovered that Medhost's Clinical Decision Support ("CDS") tool was non-functional, CHS used static order sets to attest to CDS even though the order sets did not actually provide any of the functionality required for CDS.  Further, CHS also mapped many order sets incorrectly to the hospital formularies, causing doctors to inadvertently place orders for incorrect medications and medication dosages.  One CHS employee warned that the CHS order set's flaws had "a very high potential for causing a catastrophic event."

19.     Medhost and CHS were both aware of the functional limitations with the Medhost products throughout 2013, 2014 and 2015.  Nonetheless, Defendants submitted, or caused to be submitted, false attestations for incentive subsidies representing that the certified functionalities were met by the Medhost EDIS and Enterprise modules and that CHS hospitals had met the required Meaningful Use objectives and measures.

598012.1

20.     As described below, despite repeatedly being made aware of flaws in the certified functionality of its EDIS and Enterprise EHR, Medhost continued to re-certify its software and knowingly caused CHS to falsely attest to MU objectives.

21.     The functional limitations, flaws, and lack of reliability with the Medhost software and CHS's implementation of the software should have made the CHS hospitals ineligible for Meaningful Use incentive payments.  Nonetheless, CHS, on behalf of its hospitals, knowingly misrepresented to the Government that the hospitals were eligible for subsidy payments.  CHS's attestations were additionally false because Medhost had offered it free software at certain hospitals in exchange for its business, an unlawful kickback.

22.     CHS also knowingly misrepresented its eligibility for Meaningful Use incentive payments for sixty hospitals that CHS acquired through a merger with Health Management Associates ("HMA").  These sixty hospitals used a modular EHR technology known as PULSE, which HMA had developed itself.  The PULSE EHR modules at these sixty hospitals could not be integrated with the other EHR technologies necessary to perform the functions required for Meaningful Use.  Basic functions, such as admitting a patient from the emergency department or transferring a patient from one inpatient department to another, could not be performed electronically, contrary to the requirements for certification and attestation, forcing hospital staff to print out the patient medical records for delivery to the new department.  CHS managers responsible for the technology across the sixty hospitals knew that PULSE did not enable users to perform functions required for the hospitals to submit truthful attestations under the Meaningful Use program.  Nonetheless, CHS submitted attestations for each of the hospitals.

23.     Throughout this course of conduct, CHS knowingly and repeatedly misrepresented to the Government that the CHS hospitals using Medhost and PULSE met all

required Meaningful Use objectives and measures and were eligible for Meaningful Use incentive payments.

24.     The Government would not have made Meaningful Use subsidy payments to the CHS hospitals that used the Medhost or the PULSE software if it had known of the flaws with the software and problems with implementation of the software that resulted in failure to perform required functions.

25.     Defendants' false and fraudulent statements and conduct alleged in this Complaint violate the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*. The FCA allows any person having information about an FCA violation (referred to as a *qui tam* plaintiff or "relator") to bring an action on behalf of the Government, and to share in any recovery.

26.     *Qui tam* Plaintiff-Relators Derek Lewis and Joey Neiman seek through this action to recover all available damages, civil penalties, and other relief for the FCA violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## II.     PARTIES

### A.     Plaintiffs

27.     Plaintiff United States of America is the real party in interest herein. The United States, acting through HHS, administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 ("Medicare"), and administers grants to states for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq*. ("Medicaid"). The United States, acting through HHS, also administers the Meaningful Use program and a certification program for EHR technology.

28.     *Qui tam* Plaintiff-Relator Derek Lewis ("Relator Lewis") is a resident of Murfreesboro, Tennessee. Relator Lewis worked for Defendant CHS from January 2009 to December 2016. Between December 2012 and February 2015, Relator Lewis was CHS's

8

Manager of Design and Midrange Engineering, Technology.  In that role, he helped to provide infrastructure strategy and management to support CHS's upgrade of 130 facilities to Medhost's HMS 12.0 software.  In February 2015, Relator Lewis became CHS's Manager of Product Engineering, Deployment, where he was responsible for the configuration management, automation, and user experience components of CHS's EHR product strategy.  In August 2015, he was promoted to Director of Technology Adoption, Deployment, where he was responsible for managing EHR implementation projects at CHS hospitals.

29.    *Qui tam* Plaintiff-Relator Joey Neiman ("Relator Neiman") is a resident of Thompson's Station, Tennessee.  Relator Neiman worked for Defendant CHS from March 2012 to December 2016.  He joined CHS as a Technical Specialist for CHS's Tier 1 Clinical Systems (CHS hospitals that utilized Medhost's EHR software) and was responsible for leading technical projects involving the clinical systems at CHS's hospitals.  In February 2014, Relator Neiman was promoted to CHS's Manager of Health Information System Delivery, Deployment Services. In that role, he was responsible for building EHR systems as part of hospital conversions and acquisitions, as well as program management for various projects involving CHS's EHR software.

B.    **Defendants**

1.    **Community Health Systems, Inc.**

30.    Defendant Community Health Systems, Inc. ("CHSI") is one of the largest publicly traded hospital companies in the United States and is a leading operator of general acute care hospitals. CHSI is incorporated under the laws of the state of Delaware, and headquartered at 4000 Meridian Boulevard, Franklin, Tennessee 37067.  As of January 2018, through its wholly owned direct or indirect subsidiaries, CHSI owned, leased, or operated 127 hospitals in 20 states

9

with an aggregate of approximately 26,000 licensed beds. Together, CHSI and its directly or indirectly owned affiliate companies are referred to herein as "CHS."

### 2.    CHSPSC, LLC

31.    Defendant CHSPSC, LLC (formerly Community Health Systems Professional Services Corporation) is a Delaware corporation headquartered at 4000 Meridian Boulevard, Franklin, Tennessee 37067.  CHSPSC is a subsidiary of CHSI that manages CHS's hospitals and other affiliates.

### 3.    CHS Hospitals

32.    The Defendant CHS Hospitals are identified in Exhibit A and incorporated by reference herein.  CHSI and/or its direct and indirect subsidiaries owned, leased, or operated each of the hospitals during the relevant time period.  Each hospital attested to Meaningful Use of certified EHR technology based on their use of Medhost or PULSE software and thereby claimed incentive payments under the HITECH Act or avoided reductions in federal program reimbursement.  Exhibit B, incorporated by reference herein, identifies some of the attestations that the Defendant Hospitals submitted for Medhost EHR technology and/or PULSE, including, for each attestation, the date the hospital attested, the certified technology or technologies that the hospital used to attest, and the specific functionality the hospital claimed to have used.

### 4.    Medhost, Inc.

33.    Defendant Medhost, Inc. ("Medhost"), is a health information technology company that provides enterprise, departmental, and healthcare engagement solutions to over 1,100 healthcare facilities in the United States. It is headquartered at 6550 Carothers Parkway, Suite 100, Franklin, TN 37067. Medhost's suite of EHR software consists of multiple applications, including an Enterprise System for inpatient care, an EDIS system for Emergency

Departments, a PIMS system for surgical operations and scheduling, and a business intelligence system for tracking and reporting Meaningful Use.

34.     CHS is one of Medhost's largest customers.  Medhost's other significant customer is the Brentwood, Tennessee-based LifePoint Health, Inc. ("LifePoint"), another large hospital chain.   LifePoint hospitals have also certified to Meaningful Use, and received incentive payments, based on the use of Medhost's suite of EHR software.

## III.     <u>JURISDICTION AND VENUE</u>

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Although the issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relators' knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.  Regardless of whether such a disclosure has occurred, Relators qualify as "original sources" of the information on which the allegations or transactions in this Complaint are based.  Before filing this action, Relators voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based. Additionally, Relators have direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to their claims.

36.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the

Defendants have minimum contacts with the United States. Moreover, one or more Defendants can be found in and/or transact business in the Southern District of Florida.

37. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732(a) because one or more Defendants can be found in and/or transact business in this District, and because violations of 31 U.S.C. §§ 3729 *et seq*. alleged herein occurred within this District. CHS, for example, operated hospitals within this District, including the Lower Keys Medical Center located in Key West, Florida. As discussed below, the Lower Keys Medical Center submitted false records and statements to the Government to claim incentive payments for their use of PULSE and other EHR modules.

## IV.  STATUTORY AND REGULATORY BACKGROUND

### A.  The False Claims Act

38. The FCA imposes civil liability on any person who, *inter alia*: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or (4) conspires to violate the FCA. 31 U.S.C. §§ 3729(a)(l)(A), (B). (C), and (G).

39. The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that - (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest ...." *Id.* at § 3729(b)(2).

40.     The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  *Id*. at § 3729(b)(1)(A).  The FCA does not require proof of specific intent to defraud.  *Id*. at § 3729(b)(l)(B).

41.     The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id*. at § 3729(b)(4).

42.     Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government.  *Id*. at § 3729(a)(l).

**B.      The Anti-Kickback Statute**

43.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), provides, in pertinent part:

> (2)      Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person -
>
> (A)      To refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)      To purchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

44.     Accordingly, manufacturers of products paid for in whole or in part by federal healthcare programs may not offer or pay any remuneration, in cash or in kind, directly or

13

598012.1

indirectly, to induce physicians, medical practices, or others to order or recommend products paid for in whole or in part by Federal healthcare programs such as Medicare and Medicaid.

45.     The Patient Protection and Affordable Care Act ("PPACA"), Publ. L No. 111-48, 124 Stat. 119 (2010), provides that violations of the AKS are *per se* violations of the FCA: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

46.     The PPACA also clarified the intent requirement of the Anti-Kickback Statute, and provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." *Id.*

**C.     HITECH Act**

47.     Launched in 2010, the Health IT Certification Program is a voluntary certification program that allows for health IT vendors to obtain certification that their products meet federally-established standards, implementation specifications and certification criteria.  These standards, specifications and certification criteria are promulgated through a series of rulemakings and adopted by the Secretary of Health and Human Services.

48.     To obtain certification under the Health IT Certification Program, EHR vendors must pass testing with an ONC-Authorized Testing Laboratory ("ATL") and attest to an ONC-Authorized Certification Body ("ACB") that their EHR system meets all applicable standards, specifications and certification criteria required by law.  Both the ONC itself and the ACB are authorized to conduct surveillance of certified health IT products and may require remediation or proceed with decertification.

49.     Once an EHR is certified, a vendor may certify later versions of that software via Inherited Certified Status ("ICS") if the capabilities for the certification criteria have not been

14

adversely affected by the changes to the software.  For example, a software developer may have added new uncertified capabilities to a newer version and/or made improvements to the interfaces.  If the ACB determines that the certified capabilities were not adversely affected by these changes, the ACB may grant ICS to the newer version without re-testing of the previously certified capabilities.

50.     After obtaining certification through testing or inheritance, an EHR vendor must maintain that certification by complying with all applicable conditions and requirements of the certification program.  Among other things, the EHR product must be able to accurately, reliably, and safely perform its certified capabilities while in use in hospitals and physician offices.

51.     The Health IT Certification Program has released three editions of certification criteria and regulations for Program requirements set forth herein and designated as 2011, 2014 and 2015 Edition rules.  Each new edition of certification criteria included more robust technical and interoperability requirements.

**D.     Medicare and Medicaid Electronic Health Records "Meaningful Use" Incentive Programs**

52.     In 2011, CMS established the Medicare and Medicaid EHR Incentive Programs to encourage physicians and eligible hospitals to adopt, implement, upgrade and demonstrate meaningful use of Certified Electronic Health Record Technology ("CEHRT").

53.     The Meaningful Use Incentive Program, as set forth herein, consisted of three stages (Stage 1, Stage 2, and Stage 3).

54.     In April 2018, CMS renamed the EHR Incentive Programs as the Promoting Interoperability Program and promulgated additional rules with program requirements.

### 1.     2011 Edition Rule and Stage 1 Meaningful Use Criteria

55.     HHS implemented the EHR certification criteria and incentive payment requirements in multiple stages.  On January 13, 2010, HHS published in the Federal Register interim final rules setting forth the "2011 Edition" certification criteria and a proposed rule setting forth the "Stage 1" requirements for incentive payments.  HHS finalized these rulemakings by publication in the Federal Register on July 28, 2010.  In Stage 1, Eligible Hospitals and Critical Access Hospitals ("CAHs") needed to satisfy fourteen "core objectives" and five out of ten "menu set objectives."

| Meaningful Use Stage 1 Objective | Meaningful Use Stage 1 Measure |
|---|---|
| Use CPOE for medication orders directly entered by any professional who can enter orders into the medical record per State, local and professional guidelines. | CHP-01956 More than 30% of medication orders created by the EP or authorized providers of the EH's or CAH's inpatient or emergency department (POS 21 or 23) during the EHR reporting period are recorded using CPOE.  *Exclusions apply: see CMS rule for details |
| Implement drug-drug and drug-allergy interaction checks. | The EP/EH/CAH has enabled this functionality for the entire EHR reporting period. |
| Maintain an up-to-date problem list of current and active diagnoses. | More than 80% of all unique patients seen by the EP or admitted to the EH's or CAH's inpatient or emergency department (POS 21 or 23) have at least one entry or an indication that no problems are known for the patient recorded as structured data. |
| Maintain active medication list. | More than 80% of all unique patients seen by the EP or admitted to the EH's or CAH's inpatient or emergency department (POS 21 or 23) have at least one entry (or an indication that the patient is not currently prescribed any medication) recorded as structured data. |
| Maintain active medication allergy list. | More than 80% of all unique patients seen by the EP or admitted to the EH's or CAH's inpatient or emergency department (POS 21 or 23) have at least one entry (or an indication that the patient has no known medication allergies) recorded as structured data. |
| EHs/CAHs: Implement one clinical decision support rule related to a high priority hospital condition along with the ability to | Implement one clinical decision support rule. |

16

| | |
|---|---|
| track compliance with that rule. | |
| Protect electronic health information created or maintained by the CEHRT through the implementation of appropriate technical capabilities. | Conduct or review a security risk analysis in accordance with the requirements under 45 CFR 164.308(a)(1) and implement security updates as necessary and correct identified security deficiencies as part of its risk management process. |
| EHs/CAHs: Provide patients the ability to view online, download, and transmit information about a hospital admission. | EHs/CAHs: More than 50% of all unique patients who are discharged from the inpatient or emergency department (POS 21 or 23) of an EH or CAH have their information available online within 36 hours of discharge. |
| Provide clinical summaries for patients for each office visit. | Clinical summaries provided to patients for more than 50% of all office visits within 3 business days.<br><br> *Exclusions apply: see CMS rule for details |
| The EP, EH, or CAH who transitions their patient to another setting of care or provider of care or refers their patient to another provider of care should provide summary care record for each transition of care or referral. | The EP, EH, or CAH that transitions or refers their patient to another setting of care or provider of care provides a summary of care record for more than 50% of transitions of care and referrals. *Exclusions apply: see CMS rule for details |
| The EP, EH, or CAH who receives a patient from another setting of care or provider of care or believes an encounter is relevant should perform medication reconciliation. | The EP, EH or CAH performs medication reconciliation for more than 50% of transitions of care in which the patient is: [EH/CAH] admitted to the eligible hospital's or CAH's inpatient or emergency department (POS 21 or 23). |

## 2.      2014 Edition Rule and Stage 2 Meaningful Use Criteria

56.      On September 4, 2012, HHS published in the Federal Register the final rules setting forth the "2014 Edition" certification criteria and "Stage 2" requirements for incentive payments.  In Stage 2, Eligible Hospitals and CAHs needed to satisfy sixteen "core objectives" and three out of six "menu set objectives." An Eligible Professional's use of certified EHR technology generally needed to satisfy seventeen "core objectives" and three out of six "menu set objectives."

57.      On October 16, 2015, CMS published in the Federal Register a final rule with comment period setting forth the "Modified Stage 2" requirements for incentive payments.  For

years 2015 through 2017, Modified Stage 2 eliminated the concept of "menu set objectives" and required all Eligible Hospitals, CAHs, and Eligible Professionals, to attest to a single set of objectives and measures.

| Meaningful Use Stage 2 Objective | Meaningful Use Stage 2 Measure |
|---|---|
| Use CPOE for medication, laboratory and radiology orders directly entered by any licensed healthcare professional who can enter orders into the medical record per State, local and professional guidelines. | More than 60% of medication, 30% of laboratory, and 30% of radiology orders created by the EP or authorized providers of the EH's or CAH's inpatient or emergency department (POS 21 or 23) during the EHR reporting period are recorded using CPOE.<br><br>*Exclusions apply: see CMS rule for details |
| Use clinical decision support to improve performance on high-priority health conditions. | 1. Implement five clinical decision support interventions related to four or more clinical quality measures at a relevant point in patient care for the entire EHR reporting period. Absent four clinical quality measures related to an EP's, EH's, or CAH's scope of practice or patient population, the clinical decision support interventions must be related to high-priority health conditions.  Absent four clinical quality measures related to [an EP's scope of practice or patient population/an eligible hospital or CAH's patient population], the clinical decision support interventions must be related to high-priority health conditions |
| Use clinical decision support to improve performance on high-priority health conditions | 2. The EP, EH, or CAH has enabled and implemented the functionality for drug-drug and drug-allergy interaction checks for the entire EHR reporting period. |
| EHs/CAHs: Implement one clinical decision support rule related to a high priority hospital condition along with the ability to track compliance with that rule. | Implement one clinical decision support rule. |
| Protect electronic health information created or maintained by the CEHRT through the implementation of appropriate technical capabilities. | Conduct or review a security risk analysis in accordance with the requirements under 45 CFR 164.308(a)(1), including addressing the encryption/security of data stored in CEHRT in accordance with requirements under 45 CFR 164.312 (a)(2)(iv) and 45 CFR 164.306(d)(3), and implement security updates as necessary and correct identified security deficiencies as part of the EP's, EH's, or CAH's risk management process. |
| EHs/CAHs: Provide patients the ability to view online, download, and transmit information about a hospital | (1) More than 50% of all unique patients seen by the EP during the EHR reporting period are provided timely (within 4 business days after the information is available to the EP) online access to their health information subject to the EP's discretion to withhold certain information.  (2) More than 5% of |

18

| admission | all unique patients seen by the EP during the EHR reporting period (or their authorized representatives) view, download, or transmit to a third party their health information. *Exclusions apply: see CMS rule for details |
|---|---|
| Provide clinical summaries for patients for each office visit. | Clinical summaries provided to patients or patient-authorized representatives within 1 business day for more than 50% of office visits.  *Exclusions apply: see CMS rule for detail |
| The EP, EH, or CAH who transitions their patient to another setting of care or provider of care or refers their patient to another provider of care provides a summary care record for each transition of care or referral. Transitions of care. | (1) The EP, EH, or CAH that transitions or refers their patient to another setting of care or provider of care provides a summary of care record for more than 50% of transitions of care and referrals.  (2) The EP, EH, or CAH that transitions or refers their patient to another setting of care or provider of care provides a summary of care record for more than 10% of such transitions and referrals either – (a) Electronically transmitted using CEHRT to a recipient; or (b) Where the recipient receives the summary of care record via exchange facilitated by an organization that is a NwHIN Exchange participant or in a manner that is consistent with the governance mechanism ONC establishes for the nationwide health information network.  3. An EP, EH, or CAH must satisfy one of the following:  (A) Conducts one or more successful electronic exchanges of a summary of care record meeting the measure (for EPs at § 495.6(j)(14)(ii)(B) and for eligible hospitals and CAHs the measure at§ 495.6(l)(11)(ii)(B)) with a recipient using technology to receive the summary of care record that was designed by a different EHR developer than the sender's EHR technology certified at 45 CFR 107.314(b)(2); or (B) Conducts one or more successful tests with the CMS designated test EHR during the EHR reporting period. |
| The EP, EH, or CAH who receives a patient from another setting of care or provider of care or believes an encounter is relevant should perform medication reconciliation. | The EH or CAH performs medication reconciliation for more than 50% of transitions of care in which the patient is admitted to the eligible hospital's or CAH's inpatient or emergency department (POS 21 or 23). |

### 3.    2015 Edition Rule and Stage 3 Meaningful Use Criteria

58.    In October 2015, CMS also released a final rule that established Stage 3 in 2017 and beyond, which focuses on using certified EHR technology to improve quality, safety, and efficacy of health care, including promoting patient access to self-management tools and improving population health.

19

59.     Starting in 2015, all providers were required to use technology certified to the 2014 Edition.  For 2016 and 2017, providers could choose to use technology certified to the 2014 Edition or the 2015 Edition.

60.     To qualify for incentive payments in each Stage of the Meaningful Use program, healthcare providers are required each year to attest that they used certified EHR technology and satisfied the applicable Meaningful Use objectives and measures.   Use of certified EHR technology and satisfaction of applicable Meaningful Use objectives and measures are material to payment under the Meaningful Use program.

**4.      Incentives Available Under the Meaningful Use Program**

61.     In general, Hospitals and CAHs are eligible for Medicare's Meaningful Use incentives if they are paid using the Medicare Inpatient Prospective Payment System ("IPPS"), and are eligible for Medicaid's Meaningful Use incentives if they have a Medicaid patient volume of at least 10 percent. Hospitals can be dual-eligible and receive incentives under both programs.

62.     The incentive payments from Medicare and/or Medicaid are the product of three factors: (1) an "initial amount" between $2,000,000 and $6,370,200, which is determined based on the number of discharges; (2) the Medicare or Medicaid "share percentage," which is based on the hospital's ratio of Medicare or Medicaid inpatient days to total inpatient days (modified by charges for charity care); and (3) a "transition factor" based on the year the hospital began receiving incentive payments.

63.     Medicare payments to Eligible Hospitals under this formula ended after 2016. Medicaid payments to Eligible Hospitals can continue until 2021, although hospitals may not gain eligibility after 2016.

64.     Meanwhile, Eligible Hospitals that fail to meaningfully use Certified EHR technology are subject to negative payment adjustments under the Medicare program.  Each year, Medicare adjusts the IPPS for inflation. Hospitals that fail the criteria are penalized by a reduction in this increase. The payment adjustment occurs two years after the EHR reporting period, and was a 25% reduction in 2015, a 50% reduction in 2016, and will be a 75% reduction for 2017 and after.  There are no payment adjustments under the Medicaid program.

65.     CAHs are also eligible for Medicare and Medicaid incentives under the program; however, the Medicare incentives are calculated differently. CAHs could qualify for an incentive payment from Medicare equal to the product of: (1) the CAH's reasonable costs incurred for the purchase of certified EHR technology; and (2) the CAH's Medicare share percentage, which in this instance is the Medicare share percentage as computed for Eligible Hospitals plus 20 percentage points, subject to a maximum share percentage of 100%.  Medicare incentive payments under this formula for CAHs ended after 2015.

66.     Starting in 2017, the Medicare EHR Incentive Program for Eligible Professionals was incorporated into the Merit-based Incentive Payment System (MIPS) under the Quality Payment Program created by the Medicare Access and CHIP Reauthorization Act (MACRA), 42 U.S.C. § 1395ee.

### 5.     Certified EHR Technology and the IQR Program

67.     The Hospital Inpatient Quality Reporting Program (IQR) is a voluntary reporting program that provides a financial incentive for hospitals to submit data to CMS on specified quality measures for services furnished to Medicare beneficiaries. The Program's goal is to drive quality improvement through measurement and transparency by publicly displaying data that

21

helps consumers make more informed decisions about health care. It is also intended to encourage hospitals and clinicians to improve the quality and cost of inpatient care.

68.     Similar to the negative payment adjustment for failure to meet Meaningful Use requirements, failure to report the data required under the IQR Program results in a negative payment adjustment to the hospital, calculated as a percentage reduction in Medicare's annual increase to the IPPS. The payment adjustment occurs two years after the IQR reporting period. In 2005-2006, the penalty was a .4% reduction, in 2007-2014 it was a 2% reduction, and from 2015 onward, the penalty is a 25% reduction.

69.     Originally, hospitals had to manually compile all of the data for submission to the Program. However, beginning in 2014, CMS gave hospitals the option of reporting some of the IQR data to CMS electronically in the form of electronic clinical quality measures ("eCQMs"). To submit eCQMs, CMS required hospitals to use Certified EHR technology. In 2016, CMS made the submission of eCQMs for the IQR Program mandatory, and required that hospitals submit the data using either 2014 Edition or 2015 Edition Certified EHR technology. These rules for the Program will continue at least through the 2018 reporting period.

**E.     ONC's Role in the Surveillance and Decertification Process**

70.     Under regulations promulgated in 2016, the ONC has authority to directly review CEHRT when it has reason to believe that the CEHRT may not conform to requirements of program criteria because the certified health IT is "causing or contributing to serious risks to public health or safety" and for additional reasons.  ONC may require corrective action be taken by software vendors for non-conformities and, when necessary, may suspend or terminate a certification issued to a complete EHR or a health IT module.  45 C.F.R. § 170.580; *see also* 81 Fed. Reg. 72404 (Oct. 19, 2016).

71.     Notably, in the Preamble to the Final Rule published in October 2016 concerning

ONC's authority to conduct direct review of CEHRT, HHS noted that it has been a requirement

since the first rule promulgated under the HITECH Act in 2010 that CEHRT be able to perform

required specifications and capabilities in an "accurate and reliable manner . . . including in a

manner that does not contribute to serious risks to public health or safety or other outcomes

inconsistent with the National Coordinator's responsibilities [under the statute]." 81 Fed. Reg.

72404, 72411–12 (Oct. 19, 2016).  For example, it notes that it is not enough that software be

able to perform CPOE for medication but that it must also order it for the right patient and the

right medication/dose.  *Id*.  HHS further notes: "this requirement applies to the use of certified

capabilities individually and in combination with other certified and uncertified capabilities of

health IT . . . failure to design and make certified capabilities available so that they perform in an

accurate and reliable manner impairs the safe and effective use of certified capabilities and is a

non-conformity under the Program."  *Id.* at 72413.

72.     The 2016 Final Rule provides examples where ONC takes actions even where

hospitals and physicians were aware of the deficiencies and had created manual workarounds to

reduce risks.

> ***Example A****:* ONC receives multiple, detailed reports that a cloud-based EHR system
> (certified to the 2015 Edition) has become so slow that it may take up to five minutes to
> load a patient's record or to display information within a patient's record, such as the
> patient's medication and medication allergy lists. When providing emergency treatment,
> clinicians cannot wait five minutes for this information and must order medications with
> incomplete information about patients' current medications and medication allergies.
> Even when treatment is not urgent, the system's delays in responding lead many
> clinicians to assume that the EHR is not working and to order medications based on their
> best recollection of patients' current medications and allergies.
>
> Clinicians at several hospitals in multiple states are experiencing these problems. There is
> no indication that these hospitals are maintaining substandard hardware or network
> infrastructure below the recommendations from the health IT developer, nor that they
> have customized their health IT in a way that would adversely affect system performance.

23

The health IT did not behave this way when it was installed, but as the clinical data and number of records has grown the speed of the EHR's responsiveness has decreased.

In this example, ONC may initiate direct review of the certified health IT. The facts suggest that several capabilities of the certified health IT are implicated, including § 170.315(a)(6) (Problem list) and § 170.315(a)(7) (Medication list). The capabilities as implemented appear to be performing or interacting in a way that is causing or contributing to a serious risk of harm to public health or safety. The risk of harm is serious for several reasons. First, clinicians are abandoning use of the capabilities and resorting to memory to order medications for patients, which could result in severe harm to patients, including serious injury or death. Moreover, the risk is imminent because it is likely that harm will occur soon unless immediate action is taken to address the unsafe conditions. Further, the extent of the risk is large because the unsafe conditions have been reported at several hospitals in multiple states and may therefore put at risk a large number of patients.

Assuming ONC were to initiate direct review, it would examine the certified capabilities to determine why they are not performing in an accurate and reliable manner and whether the cause of the problem was within the ability of the health IT developer to reasonably influence or control. The facts suggest that the problem is common across multiple customers and is not the result of any actions of the developer's customers or users. Because the problem developed over time, the developer would have been aware of the problem and could have prevented it by employing best software practices to prevent a system related slow-down under load. If this were established, ONC would find a non-conformity.

. . .

***Example C:*** ONC receives multiple reports from a large hospital concerning a potential problem with its EHR. Over the past week, several patients with congestive heart failure (CHF) had to be readmitted because of CHF exacerbations. Clinical and IT staff at the hospital have investigated the problem and believe that it is due to an error in the hospital's EHR, which is certified to the 2015 Edition. The hospital reports that its CHF patients are all given electronic scales that record their weight and automatically transmit the daily weight back to the hospital's EHR. The weight can be tracked and the patients can be alerted if they are gaining too much weight (from excess fluid, one of the signs of a CHF exacerbation) and need to adjust their CHF medications accordingly. The readmissions happened due to inaccurate weight data being presented to clinicians, which caused the clinicians to not adjust diuretic medication to manage patients' fluid status appropriately.

Based on these facts, ONC may initiate direct review of the certified health IT. ONC could form a reasonable belief that the certified health IT may be causing or contributing to serious risks to public health or safety, in violation of Program requirements. A number of certified capabilities appear to be implicated, including § 170.315(e)(3) (Patient Health Information Capture) and certified capabilities that interact with vital

24

signs data (which is part of the Common Clinical Data Set (§ 170.102)). Although the cause of the problem is not yet clear, it is reasonable to believe that it may be a result of one or more of these certified capabilities or of their interaction with other uncertified capabilities or products. Meanwhile, the occurrence of multiple readmissions in the past week suggests that, if the certified health IT is causing or contributing to these risks to public health or safety, the risks are sufficiently serious as to constitute a non-conformity and to warrant ONC's review.

81 Fed. Reg. 72404, 72420–21 (Oct. 19, 2016).

73.     ONC also has authority to take action where there are "credible allegations that a health IT developer obtained or maintained any part of the certification of its health IT by means of false or misleading statements or representations to an ONC-ACB; misrepresented or made false or misleading statements to customers or users about the certification or certified capabilities of the health IT; concealed problems, deficiencies, or potential non-conformities; or took other actions that would be likely either to compromise or to circumvent processes under the Program for testing, certifying, and conducting ongoing surveillance and review of certified health IT." *Id.* at 72420.

## V.     ALLEGATIONS

74.     This case concerns fraud, perpetrated by Medhost and CHS, in obtaining hundreds of millions of dollars in incentive payments under the Meaningful Use program by CHS and many other hospitals.

75.     Beginning in 2010, Medhost sought certification for its EHR technologies that would enable its customers to claim incentive payments from HHS under the HITECH Act, provided they met the requirements for demonstrating Meaningful Use.  In attesting to certifying bodies that its software met the requirements for Certified EHR Technology, Medhost misrepresented the ability of its software to perform functions required for the software to be eligible for certification, including that the software perform required functions safely and

25

reliably. Its misrepresentations caused Medhost's customers, including CHS, to claim hundreds of millions of dollars in incentive payments for software that was ineligible for such payments. Had Medhost not misrepresented the eligibility of its software for incentive payments, the Government would not have paid hospitals for Meaningful Use of that software.

76.     Beginning in 2012, CHS represented to the Government that dozens of its hospitals met the objectives and measures for Meaningful Use of certified EHR technology based on their use of Medhost's software.  Based on those representations, CHS received over $385 million in Meaningful Use incentive payments between 2012 and 2014.

77.     CHS's attestations were false.  The EHR modules that CHS implemented lacked required functionality and presented serious functional flaws that endangered patients, making its hospitals ineligible for incentive payments under the Meaningful Use program.  The missing functionality in the software included a systemic lack of integration between EHR modules that meant that problem lists, medication lists, and allergy lists might not be available to clinicians as required for patients admitted through the Emergency Department.  Other required functionality that was missing in CHS's hospitals included the ability to create electronic medication orders accurately and safely.  For example, CHS found that Medhost could not calculate weight-based dosing accurately for medication orders, causing the software to record orders that did not reflect the intent of the health care provider and consequently exposing patients to mistakes that are easily missed in institutional settings and potentially catastrophic.  Many CHS physicians, nurses, and hospital managers who relied on Medhost software often viewed it as an impediment to care, rather than an improvement.

78.     Similar problems existed for the CHS hospitals that used PULSE EHR software modules.  There too, the hospitals failed to integrate different EHR modules, forcing providers to

26

print clinical information when patients transitioned from one care setting to another, as well as when doctors entered medication orders.  Many workflows required nurses to enter the same patient information into the EHR multiple times, with the risk of patient harm increasing with each unnecessary step.

79.     The Government would not have made Meaningful Use incentive payments to CHS or other attesting users had it known of the serious flaws with functional use of the Medhost and PULSE software systems.

A.     **Background**

1.     **Medhost's Certified EHR Technology**

80.     Founded in 1997, Medhost originally limited its business to developing software for use in emergency departments with a program called Emergency Department Information System ("EDIS").  In 2010, Healthcare Management Systems ("HMS") acquired Medhost and marketed the EDIS product with a wider suite of health information technology systems, including an inpatient hospital system known as Enterprise.

81.     Medhost's specialty was with EHR modules in the acute care hospital setting and even years before the enactment of the HITECH Act, it participated in voluntary standard setting organizations focused on functional requirements for hospital EHRs.  Medhost advertised to the public for many years that its Emergency Room software (EDIS) integrated seamlessly with its inpatient hospital software (Enterprise).  In 2010, for example, Medhost announced that its merger with HMS would allow it to "develop an integrated emergency department system for the HMS enterprise-wide solution designed for community hospitals" and provide it with "opportunities within the HMS customer base, to offer a fully integrated product with a consistent look and feel and all the benefits of the MEDHOST user."

27

82.     To certify its software, Medhost worked with Drummond Group Inc. ("Drummond"), which is both an accredited testing laboratory (ATL) and an ONC authorized certification body (ACB).

83.     As a part of the certification process directed by ONC, Drummond requires vendors to pass a series of test scripts that are intended to demonstrate that the software meets required criteria being tested.  Drummond also requires that vendors attest to the use of certain standardized nomenclature and technical specification, the accuracy of the information submitted, and that the functions demonstrated during testing are typical of the regular functionality of the software.

84.     If changes are made to certified software and a vendor seeks certification of the new version, Drummond works with vendors to determine whether the certification criteria have been adversely affected by the changes. If Drummond determines that the certification criteria have not been adversely affected by the changes based on the information it receives from the vendor, Drummond allows the vendor to "inherit" the certification of its older software to the newer version without re-testing.

### 2.      CHS's Implementation of Medhost EHR Technology for MU Stage 2

85.     CHS was one of Medhost's largest customers and used its EHR at dozens of hospitals in its network.  Beginning in 2012, CHS implemented Medhost's 2011 Edition software and attested to Meaningful Use at 78 hospitals during the Stage 1 reporting period.  In late 2013, CHS began to implement Medhost's 2014 Edition software at the hospitals that had used the 2011 Edition for Stage 1, while concurrently implementing 2011 Edition software at hospitals that had not attested to Meaningful Use in Stage 1.  CHS's goal was to implement

28

certified EHR technology at as many of its hospitals as possible ahead of the 2014 Meaningful Use attestation reporting period.

86.    The senior CHS executive responsible for the implementation project was Chief Information Officer ("CIO") J. Gary Seay.  Seay managed a large team from CHS's corporate-level clinical operations and IT departments, including a deployment team that implemented Medhost's EHR software at CHS hospitals as well as a clinical applications team that was responsible for testing new software releases and working support tickets from the field.  The clinical applications team reported to Deputy CIO Manish Shah and was led by Vice President of Clinical Applications Jay Skibinski, Director of Clinical Systems Gary Fritz, and CHS Senior Manager of Physician Tools Tim Moore.  The deployment team reported to Mr. Seay and was led by CHS Vice President Michael Yzerman, Vice President of Information Systems Steve Hernandez, and Program Management Director Teri Mitchell.  Together, the teams were responsible for deploying EHRs at CHS hospitals and for ensuring that the hospitals were prepared to submit Meaningful Use attestations to the Government.

87.    CHS hosted regular Meaningful Use Governance meetings. At these meetings, the CHS executive leadership discussed issues, risks, gaps and challenges regarding Meaningful Use attestations. Attendees to the Meaningful Use Governance meetings included Steve Hernandez, Director of IT Internal Audit and Compliance Kristi Meyer, Manish Shah, Senior Vice President of Internal Audit Mark Buford, Director of Clinical Informatics Connie Senseney, and Senior Director of Operations Meagan Strawhacker.

88.    In the months leading up to the 2014 Meaningful Use attestation reporting period, CHS rolled out updated versions of Medhost software at numerous CHS hospitals, which included new CPOE functionality intended to satisfy the Stage 2 Meaningful Use criteria.

29

During the rollout, CHS was focused primarily on implementation of the software with the speed necessary to ensure receipt of tens of millions of dollars in Government awards through the EHR incentive programs.  CHS's focus on speed came at the expense of patient safety.  Throughout 2014 and 2015, CHS employees discovered that required functions were missing or broken in Medhost's software, leading CHS Vice President and Chief Medical Information Officer Anwar Hussain to circulate educational memos to the CHS hospitals that used Medhost to describe problems in the Medhost software, the implications to patient safety, and any appropriate workarounds.  CHS did not halt the rollout, and instead chose to move forward so as not risk receipt of the Meaningful Use incentive payments.  CHS did not want to risk losing incentive payments in 2014 because those payments were included in revenue forecasts that had been shared with investors and because meeting the 90-day attestation period in 2014 allowed them to submit for the 365-day attestation period in 2015.

89.     The team charged with reporting Meaningful Use measures to CMS consisted of Kristi Meyer along with her associates Connie Senseney and Meagan Strawhacker.  Ms. Meyer would assemble Meaningful Use attestation packets, which were then sent to facility CFOs before being passed on to CMS for attestation.  Ms. Strawhacker was responsible for monitoring Meaningful Use compliance, and Ms. Senseney was responsible for the operational aspects of the Medhost Meaningful Use reporting tool.

90.     Soon after the Medhost rollout began, doctors and hospital administrators began to report that the updated Medhost software was not able to perform required functions accurately and reliably, and that the inadequate functionality was putting the safety of CHS patients at risk.  For example, on July 8, 2014, the Director of Physician Services at CHS's Deaconess Hospital wrote to the hospital CEO regarding physician frustration with the system:

30

the doctors are "frustrate[ed] regarding the fact that the issues with Medhost are still a way from being resolved through upgrades, etc. … [and] they are expected to practice safety but the system has created an unsafe practice." Another doctor at Deaconess, responding with a message that was forwarded on July 9 to Anwar Hussain, went further:

> Please pass this along to any and every person who can leverage this. There are 'known issues' from many months ago from previous deployments which have not been addressed. We are finding new issues every, and I mean every, day. I realize it would be convenient if all these could be addressed in a single massive upgrade later. Many of these cannot wait two or three or six months. An easy example of "safety issue" is there is no warning mechanism when meds have been duplicated, or tests duplicated. We cannot push safety as we have been doing for the last 2 years as a priority if we give no priority to a safe [EHR]. Things we identified a month ago are still unresolved. Our list is growing, and frustration is not lessening.

91.     As more and more hospitals sounded the alarm, CHS instituted weekly "critical issues" calls to discuss the problems the hospitals were experiencing with Medhost's EHR.  The calls were led by corporate-level executives, including Mr. Fritz and Mr. Moore, and included IT and clinical informatics personnel from each of the Medhost hospitals.  The calls began in approximately May 2014 and continued into at least November 2014.  On the calls, the hospitals repeatedly voiced their concern about the EHR's lack of functionality and safety.

92.     In conjunction with the calls, CHS issued regular advisory memoranda to the hospitals.  Many of the advisories came from Anwar Hussein as well as CHS Vice President and Chief Nursing Officer Pam Rudisill.  The advisories were directed to the medical staff and senior executives (e.g., Chief Executive Officers and Chief Nursing Officers) at the hospitals.  The advisories warned of serious, unresolved problems with the Medhost EHR software and instructed CHS hospitals to implement additional safety checks because of them.  For example, Ms. Rudisill sent advisories to the hospitals titled "Double Checking Multi-Dose medication

31

administration," "Double Checking of Medications with Multiple Tablets Dispensed," and "IMPORTANT ACTION REQUIRED: Medhost/HMS Order Sets."

93.     In their capacity as Managers working on CHS teams to roll out and support health IT software, Relators were notified by physicians and other hospital personnel of the functional and safety issues with the CPOE software, including, as described further below, errors in medication selection and dose calculation, failure to trigger delivery of medications at the correct time, and inability to reliably perform drug-drug and drug-allergy checking.  Relators believe that this list of issues represents only a sample of the required functions that were lacking in CHS's Medhost EHR software. Taken together, these flaws reveal EHR modules that are not able to perform certain functions reliably as required by federal law.

94.     The Government created the EHR incentive program to facilitate the use of software to enhance public health and achieve superior health outcomes, and it chose the specific criteria required under the program to advance that goal. The ability of EHR software to meet the basic criteria for certified EHR technology is material to the government's decision to pay users of the software under the EHR incentive programs.

**B.      Medhost's EHR Technology Lacked Functionality Required for Certification and for Users to Attest to Meaningful Use**

95.     Medhost's EHR technologies lacked the functionality required for the technology to be eligible for certification as certified EHR technology ("CEHRT") under the Health IT Certification Program.  Medhost knew that the technology did not enable users to perform the required functions but nonetheless represented to Drummond that its products were capable of performing those functions.  Due to those knowing misrepresentations, health care providers, including CHS, attested to Meaningful Use based on their use of Medhost's certified EHR products and claimed incentive payments from HHS that they were not eligible to receive.  CHS

32

knew, having tested and evaluated Medhost's software extensively, that Medhost's software was ineligible for certification and that the Meaningful Use attestations it submitted based on that software were false.

> **1.    Medhost EDIS and Enterprise Modules Did Not Provide for Electronic Communication Between Emergency Department and Inpatient Units Within CHS Hospitals**

96.     CHS made false claims, and false records and statements material to false claims, in attesting to Meaningful Use based on a combination of two certified Medhost EHR technologies: EDIS, a system specialized for use in hospital emergency departments, and Enterprise, a system designed for inpatient hospital use.  As explained below, the attestations were false because EDIS and Enterprise were improperly integrated and the combined systems could not perform the functions that CHS hospitals needed to perform to attest to Meaningful Use.  CHS and Medhost both knew that the attestations were false.

> *(a)    Requirements for Attesting to Meaningful Use on the Basis of Multiple EHR "Modules"*

97.     Under ONC regulations, EHR vendors may certify EHRs as either "Complete EHRs" or "EHR Modules." Hospitals and other providers may either purchase and implement a Complete EHR or purchase and configure modules to perform all certified functions.  In either event, whether using a single Complete EHR system, or a combination of EHR Modules, the resultant combination must meet all applicable certification criteria necessary for the federal subsidy payment.  As stated in the 2014 Edition ONC rules regarding Certified Electronic Health Record Technology, 77 Fed. Reg. 54277:

> The 2014 Edition EHR certification criteria support the MU objectives and measures under the EHR Incentive Programs and will be used to test and certify EHR technology (Complete EHRs and EHR Modules). EPs, EHs, and CAHs must adopt and implement certified Complete EHRs and/or certified EHR Modules in order to have CERHT. EPs, EHs, and CAHs who seek to qualify for incentive payments under the EHR Incentive Programs are required by statue to use CEHRT.

33

98.     If a user elects to use a combination of EHR modules instead of a Complete EHR system, it is the user's responsibility to ensure that the modules work together properly. Beginning in 2010, ONC defined Certified EHR Technology to include "a combination of EHR Modules" only if "the resultant combination also meets the requirements included in the definition of a Qualified EHR."  45 C.F.R. § 170.102 (July 28, 2010).  ONC cautioned users that "eligible hospitals that elect to adopt and implement certified EHR Modules should take care to ensure that the certified EHR Modules they select are interoperable and can properly perform in their expected operational environment," 75 Fed. Reg. 2014, 2022 (Jan. 13, 2010), and that "if they chose to use EHR Modules to meet the definition of Certified EHR Technology, they alone would be responsible for properly integrating multiple EHR Modules."  75 Fed. Reg. 36158, 36188 (June 24, 2010).

99.     Starting in 2011, EHR vendors marketing complete or modular EHR systems for hospitals were on notice that modules should be able to document clinical information about patients from admission, including admission through the emergency room to discharge of an inpatient.  EHR vendors were not required to certify an interface between EHR modules but hospital EHRs needed to be able to maintain problem lists, medication lists, and allergy lists during a patient's single hospital stay, and such information should be transmittable to the next care setting in electronic form.

100.     Such integration within the hospital setting, and compilation of such information from a hospital stay, was understood by Congress and regulators to be critical to ensuring patient safety and to lay the foundation for health information exchange between providers and with patients.

34

(b)     **EDIS and Enterprise Could Not Be Integrated Properly to Perform the Functions Required for Meaningful Use**

101.    From approximately 2010 through 2016, Medhost sold numerous hospitals the combination of EDIS and Enterprise.  Medhost and the hospitals knew, or had ample reason to know, that a hospital that deployed EDIS and Enterprise would use both systems to store information on patients who received services in the emergency department and were subsequently admitted to the hospital.  For the two modules to meet the requirements of certified EHR technology, they had to be capable of communicating information from EDIS to Enterprise safely and accurately.

102.    CHS deployed the combination of EDIS and Enterprise at numerous hospitals nationwide and those hospitals attested to Meaningful Use.  At all relevant times, however, Medhost and CHS knew that EDIS and Enterprise were not integrated and that clinical information recorded in EDIS did not pass to Enterprise accurately and reliably.  Specifically, the data interface between EDIS and Enterprise was flawed and either did not allow or improperly transferred information on medications, allergies, and problem lists.  In addition, certain information, such as medication administration and electronic orders created or performed in the emergency department, did not cross over at all from EDIS to Enterprise.

103.    As explained below, the combination of EDIS and Enterprise did not meet the requirements of certified EHR technology and hospitals were not eligible for incentive payments based on their use of the two modules.  Medhost knew the two systems did not meet the requirements for certified EHR technology and made false records and statements that caused hospitals to submit false attestations of Meaningful Use.  CHS, meanwhile, falsely attested to Meaningful Use knowing that EDIS and Enterprise did not meet the requirements of certified EHR technology.

35

       (i)    *Medhost's Software Did Not Enable Users to Perform Drug-Drug and Drug-Allergy Checks on Medication Orders Because It Could Not Reliably Communicate Information Between EDIS and Enterprise*

104.    To meet the requirements for a certified EHR, the EHR must check all medication orders for drug-drug and drug-allergy interactions, which require that it automatically and electronically indicate to the user prior to completing and acting upon the medication order any drug-drug and drug-allergy contraindications based on the patient's medication list and medication allergy list.  The EHR must perform the drug interaction checks accurately, reliably, and safely.  Medhost's EDIS and Enterprise software did not meet this requirement.

105.    Under the 2011 edition criteria, 45 C.F.R. § 170.302(a) provided:

> Complete EHRs or EHR Modules must include the capability to perform the following functions electronically, unless designated as optional . . . (a) Drug-drug, drug-allergy interaction checks—(1) Notifications. Automatically and electronically generate and indicate in real-time, notifications at the point of care for drug-drug and drug-allergy contraindications based on medication list, medication allergy list, and computerized provider order entry (CPOE).

106.    Under the 2014 edition criteria, 45 C.F.R. § 170.314(a)(2) provides:

> Complete EHRs or EHR Modules must include the capability to perform the following functions electronically, unless designated as optional . . . (2) Drug-drug, drug-allergy interaction checks - (i) Interventions: Before a medication order is completed and acted upon during computerized provider order entry (CPOE), interventions must automatically and electronically indicate to a user drug-drug and drug-allergy contraindications based on a patient's medication list and medication allergy list.

107.    Medhost received certification for the 2011 edition of electronic health record criteria for Drug Interaction Checking on the following dates for the below EDIS software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|

| | | |
|---|---|---|
| *EDIS 4.2* | CHP-007341 | 11/1/2010 |
| *EDIS 4.2* | CHP-007628 | 2/11/2011 |
| *EDIS 4.2* | CHP-006458 | 3/17/2011 |
| *EDIS 4.3* | CHP-006964 | 5/5/2011 |
| *EDIS v4.3* | CHP-008404 | 3/29/2012 |

108.    Medhost received certification for the 2014 edition of the electronic health record criteria for Drug Interaction Checking on the following dates for the below EDIS software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *EDIS v4.4* | CHP-019266 | 4/18/2013 |
| *EDIS v4.2* | CHP-019264 | 4/18/2013 |
| *EDIS v4.3* | CHP-019265 | 4/18/2013 |
| *EDIS v4.4* | CHP-020658 | 10/10/2013 |
| *EDIS v4.4* | CHP-021753 | 12/19/2013 |
| *EDIS v4.3 SR2* | CHP-022198 | 3/20/2014 |
| *EDIS v4.4 SR2* | CHP-022199 | 3/20/2014 |
| *EDIS 2014 R1* | CHP-023063 | 6/5/2014 |
| *EDIS 2014 R1 SR1* | CHP-024045 | 9/11/2014 |
| *EDIS 2015 R1* | CHP-025338 | 3/5/2015 |
| *EDIS v4.4 SR3* | CHP-025549 | 4/23/2015 |
| *EDIS 2015 R1 SR1* | CHP-027925 | 8/6/2015 |
| *EDIS 2015 R1 SR3* | 14.04.04.2788.MEDH.ED.01.1.160707 | 7/7/2016 |

109.    Medhost received certification for the 2011 edition of the electronic health record criteria for Drug Interaction Checking on the following dates for the below Enterprise software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *Enterprise 9.2* | CHP-007159 | 1/19/2011 |
| *Enterprise v10.0* | CHP-007760 | 8/4/2011 |
| *Enterprise 10.0.0* | CHP-007910 | 12/1/2011 |
| *Enterprise version 10.1* | CHP-007546 | 2/2/2012 |
| *Enterprise v11* | CHP-009004 | 7/12/2012 |
| *Enterprise v11.1* | CHP-009408 | 9/20/2012 |

37

110. Medhost received certification for the 2014 edition of the electronic health record criteria for Drug Interaction Checking on the following dates for the below Enterprise software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *Enterprise v12* | CHP-019567 | 6/13/2013 |
| *Enterprise v12* | CHP-021296 | 11/14/2013 |
| *Enterprise v12.0 & v3.0* | CHP-021298 | 11/14/2013 |
| *Enterprise 2014 R1* | CHP-022018 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022017 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022966 | 5/19/2014 |
| *Enterprise 2014 R1* | CHP-022965 | 5/19/2014 |
| *Enterprise 2014 R2* | CHP-023895 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023897 | 8/28/2014 |
| *Enterprise 2014 R2* | CHP-023891 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023893 | 8/28/2014 |
| *Enterprise v12* | CHP-023890 | 8/28/2014 |
| *Enterprise v12 and v3* | CHP-023889 | 8/28/2014 |
| *Enterprise 2014 R2 SR3* | CHP-025317 | 2/26/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027640 | 6/25/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027642 | 6/25/2015 |
| *Enterprise 2015 R1* | CHP-028401 | 11/12/2015 |
| *Enterprise 2015 R1 SR1* | CHP-028970 | 12/30/2015 |
| *Enterprise 2015 R1 SR1* | CHP-028971 | 12/30/2015 |
| *Enterprise 2015 R1 SR2* | CHP-029180 | 3/3/2016 |
| *Enterprise 2016 R1* | 14.04.04.2788.MEDH.16.01.1.160616 | 6/16/2016 |
| *Enterprise 2016 R1 SR1* | 14.04.04.2788.MEDH.CO.01.1.161006 | 10/6/2016 |

111. However, despite attesting that its software could perform the Drug Interaction Checking function, and obtaining certification on that function, Medhost's software did not reliably perform the drug and allergy interaction checks required for certified EHR technology.

112. EDIS uses a different drug codification scheme than Enterprise. The codification scheme used by EDIS is created by First Databank ("FD"); Enterprise's drug codification scheme is created and maintained by a different company, Medi-Span.

113.    There are multiple vocabularies that are designed to enable EHR technologies to communicate medication information to other EHR technologies safely and accurately, with the best known being the non-proprietary Unified Medical System, RxNorm, from the National Library of Medicine.   The purpose of these unifying languages is exactly to prevent issues described herein.

114.    Both Medi-Span and FD codification should have been linked to RxNorm codes. Instead of using RxNorm when sending medication information to Enterprise, however, EDIS and Enterprise used a text-matching algorithm to attempt to match EDIS's FD codes to Enterprise's Medi-Span codes, a flawed system that caused failures with interaction checking with stunning frequency.

115.     When a patient is admitted to a CHS emergency room, the emergency department will record the patient's home medications and allergies in EDIS, which assigns them FD codes. If the patient is admitted to the hospital, the hospital must import the patient's home medications and allergies from EDIS into Medhost Enterprise.

116.    Because Medhost Enterprise uses a different codification scheme than EDIS, Enterprise uses text mnemonics to translate the patient's FD codes into Medi-Span identifiers. The process of matching FD codes to Medi-Span identifiers using mnemonics has caused errors in which the drugs saved in EDIS for the patient are mismatched in Enterprise to different drugs, or to different units of measure or methods of administration.

117.    It was a known issue to both Medhost and CHS that drugs and allergies did not transfer over accurately and reliably from EDIS to Enterprise.

118.    For example, the failure of EDIS and Enterprise to properly transfer medications was discussed on multiple CHS "ClinRec Issues" calls.  On a January 21, 2015 "ClinRec Issues"

39

call, Angela McKerrow of CHS noted that the interface between EDIS and Enterprise was "junk" and had to be disabled.  Without an interface, all medications crossed over as uncodified, unstructured data that had to be "cleaned-up" manually by pharmacists.  The transfer of uncodified, medication information—including routes, frequencies, units of measure, and drug name—was again discussed on an April 15, 2015 "ClinRec Issues" call.

119.    These concerns continued to be voiced in a July 16, 2015 "ClinRec Issues" call. On this call, McKerrow referenced a mapping tool—discussed further below—that supposedly matched 70-80% of the drugs from EDIS to Enterprise; however, per McKerrow, the amount of unstructured data orders was still higher than she expected.  Basic drugs, such as aspirin, were crossing over as unstructured data.  Furthermore, there was no alert to nurses that drug dosages, frequencies, etc. were being imported to Enterprise as unstructured data.  The call participants discussed patient safety concerns with the units of measure for unstructured data orders.  The unstructured data were causing downstream problems for physician due to the lack of interaction checking.  Amanda Dorr at the DeTar facility noted that "patient safety issues had been horrendous without an EDIS interface."  Physicians complained about Medhost as "substandard" compared to Cerner and EPIC, two competing EHR vendors.  In response to questions on why two Medhost EHR modules used two different databases, McKerrow and Tom Frundle explained that the problem was the acquisition of two different Medhost products but the problems would be fixed by a promised Medhost mapping tool.  Yet, these interface failures continued through at least October 27, 2015.

120.    Furthermore, the inability of allergies to transfer into Enterprise was a "critical" "known issue" at Medhost for Enterprise, as recently as its Enterprise 2014 R2 SR3 version, which was certified in February 2015.  A log from 2015 reflects that there is an "error when

40

importing Allergies from CCD." The "alternative workflow solution" that Medhost proposed both acknowledged that "[t]his is new functionality that isn't working" and that "[a]llergies need to be entered manually."  Medhost slated to fix the issue in later releases, Enterprise 2014 R2 SR4 and Enterprise 2015 R1, which were not certified until June 2015 and November 2015.  In other words, Medhost did not implement functionality to perform allergy checking by users of EDIS and Enterprise—as required for them to attest to Meaningful Use—for 4-9 months after it knew that its functionality was inadequate.  During that interim, Medhost purported to have a software that met the requisite regulatory criterion, while knowing that the functionality was not working.

121.    Notably, compounding the problem of transferring allergy and drug information from EDIS to Enterprise, Medhost did not include many basic allergies in its coding.  This necessitated the creation of one-off hard coded additions to each hospital's software.  For example, a Lake Wales, Florida facility complained,

> When pre-built allergies cannot be located in MedHost*, they will be free-texted in the system which will bypass secondary background checking*. Allergies are updated presently as they are discovered as missing. Potential regular enhancement or updates needed, especially based on what has already been discovered.  Many of these are basic allergies and should already be part of the standard build.

122.    In other words, unless a facility manually updated its allergy lists, the allergy would be entered as unstructured data, or "free-text," and thus the allergy would not be subject to allergy interaction checking.

123.    Medhost attempted various methods of transferring or translating the FD codes to Medi-Span identifiers, including hard-coding a limited number of medications or allergies into a crosswalk between FD and Medi-Span.  However, such hard-coding did not solve the problems with unstructured data that arose when a drug or allergy was not included on the crosswalk.

41

124.     Moreover, for drugs, Medhost attempted to apply a basic text-matching algorithm to the FD codes, looking for a textual match to the formulary database in Medhost Enterprise. When Medhost Enterprise successfully matched an FD code to the formulary database, it would map that code to a Medi-Span identifier and run a drug and/or allergy interaction check.  If Medhost Enterprise was unable to match the FD code, however, it would import the code as unstructured data.

125.     However, like all unstructured data entries, Medhost Enterprise excludes the unmatched codes from the medication and allergy lists it uses for drug interaction checks.  On or about May 9, 2014, Medhost learned that a CHS facility in Cedar Park had an incident where a drug administered through PCA (i.e., patient controlled administration) failed to flag as an allergy.  Medhost was made aware that there were "more examples" where there were "no alert[s] to an allergy."

126.     This problem was compounded by the frequent use of unstructured medication entries at CHS hospitals for medications brought by the patient from home ("home medications").  When Medhost Enterprise imports a code as an unstructured data element, it fails to import any information on the route, frequency, or unit of measurement for the relevant medication, which can lead to errors if the doctor continues the medication while the patient is in the hospital.

127.     The text-matching algorithm has a high failure rate.  Even after multiple revisions, the algorithm works less than seventy percent of the time under test conditions in the case of home medications.

128.     In addition, the Medhost EHR's drug interaction checks do not function reliably with custom and local medications. Custom medications are medications that are modified by a

42

doctor to suit a particular patient's needs. Local medications are those that doctors or patients provide themselves, outside of the normal hospital pharmacy process.

129.    Custom medications and local medications are frequently not on the hospital formulary, and therefore do not have available Medi-Span identifiers in the Medhost database. Providers are able to order such medications in Enterprise using a Medi-Span search function, but those medication orders are not screened for drug interactions because the medications lack Medi-Span identifiers.

> (ii)    *Medhost's Software Did Not Meet Requirements to Maintain Problem List, Medication List, Medication Allergy List, and Perform Clinical Information Reconciliation*

130.    Under the 2014 edition criteria, 45 C.F.R. § 170.314(b)(4) provides that complete EHRs or EHR Modules must include the capability to "enable a user to electronically reconcile the data that represent a patient's active medication, problem, and medication allergy list," a process known as Clinical Information Reconciliation.  For each list type, the software must "[e]lectronically and simultaneously display (i.e., in a single view) the data from at least two list sources in a manner that allows a user to view the data and their attributes," "[e]nable a user to create a single reconciled list of medications, medication allergies, or problems," and "[e]nable a user to review and validate the accuracy of a final set of data and, upon a user's confirmation, automatically update the list."

131.    Medhost received certification for the 2014 edition of electronic health record criteria for Problem List, Medication List, Medication Allergy List, and Clinical Information Reconciliation on the following dates for the listed software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *Enterprise v12* | CHP-019567 | 6/13/2013 |

43

| Software | CHP Identification | Certification Date |
|---|---|---|
| *Enterprise v12* | CHP-021296 | 11/14/2013 |
| *Enterprise v12.0 & v3.0* | CHP-021298 | 11/14/2013 |
| *Enterprise 2014 R1* | CHP-022018 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022017 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022966 | 5/19/2014 |
| *Enterprise 2014 R1* | CHP-022965 | 5/19/2014 |
| *Enterprise 2014 R2* | CHP-023895 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023897 | 8/28/2014 |
| *Enterprise 2014 R2* | CHP-023891 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023893 | 8/28/2014 |
| *Enterprise v12* | CHP-023890 | 8/28/2014 |
| *Enterprise v12 and v3* | CHP-023889 | 8/28/2014 |
| *Enterprise 2014 R2 SR3* | CHP-025317 | 2/26/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027640 | 6/25/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027642 | 6/25/2015 |
| *Enterprise 2015 R1* | CHP-028401 | 11/12/2015 |
| *Enterprise 2015 R1 SR1* | CHP-028970 | 12/30/2015 |
| *Enterprise 2015 R1 SR1* | CHP-028971 | 12/30/2015 |
| *Enterprise 2015 R1 SR2* | CHP-029180 | 3/3/2016 |
| *Enterprise 2016 R1* | 14.04.04.2788.MEDH.16.01.1.160616 | 6/16/2016 |
| *Enterprise 2016 R1 SR1* | 14.04.04.2788.MEDH.CO.01.1.161006 | 10/6/2016 |

132.    Clinical Information Reconciliation is the process of creating a complete and accurate list of a patient's current medications and comparing the list to those in the patient record or medication orders. This reconciliation is done to avoid medication errors such as omissions, duplications, dosing errors, or drug interactions.

133.    Clinical Information Reconciliation should be done at every transition of care in which a new medication is ordered or an existing medication order is rewritten. "Transitions of care" refers to changes in practitioner or setting, like being transferred from a surgery unit to a general care unit, or being discharged from the hospital.   If no Clinical Information Reconciliation process is in place, it may be easy for a specialty health care provider, focused on one component of care at a specific point in the patient's hospital stay, to overlook other aspects

44

of the patient's health care needs at other points in the patient's stay.  For example, a patient may take a daily anticoagulant that needs to be discontinued during her hospital stay for a surgery, and a medical provider may forget to order the restart of that medication upon discharge. Clinical Information Reconciliation creates a streamlined process at each transition so that there are no medication, allergy, or problem duplicates or discrepancies, which would cause patient safety issues.

134.    EHR software that is certified to the Meaningful Use Clinical Information Reconciliation criterion must enable a user to create a single reconciled list of medications, medication allergies, or problems.  It must also allow the user to review and validate the accuracy of a final set of data and automatically update the list once the user has confirmed the accuracy.

135.    Medhost had a Clinical Information Reconciliation software module called "ClinRec." Within ClinRec, users could complete the reconciliation process, and then once the information was reconciled, users could place medication orders.

136.    However, Medhost's ClinRec did not function properly, and consistently endangered patients.  Around late April or early May 2014 after a recent rollout to CHS facilities of new features within Enterprise, CHS facilities noticed an alarming problem with ClinRec: during an admission or transfer reconciliation, when a physician selected to "continue" a medication, the prior order was cleared out and a new order was created rather than a continuation occurring. The creation of a new order was contrary to the function the provider intended to perform (continuing an existing order) and caused patient safety issues. For example, if a patient received a dose of morphine in a general care setting and then an hour later was transferred to surgery, a physician using Enterprise for medication reconciliation might choose to

45

continue the morphine use.  Instead of recording the physician's order, Enterprise would wipe out the order and replace it with a new order. Thus, the original order with the record of the initial administration would be discontinued, and a new morphine order would show up on the electronic Medication Administration Record (eMAR) as available to give to the patient. A new nurse could then give the patient morphine again, earlier than the patient's next scheduled dose under the original order, causing significant risk for overdosing.  CHS notified Medhost of this problem in early May 2014.   Medhost's response was that the system was functioning as designed.

137.    This ClinRec problem in Medhost's Enterprise software was such a risk to patient safety that CHS implemented a workaround and put manual checks in place to account for patient safety, while simultaneously escalating the issue with Medhost as a critical problem that needed to be fixed. In an email on May 9, 2014 with a subject line of "MedHost Tier 1 critical issues update," CHS Deputy CIO Manish Shah noted "MedRec [Medication Reconciliation] currently has a manual workflow in place, and a permanent fix is scheduled to be delivered from MedHost on 5/27."

138.    Although MedHost was actively working on a fix and knew that problems with its ClinRec feature were so problematic that its customers were resorting to a workaround, MedHost again certified as to the Clinical Information Reconciliation criterion of Meaningful Use on May 19, 2014.  Medhost did not deploy software intended to fix the issue until June 11, 2014.

139.    In July 2014, CHS notified Medhost that the ClinRec function in Enterprise also could not properly reconcile home medications. When home medications imported from EDIS were transferred to Enterprise and reconciled using the ClinRec function, the software often populated the incorrect unit of measure ("UOM").  Once reconciled, the incorrect UOM became

46

a permanent part of the home medication record, and the error could not be corrected or changed. The incorrect UOM would "pre-populate or carry forward" at each subsequent admission. This caused a significant risk of incorrect dosing.

140.    In April 2015, CHS facilities also noticed that the brand name and the generic name of the same drug would sometimes appear on the discharge clinical reconciliation screen, meaning that unless this error was caught by the user, a patient could be discharged with instructions to take twice the amount of medication the physician actually intended for the patient to take.  CHS raised this issue on a call with Medhost on April 15, 2015.

141.    In June 2015, CHS notified Medhost that the issue of new orders being placed when a drug is "continued," discussed in ¶136–138 above, was still occurring, notwithstanding the software fix that Medhost had deployed. Additionally, ClinRec was not maintaining the record of home medications through the entirety of the patient's stay, such that during reconciliation at discharge, a physician could not discharge the patient with the same home medication they were taking before their hospital stay.

142.    Despite these regular problems with clinical information reconciliation that Medhost was aware of and working to fix, Medhost continued to certify and re-certify its software as to Clinical Information Reconciliation criterion of Meaningful Use.

47

598012.1

   2.   **Medhost EDIS and Enterprise Systems Did Not Consistently Enable Providers to Perform "Computerized Provider Order Entry" (CPOE)**

143.   Medhost's EHR software failed to enable users to perform computerized provider order entry ("CPOE") in a manner that met the requirements for certification as Certified EHR Technology.

144.   Under the 2011 edition criteria, there were two regulations, 45 C.F.R. § 170.304(a) and 45 C.F.R. § 170.306(a), that specified the requirements for CPOE, one for an ambulatory setting and the other for an inpatient setting.

145.   Both regulations required:

Computerized provider order entry.  Enable a user to electronically record, store, retrieve, and modify, at a minimum, the following order types: (1) Medications; (2) Laboratory; and (3) Radiology/imaging.

146.    Under the 2014 edition criteria, 45 C.F.R. § 170.314(a)(1) provides:

Computerized provider order entry. Enable a user to electronically record, change, and access the following order types, at a minimum: (i) Medications; (ii) Laboratory; and (iii) Diagnostic imaging.

147.   Under both editions, medication orders must have been recorded in RxNorm, the standard specified in § 170.207(d)(2).

148.   As with any EHR criteria, the EHR must be able to perform the required CPOE functions accurately, reliably, and safely.

149.   Medhost received certification for the 2011 edition of electronic health record criteria for CPOE on the following dates for the below EDIS software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *EDIS 4.2* | CHP-007341 | 11/1/2010 |
| *EDIS 4.2* | CHP-007628 | 2/11/2011 |
| *EDIS 4.2* | CHP-006458 | 3/17/2011 |
| *EDIS 4.3* | CHP-006964 | 5/5/2011 |
| *EDIS v4.3* | CHP-008404 | 3/29/2012 |

48

150.    Medhost received certification for the 2014 edition of the electronic health record criteria for CPOE on the following dates for the below EDIS software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *EDIS v4.4* | CHP-019266 | 4/18/2013 |
| *EDIS v4.2* | CHP-019264 | 4/18/2013 |
| *EDIS v4.3* | CHP-019265 | 4/18/2013 |
| *EDIS v4.4* | CHP-020658 | 10/10/2013 |
| *EDIS v4.4* | CHP-021753 | 12/19/2013 |
| *EDIS v4.3 SR2* | CHP-022198 | 3/20/2014 |
| *EDIS v4.4 SR2* | CHP-022199 | 3/20/2014 |
| *EDIS 2014 R1* | CHP-023063 | 6/5/2014 |
| *EDIS 2014 R1 SR1* | CHP-024045 | 9/11/2014 |
| *EDIS 2015 R1* | CHP-025338 | 3/5/2015 |
| *EDIS v4.4 SR3* | CHP-025549 | 4/23/2015 |
| *EDIS 2015 R1 SR1* | CHP-027925 | 8/6/2015 |
| *EDIS 2015 R1 SR3* | 14.04.04.2788.MEDH.ED.01.1.160707 | 7/7/2016 |

151.    Medhost received certification for the 2011 edition of electronic health record criteria for CPOE on the following dates for the below Enterprise software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *Enterprise 9.2* | CHP-007159 | 1/19/2011 |
| *Enterprise v10.0* | CHP-007760 | 8/4/2011 |
| *Enterprise 10.0.0[1]* | CHP-007910 | 12/1/2011 |
| *Enterprise version 10.1* | CHP-007546 | 2/2/2012 |
| *Enterprise v11* | CHP-009004 | 7/12/2012 |
| *Enterprise v11.1* | CHP-009408 | 9/20/2012 |

152.    Medhost received certification for the 2014 edition of electronic health record criteria for CPOE on the following dates for the below Enterprise software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|

---

[1] This version did not include certification for section 170.306(a).

49

| *Enterprise v12* | CHP-019337 | 5/2/2013 |
|---|---|---|
| *Enterprise v12* | CHP-019567 | 6/13/2013 |
| *Enterprise v12* | CHP-021296 | 11/14/2013 |
| *Enterprise v12.0 & v3.0* | CHP-021298 | 11/14/2013 |
| *Enterprise 2014 R1* | CHP-022018 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022017 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022966 | 5/19/2014 |
| *Enterprise 2014 R1* | CHP-022965 | 5/19/2014 |
| *Enterprise 2014 R2* | CHP-023895 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023897 | 8/28/2014 |
| *Enterprise 2014 R2* | CHP-023891 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023893 | 8/28/2014 |
| *Enterprise v12* | CHP-023890 | 8/28/2014 |
| *Enterprise v12 and v3* | CHP-023889 | 8/28/2014 |
| *Enterprise 2014 R2 SR3* | CHP-025317 | 2/26/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027640 | 6/25/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027642 | 6/25/2015 |
| *Enterprise 2015 R1* | CHP-028401 | 11/12/2015 |
| *Enterprise 2015 R1 SR1* | CHP-028970 | 12/30/2015 |
| *Enterprise 2015 R1 SR1* | CHP-028971 | 12/30/2015 |
| *Enterprise 2015 R1 SR2* | CHP-029180 | 3/3/2016 |
| *Enterprise 2016 R1* | 14.04.04.2788.MEDH.16.01.1.160616 | 6/16/2016 |
| *Enterprise 2016 R1 SR1* | 14.04.04.2788.MEDH.CO.01.1.161006 | 10/6/2016 |

> *(a)* *Medhost's Software Failed to Enable Users to Create Medication Orders Accurately*

153.    Medhost's EHR technology is made up of many separate software applications, which are supposed to work together as a single integrated system.  Several of the Medhost applications can be used by providers to place medication orders and comprise the CPOE functionality to which Medhost certified and for which users attested to Meaningful Use.  Those applications included the Java-based Clinical View portal ("ClinView"), the web-based "PhysDoc" module, the Clinical Reconciliation module ("ClinRec"), and the Pharmacy module ("GUI").  During the time period relevant to this Complaint, physicians and nurses at the CHS Medhost hospitals primarily used PhysDoc and ClinView to enter medication orders into the Medhost system.

50

154.    As explained below, Medhost's EHR software is incapable of recording medication orders in an accurate and reliable manner, as required for certification as certified EHR technology, because medication orders recorded through ClinView often do not reflect the order the doctor intended to enter, such as by containing a different dose, a different time for administration, or even a different medication altogether.  Because the software did not reliably enable users to record accurate medication orders, it was ineligible for certification for CPOE.

        (i)     *Medhost Software Miscalculates IV Drip Rates in Orders for Medications Dosed Based on the Patient's Weight*

155.    Under certain circumstances, the ClinView module fails to calculate and record the dose for weight-based medications accurately. Once circumstance where this occurs is when the software calculates a dosage for weight-based medications requiring a "drip-rate"—the measurement of rate at which medications are to be administered through an intravenous (IV) drip.

156.    On learning of this flaw in the system, CHS instructed its pharmacists not to rely on the Medhost EHR's drip-rate calculations, and to instead manually calculate a new rate.  That manual calculation obviated the purpose of CPOE for medications administered intravenously. Nevertheless, CHS continued to attest to the CPOE MU measure.

        (ii)     *Medhost Software Miscalculates Weight-Based Doses Using Incorrect Medication Information*

157.    Under certain circumstances, the ClinView application also miscalculates the dose ordered by the user due to a medication name mismatch in its weight-based dosing window. The issue can occur when a doctor utilizes the module to calculate the dose for a weight-based medication. After the doctor enters the name of the desired medication, the ClinView application calculates the dosage for an entirely different medication.

51

158.    On May 5, 2014, following a training associated with the rollout of the Medhost software updates, the Director of Pharmacy Teresa Stines at CHS's DeTar Healthcare System alerted CHS's software deployment team to the problem: "I tried out the weight based dosing and got some scary results. Please see the screen shots I have attached. It is not always pulling the right drug for the dosing, if [sic] fact it is wrong more that [sic] it is right. Is this a known issue?"

159.    The Director of Pharmacy illustrated two separate instances of the issue through screenshots attached to her email. One screenshot showed a medication order entry for the drug Clindamycin Phosphate. The other screenshot showed an entry for the drug Cefazolin Sodium. However, both screenshots revealed that the weight-based dosage feature had pulled the wrong medication, Gentamicin Sulfate, for the calculation.  Again, despite the inability of the software to record medication orders accurately, CHS continued to attest to the CPOE measure.

> (iii)    *Medhost's Software Records Incorrect Medication Administration Instructions When Users Select Its "Send Dose Now" Function*

160.    Medhost provided a "Send Dose Now" checkbox in the ClinView order entry window that doctors could select while making a medication order.  The purpose of the checkbox was so physicians could indicate that they wanted the medication to be immediately delivered to the patient.  However, the "Send Dose Now" checkbox did not, in fact, create medication orders designated for immediate delivery, but instead "the system defaults" to a normal order delivery at the next "scheduled frequency."

161.    For example, if a physician entered a medication order to be administered every three hours, and checked the "Send Dose Now" checkbox, the Medhost software created an order for the medication specifying administration of the medication every three hours, with the first

dose scheduled to be delivered three hours in the future.  The tool therefore did not trigger the immediate administration of a dose as the physician had intended.  Physicians who relied on the tool for that purpose were at risk of unwittingly delaying treatment.

162.   CHS and Medhost became aware of this issue no later than April 2014.  Yet, Medhost was unable to fix the flaw.  Despite being flagged as "high priority" and "impacting all sites," Medhost did not even disable the feature until the end of July 2014, allowing providers to attempt to use a broken feature for medication ordering for over four months without notifying them of the problems with the ordering mechanism.  An August 2014 issue log reported the issue was resolved by disabling the broken feature, stating: "Send Dose Now is disabled with sites trained to not use button."

163.   CHS was no less culpable.  Rather than disable the broken feature on its own, CHS instructed doctors to either call the pharmacy to clarify their orders, or to enter two separate orders for the medication thereby circumventing the requirement of placing medication orders through the electronic health records system.

164.   In May 2014 and August 2014, Medhost obtained re-certification of the CPOE criterion even though, as reflected above, its CPOE functionality was incapable of accurately recording medication orders entered using the Send Dose Now feature.

(iv)   *Medhost Software Miscalculates Weight-Based Medication Doses Using Static Clinical History Profile Data*

165.   Medhost's EHR software did not reliably calculate correct medication doses based on the patient's weight, body surface area ("BSA"), or creatinine ("CrCl") levels.  The EHR uses information from the patient's Clinical History Profile ("CHP") to determine the weight, BSA, and CrCl used in the dosage calculation.  Providers typically complete the CHP when the patient is admitted to the hospital.

53

166. Over the course of an inpatient stay, a patient's measurements can change significantly, often enough to yield relevant changes in medication dosage. When a hospital takes new measurements from the patient, Medhost's software will save the new measurements in the EHR but will not update the information in the patient's CHP. Even though the information in the CHP is no longer current for the patient, the software will continue to use the CHP to calculate the patient's medication dosages.

167. Consequently, a patient who suffers weight loss or declining renal function while in the hospital (or a newborn who gains weight while in the hospital) is at risk of receiving medications at doses the EHR calculated based on his or her condition upon admission. Moreover, if a patient were readmitted, unless a nurse intervened, the EHR would administer drugs based on the historical CHP in the patient's chart. Patients who receive such doses may be at risk of significant overdosing or under dosing.

168. By at least July 2014, CHS flagged this issue for Medhost. Medhost responded that the issue would be "addressed in the Pharmacy experience which is now in the high level planning process." Medhost continued that "[o]nce timeline is available, Medhost will communicate with CHS." In other words, despite learning of the risk of patients receiving a miscalculated drug does, Medhost did nothing to remedy the issue.

169. This miscalculation risk continued to months. For example, in an October 28, 2014 Physician Tools User Group call at CHS, the participants discussed that when a patient's weight was updated in the vitals module, the weight was not updated in the CHP and caused weight-based dosing to be incorrect.

54

170.    In the interim, despite being aware that the software did not record medication orders accurately, CHS continued to attest to the CPOE measure and Medhost continued to obtain re-certification for the CPOE criteria.

> (v)    *Medhost's Software Is Incapable of Creating Accurate PRN Medication Orders*

171.    Medhost's EHR is also incapable of reliably recording PRN medication orders—orders to be administered "as needed."  When a physician enters a PRN medication order that includes an expiration time for the order and a maximum number of doses, Medhost's EHR may terminate the order early (i.e., prior to the expiration date the physician chose) or fail to display the maximum number of doses the physician had set.

172.    On July 30, 2014, the Director of Pharmacy Services David M. Dirig at CHS's Fallbrook Hospital wrote to CHS Pharmacy Informatics Manager Jeannie Bennet and others regarding "flawed PRN frequencies in CPOE [that] represent a medication safety risk."  In the email, the Director used the example of an order for 6mg of the migraine medication Sumitriptan to illustrate a flaw that"[a]ppear[ed] to be built into all PRN frequencies." The Director explained than an order for Sumitriptan is to be administered every hour as needed for migraine headache, but with a maximum of 3 doses to be administered over not more than 12 hours. The Director warned that the Medhost EHR was incapable of recording the order as the provider had intended—depending on how the provider entered the order into the Medhost EHR, the software would either create an order for a maximum of 3 doses to be administered over not more than 3 hours, or for unlimited doses to be administered over not more than 12 hours. "Either way," the Director wrote, "the order as entered would not actually reflect what was ordered."

173.    Medhost acknowledged to CHS that the problem with PRN medication orders was a "limitation of the system."  Medhost refused to fix the problem, however, with one

employee writing CHS that: "at some point nurses treating patients have to take some 'clinical responsibility' because [Medhost software] cannot be made fool proof."  To the Relators' knowledge, Medhost had not corrected the problem as of late 2016, even though it continued to seek and received certification for the CPOE criterion through 2016.

> (vi)     *Medhost's Software Creates Inaccurate Medication Orders If Physicians Use Medhost's "Physician's Favorites" Feature to Create Orders*

174.    The Medhost EHR also does not reliably create medication orders entered using a feature called "Physician Favorites," which allows doctors to create a list of the medication configurations they commonly order from the hospital formulary.  The purpose of the list is to allow the doctor to quickly select and order the configurations they tend to use in practice.  The feature contains a flaw, however, that in certain circumstances can cause the hospital pharmacy to fill the order incorrectly.

175.    When a doctor sets a Physician Favorite, the EHR displays a description of the medication (type, dose, route, etc.) in the doctor's Physician Favorites list and assigns it a "mnemonic" text string that corresponds to the text string used for the medication in the hospital's formulary.  The EHR uses the text string to record and place orders for the Physician Favorite.  When a doctor enters an order, the EHR compares the mnemonic string to the list of strings in the formulary database, and places an order for the resulting match.

176.    Medhost does not connect the information displayed to the provider in the Physician Favorite list with the hospital formularies.  Hospitals can, and do, change the configuration of drugs in the formulary without changing the mnemonic code that identifies the drugs on the formulary.  In such instances, the EHR will display the original configuration to the doctor on the Physician Favorite list.  When the doctor orders the medication, however, the EHR

will match the text string to the text string in the formulary for the new configuration.  The EHR will trigger an order for the new configuration, not the configuration that the doctor intended to order.  The EHR does not alert the doctor to the change in the formulary or remove the medication from the Physician Favorite tool.

177.    This problem occurs most commonly when a hospital changes a medication's unit of measurement (*e.g.*, from grams to milligrams).  At CHS, the text string for a medication will not change when a hospital changes the unit of measurement for the medication in its formulary. If a doctor enters an order for such a drug using the EHR's normal CPOE interface, the interface will display the new unit of measurement, alerting the doctor to the change.  If the doctor uses the Physician Favorite tool, however, the EHR will display the old unit of measurement.  The dose the doctor orders, therefore, will be based on an incorrect unit of measurement for the drug. Making the problem especially dangerous, the pharmacist who fills the order may have no reason to suspect that the dose is based on an outdated unit of measurement.

178.    On or about June 30, 2014, Medhost had originally informed CHS Manager Pharmacy Informatics Cliff Kolb that if a UOM was altered on the formulary, the "system would not allow a change if a drug using that UOM was saved in a physician's favorites."  However, once implemented Mr. Kolb learned from pharmacists that "they changed the UOM and [the system] did not alert them of favorites."  In fact, pharmacists "had received order with the incorrect UOM attached."

179.    The danger posed by this flaw was amplified by a series of flawed formulary changes, described below, which CHS implemented at its hospitals during the same timeframe and that included many unit of measurement changes.

57

598012.1

(vii)    *Medhost's Software Does Not Enable Users to Verify That the Medications they Administer Accurately Reflect the Medication Order for the Patient*

180.    Medhost has certified Medhost Enterprise since June 2013 to 45 C.F.R. § 170.314(a)(16), which requires that the EHR technology enable users to electronically verify before administering a medication that the patient, medication, dose, route, and time of administration all match the medication order, using assistive technology that provides automated information on each parameter being matched.  Contrary to that requirement, under certain circumstances the Medhost EHR does not provide automated information to users that the dose being administered does not match the dose on the medication order.

181.    The lack of functionality applies to medication orders for partial doses or doses that are less than a dispensable quantity.  Hospitals fill many orders using an automated dispensing machine, such as the Pyxis system used at CHS.  Pyxis dispenses medications based on the dose information in the hospital's formulary.  When a doctor uses Medhost's CPOE function to order a "partial dose" of a medication—a dose that is less than the full dose found in the hospital's formulary (*e.g.*, 50 mg of drug X, when 100 mg is the smallest dose available from the Pyxis machine)—the Pyxis machine will fill the order for the full dose unless a pharmacist intervenes.  When Pyxis fills an incorrect dose, Medhost's eMAR system will not provide automated information to the user that the dose being administered does not match the dose on the medication order, potentially causing the user to overdose the patient.

182.    In May 2014, a nurse at the Cedars Park facility alerted CHS information systems personnel of an incident where a physician entered an order for Xaralto 10 mg into Enterprise.  However, because the physician put 1 tablet as the dose, Pyxis dispensed "Xaralto 1 mg".  The nurse described the incident as a "near miss."  While this issue occurred with a specific patient's

58

medication, the nurse explained that the dosage error "occured [sic.] on multiple occasions prior."

183.    Not all patients were so lucky.  The automated dispensing flaw led at least one CHS patient to receive an overdose of Potassium.  The error occurred in CHS's Lake Wales, Florida facility and was raised by the hospital's pharmacy director during an October 16, 2014 issues call with Medhost.

184.    In January 2014, CHS learned of another lack of functionality in the eMAR system that caused risks of overdosing automatically dispensed drugs.  Specifically, with injectable drugs, the eMAR "recorded [the medication] as administered after the first unit is scanned regardless of the number of individual vials or units that comprise the dose."  Per Pam Rudisill, the Chief Nursing Officer at CHS, this flaw raised the possibility that the "number of administered doses recorded on the eMar is different than actually administered."  Thus, providers were instructed to double-check multi-dose medication administration.

> (viii)    *Medhost's EHR Fails to Run Drug Interaction Checks on Medications Ordered at Discharge*

185.    Providers at CHS hospitals perform a clinical reconciliation at discharge ("discharge reconciliation"), in which the provider can use CPOE to continue or discontinue medications that the patient received during the inpatient stay and can restart any home medications that had been discontinued upon admission.

186.    The placement of an order for medication at discharge is a new order.  Medhost's EHR software, however, does not perform drug interaction checks when a provider continues or discontinues a medication during discharge reconciliation.  Although it is appropriate for Medhost to screen for drug-drug or drug-allergy contraindications at the time a provider creates a medication order, the decision to configure the medication at discharge as a continuation of a

598012.1

medication, rather than to enter a new order using Medhost's CPOE function, meant that the EHR did not indicate drug-drug or drug-allergy contraindications to the provider as required.

> (ix)     *Additional Issues With Medhost's CPOE Function That Posed Serious Patient Harm*

187.    On March 17, 2014, CHS Manager of Pharmacy Informatics Cliff Kolb complained of an issue at the Shelbyville facility where unstructured medication orders entered into the MedRec module (a subset of the ClinRec module) did not cross over to pharmacy. However, neither the physician nor the pharmacy were informed by the EHR that the unstructured data medication orders would not be sent to the pharmacy. The Manager emphasized that there would be "missing medications if this is not told to the physicians." Thus, unbeknownst to a physician, a patient may not be administered an ordered medication; an oversight that could cause serious patient harm.

188.    Similarly, on May 15, 2015, IS Clinical Informaticist Amanda Dorr at DeTar Healthcare System in Victoria, Texas complained that "all types of orders" "never made it through" when a provider entered an order in Medhost's Order Management application.  When a provider entered the order, it appeared to function as required because the provider would see the entered order and would not receive any error message.  Even though the facility "pushed the entire week through all of our issues" caused by the Order Management failure, Dorr wrote that the facility could not continue to use the Order Management system due to concerns for "the safety of our patients."

189.    In addition, on May 8, 2014, Las Cruces facility complained that the CPOE "build team" was improperly building IV packs because (1) they did not match the hospital's IV packs and (2) they were removing default frequency information from the build.  The Director of Pharmacy noted that the latter issue was a "patient safety issue."

60

190.     CHS and Medhost knew that the inadequate CPOE functions at the CHS hospitals were creating patient safety issues.  DeTar's Teresa Stines, for example, complained to Cliff Kolb, Jeannie Bennet, and Dale Resch during a facility visit that pharmacists at her facility had to revise approximately 40% of medication orders entered electronically using Medhost, due to a multitude of errors.  She noted in particular that pharmacists were "constantly needing to change CPOE physician orders here due to med selection errors, non-formulary issues, substitution, med rec/home med issue, free text meds (about 20% of orders reported by pharmacist staff), comment instructions regarding dose, time, adm, etc., etc." This issue was formally assigned to Connie Senseney to resolve in CHS's issue logs.

### 3.     To Increase Its Meaningful Use Measures, CHS Developed Flawed Order Sets That Prevented Users From Recording Medication Orders Accurately and Reliably Using CPOE

191.     Under the 2011 and 2014 Meaningful Use regulations, EHRs were required to have CPOE functionality that enabled users to electronically record, store, retrieve, and modify medication orders, laboratory orders, and radiology/diagnostic imaging orders.

192.     CMS's Stage 1 and Stage 2 objectives for CPOE, articulated in 42 C.F.R. § 495.6(d) – (g) and 42 C.F.R § 495.6(j) – (m) was to "Use CPOE for medication orders directly entered by any professional who can enter orders into the medical record per State, local and professional guidelines."

193.     In 2013 and 2014, CHS became concerned that it would not be able to deploy Medhost Enterprise's CPOE functionality in time for its hospitals to meet the measures necessary to attest to Meaningful Use.  In an attempt to deploy the functionality more quickly and expedite the hospitals' use of it, CHS created a uniform electronic order set that it deployed

across all hospitals running Medhost Enterprise.  Physicians were supposed to use the uniform order set to enter orders using Medhost's CPOE function.

194.    An order set is a curated selection of related medication and other orders—designed for application in a specific scenario—that a doctor can select quickly and easily using CPOE. When used correctly, order sets can reduce medical errors, standardize hospital procedures, and increase efficiency. CHS and Medhost intended to use order sets as the primary method for medication ordering in the Medhost EHR.

195.    During the deployment of the Medhost EHR software, CHS rolled out a series of electronic order sets that doctors were supposed to use with the EHR software.  To make the order sets function with Medhost's CPOE, each medication order embedded within an order set must be mapped to the hospital formulary using mnemonics. To create the mapping for the order sets, CHS started from templates created by Zynx Health, a source of evidence-based clinical information.  CHS modified the Zynx templates, and then mapped them to each hospital's formulary using a software tool created by Medhost.

196.    The CHS process failed to account for the numerous differences in hospital formularies within CHS, and CHS did not designate pharmacists or others with subject-matter expertise to oversee the mapping process. As a result, order sets were rolled out to the hospitals with a large volume of dangerous errors in the mapping of individual orders. CHS Pharmacy Informatics Manager Jeannie Bennet was intimately involved in the implementation of the flawed order sets and aware of the patient safety issues order sets would pose due to her role as trainer for hospital Directors of Pharmacy.

197.    CHS and Medhost learned of the issues almost immediately, as members of the CHS implementation team and practitioners at individual hospitals began to flag concerns. For

example, on September 30, 2013, the deployment team at Heartland Regional Medical Center reported an issue that the "available pharmacy/formulary NDC code does not match the order set content."

198.    The order set issues occurred at other CHS sites as well. On March 10, 2014, CHS Manager of Pharmacy Informatics Cliff Kolb wrote to others on the CHS implementation team in an email with subject line: "Serious concerns on Order sets and model build."  The email detailed concerns from a review that Mr. Kolb had conducted of the build at the first six sites scheduled to go live with the new order sets:

> Within a few minutes, we found some glaring issues. Zofran 4 mg was mapped to the 40mg vial not the 4mg vial which could cause a 10 fold overdose. When looking at the Hydromorphone and Morphine, they were mapped to regular form when the mapping should have been preservative free. With this brief review, it brought up red flags as to what else is out there that we did not have time to find….

> We are seeing this at the other 5 facilities as well…

> We have been asking who is completing the quality review. We were told today that the sets are being reviewed by analyst not pharmacists. We have concerns that this should only be done by clinical staff… However, [they do] not currently have access to the order sets so they can review….

> In the above example, the Zofran would never be in the Pyxis machines as [described]…. [T]he nurse would not be able to get it and the pharmacist will have to edit it. This would not meet MU standards.

> We need someone to go in and clean up the [model order set] before more sets are pushed to any sites…. Based on comments from Medhost folks, this is a one to two week process to clean up. I am not sure we have time but it is a patient safety issue.

199.    Two weeks later, CHS had not begun to address the issue.  On March 25, CHS Director of Pharmacy Operations, Jerry Reed, sent an email expressing his alarm to CHS Vice President of Operations Support Tim Park:

> I am not sure where my authority stops, but will push forward until I get a cease and desist.

63

-None of my pharmacists are involved in the build.

-Most of the issues go back to the [model order set]. I think urgent cleanup is necessary. The order sets are being mapped out of the [model order set] to the facilities and until this is cleaned up we are going to continue to experience this…. Examples: Acetaminophen suppositories is mapped to orally. Normal saline is asking for weight based dosing.

-Pharmacists must oversee the drug component of the [model order set] and model build.

-Cliff and Jeannie have been bringing up these issues for the last month.

-The readiness documentation does not even include pharmacy directors because the deployment team still seems to think that pharmacy had nothing to do with CPOE.

200.    In response to the email, Mr. Park acknowledged that the issue created fertile ground for patient harm, writing that "These medication sentences have **a very high potential** for causing a catastrophic event."

201.    Despite acknowledging the danger of rolling out flawed order sets, however, CHS continued to push forward with deploying the order sets at additional hospitals in advance of the 2014 attestation period with its intended purpose being to collect Meaningful Use subsidies for those hospitals.  CHS did not assign pharmacists or subject-matter experts to correct the problems it had identified at the hospitals that had already received the order sets.  Instead, CHS instructed non-clinical staff, including Relator Neiman, to resolve the safety issues while prioritizing strategies to meet the target dates for implementation to ensure that CHS would receive Meaningful Use incentive payments.

202.    The inaccurate mapping between order sets and hospital formularies prevented physicians from creating orders safely, accurately, and reliably using the CPOE function. Because there was no assurance that the medication information in the order sets would match

the medication information that pharmacists used to fill medication orders, CHS's hospitals did not meet the objective of using CPOE for medication orders.

### C. Medhost Enterprise Software Did Not Enable Users to Perform Clinical Decision Support

203. Under the 2014 edition criteria, 45 C.F.R. § 170.314(a)(8) provides that complete EHRs or EHR Modules must include the capability to "[e]nable a limited set of identified users to select (i.e., activate) one or more electronic clinical decision support interventions (in addition to drug-drug and drug-allergy contraindication checking) based on each one and at least one combination of the following data: (A) Problem list; (B) Medication list; (C) Medication allergy list; (D) Demographic; (E) Laboratory tests and values/results; and (F) Vital signs."

204. Medhost received certification for the 2014 edition of electronic health record criteria for Clinical Decision Support ("CDS") on the following dates for the listed software versions:

| Software | CHP Identification | Certification Date |
|---|---|---|
| *Enterprise v12* | CHP-019337 | 5/2/2013 |
| *Enterprise v12* | CHP-019567 | 6/13/2013 |
| *Enterprise v12* | CHP-021296 | 11/14/2013 |
| *Enterprise v12.0 & v3.0* | CHP-021298 | 11/14/2013 |
| *Enterprise 2014 R1* | CHP-022018 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022017 | 2/20/2014 |
| *Enterprise 2014 R1* | CHP-022966 | 5/19/2014 |
| *Enterprise 2014 R1* | CHP-022965 | 5/19/2014 |
| *Enterprise 2014 R2* | CHP-023895 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023897 | 8/28/2014 |
| *Enterprise 2014 R2* | CHP-023891 | 8/28/2014 |
| *Enterprise 2014 R1* | CHP-023893 | 8/28/2014 |
| *Enterprise v12* | CHP-023890 | 8/28/2014 |
| *Enterprise v12 and v3* | CHP-023889 | 8/28/2014 |
| *Enterprise 2014 R2 SR3* | CHP-025317 | 2/26/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027640 | 6/25/2015 |
| *Enterprise 2014 R2 SR4* | CHP-027642 | 6/25/2015 |
| *Enterprise 2015 R1* | CHP-028401 | 11/12/2015 |

65

| Enterprise 2015 R1 SR1 | CHP-028970 | 12/30/2015 |
| Enterprise 2015 R1 SR1 | CHP-028971 | 12/30/2015 |
| Enterprise 2015 R1 SR2 | CHP-029180 | 3/3/2016 |
| Enterprise 2016 R1 | 14.04.04.2788.MEDH.16.01.1.160616 | 6/16/2016 |
| Enterprise 2016 R1 SR1 | 14.04.04.2788.MEDH.CO.01.1.161006 | 10/6/2016 |

      1.     **Medhost's Enterprise Software Cannot Reliably Perform CDS or Track When and Whether CDS Rules Have Been Enabled**

205.    CDS is a process designed to aid directly in clinical decision making, in which characteristics of individual patients are used to generate patient-specific interventions, assessments, recommendations, or other forms of guidance that are then presented to a decision-making recipient or recipients that can include clinicians, patients, and others involved in care delivery.

206.    ONC has identified CDS as a key functionality of health IT that—when effectively applied—contributes to "improved care quality, enhanced health outcomes, error and adverse event avoidance, improved efficiency, reduced costs, and enhanced provider and patient satisfaction."   ONC, *Clinical Decision Support: More than Just 'Alerts' Tipsheet*, July 2014 (noting that "Congress included CDS as a centerpiece of the Medicare and Medicaid EHR Incentive Programs").

207.    Medhost's Enterprise software did not meet the above requirements, as Medhost's software is unable to reliably perform CDS or track when and whether CDS rules have been enabled. Medhost knew of this failing, but certified its software as to the CDS criteria regardless, and re-certified this criteria despite knowing about ongoing problems with CDS.

208.    One instance of Medhost's failing CDS functionality came to Relator Neiman's attention in September 2014. CHS learned that the CDS rules in Enterprise had completely stopped functioning around August 14, 2014, while many hospitals that were in the middle of their attestation periods. When Relator Neiman did a spot check to determine which attesting

hospitals were having this problem, he discovered that the CDS rules were not working at any of the 17 hospitals he checked. These sites were using two releases of Enterprise v12, certified on June 13, 2013 (CHP-019567) and November 14, 2013 (CHP-021296), both certified as to CDS under MU Stage 2.

209.    The CDS function did not work in any of the above facilities, and likely many more, and yet Medhost certified to that criterion repeatedly, often inheriting its previous false certification into the new version of Enterprise.

210.    Relator Neiman created a help desk ticket with Medhost to notify Medhost of the problem and followed up on September 18, 2014.  CHS discussed the problem with Medhost during a weekly/biweekly issue call on September 30, 2014. Medhost acknowledged the issue on the call and informed CHS that Medhost would have to re-build the CDS code to resolve the problem. CHS Director of IS at Quorum Health Tim Moore reached out to Relator Neiman on several occasions throughout 2014 to address the reporting and rule "not firing" issues.  Medhost further explained that the CDS interventions would not fire until the re-build was complete.

211.    Medhost "re-built" the CDS functionality in its EHR software in early October 2014, and CHS again planned to rely on the functionality for its second wave of attestation, which began its reporting period October 1, 2014.

212.    However, CDS continued not to function. In late October 2014, CHS management learned that Medhost's CDS functionality was still failing.  On October 28, 2014, a CHS Regional Clinical Informaticist, Phyllis J. Fawcett, who had previously reported CDS issues at hospitals during the first wave, emailed the implementation team regarding further failures:

> I have another one.  I was at [the hospital in] Selmer today and we took a look at the CDS rules to make sure they were running.  I am seeing a similar scenario as I saw at [the hospital in] Lexington a few weeks ago.  It appears, according to the Acknowledgement report that the triggers

stopped firing on the 15th. However, according to the status report the rules have not been active for 0 of 28 days….

213.   On November 20, 2014, in an email responding to an issue ticket submitted by a CHS hospital, Medhost confirmed that the CDS reporting problem was a known issue with the software, and that it affected facilities beyond just CHS. Medhost also indicated that it had no estimate for when it could provide a fix:

> [T]he issue you are having with established Clinical Decision Support rules not showing on the ODS Acknowledgement Report is a known issue. This has happened on several other facilities in our system. . . .
>
> There is a program fix that is being developed and tested to resolve this issue, PIF 1711. At this time, we do not have an ETA on the completion and implementation of this PIF, but we do believe that it will be soon. We apologize for any inconvenience this has caused for you as you are working through your Attestation.

214.   Leading up to and during this time period, Medhost certified the following versions of its software as to CDS on the following dates:

- Enterprise v12.0 and v3.0 on November 14, 2013, CHP-021298

- Enterprise 2014 R1 on February 20, 2014, CHP-022018

- Enterprise 2014 R1 on February 20, 2014, CHP-022017

- Enterprise 2014 R1 on May 19, 2014, CHP-022965

- Enterprise 2014 R1 on May 19, 2014, CHP-022966

- Enterprise 2014 R2 on August 28, 2014, CHP-023895

- Enterprise 2014 R1 on August 28, 2014, CHP-023897

- Enterprise 2014 R2 on August 28, 2014, CHP-023891

- Enterprise 2014 R1 on August 28, 2014, CHP-023893

- Enterprise v12 on August 28, 2014, CHP-023890

- Enterprise v12 and v3 on August 28, 2014, CHP-023889

68

215.    As of late December 2014, Medhost still had two software enhancement requests (PIRs) open to address the issue, even though it had again recently certified its Enterprise software as to CDS, on August 28, 2014. Vice President and Deputy CIO Jay Skibinski maintained the PIR list from November 2014 onward. Mr. Skibinski was in charge of prioritizing the requests, where enhancement requests to fix CDS reporting were prevalent.

### 2.    CHS Falsely Attested That It Met Meaningful Use Requirements for Clinical Decision Support

216.    The 2011 edition of Meaningful Use required that EHRs must "[i]mplement automated, electronic clinical decision support *rules* (in addition to drug-drug and drug-allergy contraindication checking) based on the data elements included in: problem list; medication list; demographics; and laboratory test results." The EHR must also "[a]utomatically and electronically generate and indicate in real-time, notifications and care suggestions based upon clinical decision support rules. 45 C.F.R. § 170.306(c).

217.    As discussed above, the 2014 edition of Meaningful Use required that EHRs must "[i]mplement automated, electronic clinical decision support rules (in addition to drug-drug and drug-allergy contraindication checking) based on the data elements included in: problem list; medication list; demographics; and laboratory test results." 45 C.F.R. § 170.314(a)(8).

218.    For Stage 1, CMS required that Eligible Professionals and Eligible Hospitals "Implement one clinical decision support rule relevant to specialty or high clinical priority along with the ability to track compliance with that rule." *See* 42 C.F.R. § 495.6(d)-(e).

219.    For Stage 2, CMS stated that Eligible Professionals and Eligible Hospitals must "[i]mplement five clinical decision support interventions related to four or more clinical quality measures at a relevant point in patient care for the entire EHR reporting period. Absent four clinical quality measures related to an EP's scope of practice or patient population, the clinical

69

decision support interventions must be related to high-priority health conditions." *See* 42 C.F.R. § 495.6(d)-(e).

220.    CHS falsely attested that it met the CDS Meaningful Use measures for Stage 1 and Stage 2.  In Stage 1, CHS did not implement Medhost's rules engine and falsely attested to Meaningful Use compliance on the basis of a software feature that resembled, but was not, a CDS intervention.  In Stage 2, CHS attested to Meaningful Use compliance despite the fact that Medhost's rules engine had not triggered CDS interventions during the reporting period.  To conceal its failure to meet a core objective of the program, CHS took the position in its attestations that the static order sets it had built into the EHR met the requirements for CDS, when it knew they did not.

> *(a)    CHS's Use of the Fall Risk Assessment Failed to Meet the CDS Objective in MU Stage 1*

221.    For a CDS rule to count towards Meaningful Use, it needed to be automated, based on patient specific data, and provide a notification. The CDS "workaround" that CHS hospitals relied on to attest during MU1 did not complete any of these functions. In Medhost's EHR, the CDS rules engine is designed for use with the CPOE application.  Because CHS did not implement CPOE in Stage 1 (it was not yet a core objective), it did not program a single CDS intervention using Medhost's rules engine.  Despite not using the CDS functionality in Medhost's EHR, CHS attested to meeting the objectives and measures for CDS on the basis of a "workaround," which was to cite an unrelated function of the EHR—a protocol that nurses used to perform fall risk assessments—as though it were a CDS.

222.    In late 2011 or early 2012, CHS distributed a guide to instruct nurses on the workflow for the fall risk "intervention."  Under the workflow, nurses were responsible for identifying the need to perform a fall risk assessment on the patient.  Once the nurses decided to

598012.1

perform the assessment on a patient, they were to select the assessment in the EHR, which would display a series of quantitative questions based on a common method to calculate fall risk. The nurses were to assign a score for each question.  At the end of the assessment, the software would automatically total the scores, producing a single "Fall Risk" score that it displayed in an output field entitled "Score Total."

223.    At this point, in a step CHS's fall risk intervention guide described as "mandatory for the Meaningful Use requirements," the software would display a window in which the nurse would select a checkbox indicating whether the Score Total was more or less than 25.  If the nurse selected the checkbox for a score less than 25, the assessment ended.  If the nurse selected the checkbox for a score over 25, the EHR prompted the nurse to select a care plan for the patient from a list (one of the plans the nurses could choose was "fall risk").  The nurse then had to manually add the care plan to the patient's profile.

224.    Thus, CHS fabricated a CDS "intervention" by creating an extra, unnecessary step in the nurses' workflow concerning fall risk assessments, indicating to the nurse that a score under 25 did not require further action while a score over 25 warranted the selection of a care plan.

225.    This fall risk "intervention" did not meet the requirements for the CDS measure, as it did not use computable information from the problem list, medication list, demographics, or laboratory test results. Instead, all of the information used to determine a fall risk score came from the nurse manually entering data. Moreover, the fall risk "intervention" did nothing to improve the quality, safety, or efficiency of patient care.  Because CHS's workaround did not constitute a CDS rule under the Meaningful Use program, CHS did not meet the core objective and measure for CDS in Stage 1, and its attestations of Meaningful Use were false.

226.    CHS knew that the fall risk assessment workaround did not meet the objective and measure for CDS.  As one CHS employee explained:

> For stage 1 we did not have any actual CDS rules built [in the Medhost rules engine] because CPOE was not active.  So, what we did was, we used the Nursing Fall risk assessment within Pt care.  When a nurse completed the fall risk assessment then the assessment would prompt the nurse to create a risk specific care plan based on the fall risk score.

227.    In addition to the assessments not constituting "actual CDS rules" within the EHR, CHS knew that it lacked the ability to track providers' compliance with the "intervention" in the assessments, which was also an objective required by CMS under MU1. The ability to track compliance with the CDS rule meant that hospitals were required to track not only how many times a CDS rule was executed creating a recommended care plan, but additionally how many times an Eligible Professional complied with the recommended care plan. For example, if a nurse performed 100 risk assessments and 40 of those had a risk score greater than 25, CHS should have been able to track how many times a nurse followed through on a care plan consistent with the risk.

228.    On April 8, 2014, Lisa Fitts, CHS's Clinical IS Team Lead—Physical Tools, emailed several CHS employees about their efforts to map the workaround to a CDS audit report, which would enable CHS to determine if the "intervention" was operative.  In her email, Ms. Fitts wrote: "It does not sound like the care plan would be captured on a CDS audit report.  I say this because I don't know that a care plan can be designated as a CDS rule [in the rules engine]." CHS's inability to track compliance with the CDS rules further demonstrates that CHS did meet the core objective and measure for CDS in Stage 1, and its attestations of Meaningful Use were false.

72

229.    The CHS hospitals listed in Exhibit B attested during Stage 1 using this CDS workaround.

***(b)    CHS's Use of Static Order Sets Failed to Meet the CDS Objective in MU Stage 2***

230.    CHS developed five CDS interventions using Medhost's rules engine in advance of the Stage 2 reporting period.  Many of CHS's hospitals were scheduled to have a 90-day attestation period from July 1, 2014 through September 30, 2014 with attestation occurring on October 1, 2014. At this wave of hospitals, the required five interventions had been programmed into the system.

231.    As discussed in paragraphs 205–215 above, the CDS rules engine failed at CHS's Medhost hospitals in the middle of this attestation period, around August 14, 2014.

232.    Within its corporate offices, CHS acknowledged that it could not attest to meeting the core objective during the attestation period because its rules engine had been broken for much of it.  In a September 24, 2014 email to CHS management, CHS Director of Information Systems Teri Mitchell wrote that "we can't attest" if the CDS rules were not firing.

233.    CHS, however, was unwilling to forego incentive payments for the hospitals, and decided to attest to meeting the CDS objective even though the hospitals had been incapable of using CDS for much of the attestation period.  As in Stage 1, CHS turned to a "workaround" to support its attestations.  The "workaround" was primarily developed by Director of IT Internal Audit and Compliance Kristi Meyer and Senior Manager of Physician Tools Tim Moore, while individuals such as CHS Senior Vice President and CIO Manish Shah, Director of Clinical Systems Gary Fritz, and Chief Medical Information Officer Anwar Hussain all were aware of the inability to reach the CDS objective and the proposed "workaround" plan. Ms. Meyer and Mr. Moore were aided in developing and implementing the CDS "workaround" by Director of

73

Clinical Informatics Connie Senseney and Senior Director of Operations Meagan Strawhacker. Product Manager of Physician Tools Lisa Fitts worked directly with Relator Neiman to implement the Medhost Stage 2 product with a focus on the CDS "workaround."  In this instance, CHS submitted attestations on the basis of static order sets.  CHS selected five order sets that related to four or more clinical quality measures and treated them as CDS interventions for purposes of its attestations.

234.    CHS's order sets did not meet the requirements for CDS functionality.  Unlike a CDS intervention, the content of the order sets was static and did not change or trigger alerts based on the patient's problem list, medication list, demographics, vital signs, or lab results.  The EHR also did not suggest particular order sets to providers based on patient information. Instead, providers had to choose the order sets manually from a wider list of available order sets in the system.  Consequently, the order sets did not meet the objectives or measures for CDS.

235.    On October 3, 2014, after the attestation period had ended, Relator Neiman was directed by CHS Senior Manager of IT Internal Audit and Compliance Kristi Meyer to ensure that the order sets were installed at the hospitals in the attestation wave:

> Meagan and Connie agree that the [order set] extract is exactly what we need as a starting point. We will use that extract for the Medhost hospitals to validate we have 5 that apply for CDS Rules.
>
> Can you help run these for us for every 7/1 [first wave] Stage 2 site?

236.    On October 6, 2014, a week after the end of the reporting period for the hospitals, Ms. Meyer realized that several of the hospitals did not have the five order sets that they intended to use for attestation. She asked Relator Neiman to investigate.

> [A]fter reviewing the evidence, we identified 8 hospitals that only had 3 of the "approved" order sets active the entire time. Therefore, could your team provide us with a listing of all active order sets from 7/1-9/30 for those 8 hospitals? Based on your output, we will work with OPS to determine the other order set to use for attestation.

74

237.    Three weeks later, on October 30, 2014, Ms. Meyer sent another update regarding the issue, stating that the eight facilities mentioned were still in "limbo," lacking sufficient order sets for attestation. She subsequently determined to add the fall risk assessment, which CHS had relied upon for Stage 1, as a final intervention. On November 1, 2014, wave 1 CHS hospitals submitted attestations to CMS using order sets.

238.    The CHS hospitals listed in Exhibit B attested during the attestation periods discussed above using this CDS workaround.

**D.    Medhost Enterprise Failed to Meet Certification Requirements for e-Prescribing**

239.    Enterprise did not meet the requirements for certification for electronic prescribing.

240.    For 2014 edition software, certified EHR technology was required to "[e]nable a user to electronically create prescriptions and prescription-related information for electronic transmission in accordance with" two standards:  NCPDP SCRIPT version 10.6 and RxNorm. 45 C.F.R. § 170.314(b)(3).  "The use of RxNorm as the sole vocabulary standard would entail its use to represent medications within an electronic prescription formatted according to the SCRIPT 10.6 standard."  77 Fed. Reg. 54163, 54199 (Sept. 4, 2012).

241.    Beginning on June 13, 2013, Medhost sought and received certification of multiple versions of Enterprise for the e-prescribing function:

| Software | CHPL ID | Edition | Certification Date |
|---|---|---|---|
| Enterprise v12 | CHP-019567 | 2014 | 6/13/2013 |
| Enterprise v12 | CHP-021296 | 2014 | 11/14/2013 |
| Enterprise v12.0 & v3.0 | CHP-021298 | 2014 | 11/14/2013 |
| Enterprise 2014 R1 | CHP-022018 | 2014 | 2/20/2014 |
| Enterprise 2014 R1 | CHP-022017 | 2014 | 2/20/2014 |
| Enterprise 2014 R2 | CHP-023895 | 2014 | 8/28/2014 |

75

| Software | CHPL ID | Edition | Certification Date |
|---|---|---|---|
| Enterprise 2014 R1 | CHP-023897 | 2014 | 8/28/2014 |
| Enterprise 2014 R2 | CHP-023891 | 2014 | 8/28/2014 |
| Enterprise 2014 R1 | CHP-023893 | 2014 | 8/28/2014 |
| Enterprise v12 | CHP-023890 | 2014 | 8/28/2014 |
| Enterprise v12 and v3 | CHP-023889 | 2014 | 8/28/2014 |
| Enterprise 2014 R2 SR3 | CHP-025317 | 2014 | 2/26/2015 |
| Enterprise 2014 R2 SR4 | CHP-027642 | 2014 | 6/25/2015 |
| Enterprise 2015 R1 SR1 | CHP-028970 | 2014 | 12/30/2015 |
| Enterprise 2015 R1 SR2 | CHP-029180 | 2014 | 3/3/2016 |
| Enterprise 2016 R1 | 14.04.04.2788.MEDH.16.01.1.160616 | 2014 | 6/16/2016 |
| Enterprise 2016 R1 SR1 | 14.04.04.2788.MEDH.CO.01.1.161006 | 2014 | 10/6/2016 |

242.    For each version it caused to be certified, Medhost relied on outside e-prescribing software, DrFirst Rcopia, for e-prescribing certification.  Physicians who sought to create and transmit a prescription electronically had to access Enterprise to create the prescription and DrFirst to transmit the prescription to a pharmacy.

243.    Medhost Enterprise did not enable users to create and transmit electronic prescriptions in accordance with ONC requirements.  When users created a prescription electronically using Medhost Enterprise, the information in that prescription often would not cross over to DrFirst and thus be transmitted to the pharmacy.  In other cases, the information that crossed over to DrFirst would be different than the information in the prescription the user had created in Enterprise.  Because the prescription a user created would not necessarily reflect the prescription transmitted to the pharmacy, Medhost Enterprise lacked the functionality necessary to be eligible for certification for e-prescribing.

76

244.     CHS tested Medhost Enterprise's e-prescribing function between 2014 and 2016 and determined not to implement it because of its unreliability.  In early 2014, Relator Neiman attended a meeting at Medhost intended to demonstrate Medhost Enterprise's e-prescribing feature to a large audience of CHS managers.  Medhost's demonstration revealed, however, that medication information recorded for a patient in Medhost Enterprise sometimes would not appear for the patient in DrFirst.

245.     Beginning in approximately June 2015, Relator Lewis attended regular meetings between CHS and Medhost to discuss product issues.  In one meeting in September or October 2015, CHS's Jay Skibinski reported that CHS had tested Medhost Enterprise's e-prescription feature and determined that it did not function properly.  According to Mr. Skibinski, CHS found that prescriptions created using the feature could be inaccurate and that medications did not cross from Medhost Enterprise to DrFirst accurately.  Based in part on that assessment, CHS did not implement Medhost Enterprise with DrFirst for e-prescribing.

246.     In approximately April 2019, Medhost disclosed to ONC that two versions of Medhost Enterprise, 2017 R2 and 2018 R1, failed to transmit RxNorm codes in electronic prescriptions as required.  Encouraging the use of RxNorm, which assigns a unique code to medications, was a "primary purpose" of ONC in designing the certification for e-prescribing, *see* 77 Fed. Reg. 54163, 54177 (Sept. 4, 2012), which was intended to "promote[] efficiency and safety through reduced communication errors."  *See* 77 Fed. Reg. 13698, 13710 (March 7, 2012). If prior versions of Medhost Enterprise had created and transmitted RxNorm codes in electronic prescriptions as required, the issues that CHS discovered in 2014 and 2015 with mismatched medication information between Medhost Enterprise and DrFirst could not have occurred.  The inability of Medhost Enterprise to create and transmit electronic prescriptions accurately in 2014

77

and 2015 is consistent with a failure to represent medications using RxNorm, as required for certification.

247.    Medhost knew that Medhost Enterprise was incapable of creating and transmitting electronic prescriptions accurately no later than early 2014, when its meeting with CHS laid bare the lack of functionality in its product.  Medhost therefore knew that its requests for certification were false because its product was ineligible for certification.

E.    **Medhost Falsely Certified Its Software As to the Meaningful Use "Auditable Events and Tamper-Resistance" Objective**

248.    Under the 2014 edition criteria, 45 C.F.R. § 170.314(d)(1) provides in part that complete EHRs or EHR Modules must include the capability to "(i) [v]erify against a unique identifier(s) (e.g. username or number) that a person seeking access to electronic health information is the one claimed" and "(ii) Establish the type of access to electronic health information a user is permitted based on the unique identifier(s)."   In addition, Section 170.314(d)(2) provides that complete EHRs or EHR modules must, inter alia, "[r]ecord actions related to electronic health information…." In addition, "[w]hen disabling the audit log is permitted…. The ability to do so must be restricted to a limited set of identified users."

249.    Medhost's EHR Software failed to meet the requirements of the Auditable Events and Tamper Resistance objective.   Notwithstanding the requirements of 170.314(d)(1)-(2), Medhost's EHR software allowed all users to access, view, and modify patient and other electronic health information, and to do so without an audit record.

250.    Healthcare providers, including at CHS, that used Medhost's clinical and/or financial software did so with user interfaces designed by Medhost.  Much of the operation of the software, as well as the storage of patient and financial data, occurs on AS400 servers that run

78

the back-end portion of Medhost's software. These servers also store all of the patient and other financial data used and generated by Medhost software in various database tables.

251.    Medhost's software allows all users the full ability to both access and change all the underlying data tables stored on the AS400 servers, and under some circumstances lacks any capability to log or audit such actions.

252.    The vulnerability arises from the way Medhost software handles "objects" on the back-end servers.  By design, for Medhost's clinical software to be able to access data in the data tables on behalf of users, the data tables are configured with a setting: "Public Authority *all". This setting allows access to the data tables for any individual with Medhost credentials and allows both viewing and changing of the data.

253.    Due to this method of object handling, any user can use FTP, ODBC, or JDBC connections to view and modify the data tables.  In addition, any access or changes made to data table using these methods will not be captured by Medhost's audit logging.  Due to these security vulnerabilities, Medhost was ineligible for certification to the auditable events and tamper-resistance criteria.

254.    CHS was aware of this issue since at least 2009, when CHS employee Jim Berryhill described the issue to Relator Lewis.  The issue continued to exist through at least August 2015, when Manish Shah convened a meeting with Relator Lewis and others to discuss how to address the issue.  Medhost, meanwhile, knew about the issue no later than October 2014.

F.    **CHS Falsely Attested That Its HMA Hospitals Met Meaningful Use Requirements**

255.    In January 2014, CHS acquired Health Management Associates ("HMA"), a competing for-profit hospital chain.  The transaction expanded CHS's hospital network from 135 to 206 facilities.

79

256.     The hospitals that CHS acquired from HMA (the "HMA hospitals") used modular EHR technologies.  As discussed above in paragraphs 97–100, eligible hospitals may combine EHR modules to meet the definition of certified EHR technology, provided they ensure that the modules are integrated properly and capable of enabling users to perform the functions required of certified EHR technology.

257.     The EHR modules that the HMA hospitals deployed during the Stage 2 reporting period were not integrated properly and were incapable of performing the functions required of certified EHR technology.

### 1.     HMA Hospitals Attested That They Met Meaningful Use

258.     Sixty of the HMA hospitals submitted Meaningful Use attestations during Stages 1 and/or 2 and were paid a total of $206 million in incentive payments. Exhibit B provides the details of these hospitals, their attestation dates, and the incentive payments.

### 2.     CHS Falsely Attested That Its HMA Hospitals Met the Meaningful Use Interoperability Requirements for Modular EHRs

259.     Despite relying on multiple EHR technologies for patient care, the HMA hospitals that CHS acquired in January 2014 failed to integrate the technologies so that the clinical information stored in one system was reliably accessible to the other systems, as required for HMA to meet requirements for demonstrating Meaningful Use.  In particular, the HMA hospitals did not develop key software interfaces—protocols by which the applications could exchange information—that would allow the hospitals to transfer information on medication orders electronically from one department to another.  Without the interfaces, providers could not move a patient from one EHR module to another without printing the patient's medical record and entering the contents by hand into the new module. Both CHS Senior Vice President and Chief Information Officer Gary Seay and President of Division VI Operations Bill Hussey were aware

of the lack of interface between software modules that forced healthcare providers to depend on printed copies of patient records.

> ### (a)    HMA Hospitals' Emergency Department Software Did Not Interface With the Hospitals' Inpatient Software

260.    The hospitals' emergency department information system, Medhost EDIS, did not interface with the hospitals' inpatient EHR system, PULSE, to transmit information on medication orders.  The only patient data that is shared between the EDIS and PULSE systems without manual input is demographic information, billing information, laboratory orders and results, and radiology orders, and results.

261.    All other essential patient data would be transferred from the Emergency Department ("ED") to the inpatient facility via printed copies of patient records. These records, printed from the EDIS system, would then be hand typed into the PULSE system.  After a patient is discharged from the Emergency Department ("ED") into the hospital's inpatient facility, the EDIS system would implement a "chart lock" that would last typically between 12 and 24 hours. For the duration of the "chart lock", the ED personnel has the ability to amend and finalize the patient's medical record. After the "chart lock" period has expired, the EDIS system generates a patient "report" in PDF format.  To transfer information from EDIS to PULSE, an ED staff member would print out the PDF formatted patient "reports", compile them into a binder, and then bring the information to a staff member on the inpatient side of the hospital.  An inpatient staff member would manually transfer the information in the binder into the PULSE system. During the admission process, which would happen prior to the end of the "chart lock" period, the admitting nurse would receive a condensed patient file from the ED via fax known as Situation, Background, Assessment, and Recommendation ("SBAR"). This meant that patients were admitted into inpatient facilities before receiving a full patient record from the ED, and the

full patient record would be eventually entered manually, introducing a risk of transcription errors that would not exist with an integrated, electronic system.

> **(b)** **HMA Hospitals' Inpatient Software Did Not Provide a Medication Order Interface With the Hospitals' CPOE Application**

262.    PULSE did not provide a medication order interface with the hospitals' CPOE application, PatientKeeper.  At the HMA hospitals, physicians entered medication orders using a proprietary application called the Medical Access Portal ("MAP").  When a physician created an order using MAP, the application would communicate the order to PatientKeeper via a software interface.  Nurses at the HMA hospitals used PULSE for their workflows and did not have access to MAP or PatientKeeper.   There was no interface to communicate information from PatientKeeper to PULSE, which prevented nurses from viewing the medication orders in the patient's EMR.  When physicians signed medication orders, the hospitals had to print the orders in the appropriate hospital department for review by the nursing staff. The admitting physician would also need to re-enter medication orders initially placed in the ED to PatientKeeper if the physician wanted to continue or modify the medications prescribed in the ED.  The admitting nurse, physician, or pharmacist would closely inspect the printed medication orders to determine the last administration of medications given to patients in the ED as to avoid any overdosing. Because the problem affected every medication order entered in the hospital, the HMA hospitals programmed PatientKeeper to print medication orders automatically.   Therefore, the HMA hospitals did not have a CPOE process that was truly electronic and therefore lacked the functionality necessary to meet the requirements of the CPOE measure.

> (c)   **HMA Hospitals' CPOE Application Did Not Interface With Its Pharmacy Management System**

263.    The HMA hospitals lacked an interface from PatientKeeper to their pharmacy management system, Horizon Meds Manager ("HMM").  When a physician entered a medication order, the order would not appear in HMM.  Instead, PatientKeeper would generate an email to the pharmacist, who would have to transcribe the contents of the email into HMM.  Manually copying medication order information from PatientKeeper to HMM increased the risk of medication errors.  Moreover, it made the hospitals' Meaningful Use reporting less accurate, as pharmacists who received orders via email had to guess whether those orders originally had been entered using CPOE.

264.    Because PULSE did not communicate with Medhost EDIS or PatientKeeper, and because HMM did not communicate with PatientKeeper, the HMA hospitals were unable to safely and reliably maintain patients' problem lists, active medication lists, and medication histories for the duration of the patient's entire hospitalization, as required for Meaningful Use.

> **3.    CHS Falsely Attested That Its HMA Hospitals Met Meaningful Use Medication Reconciliation Requirements**

265.    As discussed in paragraph 130 above, EHRs were required to enable a user to electronically reconcile the data that represent a patient's active medication, problem, and medication allergy list.

266.    CMS's Stage 1 and Stage 2 objectives for Medication Reconciliation, as articulated in 42 C.F.R. § 495.6(d)–(g) and 42 C.F.R § 495.6(j)–(m), was that the provider who "receives a patient from another setting of care or provider of care or believes an encounter is relevant should perform medication reconciliation."

267.    CMS's corresponding Stage 1 and 2 measures required that medication reconciliation must have occurred for more than 50% of transitions of care in which the patient is

83

transitioned into the care of the Eligible Professional or admitted to the eligible hospital's inpatient or emergency department.

268.   To be certified to the 2011 and 2014 Edition certification criteria, CMS further requires that EHRs be capable of automatically and electronically triggering evidence-based decision support interventions based on certain patient data stored in the EHR system, including a patient's problem list, medication list, medication allergy list, demographics, lab results, or vital signs.

269.   However, the lack of interoperability of EHR modules at HMA hospitals prevented users from using EHR technology to reconcile clinical information.  The HMA hospitals store active medication lists, problem lists, and medication allergy lists in PULSE. Physicians do not have access rights to PULSE.  Physicians also cannot access the information in PULSE indirectly because their applications—MAP and PatientKeeper—do not interface with PULSE.  For physicians to reconcile the clinical information in PULSE with clinical information from other sources, a nurse must print the patient's medication reconciliation form for the physician to complete by hand.  Once the form is complete, the nurse must manually re-enter the contents of the form into PULSE.

270.   Physicians could not electronically reconcile the clinical information in PULSE and did not meet CMS's requirement that they do so at least 50% of the time. Therefore, the HMA hospitals did not meet the requirement that providers safely and reliably electronically reconcile a patient's active medication list at admission and other relevant encounters.

271.   Because the EHR modules at the HMA hospitals lacked the functionality necessary to meet CMS requirements for certified EHR technology, the hospitals were ineligible for incentive payments under the Meaningful Use program.  Despite their ineligibility, 60 of the

HMA hospitals submitted Meaningful Use attestations during Stages 1 and/or 2 and were paid a total of $206 million in incentive payments, as Exhibit B details.

### 4. CHS Knew That the HMA Hospitals Would Not Be Able to Truthfully Attest to Meaningful Use

272. CHS knew that the EHR technology at the HMA hospitals was seriously flawed. Prior to its acquisition, HMA hired a consulting firm, Accenture, to evaluate HMA's readiness to meet Stage 2 requirements. In a December 3, 2013 report, Accenture warned that "HMA's complex application portfolio results in excessive potential points of failure and limits key functionality." One of the failure points Accenture identified was the processing of medication orders, which it found were "highly fragmented involving duplicate data entry and manual workarounds that increase the potential for errors." Accenture noted that "[t]he number of order entry systems and complex set of clinical workflows that have been created increase the opportunity for more gaps in care and patient safety risks."

273. Due in part to these flaws, Accenture concluded that HMA was not close to meeting Stage 2 requirements. It found that HMA had deployed PatientKeeper at only 32 of its 71 hospitals and was not scheduled to complete deployment at the remaining hospitals until May 27, 2014. Accenture also found that "Clinical Decision Support, a key functionality of MU Stage 2, is currently not implemented in MAP nor evident in product roadmap." Accenture warned that "[t]he fragmentation of applications, workflows and clinical processes impacts patient safety and potentially creates significant financial risks (MU Stage 2 and HIPAA compliance)."

274. In a subsequent report to CHS dated January 6, 2014, Accenture found that significant applications remained in development. PULSE, for example, lacked functionality for transitions of care, data portability, consolidated clinical document architecture ("C-CDA"), and

interfaces with other applications.  Accenture wrote that PULSE was "still in the planning phase" for C-CDA and "still in development and testing" for integrating CDS with other EHR modules. For transitions in care, Accenture found that PULSE's "business requirements for this functionality are still in review," while "[i]nterfaces for vendor software such as MEDHOST, Patient Safe Systems and Medicity need to be developed."  For the HMA hospitals to attest to Meaningful Use in Stage 2, Accenture advised that CHS deploy the applications no later than April 1, 2014, leaving only three months to develop core functionality from scratch.

275.    Despite knowing that the HMA hospitals lacked the functionality necessary for meaningful use, CHS decided it would be too costly to convert the hospitals to a different EHR system.  Even before completing the acquisition, however, CHS and HMA reduced the number of the developers responsible for PULSE and MAP and did not allocate other resources to developing the applications.  As a result, CHS did not develop the functionality needed to meet Stage 2 requirements and the problems that Accenture had identified prior to the HMA acquisition persisted through the Stage 2 reporting period and beyond.

276.    The HMA hospitals knew that their EHR systems lacked required functionality and alerted CHS to the problems.  In June 2015, for example, Relator Lewis joined two of the leaders of CHS's deployment team, Mr. Yzerman and Mr. Hernandez, on a visit to Midwest Regional Medical Center, an HMA hospital located in Midwest City, Oklahoma.  CHS Project Chief Nursing Officer Dana Steffer accompanied the deployment team and remained heavily involved with the patient safety aspects of PULSE at Midwest Regional after the initial visit. CHS had received numerous complaints from the hospital about PULSE's cumbersome workflows, unsafe functionality, and unstable infrastructure, with physicians threatening to no

86

longer refer patients to Midwest Regional if the problems continued.  The purpose of the visit was to evaluate whether to transition Midwest Regional to a different EHR system.

277.    During the visit, physicians told the CHS executives that the hospital was relying on paper to bridge its disparate EHR systems and that this "hybrid system" posed a significant safety concern.  The physicians said that the lack of an integrated EHR system with modules that could communicate with one another forced the hospital to print and re-enter chart information whenever patients were admitted from the ER or transferred from one department to another. The physicians also said that the hospital was forced to chart medications on paper at the same time it was using PULSE to administer medications.  The physicians warned that if there was an error or delay in entering a medication order from a paper chart into PULSE, a nurse using the hospital's eMAR system could miss the medication order or administer a duplicate dose.

278.    Physicians in the cardiology department, meanwhile, identified medication reconciliation as a "huge patient safety concern" that they feared would "kill a patient."  One cardiologist told the CHS executives that physicians were using paper to reconcile medication lists because they did not have access to PULSE and that nurses were entering the completed reconciliation forms into PULSE by hand.  According to the cardiologist, physicians had caught errors in the re-entered forms that would have sent patients home with the wrong drugs, doses, or instructions.  The cardiologist said that physicians at Midwest Regional required nurses to print the re-entered forms so that they could check for such errors.

279.    In meetings at Midwest Regional attended by Relator Lewis, the CFO of Midwest Regional Brandon Bullard and Midwest Regional NP and PULSE champion Calli Landes reported many specific concerns about PULSE in relation to patient safety. Mr. Bullard was directly involved with the hospital's Meaningful Use attestation and may have signed the

attestation packet submitted to the government. In one meeting, Mr. Bullard expressed significant frustration regarding the PULSE system, and threatened to leave the Midwest City facility if the PULSE failures were not resolved immediately.

280. At the time of the visit, Midwest Regional had attested to its meaningful use of certified EHR technology on four occasions and received $5.95 million in Meaningful Use incentive payments from the Government. Because Midwest Regional had never implemented EHR technology that met CMS's certification requirements, each of the hospital's attestations had been knowingly false. While the Midwest Regional provides an effective example of knowingly false Meaningful Use attestations, the substantial integration gaps between modules such as PULSE, Patient Keeper, and HMM were not isolated to the Midwest Regional facility. CHS Vice President of IT Byung Kang, along with Vice President of Data Analytics Gowri Muthumalai had direct and substantial knowledge of PULSE failures across many CHS facilities, including Midwest Regional.

### G. Medhost Illegally Provided Free Software to Induce CHS to Purchase Medhost's EHR Software

281. CHS's use of Medhost's software was partly the result of illegal kickbacks. No later than 2013, Medhost began to provide CHS with free financial software for the purpose of inducing CHS to purchase full licenses of its EHR software suite. The financial software, known as Medhost Enterprise Financials ("Medhost Financials"), is a suite of financial applications, capable of performing hospital accounting, billing, and other management functions. The products include Accounts Payable, General Ledger, Materials Management, Payroll/Human Resources, Patient Accounting, and Health Information Management applications. A license for Medhost Financials is worth approximately $250,000. Medhost provided free licenses to at least 19 CHS hospitals, totaling kickbacks with a value of over $4,750,000.

282.    For nearly three decades prior to the kickback scheme, CHS had used—and paid for—the Medhost financial software at most of its hospitals.

283.    Medhost initiated the illegal kickback scheme at the same time it expanded the Medhost Enterprise software suite to include Medhost's clinical package, which CHS later used to attest to Meaningful Use.  It offered to provide Medhost Financials for free to all CHS hospitals, both those that utilized the full Medhost Enterprise EHR suite and those that used third-party EHRs, to induce CHS to deploy the clinical package.  For each hospital, Medhost only required that CHS pay approximately $137,000 for accompanying software products and interfaces, including Advanced Security, eArchive, Insurance Eligibility, and SSI Electronic Billing.

284.    CHS knew that Medhost's offer of free product was intended to induce it to purchase EHR software.  During the relevant time period, Relators both worked as direct reports to Steve Hernandez, CHS's Senior Director of Information Systems, who was responsible for finalizing software pricing with Medhost.  During that time, it was commonly known and discussed among CHS employees that Medhost's offer was intended to induce CHS to continue doing business with Medhost and, specifically, to purchase Medhost Enterprise.  Even for CHS hospitals that continued to use third-party EHRs, Medhost's goal was to maintain a software presence at the hospitals to increase the likelihood that CHS would convert those hospitals to the Medhost EHR in the future.

285.    In September 2015, CHS entered into an agreement with Medhost to pay $25 million to Medhost to convert ten (10) Tier-1 facilities to software and services offered by Medhost and purchase Medhost's surgical software suite, Perioperative Information Management

System ("PIMS"), for all CHS Medhost facilities.  As part of the PIMS purchase, CHS and Medhost entered into a side-agreement whereby CHS obtained equity in Medhost.

286.    Relator Lewis was involved in discussions related to the purchasing of the PIMS software and the Tier 1 hospital conversions in September and October 2015.  In such discussions, he was informed by Mr. Hanson, that Larry Cash was interested in executing the PIMS and Tier 1 conversion deal in order to take advantage of a $25 million equity exchange that Medhost offered CHS.  The PIMS / Tier 1 conversion purchase paperwork that Relator Lewis reviewed only referenced payment from CHS to Medhost for the software purchase.  None of the PIMS / Tier 1 purchase documents that Relator Lewis reviewed included any reference to a $25 million equity exchange.  Yet, Mr. Hanson informed Relator Lewis that Mr. Cash insisted on completing the $25 million PIMS / Tier 1 conversion in order for CHS to obtain $25 million in equity in Medhost.

287.    Medhost additionally regularly offered discounts to CHS for its software and maintenance to induce CHS to continue to purchase its software.  Gary Seay was also aware of these negotiated discounts for future business agreements between CHS and Medhost.  Doug Hanson continually questioned why CHS insisted on spending capital on Medhost.  In late 2016, a CHS hospital in Key West converted its EHR system from PULSE to Medhost. Mr. Hanson questioned the decision as CHS could have implemented a superior product for an equivalent or lesser price.

288.    On multiple occasions, CHS corporate leadership chose the Medhost EHR for hospitals over the objection of CHS implementation and hospital staff, who were concerned about the Medhost EHR's poor track record and a strong preference by doctors for other EHRs that were of similar cost.  The explanation that CHS gave to Relators and other employees was

that CHS needed to "take care of its friends," referring to Medhost, and "make sure they get some business." For example, Medhost Senior Vice President of Corporate Accounts Ken Williamson frequently took CHS Chief Financial Officer Larry Cash to play golf where the PIMS software purchase from Medhost and other Medhost software purchases for CHS were negotiated.

289.    The EHR technologies that CHS acquired from Medhost are funded in part by Medicare and Medicaid through the EHR incentive programs.

## VI.    **Defendants Violated the False Claims Act**

290.    Medhost knowingly misrepresented to customers and to Drummond Group, acting on behalf of the government as an authorized certification body, that its EHR products satisfied federal Meaningful Use requirements. Medhost had actual knowledge, or at least acted in reckless disregard of the truth, that its software did not satisfy the federal Meaningful Use requirements.

291.    Medhost's misrepresentations foreseeably caused Drummond to certify its software. Medhost's misrepresentations also foreseeably caused customers, including CHS, to purchase its EHR technology.   The misrepresentations also foreseeably caused the purchasers to attest to compliance with Meaningful Use requirements when they were not in compliance with those requirements, and foreseeably caused the purchasers to submit claims to the Federal Government for EHR incentive payments to which they were not entitled.   In this manner, Medhost knowingly caused false claims, and false statements material to false claims, to be submitted to the Government.

292.    Medhost has caused federal Meaningful Use incentive payments to be paid for its EHR system even though its software does not meet fundamental requirements for certification

91

and attestation as defined by the Meaningful Use criteria.  These standards for performance are core requirements for any EHR system.  Every claim for payment submitted to the Government for incentive payments for use of EHR software that does not the requirements for Certified EHR Technology or Meaningful Use requirements is a false or fraudulent claim in violation of the FCA.

293.    CHS knew that Medhost's EHR technology did not meet the requirements for Certified EHR Technology or Meaningful Use requirements.  CHS and CHS hospitals knowingly presented and caused to be presented submission of false claims to the Government for EHR incentive payments to which they were not entitled.  CHS and CHS hospitals also presented and caused the presentment of false attestations of compliance with Meaningful Use requirements, which were material to their false claims for EHR incentive payments.

294.    CHS knew that the modular PULSE EHR software used by the former-HMA hospitals also did not satisfy Meaningful Use requirements.  CHS and the former-HMA hospitals knowingly presented and caused the presentment of false claims, and made and caused to be made false records and statements material to false claims, for EHR incentive payments to which they were not entitled.

295.    By arranging for Medhost to provide CHS with valuable financial software for free in return for CHS's purchase of full licenses of Medhost's EHR software suite, Medhost and CHS knowingly and willfully offered and accepted unlawful remuneration in violation of the AKS.  Compliance with the AKS is material to the Government's decision to pay the claims that CHS submitted for payment or approval under the Meaningful Use program.  All claims made to the Government under the Meaningful Use program as a result of services tainted by these unlawful payments are false and/or fraudulent within the meaning of the FCA.

296.    Through the conduct discussed above, the Defendants knowingly caused the submission of false claims and false statements material to false claims to be submitted to the Government in violation of the False Claims Act.

**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A), (B), (C), & (G)**

297.    Relators reallege and incorporate by reference the allegations contained in paragraphs 1 through 296 above as though fully set forth herein.

298.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

299.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

300.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

301.    By virtue of the acts described above, Defendants knowingly caused the concealment or improper avoidance or decrease of an obligation to pay or transmit money or property to the Government;

302.    By virtue of the acts described above, Defendants knowingly conspired with others to violate the FCA.  Moreover, Defendants took substantial steps toward the completion of the goals of that conspiracy by the conduct alleged herein.

303.    Relators cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false claims were presented by several separate entities.

Relators do not have access to the records of all such false or fraudulent statements, records, or claims.

304.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

305.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

306.    Additionally, the United States is entitled to the maximum penalty for each and every violation arising from Defendants' unlawful conduct alleged herein.

## PRAYER

WHEREFORE, *qui tam* Plaintiff-Relators Derek Lewis and Joey Neiman pray for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729;

3.    That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.    That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That Relators recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

598012.1

Dated: July 26, 2019

David J. Chizewer
David E. Morrison*
Harleen Kaur
Danielle K. Johnson
Juan C. Arguello
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60565
Tel: (312) 201-4000
Fax: (312) 863-7472
David.chizewer@goldbergkohn.com
David.morrison@goldbergkohn.com
Harleen.kaur@goldbergkohn.com
Danielle.johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com

/s/*Jeffrey W. Dickstein*
Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Colette G. Matzzie*
Luke J. Diamond
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com
ldiamond@phillipsandcohen.com

Edward Arens*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

*Attorneys for Qui tam Plaintiffs
Derek Lewis and Joey Neiman*

*\*Admitted Pro Hac Vice*

95