# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA,
## MIAMI DIVISION

Case NO. 18-20394-CIV-Scola/Torres

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* | ) |
| DEREK LEWIS and JOEY NEIMAN, | ) |
| | ) |
| Plaintiffs/Relators, | ) |
| | ) |
| vs. | ) |
| | ) |
| COMMUNITY HEALTH SYSTEMS, | ) |
| INC. *et al.* | ) |
| | ) |
| Defendants. | ) |

## DEFENDANT MEDHOST INC.'S
## MOTION TO DISMISS RELATORS' AMENDED COMPLAINT AND
## INCORPORATED MEMORANDUM OF LAW

## TABLE OF CONTENTS

<strong>Page</strong>

INTRODUCTION ............................................................................................................. 1

FACTUAL AND LEGAL BACKGROUND ....................................................................... 2

    A.    The Parties ............................................................................................... 2

    B.    The Meaningful-Use Program ................................................................. 2

          1.    EHR Software Certification ......................................................... 3

          2.    Meaningful-Use Incentives ......................................................... 4

    C.    Relators' Factual Allegations ................................................................. 5

    D.    Relators' Claims Against MEDHOST ..................................................... 6

    E.    Procedural History ................................................................................. 7

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT ……………………………………………………………………………..8

I.    Relators' Claims About the Meaningful-Use Program Are Neither Plausible Nor Alleged with Particularity And Should Be Dismissed ................................................... 8

    A.    Relators' Allegations Do Not Satisfy Rule 9(b) ................................................. 8

          1.    Relators Fail to Specifically Allege Why a Particular Claim Was False ........................................................................................... 9

          2.    Relators Fail to Specifically Identify MEDHOST's Supposedly Fraudulent Conduct ................................................................... 9

          3.    Relators Are Not Entitled to Any Relief From Rule 9(b)'s Demands ..................................................................................... 10

    B.    Relators Have Not Plausibly Alleged that Any Claims Were False .................... 11

          1.    Relators Do Not Identify Anything False About CHS's Meaningful-Use Attestations ................................................... 11

          2.    Relators Do Not Allege That MEDHOST's Software Fell Short of the ONC Criteria .................................................................... 12

              a)    Relators Imply an Interoperability Requirement That Does Not Exist ................................................................ 12

              b)    Relators' Allegations About CPOE Reliability Do Not Bear on Any Certification Criteria ................................... 13

              c)    Relators' Allegations About Software Problems with Clinical Decision Support Do Not Bear on Any Certification Criteria ................................................... 14

**TABLE OF CONTENTS**
(continued)

**Page**

|   |   |   |   |
|---|---|---|---|
| | d) | Relators' Allegations About Electronic Prescribing Show That CHS Did Not Use MEDHOST Software for This Purpose | 15 |
| | e) | Relators' Allegations About Software Security Again Fall Outside the Certification Requirements | 15 |
| C. | | Relators Have Not Plausibly Alleged That Any Purported Falsity Was Material to the Government's Incentive Payment Decisions | 16 |
| D. | | Relators Have Not Plausibly Alleged That MEDHOST Acted with Improper Scienter | 18 |
| E. | | Relators Have Not Plausibly Alleged the Additional Requirements for Their False Statements Claim. | 20 |
| F. | | Relators Have Not Plausibly Alleged a Conspiracy to Violate the FCA | 20 |
| G. | | Relators Have Not Plausibly Alleged a Reverse False Claim by MEDHOST | 21 |

II. Relators' Kickback Theory Should Be Dismissed ................................................. 22

REQUEST FOR HEARING ....................................................................................... 24

CONCLUSION .......................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Ambrosia Coal & Const. Co. v. Pages Morales*,
  482 F.3d 1309 (11th Cir. 2007) ...............................................................................10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................................7

*Bingham v. BayCare Health Sys.*,
  No. 8:14-cv-73-T-23JSS, 2016 WL 8739056 (M.D. Fla. Dec. 16, 2016) ...........................23

*Bocage v. Acton Corp.*,
  No. 2:17-cv-01201-RDP, 2018 WL 905351 (N.D. Ala. Feb. 15, 2018) ................................7

*Burkes v. Dylewski*,
  No. 1:14-cv-22079-UU, 2016 WL 9526692 (S.D. Fla. May 3, 2016) ..................................21

*Corsello v. Lincare*,
  428 F.3d 1008 (11th Cir. 2005) ............................................................................... 8, 10

*Davila v. Delta Air Lines, Inc.*,
  326 F.3d 1183 (11th Cir. 2003) ...................................................................................7

*Georgia ex rel. Hunter Labs., LLC v. Quest Diagnostics Inc.*,
  No. 1:13-cv-01838-SCJ, 2014 WL 12543888 (N.D. Ga. Mar. 17, 2014) ...........................24

*Henderson v. Sun Pharms. Indus.*,
  809 F. Supp. 2d 1373 (N.D. Ga. 2011) .........................................................................7

*Hopper v. Solvay Pharms., Inc.*,
  588 F.3d 1318 (11th Cir. 2009) ............................................................................20, 23

*Pencheng Si v. Laogai Research Found.*,
  71 F. Supp. 3d 73 (D.D.C. 2014) ...........................................................................21, 22

*Rutledge v. Aveda*,
  No. 2:14-cv-00145-AKK, 2015 WL 2238786 (N.D. Ala. May 12, 2015) ...........................17

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ...................................................................................................19

*Taul v. Nagel Enters., Inc.*,
No. 14-cv-0061-VEH, 2017 WL 432460 (N.D. Ala. Feb. 1, 2017)........................................22

*United States ex rel. Aquino v. Univ. of Miami*,
250 F. Supp. 3d 1319 (S.D. Fla. 2017) .................................................................................8

*United States ex rel. Atkins v. McInteer*,
470 F.3d 1350 (11th Cir. 2006) .........................................................................................8

*United States ex rel. Barrett v. Beauty Basics, Inc.*,
No. 2:13–cv–1989–SLB, 2015 WL 3650960 (N.D. Ala. June 11, 2015)............................19

*United States ex rel. Besancon v. Uchicago Argonne, LLC*,
No. 12 C 7309, 2014 WL 4783056 (N.D. Ill. Sept. 24, 2014)............................................21

*United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
No. 10-81634-CIV-RYSKAMP/HOPKINS, 2014 WL 12284079
(S.D. Fla. June 23, 2014)........................................................................................... 8, 9, 11

*United States ex rel. Childress v. Ocala Heart Inst., Inc.*,
No. 5:13-cv-470-Oc-22PRL, 2015 WL 13793109 (M.D. Fla. July 2, 2015)...................22, 24

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
290 F.3d 1301 (11th Cir. 2002) ....................................................................7, 8, 10, 11

*United States ex rel. Davern v. Hoovestol, Inc.*,
No. 11-CV-6630 CJS, 2015 WL 6872427 (W.D.N.Y. Nov. 9, 2015) ...........................21, 22

*United States ex rel. Fernandez v. Miami Cancer Inst.*,
No. 17-24051-Civ-Scola, 2019 WL 1993513 (S.D. Fla. May 6, 2019) ........................ 8, 9, 10

*United States ex rel. Fla. Society of Anesthesiologists v. Choudhry*,
262 F. Supp. 3d 1299 (M.D. Fla. 2017)........................................................................22, 23

*United States ex rel. Keeler v. Eisai, Inc.*,
568 F. App'x 783 (11th Cir. 2014)....................................................................................10

*United States ex rel. Ligai v. ETS–Lindgren Inc.*,
No. H–112973, 2014 WL 4649885 (S.D. Tex. Sept. 16, 2014) .........................................21

*United States ex rel. Lorona v. Infilaw Corp.*,
No. 3:15-cv-959-J-34PDB, 2019 WL 3778389 (M.D. Fla. Aug. 12, 2019).........................17

*United States ex rel. Mastej v. Health Mgmt. Assocs.*,
    869 F. Supp. 2d 1336 (M.D. Fla. Feb. 16, 2012) ....................................................20, 21, 22

*United States ex rel. Petratos v. Genentech, Inc.*,
    141 F. Supp. 3d 311 (D.N.J. 2015) ...................................................................................21

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
    857 F.3d 1148 (11th Cir. 2017) ........................................................................................19

*United States ex rel. Ruckh v. Salus Rehab., LLC*,
    304 F. Supp. 3d 1258 (M.D. Fla. 2018)............................................................................20

*United States ex rel. Scollick v. Narula*,
    215 F. Supp. 3d 26 (D.D.C. 2016) ....................................................................................21

*United States ex rel. Shurick v. Boeing Co.*,
    330 F. App'x 781 (11th Cir. 2009)......................................................................................8

*United States ex rel. Sobek v. Education Mgmt, LLC*,
    No. 10-131, 2013 WL 2404082 (W.D. Pa. May 31, 2013) ...............................................21

*United States ex rel. Stepe v. RS Compounding LLC*,
    No. 8:13–cv–3150–T–33AEP, 2017 WL 5178183 (M.D. Fla. Nov. 8, 2017) ......................21

*Universal Health Services v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016) ............................................................................................17, 18, 20

*Urquilla-Diaz v. Kaplan Univ.*,
    780 F.3d 1039 (11th Cir. 2015) ........................................................................................19

## STATUTES

31 U.S.C. § 3729(a)(1)(A) ........................................................................................................6

31 U.S.C. § 3729(a)(1)(B)....................................................................................................6, 20

31 U.S.C. § 3729(a)(1)(C) ........................................................................................................6

31 U.S.C. § 3729(a)(1)(G) ...................................................................................................6, 21

31 U.S.C. § 3729(b)(1)(A) ......................................................................................................19

42 U.S.C. § 1320a-7b(b) ...........................................................................................................7

42 U.S.C. § 1320a-7b(b)(2)..........................................................................................7, 22, 23

42 U.S.C. § 1320a-7b(g) ..................................................................................22

**FEDERAL REGULATIONS**

42 C.F.R. § 495.20(i) .......................................................................................4

42 C.F.R. § 495.20(*l*)–(m) ...............................................................................4

42 C.F.R. § 495.20(*l*)(1) ..................................................................................4

42 C.F.R. § 495.20(*l*)(1)(ii)(A)–(C) ................................................................4

42 C.F.R. § 495.20(*l*)(1)(ii)(A) .....................................................................14

42 C.F.R. § 495.20(*l*)(5)(ii) ...........................................................................15

42 C.F.R. § 495.40(a) .....................................................................................11

45 C.F.R. § 170.102 .........................................................................................3

45 C.F.R. § 170.314(a)(1) ..............................................................................13

45 C.F.R. § 170.314(a)(8) ..............................................................................15

45 C.F.R. § 170.314(d)(1)–(2) .......................................................................16

45 C.F.R. § 170.545 .........................................................................................3

45 C.F.R. § 170.545(d)(1) ...............................................................................3

45 C.F.R. § 170.550 .........................................................................................3

45 C.F.R. § 170.556(b) ...................................................................................18

45 C.F.R. § 170.556(d) ...............................................................................5, 18

75 Fed. Reg. 36,158 (June 24, 2010) .............................................................13

76 Fed. Reg. 1,262 (Jan. 7, 2011) ...............................................................5, 18

77 Fed. Reg. 53,968 (Sept. 4, 2012) ..............................................................12

77 Fed. Reg. 54,163 (Sept. 4, 2012) ..............................................................12

81 Fed. Reg. 72,404 (Oct. 19, 2016) ....................................................3, 13, 14

## OTHER AUTHORITIES

*Certified Health IT Product List*, HEALTHIT.GOV, https://chpl.healthit.gov  (last
    visited Sept. 24, 2019)....................................................................................................3

*Certified Health IT Product List*, HEALTHIT.GOV,
    https://chpl.healthit.gov/#/product/5237 (last visited Sept. 24, 2019)...................................16

*Eligible Hospital and Critical Access Hospital (CAH) Attestation Worksheet for
    Stage 1 of the Medicare Electronic Health Record (EHR) Incentive Program*,
    CMS.GOV, https://www.cms.gov/Regulations-and-
    Guidance/Legislation/EHRIncentivePrograms/Downloads/Hospital_Attestatio
    n_Stage1Worksheet_2014Edition.pdf (last visited Sept. 24, 2019).......................................4

*FAQ #6097*, CMS.GOV, https://wayback.archive-
    it.org/2744/20180307205953/https://www.cms.gov/Regulations-and-
    Guidance/Legislation/EHRIncentivePrograms/Downloads/FAQ_Audit.pdf
    (last visited Sept. 24, 2019) ........................................................................................18

*How to Identify and Address Unsafe Conditions Associated with Health IT*,
    HEALTHIT.GOV,
    https://www.healthit.gov/sites/default/files/How_to_Identify_and_Address_U
    nsafe_Conditions_Associated_with_Health_IT.pdf (last visited Sept. 24,
    2019)...................................................................................................................18

*ONC-ACB Surveillance*, HEALTHIT.GOV,
    https://www.healthit.gov/topic/certification-ehrs/onc-acb-surveillance  (last
    visited Sept. 24, 2019)...........................................................................................4, 18

*Testing Process & Test Methods*, HEALTHIT.GOV,
    https://www.healthit.gov/topic/certification-ehrs/testing-process-test-methods
    (last visited Sept. 24, 2019) .........................................................................................3

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), Defendant MEDHOST, INC. ("MEDHOST") files this brief in support of its Motion to Dismiss Relators' Amended Complaint ("Amended Complaint" or "Am. Compl.").

## INTRODUCTION

This case concerns the federal government's meaningful-use program, through which the government uses financial incentives to encourage hospitals to use electronic health records ("EHRs"). To earn these incentives, hospitals must meaningfully use EHR software that has been certified as meeting specifications that are detailed in federal regulations. Federal regulations also spell out what it means to meaningfully use such software, and hospitals must attest to having met those requirements.

In this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, Relators allege that Defendant Community Health Systems, Inc. ("CHS") improperly obtained incentive payments for using EHR software developed by Defendant MEDHOST, such that MEDHOST should be liable for causing the submission of false claims for government payment. As Relators acknowledge, however, MEDHOST's software was indeed certified for compliance with the regulatory requirements. In addition, CHS did indeed attest that it meaningfully used this certified software in conformity with the regulatory requirements. Relators insist that MEDHOST nonetheless should be liable because of problems with its software.

Relators' allegations, however, are riddled with defects. Even accepting the theory on its face—which would require many dubious leaps—the allegations lack the particularity required by Rule 9(b). Relators never allege why any specific CHS meaningful-use attestation was false, nor do they ever specifically explain how MEDHOST engaged in fraud. For example, Relators do not identify *any* misrepresentations made by MEDHOST during the software certification process. Relators also do not allege that MEDHOST ever misrepresented its software's capabilities to CHS. Without such details, Relators' FCA claims cannot stand.

But Relators have many other problems as well. There was nothing false about CHS's meaningful-use attestations, which correctly noted that MEDHOST's software had been certified, and that this software had been meaningfully used. Although Relators suggest the software had many problems, none of those problems actually bear on the regulatory criteria for certification. Thus, even if Relators have identified ways that MEDHOST's software could have been better, that does not mean the software should not have been certified. Nor did these purported problems

somehow taint CHS's meaningful-use attestations. As a result, Relators have not alleged a false claim for payment of the meaningful-use incentive.

Moreover, even if there were problems with MEDHOST's software that called its certification into question, Relators do not allege that this would have been material to the government's decision to make the incentive payments. Programming bugs are routine with EHR software (as with any software), and the government has publicly and explicitly *declined* to use such issues as a basis to refuse or revoke incentive payments. At a minimum, MEDHOST cannot have plausibly known that the alleged software problems would—at least in Relators' world—affect CHS's entitlement to the incentive payments.

All of this precludes the FCA theory that Relators advance about the meaningful-use program. In addition, Relators' four FCA claims also fail for claim-specific reasons. And their separate theory regarding the federal Anti-Kickback Statute, which barely gets any attention in the Amended Complaint, also fails as a matter of law. The Court should accordingly dismiss the claims against MEDHOST in full.

**FACTUAL AND LEGAL BACKGROUND**

**A.      The Parties**

Relators have sued: CHS, which is one of the largest publicly traded hospital companies in the United States, Am. Compl. ¶ 30; a CHS subsidiary that manages CHS's hospitals, *id.* ¶ 31; over 140 hospitals "owned, leased, or operated" by CHS "and/or its direct and indirect subsidiaries," *id.* ¶ 32; and MEDHOST. MEDHOST is a health information technology company that develops and provides EHR software to health care facilities across the United States. *Id.* ¶ 33. Relators' claims against MEDHOST concern software provided to CHS hospitals.

**B.      The Meaningful-Use Program**

This case arises out of the federal government's meaningful-use program, which uses financial incentives to encourage hospitals and physicians to use electronic health records. The government promotes the use of EHRs because they can improve the administration of health care—by automating certain practices, reducing medical errors, etc. In order to receive meaningful-use incentives, a hospital must attest to the government that it has "meaningfully used" certified EHR software.

### 1.    EHR Software Certification

For EHR software to become certified (such that its users can qualify for incentives), the software must satisfy regulatory standards issued by the Office of the National Coordinator for Health Information Technology ("ONC") at the Department of Health and Human Services ("HHS").  The ONC standards do not demand perfect functionality, instead requiring only that software have "the capacity" to perform certain functions as well as other "capabilities" necessary to support the hospital in meeting the Meaningful Use requirements.  45 C.F.R. § 170.102.

The ONC standards cover many different software functionalities—e.g., the electronic ordering of medication, or an automatic review of a patient's medical history.  Software that meets the ONC standards for all functionalities can be called a "complete" EHR system.  But "modular" EHR software is certified for only particular functions—and thus needs to meet the ONC standards for only those functions.

Using the ONC standards, EHR software is tested and certified by independent, government-approved third parties.  *See* 45 C.F.R. §§ 170.545, 170.550.  Software developers cannot certify software themselves.[1]  Using test scripts provided by ONC, a third-party testing entity compares the software to the regulatory standards.[2]  Whether complete or modular, so long as the software satisfies the standards in question, it must be certified; certification cannot be denied for reasons that go beyond the regulatory criteria.  *See, e.g.*, 81 Fed. Reg. 72,404, 72,415 (Oct. 19, 2016) (to be codified at 45 C.F.R. pt. 170)  ("We reiterate that ONC does not intend to review the functioning of uncertified capabilities except to the extent that an uncertified capability interacts with and affects the performance of a certified capability that is under review.").  After testing, all certification results are posted publicly.[3]

---

[1] When recertifying a new version of software, however, a developer certifies "whether any change in the newer version has adversely affected the [software's] capabilities for which certification criteria have been adopted."  45 C.F.R. § 170.545(d)(1).

[2] *Testing Process & Test Methods*, HEALTHIT.GOV, https://www.healthit.gov/topic/certification-ehrs/testing-process-test-methods (last visited Sept. 24, 2019).

[3] *Certified Health IT Product List*, HEALTHIT.GOV, https://chpl.healthit.gov (last visited Sept. 24, 2019).

## 2.      Meaningful-Use Incentives

As noted, a hospital can qualify for a meaningful-use incentive only if it "meaningfully uses" certified EHR software.[4] To demonstrate "meaningful use" for the aspects of the program that are at issue in the Amended Complaint (known as Stages 1 and 2), a hospital must exceed certain benchmarks (for example, by using a functionality for enough patients). *See, e.g.,* 42 C.F.R. § 495.20(*l*)(1). These benchmarks (or criteria) vary by functionality and are set forth in a wide array of government guidance.[5] To earn a meaningful-use incentive for Stage 1 or 2, a hospital must meet all of the "core" criteria as well as three other criteria chosen from a "menu" of six additional requirements. *See, e.g.,* 42 C.F.R. § 495.20(i), (*l*)-(m). This arrangement allows hospitals to select certain functionalities that they wish to meaningfully use (while opting out of any such requirements for other functionalities).

Ultimately, to receive the meaningful-use incentive, a hospital must attest to having cleared the applicable benchmarks when using software that has been certified for the functionalities in question. *See, e.g.,* 42 C.F.R. § 495.20(*l*)(1). These benchmarks anticipate that hospitals will *not* be able to achieve complete electronic functionality; they require only the achievement of modest measures, often low numerical or percentage-based targets. *See, e.g.,* 42 C.F.R. § 495.20(*l*)(1)(ii)(A)-(C). To obtain the incentive, the hospital must attest, among other things, which software was used and that the applicable benchmarks were met or surpassed. *Id.* Because hospitals can qualify for the incentive in different ways (and using different software), hospitals' attestations will necessarily vary.

HHS recognizes that hospitals who qualify for the incentive may be using software that, while appropriately certified, ends up having technical problems in the field—and that such problems may even cause the software to fall short of the certification criteria.[6] When this

---

[4] Until 2015, the meaningful-use incentive was a single payment per year. In 2016, meaningful use instead began precluding a downward adjustment of Medicare and Medicaid payments.

[5] *See, e.g., Eligible Hospital and Critical Access Hospital (CAH) Attestation Worksheet for Stage 1 of the Medicare Electronic Health Record (EHR) Incentive Program*, CMS.GOV, https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/Hospital_Attestation_Stage1Worksheet_2014Edition.pdf (last visited Sept. 24, 2019).

[6] The ONC set up an oversight program to monitor for software problems that are significant enough to pull a product out of compliance with the certification requirements. *See*

happens, HHS expects the hospital and vendor to work together to resolve the problems. *See, e.g.,* 76 Fed. Reg. 1,262, 1,284-85 (Jan. 7, 2011) (to be codified at 45 C.F.R. pt. 170). HHS typically does not withhold or revoke meaningful-use payments and instead will generally allow the software vendor to fix the flaws.[7]

C.    **Relators' Factual Allegations**

Relators contend that MEDHOST and CHS defrauded the federal government into making meaningful-use incentive payments that were not justified because of shortcomings with the underlying software. As against MEDHOST, the allegations strictly concern software that was designed by MEDHOST, certified under the ONC criteria by the third party Drummond Group Inc. ("Drummond"), and installed and used by CHS hospitals, who in turn qualified for the meaningful-use incentive. Relators allege five basic problems with MEDHOST's software products.

*First*, Relators allege that MEDHOST's two software products—a modular product called the Emergency Department Information System ("EDIS"), and a complete system called Enterprise—were not fully interoperable with each other. Am. Compl. ¶¶ 95–142. Relators contend that this prevented departments that used EDIS from communicating seamlessly with departments that used Enterprise. *See id.*

*Second*, Relators allege that MEDHOST's two software products did not reliably allow physicians to engage in what is known as computerized provider order entry ("CPOE"). Am. Compl. ¶¶ 143–202. Relators identify nine purported problems with certain CPOE functionalities. *See id.*

*Third*, Relators allege problems with the Clinical Decision Support ("CDS") functionality that is part of MEDHOST's complete Enterprise system. Am. Compl. ¶¶ 203–238. The CDS component of the system automatically triggers certain events when particular data is entered for

---

*ONC-ACB Surveillance*, HEALTHIT.GOV, https://www.healthit.gov/topic/certification-ehrs/onc-acb-surveillance (last visited Sept. 24, 2019). The ONC then set up a procedure for how to deal with those problems. *See* 45 C.F.R. § 170.556(d) (outlining the corrective action plan process whereby the software developer must propose a corrective action plan that identifies a remedy and a plan).

[7] If the corrective action plan process does not restore the software's compliance with the ONC standards, the software's certification may then be suspended or withdrawn. *See* 45 C.F.R. § 170.556(d).

a patient—for example, by recommending intervention when a patient's cholesterol exceeds a certain level.

*Fourth*, Relators raise a complaint about electronic prescriptions ("e-prescribing"). Am. Compl. ¶¶ 239–47. Relators say this functionality was so defective that it was never even implemented by CHS. *Id.* ¶ 245.

*Finally*, Relators allege that MEDHOST's software was not adequately secure. Am. Compl. ¶¶ 248–54. According to Relators, the software did not properly limit who could view and modify patient information. *Id.* ¶ 249.

As noted, Relators' theory hinges on the supposedly improper receipt of meaningful-use incentives. As a result, Relators must show that these problems tainted CHS's claim that it had meaningfully used certified software.

### D. Relators' Claims Against MEDHOST

Relators do not (and could not) allege that MEDHOST itself received any meaningful-use incentives. Instead, Relators' theory against MEDHOST appears to be that (1) MEDHOST engaged in fraud in order to secure unwarranted software certifications from Drummond, and (2) CHS then used these faulty certifications in order to make unsupported attestations of "meaningful use"—which, in turn, resulted in the government making improper incentive payments.

Relators proceed under the FCA, which allows private citizens to recover damages on the federal government's behalf from defendants who have allegedly made or caused false claims for government payment. Against MEDHOST, Relators bring four FCA claims. The first is a "presentment" claim, which can impose liability when one "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" using federal funds. 31 U.S.C. § 3729(a)(1)(A). The second is a "false statements" claim, which can impose liability when one "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The third is a conspiracy claim, which can impose liability when one "conspires to commit a violation" of the FCA's presentment or false statements provisions. 31 U.S.C. § 3729(a)(1)(C). And the fourth is a "reverse false claims" claim, which can impose liability when one "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

These FCA claims rest principally on the "Meaningful Use" theory described above, but Relators also briefly allege a separate theory under the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). As relevant here, the AKS prohibits knowingly and willfully paying remuneration with the intent to induce the ordering of items or services reimbursable under any federal health care program. 42 U.S.C. § 1320a-7b(b)(2). Claims for government payment that result from AKS violations are actionable under the FCA. Here, Relators contend that MEDHOST violated the AKS by discounting its financial software in order to induce CHS to purchase its EHR software, and also by offering CHS equity in MEDHOST in order to induce the purchase of other software. *See* Am. Compl. ¶¶ 281–89.

### E.   Procedural History

Relators filed this case under seal on January 31, 2018. *See* ECF. No. 1. On March 12, 2019, the government notified the Court that, after investigating the allegations, it was declining to intervene in the case. ECF No. 20. The Court subsequently unsealed the case. ECF No. 21. On July 26, 2019, Relators filed the Amended Complaint, ECF No. 123, which MEDHOST now moves to dismiss.

### STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although all factual allegations are accepted as true, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). In addition, this Court can consider regulatory guidance, as well as "documents made publicly available by a government entity," when assessing the plausibility of Relators' claims. *Henderson v. Sun Pharms. Indus.*, 809 F. Supp. 2d 1373, 1379 n.4 (N.D. Ga. 2011); *see also Bocage v. Acton Corp.*, No. 2:17-cv-01201-RDP, 2018 WL 905351, at *3–7 (N.D. Ala. Feb. 15, 2018).

Because FCA claims sound in fraud, Relators must also satisfy the heightened pleading standard of Rule 9(b). Relators thus must allege particularized "facts as to time, place, and substance of the defendant's alleged fraud, specifically, the details of the defendant's allegedly fraudulent acts, when they occurred and who engaged in them." *United States ex rel. Clausen v.*

*Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (citation and internal quotation marks omitted).

## ARGUMENT

Although many of Relators' allegations are flagrantly false, MEDHOST recognizes that it must accept the non-conclusory factual allegations at face value with this Motion. Even so, Relators have failed to state a claim for several independently dispositive reasons.

**I.    Relators' Claims About the Meaningful-Use Program Are Neither Plausible Nor Alleged with Particularity And Should Be Dismissed.**

### A.    Relators' Allegations Do Not Satisfy Rule 9(b).

As an initial matter, even if the Court accepts the general contours of Relators' theory of liability—as detailed below, it should not—Relators' claims about the meaningful-use program should be dismissed in full under Rule 9(b). As lengthy as they are, Relators' allegations never identify with particularity how the alleged conduct amounted to fraud.

"The Eleventh Circuit rigidly enforces Rule 9(b)'s particularity requirement." *United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 10-81634-CIV-RYSKAMP/HOPKINS, 2014 WL 12284079, at *2 (S.D. Fla. June 23, 2014). "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)).

To satisfy Rule 9(b) for FCA claims, Relators must do at least two things. First, as this Court itself recently explained, they "must allege that the defendant actually submitted a false claim, and by extension that the government actually paid. The submission of a false claim is not a ministerial act, but the *sin[e] qua non* of a False Claims Act violation." *United States ex rel. Fernandez v. Miami Cancer Inst.*, No. 17-24051-Civ-Scola, 2019 WL 1993513, at *3 (S.D. Fla. May 6, 2019) (Scola, J.) (internal quotation marks omitted); *accord, e.g.*, *United States ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1329 (S.D. Fla. 2017). Second, in addition to identifying specific false claims, Relators must also specifically allege the circumstances of the fraud—i.e., "the 'who,' 'what,' 'where,' 'when,' and 'how' of" the fraud. *Corsello v. Lincare*, 428 F.3d 1008, 1014 (11th Cir. 2005). The Eleventh Circuit routinely affirms dismissals of FCA complaints lacking such details. *See, e.g.*, *United States ex rel. Shurick v. Boeing Co.*, 330 F.

App'x 781, 783 (11th Cir. 2009); *Corsello*, 428 F.3d at 1012; *Clausen*, 290 F.3d at 1310.  This Court has similarly not hesitated to dismiss FCA claims under Rule 9(b).  *See Fernandez*, 2019 WL 1993513, at *5.

Here, Relators fail both of the above Rule 9(b) requirements.  They do not adequately allege either (1) that CHS made false meaningful-use attestations in order to receive meaningful-use incentives, or (2) that MEDHOST engaged in misconduct that somehow tainted Drummond's certifications of the software products at issue.

### 1.   Relators Fail to Specifically Allege Why a Particular Claim Was False.

Although the submission of a false claim is "the *sin[e] qua non* of a False Claims Act violation," *Fernandez*, 2019 WL 1993513, at *3, Relators fail to identify with specificity a *single* false claim submitted or caused to be submitted by MEDHOST.  Their theory appears to be that the meaningful-use attestations submitted by CHS hospitals are false claims that MEDHOST somehow caused CHS to submit.  But none of these false claims is identified with particularity.

No doubt aware of Rule 9(b)'s demands, Relators attach a 39-page exhibit to their complaint that purports to identify "some of the attestations that the Defendant Hospitals submitted for Medhost EHR technology."  Am. Compl. ¶ 32; Exhibit B to Am. Compl. (ECF No. 123-2).  But Rule 9(b) requires a relator to provide not only the information listed in this exhibit but also details on *how* the particular claims were false.  *Bumbury*, 2014 WL 12284079, at *1 (citing *Corsello*, 428 F.3d at 1014).  Here, Relators never even allege which of the attestations were false, much less the basis for their claim of falsity.

For example, page 1 of Relators' Exhibit B to the Amended Complaint lists 17 different attestations from four different hospitals over a period of approximately five years.  ECF No. 123-2.  Each of these 17 attestations is alleged to have concerned between three and five different ONC criteria.  Which of these attestations were false?  For which criteria?  And how?  Rule 9(b) requires particularized answers to these questions, but the Amended Complaint utterly lacks them.  Even if Relators' theory otherwise held water, this fundamental lack of particularity requires dismissal.

### 2.   Relators Fail to Specifically Identify MEDHOST's Supposedly Fraudulent Conduct.

Second, Relators have separately failed to allege with particularity the circumstances of the purported fraud with respect to MEDHOST.  In other words, Relators do not sufficiently explain how MEDHOST engaged in a fraud for which it should be liable under the FCA.

Instead, Relators frequently do not even distinguish whether MEDHOST or any CHS entity

was responsible for the alleged misconduct. That itself requires dismissal under Rule 9(b). *See, e.g.*, *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (stating that a complaint that is "devoid of specific allegations with respect to each defendant" and "lump[s] together all of the defendants in their allegations of fraud" should be dismissed).

Nor can Relators rest on their vague allegation that MEDHOST "knowingly misrepresented to customers and to Drummond Group . . . its EHR products satisfied federal Meaningful Use requirements." Am. Compl. ¶ 290. That is not remotely specific enough. Relators do not allege (1) precisely *what* misrepresentations were made by MEDHOST, (2) *where* and *when* these misrepresentations were made, (3) *who* specifically made these misleading statements, and (4) *how* these statements were misleading. Rule 9(b) requires these details, which are essential to giving MEDHOST adequate notice of the alleged fraud, and to preventing an improper fishing expedition. Relators' failure to provide them requires dismissal of the claims against MEDHOST. *See, e.g.*, *Clausen*, 219 F.3d at 1310; *Corsello*, 428 F.3d at 1013–14; *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 794–98 (11th Cir. 2014).

### 3.     Relators Are Not Entitled to Any Relief From Rule 9(b)'s Demands.

Relators also are not entitled to relief from the strict demands of Rule 9(b). The Eleventh Circuit has sometimes allowed relators who lack the necessary details about an alleged fraud to proceed nonetheless when the relator "was in a 'position to know that actual false claims were submitted to the government and had a factual basis for his alleged personal knowledge.'" *Fernandez*, 2019 WL 1993513, at *3 (quoting *United States ex rel. Mastej v. Health Mgmt. Assocs.*, 591 F. App'x 693, 707 (11th Cir. 2014)). This requires not simply claiming "personal knowledge" of the underlying allegations but also alleging why the relator's intuitions about the fraud should be credited despite the absence of the details required by Rule 9(b). *Fernandez*, 2019 WL 1993513, at *3–4. Here, Relators cannot clear this high bar.

Instead, Relators are former CHS employees who held mid-level positions in the IT department. Based on the allegations, they apparently had no involvement in CHS's attestation process and certainly had no involvement in MEDHOST's software development or certification process. Rather, Relators merely claim they saw some issues that apparently dissatisfied certain CHS personnel and, based on that, spun a broad and unsubstantiated tale of fraud. Particularly when Relators were not in a position that would have given them first-hand knowledge of the crucial details, their attempt to invent a fraudulent scheme falls well short of what Rule 9(b)

10

requires. *See, e.g.*, *Bumbury*, 2014 WL 12284079, at *4 (granting defendants' motion to dismiss because of Relator's failure to allege "any firsthand knowledge of [d]efendants' billing practices," which "contradict[ed] the presence of indicia of reliability").

## B. Relators Have Not Plausibly Alleged that Any Claims Were False.

Particularity problems aside, Relators' meaningful-use theory also fails because Relators have not plausibly alleged the element of falsity—i.e., that the government received claims for payment that were false. The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the '*claim for payment.*'" *Clausen*, 290 F.3d at 1311 (citation omitted). Without a false claim, "while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage." *Id.* This, once again, is thus a dispositive problem regardless of the other flaws in Relators' claims.

### 1. Relators Do Not Identify Anything False About CHS's Meaningful-Use Attestations.

As noted, it appears that Relators' theory is that CHS submitted false claims for payment by submitting fraudulent attestations that triggered the improper payment of meaningful-use incentives. As Relators see it, these attestations were false because of problems with MEDHOST's underlying software. But Relators do not identify any representations made by CHS about the underlying software. Instead, as Relators allege, "healthcare providers are required each year to attest that they used certified EHR technology and satisfied the applicable Meaningful Use objectives and measures." Am. Compl. ¶ 60; *see also* 42 C.F.R. § 495.40(a) (stating that eligible hospitals must attest to how they "used certified EHR technology" and "[s]atisfied the required objectives and measures laid out in 42 C.F.R. § 495.20"). Under the allegations, those attestations were entirely truthful.

Relators do, to be sure, allege that "CHS's attestations were false." Am. Compl. ¶ 77. But that is a conclusory allegation not entitled to any weight, and there are no factual allegations to support this conclusion. For example, Relators do not allege that any hospitals lied when attesting that they had "used certified EHR technology." *Id.* ¶ 60. The complaint itself refutes any such claim, by alleging that MEDHOST's software had indeed been certified. *Id.* ¶¶ 110, 120, 131, 149–52, 204, 214, 241. Nor do Relators allege that any hospitals lied when attesting that they had "satisfied the applicable Meaningful Use objectives and measures." *Id.* ¶ 60. Those benchmarks are set forth in 42 C.F.R. § 495.20, and Relators do not allege how any CHS hospital failed to meet any of them. Thus, even if Relators were correct that MEDHOST's software fell short of federal

standards—as shown below, they are not—that does not render CHS's attestations false, when CHS attested only that (1) MEDHOST's software was certified, and (2) CHS meaningfully used that software.

### 2.     Relators Do Not Allege That MEDHOST's Software Fell Short of the ONC Criteria.

Relators fail to allege properly that MEDHOST's software fell short of the ONC certification requirements.  As a result, even if this Court were to indulge Relators' implication that CHS somehow represented that MEDHOST's software met those benchmarks (instead of simply representing that the software had been certified), Relators' theory still falls flat.

### a)     Relators Imply an Interoperability Requirement That Does Not Exist.

First, Relators are incorrect to suggest that MEDHOST's modular EDIS software and complete Enterprise system needed to be fully interoperable with one another.  Federal law simply does not require two EHR products to be interoperable with one another when being used within the same legal entity.

Instead, ONC adopted criteria that are designed to "*promote* enhanced interoperability, functionality, utility, and security of EHR technology through the capabilities they include and the standards they require EHR technology to meet for certification."  77 Fed. Reg. 54,163, 54,165 (Sept. 4, 2012) (to be codified at 45 C.F.R. pt. 170) (emphasis added).  Promoting interoperability through required criteria is not the same as *requiring* interoperability.  Instead, ONC has openly doubted the value of an interoperability requirement like what Relators suggest—stating that "it would be *inappropriate* and without sufficient benefit to require certification of EHR technology for transmissions that would be conducted within a single legal entity."  *Id*. at 54,198 (emphasis added).[8]

---

[8] In contrast, the ONC has "adopt[ed] standards for the electronic exchange of health information between *different legal entities*."  77 Fed. Reg. at 54,198 (emphasis added).  These certification standards correspond to the government's attestation criteria for performing medication reconciliation when a hospital "receives a patient from another setting of care or provider of care."  77 Fed. Reg. 53,968, 54,155 (Sept. 4, 2012) (to be codified at 42 C.F.R. pts. 412, 413, and 495).  None of this concerns interoperability between systems within the *same* entity (e.g., a hospital), which is the requirement that Relators try to conjure.

For their part, Relators point to no regulation that requires two independently certified systems to be fully interoperable with each other. Nor do (or could) Relators allege that MEDHOST's software was ever certified for having such interoperability. Thus, even if this might be desirable functionality, it is not anything that could have made CHS's attestations false. And, as Relators themselves allege, any need for interoperability would not be MEDHOST's responsibility. *See* Am. Compl. ¶ 98 ("If a user elects to use a combination of EHR modules instead of a Complete EHR system, it is the *user's* responsibility to ensure that the modules work together properly.") (emphasis added); 75 Fed. Reg. 36,158, 36,188 (June 24, 2010) (to be codified at 45 C.F.R. pt. 170) (same).

**b)      Relators' Allegations About CPOE Reliability Do Not Bear on Any Certification Criteria.**

Relators also miss the mark when alleging that MEDHOST's two software products "failed to enable users to perform computerized provider order entry ("CPOE") in a manner that met the requirements for certification." Am. Compl. ¶ 143. Relators contend that MEDHOST's software was not reliable with nine different functionalities, such as weight-based dosing and the use of "physician favorites." *See id.* ¶¶ 143–202. But the ONC standards did not *require* certified software to be able to perform these functions, nor did the ONC mandate how any such features should be designed.

Instead, ONC's standards for CPOE require simply that the software "[e]nable a user to electronically record, change, and access the following order types, at a minimum: (i) Medications; (ii) Laboratory; and (iii) Diagnostic imaging." 45 C.F.R. § 170.314(a)(1). There is no allegation that MEDHOST's software failed this requirement, which is the only benchmark that Drummond could apply when certifying the software for CPOE.

Although Relators do reference ONC language stating that certified software must perform in an "accurate and reliable manner," Am. Compl. ¶¶ 71–73 (citing 81 Fed. Reg. 72,404, 72,411–12 (Oct. 19, 2016) (to be codified at 45 C.F.R. pt. 170)), that language concerns only the reliability of the software's *certified* capabilities—as explained by the exact regulatory preamble that Relators cite. *See* 81 Fed. Reg. at 72,414 (distinguishing between "certified capabilities" and "uncertified capabilities"). Indeed, ONC intentionally does not "dictate how developers design uncertified capabilities within certified health IT or other technologies," and instead views uncertified functionalities as relevant only to the extent they "interact with certified capabilities and are relevant to evaluating the performance of those certified capabilities." *Id.* at 72,415.

13

Relators do not allege that any of the uncertified functionalities at issue interfered with the limited functionalities for which MEDHOST's software *was* certified.

Relators' allegations also do not bear on CHS's meaningful-use attestations. To show meaningful use of CPOE, a hospital must attest simply that its inpatient and emergency departments "us[ed] computerized provider order entry" for at least 60% of medication orders and at least 30% of laboratory and radiology orders. 42 C.F.R. § 495.20(*l*)(1)(ii)(A). There is no allegation that CHS fell short of this benchmark, which (like the certification standard) says nothing about any of the purportedly problematic functionalities highlighted by Relators. Even if there were problems with some orders—for example, Relators allege a CHS employee complained that pharmacists had to revise 40% of CPOE orders, *see* Am. Compl. ¶ 190—the regulations contemplate that a hospital's CPOE usage need not be perfect in order to qualify as meaningful use. *See, e.g.*, 42 C.F.R. § 495.20(*l*)(1)(ii)(A) (needing only 60% usage for medication orders).

Finally, as with any interoperability difficulties, many of the CPOE problems alleged by Relators—in addition to falling outside the regulatory requirements—did not involve MEDHOST. For example, CHS purportedly developed and relied on "flawed order sets" for its hospitals' CPOE attestations. Am. Compl. ¶¶ 196–201. CHS hospitals also allegedly stocked medication dosages that did not match up with the dosages listed in the hospitals' MEDHOST software. *Id.* ¶ 181. MEDHOST is not alleged to have had anything to do with these issues, and there is no theory under which MEDHOST can be held responsible for them.

> **c)** **Relators' Allegations About Software Problems with Clinical Decision Support Do Not Bear on Any Certification Criteria.**

Relators' allegations about the Clinical Decision Support ("CDS") functionality in MEDHOST's software similarly do not show that any false claims were submitted to the government. As previously described, this functionality allows the triggering of automatic interventions based on patient data. Although Relators allege multiple CDS problems, none actually relates to the certification criteria or to the meaningful-use attestations. *See* Am. Compl. ¶¶ 203–38. For example, Relators focus on the alleged shortcomings of MEDHOST's CDS audit tool, saying that the software was "unable to track . . . when and whether CDS rules have been enabled." *Id.* ¶ 207. But ONC specifications did not require software to include an audit tool that tracks the use of CDS.

Instead, the CDS certification requires that the software "enable a limited set of identified users to select . . . one or more electronic [CDS] interventions"—for which the software then must

be able to (1) "electronically identify . . . diagnostic and therapeutic reference information" and (2) trigger interventions automatically. 45 C.F.R. § 170.314(a)(8). To show the meaningful use of CDS software, hospitals must meet the following measures:

> (A) Implement five clinical decision support interventions related to four or more clinical quality measures at a relevant point in patient care for the entire EHR reporting period. Absent four clinical quality measures related to an eligible hospital or CAH's patient population, the clinical decision support interventions must be related to high-priority health conditions; and
>
> (B) The eligible hospital or CAH has enabled and implemented the functionality for drug-drug and drug-allergy interaction checks for the entire EHR reporting period.

42 C.F.R. § 495.20(l)(5)(ii).

Relators do not allege any CDS problems that bear on any of the above requirements. And though the auditing functionality described by Relators could conceivably be useful to hospitals and regulators, such auditing is not *required*. The lack of such functionality therefore cannot have rendered false any claims submitted for meaningful-use payments.

Finally, Relators once again allege CDS-related problems that MEDHOST cannot be said to have caused. Specifically, Relators contend that CHS submitted false attestations that were improperly based on "static order sets," instead of an actual field usage. Am. Compl. ¶¶ 230–38. If this happened, that would mean CHS did not attest to the use of CDS based on its use of MEDHOST functionality—which means a corresponding claim against MEDHOST cannot stand.

### d) Relators' Allegations About Electronic Prescribing Show That CHS Did Not Use MEDHOST Software for This Purpose.

As for Relators' theory about electronic prescribing ("e-prescribing"), the allegations themselves show that Relators have no claim against MEDHOST. Relators allege that CHS found MEDHOST's e-prescribing functionality so deficient that CHS chose not to implement it in any of its hospitals. *See* Am. Compl. ¶¶ 244–45. That necessarily precludes any claim against MEDHOST about this functionality. Because MEDHOST's e-prescribing functionality was not used by CHS, MEDHOST cannot have played any role in a corresponding false claim.

### e) Relators' Allegations About Software Security Again Fall Outside the Certification Requirements.

There is also no merit to Relators' theory that MEDHOST "falsely certified its software as to the Meaningful Use 'Auditable Events and Tamper-Resistance' Objective." Am. Compl. § E.

Although security considerations are part of the software certification requirements, Relators do not allege that a CHS hospital ever addressed any security-related criteria as part of a meaningful-use attestation. Nor do they allege any requirement that hospitals attest to security-related criteria in order to receive meaningful-use incentives. As a result, they do not allege any way in which purported problems with the security of MEDHOST's software could have made CHS's attestations false claims.

Moreover, Relators are also wrong to suggest that the alleged security flaws caused MEDHOST to "falsely certif[y] its software." Am. Compl. § E. For one thing, Relators allege that MEDHOST learned about these flaws in October 2014. *Id.* ¶ 254. By then, however, Drummond had *already* tested the security of MEDHOST's software and certified the software based on the results.[9] MEDHOST cannot have "falsely certified" the software when it allegedly learned about these supposed problems only after certification was complete.

The alleged problems also do not suggest that Drummond's certification was inappropriate. To be certified, EHR software must have the *capability* to (1) require user credentials (e.g., a login and password), (2) assign access levels to users, so that not all users can access all information, and (3) log user actions, with only certain users able to disable the logging. *See* 45 C.F.R. § 170.314(d)(1)–(2). Relators allege not that MEDHOST's software lacked these capabilities, but that it "*allowed* all users to access, view, and modify patient and other electronic health information, and to do so without an audit record." Am. Compl. ¶ 249 (emphasis added). But that is a complaint about how the software could have been *used*, not how it was *designed*. No regulation required the software to force its owners to fully configure and utilize the access levels. With no allegation that MEDHOST's software lacked the requisite capabilities, there is no reason to think the software should not have been certified.

### C. Relators Have Not Plausibly Alleged That Any Purported Falsity Was Material to the Government's Incentive Payment Decisions.

Even if Relators had plausibly alleged that CHS's claims for payment were false—i.e., that CHS's meaningful-use attestations were fraudulent—their FCA claims still fail because the purported falsity was not material to the government's decisions to award the meaningful-use

---

[9] Per publicly available data listed on the Certified Health IT Product List, MEDHOST Enterprise 2014 R1, CHP-022017 was certified for 45 C.F.R. § 170.314(d)(2) on February 20, 2014. *See Certified Health IT Product List*, HEALTHIT.GOV, https://chpl.healthit.gov/#/product/5237 (last visited Sept. 24, 2019).

incentive.  Materiality is not only essential to FCA liability but a "rigorous" and "demanding" requirement, reflecting that the FCA "is not an all-purpose antifraud statute." *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

To show materiality, Relators must plausibly allege that the purported falsity would have affected the government's decision on whether to pay the meaningful-use incentive to CHS.  Under this standard, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id*. at 2003–04.  Courts regularly dismiss FCA complaints on materiality grounds.  *See, e.g.*, *United States ex rel. Lorona v. Infilaw Corp.*, No. 3:15-cv-959-J-34PDB, 2019 WL 3778389, at *22 n.30 (M.D. Fla. Aug. 12, 2019) (finding that "Relators have . . . failed to meet their burden of alleging that the [defendants'] purported false certifications of compliance . . . were material to the government's decision to continue providing [payments]"); *Rutledge v. Aveda*, No. 2:14-cv-00145-AKK, 2015 WL 2238786, at *9 (N.D. Ala. May 12, 2015) ("[Relator] alleges the [defendant] certified its compliance with the program, but she never specifically alleges how and why noncompliance with the regulations allegedly violated would prevent payment by the government.").

Relators fail to allege any facts showing that the government would have refused to pay the meaningful-use incentive based on the purported problems with MEDHOST's software.  To the contrary, the government recognized that EHR software would be imperfect and set up a process to address such problems while continuing to make incentive payments in full.  As with any software, after EHR software is released, development companies address bugs and make other modifications on an ongoing basis.[10]  The ONC maintains an oversight program that monitors for software problems that are significant enough to pull a product out of compliance with the certification requirements.[11]  When a hospital first identifies such a problem, known as a

---

[10] Guidance and other materials issued by ONC evidence a clear understanding and expectation that unanticipated bugs and system faults will occur in EHR software, even when such software has been tested and certified.  *See, e.g.*, *How to Identify and Address Unsafe Conditions Associated with Health IT*, HEALTHIT.GOV, https://www.healthit.gov/sites/default/files/How_to_Identify_and_Address_Unsafe_Conditions_Associated_with_Health_IT.pdf (last visited Sept. 24, 2019).

[11] *ONC-ACB Surveillance*, HEALTHIT.GOV, https://www.healthit.gov/topic/certification-ehrs/onc-acb-surveillance (last visited Sept. 24, 2019).

"non-conformity," the ONC expects the hospital to work directly with the software vendor to rectify the issue. *See, e.g.*, 76 Fed. Reg. at 1,284. If the alleged non-conformity is not resolved, the hospital may notify the third party who certified the software, who then must investigate the issue (and who can proactively flag non-conformities as well).[12] If there is a confirmed non-conformity, the software developer must propose a corrective action plan that identifies a remedy and a plan to notify affected users.[13] In all events, however, even when the software is *known* to have become non-compliant, the government does not claw back the users' incentive payments.[14]

Relatedly, the government has *expressly permitted* hospitals to attest to meaningful use even when using software that, though previously certified, has known defects discovered after certification. As once explained with a different vendor's software, the government "does not plan to conduct an audit to find providers who relied on flawed software for their attestation information ... [because it] believe[s] that most providers who were improperly deemed meaningful users would have met the requirements of the EHR Incentive Programs using the updated certified EHR technology."[15]

These government practices for monitoring defects with certified EHR software show that such defects are not material to the government's incentive payments—as they demonstrate that "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled *no change in position*." *Escobar*, 136 S. Ct. at 2003–04 (emphasis added). For this reason, also, Relators' claims against MEDHOST about the meaningful-use program should be dismissed in full.

### D.    Relators Have Not Plausibly Alleged That MEDHOST Acted with Improper Scienter.

Relators' meaningful-use claims against MEDHOST also fail on scienter grounds. Even

---

[12] 45 C.F.R. § 170.556(b).

[13] *Id*. § 170.556(d).

[14] If the corrective action plan does not restore the software's compliance with the ONC standards, the software's certification may then be suspended or withdrawn. *See* 45 C.F.R. § 170.556(d). But the regulations do not penalize the software's past use in any way.

[15]     *See     FAQ     #6097*,     CMS.GOV,     https://wayback.archive-it.org/2744/20180307205953/https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/FAQ_Audit.pdf (last visited Sept. 24, 2019).

if the Court otherwise accepts their theory, Relators do not plausibly allege that MEDHOST knew that CHS would be submitting false claims for payment, or knew such falsity would be material to the government's payment decisions.

The FCA's "language makes plain that liability does not attach to innocent mistakes or simple negligence." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015). Instead, a defendant must knowingly cause the submission of actionable false claims, which means that the defendant must have "actual knowledge of the information," "act[] in deliberate ignorance of the truth or falsity of the information," or "act[] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

Notably, this standard precludes liability for defendants who reasonably believe that they are complying with the applicable legal standards. In such circumstances, where "the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation" of the relevant law, "a defendant who merely adopts one such interpretation" generally should not be deemed "a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007). To that end, scienter is necessarily absent when "the plain language" of the applicable law does not "put [a defendant] on notice" of its non-compliance, and when there is otherwise no reason to believe that the defendant understood the law to prohibit its actions. *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1156 (11th Cir. 2017).

Under these standards, to the extent MEDHOST can be said to have caused the submission of a false claim, MEDHOST did not act knowingly. The regulations above conclusively refute Relators' theory of liability—but if the Court disagrees, MEDHOST's understanding of the regulations is certainly reasonable, and there is no allegation that MEDHOST actually held a contrary view. As a result, Relators have not alleged that MEDHOST knowingly violated the FCA. *See, e.g.*, *United States ex rel. Barrett v. Beauty Basics, Inc.*, No. 2:13–cv–1989–SLB, 2015 WL 3650960, at *5 (N.D. Ala. June 11, 2015) (explaining that "Relators' complaint must contain some *facts* creating an inference" of scienter) (emphasis added).

Separately, even if MEDHOST plausibly had knowledge of the falsity of CHS's claims for payment, no allegation plausibly suggests that MEDHOST "knew at the moment [CHS] sought payment that the non-compliance was material to the government's payment decision." *United States ex rel. Ruckh v. Salus Rehab., LLC*, 304 F. Supp. 3d 1258, 1262 (M.D. Fla. 2018); *see also Escobar*, 136 S. Ct. at 1996 (explaining how liability requires that "the defendant knows [the

19

falsity] is material to the Government's payment decision"). Instead, for the reasons explained above, all indications are that the purported falsity was *not* material, and there is no allegation that MEDHOST believed otherwise.

### E. Relators Have Not Plausibly Alleged the Additional Requirements for Their False Statements Claim.

The problems above are all fatal to all of Relators' FCA claims for the meaningful-use theory. But Relators' false statements claim under § 3729(a)(1)(B) suffers from additional problems as well. As noted above, that provision prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). To claim liability for MEDHOST under this provision, Relators allege that, by making "misrepresentations," MEDHOST "knowingly caused false claims, and false statements material to false claims, to be submitted to the Government." Am. Compl. ¶ 291.

But Relators never allege what these supposed "misrepresentations" and "false statements" by MEDHOST were. Having not identified these statements, Relators also fail to allege how any such statement was false, why any such falsity was material, and how MEDHOST acted with scienter. All of these missing allegations are necessary to false statements liability under § 3729(a)(1)(B). *See, e.g.*, *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1330 (11th Cir. 2009). That claim against MEDHOST should be dismissed as a result.

### F. Relators Have Not Plausibly Alleged a Conspiracy to Violate the FCA.

Relators also have not plausibly alleged that MEDHOST violated § 3729(a)(1)(C) by conspiring to violate the FCA. Relators cannot rest on "bare legal conclusions of conspiracy." *United States ex rel. Mastej v. Health Mgmt. Assocs.*, 869 F. Supp. 2d 1336, 1347 (M.D. Fla. Feb. 16, 2012). Instead, with "specific factual allegations," Relators must allege "(1) that [MEDHOST] conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." *Id.* Relators fall well short of this standard for several reasons.

First, Relators have not adequately alleged an underlying false claim, which "is fatal to a conspiracy claim." *United States ex rel. Stepe v. RS Compounding LLC*, No. 8:13–cv–3150–T–33AEP, 2017 WL 5178183, at *10 (M.D. Fla. Nov. 8, 2017). But Relators also have not alleged the additional components of a conspiracy claim: (1) an agreement into which MEDHOST entered for purposes of violating the FCA, and (2) an overt act committed by any conspirator in furtherance

20

of that agreement. *Mastej*, 869 F. Supp. 2d at 1347. These essential elements must be alleged with particularity under Rule 9(b). *See Stepe*, 2017 WL 5178183, at *9 (rejecting the FCA conspiracy claim because Relator's allegations were "conclusory and insufficient to support that Defendants entered a specific agreement to submit fraudulent claims to the Government or that they took any overt act to fulfill that agreement"). Relators offer no such particularity here, and their conspiracy claim thus must be dismissed.

G. **Relators Have Not Plausibly Alleged a Reverse False Claim by MEDHOST.**

Relators' claim for reverse false claims liability, under § 3729(a)(1)(G), also should be dismissed for several reasons. First, Relators fail to allege *any* conduct by MEDHOST (or, for that matter, any other Defendant) that distinguishes this claim from their presentment or false statement claims. As many courts have held, such a reverse false claims theory should be dismissed as redundant, because otherwise "just about *any* traditional false statement or presentment action would give rise to a reverse false claim action." *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 97 (D.D.C. 2014).[16] The same result should follow here.

Second, Relators fail to allege, even in general terms, the elements of a reverse false claim violation. The provision at issue imposes liability when a person "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Relators are wrong to suggest that this provision can apply when a defendant "knowingly *caused*" the breach of an obligation to pay the Government. Am. Compl. ¶ 301 (emphasis added). Instead of prohibiting the "causing" of another person to shirk an obligation to the Government, this provision applies only when a party avoids its *own* obligation to the Government. *Mastej*, 869 F. Supp. 2d at 1346. Relators do not allege that

---

[16] *See also Burkes v. Dylewski*, No. 1:14-cv-22079-UU, 2016 WL 9526692, at *6 (S.D. Fla. May 3, 2016); *United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 41–42 (D.D.C. 2016); *United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 322 (D.N.J. 2015), *aff'd on other grounds*, 855 F.3d 481 (3d Cir. 2017); *United States ex rel. Davern v. Hoovestol, Inc.*, No. 11-CV-6630 CJS, 2015 WL 6872427, at *9 (W.D.N.Y. Nov. 9, 2015); *United States ex rel. Besancon v. Uchicago Argonne, LLC*, No. 12 C 7309, 2014 WL 4783056, at *4 (N.D. Ill. Sept. 24, 2014); *United States ex rel. Ligai v. ETS–Lindgren Inc.*, No. H–112973, 2014 WL 4649885, at *13 (S.D. Tex. Sept. 16, 2014); *United States ex rel. Sobek v. Education Mgmt, LLC*, No. 10-131, 2013 WL 2404082, at *29 (W.D. Pa. May 31, 2013).

MEDHOST ever had any "obligation" to pay money or property to the Government, or that MEDHOST ever breached any such obligation.

Third, even if Relators had stated a reverse false claims violation in general terms, they have not alleged it with the particularity required by Rule 9(b).  Because reverse false claims liability concerns a defendant's obligation to repay funds, a relator must plead particularized "facts as to the time, place, [and] substance of any retained overpayments" from the federal government. *Taul v. Nagel Enters., Inc.*, No. 14-cv-0061-VEH,  2017 WL 432460, at *13 (N.D. Ala. Feb. 1, 2017).  A relator also must allege "details about the source of the alleged [repayment] obligation" and "the parameters of that obligation,  such as what trigger[ed] the duty to repay and what sort of repayment it require[d]." *Pencheng Si*, 71 F. Supp. 3d at 96; *see also Davern*, 2015 WL 6872427, at *9 (dismissing  reverse false claims claim in part because complaint "fail[ed] to identify  any instance in which the Government requested or demanded that [the defendant] repay money").  Relators do none of this.  For this reason as well, their reverse false claims claim should be dismissed.

## II.   Relators' Kickback Theory Should Be Dismissed.

Finally,  Relators' theory concerning the AKS should also be dismissed.  The AKS is a criminal statute that can be enforced by Relators only through  the FCA, and only if an AKS violation  results in the submission  of a claim to a federal health care program.  42 U.S.C. § 1320a-7b(g).  Because "they are brought as FCA claims," "[v]iolations of the AKS . . . must be pled with particularity  under Rule 9(b)." *United States ex rel. Childress v. Ocala Heart Inst., Inc.*, No. 5:13-cv-470-Oc-22PRL,  2015 WL 13793109,  at *4 (M.D. Fla. July 2, 2015).  For their AKS theory, Relators thus must allege with particularity that MEDHOST knowingly and willfully offered or paid remuneration "in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2);  *see, e.g., United States ex rel. Fla. Society of Anesthesiologists v. Choudhry*, 262 F. Supp. 3d 1299, 1306–07 (M.D. Fla. 2017).

Relators  fall  well short of this standard.  Their kickback theory  is that MEDHOST improperly induced CHS (1) to purchase its EHR software by discounting its financial software and (2) to purchase other software by offering CHS equity in MEDHOST.  *See* Am. Compl. ¶¶ 281–89.  But none of these software products is alleged to have been reimbursable  through a

federal health care program.  As a result, even if MEDHOST paid remuneration in order to induce software purchases, that would not violate the AKS.

Recognizing this requirement, Relators do allege that "[t]he EHR technologies that CHS acquired from Medhost are funded in part by Medicare and Medicaid through the EHR incentive programs." *Id.* ¶ 289.  But these "EHR technologies" are alleged to be the subject of only the purported discounting scheme (not the supposed equity offer). *See id.* ¶¶ 286–87.  And whether Medicare or Medicaid "funded" the development of these "technologies" is beside the point.  What matters is whether the software purchased by CHS is an item "for which *payment may be made* in whole or in part under a Federal health care program," as the AKS requires, § 1320a-7b(b)(2) (emphasis added)—and whether the federal government *actually paid* for the software that CHS purchased, such that any AKS violation would be actionable under the FCA. *Hopper*, 588 F.3d at 1327.  Relators must allege both, but they allege neither.

Relators also have not alleged the supposed discounting scheme with sufficient particularity.  Such an AKS-based FCA theory must be dismissed if, for example, the relator "fails to identify with particularity who arranged the kickbacks, who received the kickbacks, precisely what the incentives were, or when and how they were provided." *Fla. Society of Anesthesiologists*, 262 F. Supp. 3d at 1306–07.  But Relators do not allege who at MEDHOST or at CHS was involved in the alleged discounts.  They do not allege in what way MEDHOST acted "knowingly and willfully" as required by the AKS.  They do not allege when specifically the improper conduct occurred, other than beginning "no later than 2013." *See* Am. Compl. ¶ 281.  They do not allege any facts suggesting that anyone specific at MEDHOST intended the discounts to induce CHS to purchase Medicare-reimbursable software, instead just vaguely claiming this "was commonly known" (which does not suffice). *Bingham v. BayCare Health Sys.,* No. 8:14-cv-73-T-23JSS, 2016 WL 8739056, at *7 (M.D. Fla. Dec. 16, 2016) (finding that Plaintiff's AKS claim failed because "Plaintiff cites to no evidence showing that [Defendants] offered remuneration with the intent to induce referrals"). And they do not allege any facts suggesting that MEDHOST knew its actions were wrong and therefore knowing or willful. *Id.* at *6 (finding that "even assuming that . . . services were provided free or not within fair market value, there is no evidence to suggest, or prove, that [Defendant] offered or paid for such services for the purpose of inducing [referrals]").  Instead, Relators offer only allegations devoid of these crucial details, which does not satisfy Rule 9(b). *See Childress*, 2015 WL 13793109, at *4 (finding that Relator's broad

allegations regarding an AKS scheme were insufficient under Rule 9(b)); *Georgia ex rel. Hunter Labs., LLC v. Quest Diagnostics Inc.*, No. 1:13-cv-01838-SCJ, 2014 WL 12543888, at *5 (N.D. Ga. Mar. 17, 2014) (Plaintiffs' entire discount "argument hinges on the conclusory allegation that Defendants did in fact engage in an improper kickback scheme. As explained by the Eleventh Circuit, '[i]f Rule 9(b) is to carry any water, it must mean that an essential allegation and circumstance of fraudulent conduct cannot be alleged in such conclusory fashion'") (quoting *Clausen*, 290 F.3d at 1313).

## REQUEST FOR HEARING

This case attacks the very essence of MEDHOST's business. The Motion to Dismiss seeks to defend that business by putting in context the lengthy Amended Complaint and complex factual subject matter it raises. Oral argument is appropriate in a case such as this and should help clarify the law and allegations for the Court. MEDHOST believes that thirty minutes will be sufficient time for its argument.

## CONCLUSION

For the reasons discussed above, Relators' Amended Complaint fails to state a claim under Rule 12(b)(6) and fails to satisfy Rule 9(b)'s specificity requirements. The fact that the Amended Complaint, despite its length, has fallen short reflects that Relators have no knowledge of actual fraud by MEDHOST. MEDHOST respectfully asks the Court to spare it further unnecessary expense and dismiss the claims against it with prejudice.

Dated: September 24, 2019

Respectfully submitted,

/s/ Erika Stephanie Whyte

**Stephen G. Sozio**
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
Email: sgsozio@jonesday.com
* admitted *pro hac vice*

**Laura F. Laemmle-Weidenfeld**
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001
(202) 879-3939
Fax: 202-626-1700
Email: lweidenfeld@jonesday.com
* admitted *pro hac vice*

**Erika Stephanie Whyte**
Jones Day
600 Brickell Avenue
Suite 3300
Miami, FL 33131
(305) 714-9700
Fax: (305) 714-9799
Email: ewhyte@jonesday.com
*LEAD ATTORNEY*

**Jessica M. Sarkis**
Jones Day
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939
Email: jsarkis@jonesday.com
* admitted *pro hac vice*

*Attorneys for Defendant MEDHOST, Inc.*

25

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on September 24, 2019, I caused to be electronically filed the foregoing with the Clerk of Court for using the Court's CM/ECF system, which sent notice of such filing to all counsel of record.

/s/ *Erika Stephanie Whyte*
Erika Stephanie Whyte