**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 18-20394-CIV-Scola/Torres

UNITED STATES OF AMERICA ex rel.       )
DEREK LEWIS and JOEY NEIMAN,           )
                                       )
        Plaintiffs,                    )
                                       )
        v.                             )
                                       )
COMMUNITY HEALTH SYSTEMS, INC.,        )
et al.,                                )
                                       )
        Defendants.                    /

**DEFENDANT CHSPSC, LLC'S MOTION TO DISMISS**
**RELATORS' FIRST AMENDED COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW**

LASH & GOLDBERG LLP
Martin B. Goldberg
Florida Bar No. 0827029
Daryl L. Saylor, Jr.
Florida Bar No. 100376
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
Michael L. Waldman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Lauren M. Cassady (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Counsel for Defendant CHSPSC, LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 3

     A.     The Meaningful Use Incentive Program ................................................... 3

           1.     Certified EHR Technology ............................................................ 4

           2.     Meaningful Use Objectives and Measures ................................... 4

     B.     CHSPSC's Participation in the Meaningful Use Program ....................... 6

ARGUMENT .............................................................................................................. 7

I.     RELATORS FAIL TO STATE A CLAIM AGAINST CHSPSC BECAUSE THEY
     DO NOT PLEAD A FALSE ATTESTATION ................................................... 7

     A.     Each Hospital correctly attested that it used certified software, and not that
           the vendor's software *should have been* certified .................................... 7

     B.     Each Hospital correctly attested that it met the required percentages of EHR
           use, and not that the EHR was flawless in every circumstance ............................ 10

           1.     Each Hospital attested to its EHR use meeting required Meaningful
                 Use percentages, and Relators do not challenge the accuracy of
                 those attestations ......................................................................... 10

           2.     The alleged hodgepodge of software problems during the software
                 implementation process does not render the Hospitals' attestations
                 false ........................................................................................... 10

           3.     Each Hospital correctly attested that it provided Clinical Decision
                 Support as required by Meaningful Use ...................................... 13

                 i.     The fall-risk assessment uses the EHR to help health care
                     providers determine care for a particular patient ...................... 133

                 ii.     Condition-specific order sets use the EHR to help health care
                     providers in providing care for particular patients ...................... 15

## TABLE OF CONTENTS—Continued

Page

II.   RELATORS FAIL TO PLEAD FRAUD WITH PARTICULARITY AGAINST CHSPSC ................................................................................................................16

    A.   Relators fail to plead the Who, What, When, Where, and How that would link software bugs to false attestations ................................................................17

    B.   Relators fail to sufficiently plead an FCA violation based on supposed issues with medical reconciliation at the HMA hospitals ....................................19

III.   RELATORS FAIL TO PLAUSIBLY PLEAD WRONGFUL KNOWLEDGE AGAINST CHSPSC ................................................................................................20

IV.   RELATORS FAIL TO STATE A VIOLATION OF THE ANTI-KICKBACK STATUTE ..........................................................................................................22

V.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS AN IMPROPER SHOTGUN PLEADING ..................................................................................24

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*,
  77 F.3d 364 (11th Cir. 1996) ...................................................25

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................22

*Blue Water Innovations, LLC v. Fettig*,
  2019 WL 1904589 (S.D. Fla. Mar. 8, 2019).............................25

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*,
  19 F.3d 562 (11th Cir. 1994) ...................................................16

*Corsello v. Lincare, Inc.*,
  428 F.3d 1008 (11th Cir. 2005) ...............................16, 17, 18, 20

*Durham v. Bus. Mgmt. Assocs.*,
  847 F.2d 1505 (11th Cir. 1988) ...............................................16

*Herengracht Grp. LLC v. WM. Wrigley Jr. Co.*,
  2011 WL 13174744 (S.D. Fla. Aug. 15, 2011)......................20, 24

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
  780 F.3d 1101 (11th Cir. 2015) ............................................20, 24

*U.S. ex rel. Aquino v. Univ. of Miami*,
  250 F. Supp. 3d 1319 (S.D. Fla. 2017) ..................................17, 18

*U.S. ex rel. Atkins v. McInteer*,
  470 F.3d 1350 (11th Cir. 2006) ............................................16, 17

*U.S. ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
  2014 WL 12284079 (S.D. Fla. June 23, 2014) .........................16

*U.S. ex rel. Butler v. Magellan Health Servs., Inc.*,
  101 F. Supp. 2d 1365 (M.D. Fla. 2000).....................................17

*U.S. ex rel. Carmen Medrano v. Diabetic Care RX, LLC*,
  2018 WL 6978633 (S.D. Fla. Nov. 30, 2018)............................24

*U.S. ex rel. Clausen v. Lab. Corp. of Am.*,
  290 F.3d 1301 (11th Cir. 2002) .................................... *passim*

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*U.S. ex rel. Fernandez v. Miami Cancer Inst.*,
  2019 WL 1993513 (S.D. Fla. May 6, 2019) ...............................................................2, 17, 20

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
  43 F. Supp. 3d 332 (S.D.N.Y. 2014).......................................................................22

*U.S. ex rel. Mastej v. Health Mgmt. Assocs.*,
  591 F. App'x 693 (11th Cir. 2014) ...........................................................................18

*U.S. ex rel. Sanchez v. Lymphatx, Inc.*,
  596 F.3d 1300 (11th Cir. 2010) .........................................................................16, 18

*U.S. ex rel. Se. Carpenters Reg'l Council v. Fulton Cty., Georgia*,
  2016 WL 4158392 (N.D. Ga. Aug. 5, 2016) ...............................................................20

*U.S. ex rel. Sheldon v. Kettering Health Network*,
  816 F.3d 399 (6th Cir. 2016) ....................................................................................13

*U.S. ex rel. Tirella v. Klausner Lumber One, LLC*,
  2016 WL 7366891, report and recommendation adopted, 2016 WL 7338442
  (M.D. Fla. Dec. 19, 2016)..........................................................................................25

*United States v. Starks*,
  157 F.3d 833 (11th Cir. 1998) ..................................................................................24

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
  136 S. Ct. 1989 (2016).........................................................................................10, 20

*Urquilla-Diaz v. Kaplan Univ.*,
  780 F.3d 1039 (11th Cir. 2015) ................................................................................20

*Weiland v. Palm Beach Cty. Sheriff's Office*,
  792 F.3d 1313 (11th Cir. 2015) ...........................................................................24, 25

**Statutes, Regulations, and Rules**

31 U.S.C. § 3729.............................................................................................................25

31 U.S.C. § 3730................................................................................................................1

42 U.S.C. § 1320a-7b(b) ...........................................................................................22, 24

42 C.F.R. § 495.6 (2014) .......................................................................................*passim*

42 C.F.R. § 495.8(b) (2014)..........................................................................................4, 7

## TABLE OF AUTHORITIES—Continued

**Page(s)**

45 C.F.R. pt. 170 subpt. C (2011) ................................................................................4

45 C.F.R. § 170.314 ........................................................................................................9

71 Fed. Reg. 45,110 (2006) ..........................................................................................22

75 Fed. Reg. 1844 (2010) .........................................................................................3, 11

75 Fed. Reg. 2014 (2010) ..................................................................................4, 8, 9, 14

75 Fed. Reg. 36,158 (2010) ............................................................................................4

75 Fed. Reg. 44,314 (2010) ...................................................................................*passim*

76 Fed. Reg. 1262 (2011) ..................................................................................4, 8, 11, 12

77 Fed. Reg. 53,968 (2012) .................................................................................4, 5, 11, 14

79 Fed. Reg. 52,910 (2014) ..........................................................................................11

Federal Rules of Civil Procedure 8 .................................................................................1

Federal Rules of Civil Procedure 9 ......................................................................*passim*

Federal Rules of Civil Procedure 12 ...............................................................................1

**Other Authorities**

Clinical Decision Support:  More Than Just 'Alerts' Tipsheet (July 2014), https://
www.healthit.gov/sites/default/files/ clinicaldecisionsupport_tipsheet.pdf ...............14, 15, 16

CMS Attestation User Guide for Eligible Hospitals,
https://www.cms.gov/Regulations-and-Guidance/Legislation/EHR
IncentivePrograms/downloads/HospAttestationUserGuide.pdf ...........................................8, 9

CMS Stage 1 vs. Stage 2 Comparison Tables for Eligible Hospitals,
https://www.cms.gov/Regulations-and-Guidance/Legislation/EHR
IncentivePrograms/Downloads/Stage1vsStage2CompTablesforHospitals.pdf .......................5

Eligible Hospital Attestation Worksheet for Stage 1 of Meaningful Use,
https://www.cms.gov/Regulations-and-Guidance/Legislation/EHR
IncentivePrograms/ downloads/Hospital-Attestation-Worksheet.pdf .......................................5

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Eligible Hospital Attestation Worksheet for Stage 2 of Meaningful Use,
https://www.cms.gov/Regulations-and-Guidance/Legislation/EHR
IncentivePrograms/ Downloads/Hospital_Attestation_Stage2Worksheet.pdf ..........................5

Health IT Feedback Form, https://www.healthit.gov/form/healthit-feedback-form.....................12

Stanford Medicine, *How Doctors Feel About EHR*, https://med.stanford.edu/
content/dam/sm/ehr/documents/EHR-Poll-Presentation.pdf .....................................................3

Jon White, *Do you have a complaint about your EHR?  ONC has a new tool that
might help* (Sept. 16, 2015), https://www.healthit.gov/buzz-blog/health-
it/healthit-complaints .................................................................................................................12

Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), Defendant CHSPSC, LLC ("CHSPSC") respectfully moves to dismiss Relators Derek Lewis and Joey Neiman's ("Relators") First Amended Complaint ("Complaint" or "FAC"), Doc. No. 123, for failure to state a claim upon which relief may be granted.[1]  In support of this motion, CHSPSC states as follows:

## PRELIMINARY STATEMENT

This is a False Claims Act ("FCA") *qui tam* action relating to the incentive program created by the Health Information Technology for Economic and Clinical Health ("HITECH") Act to promote and expand the adoption of electronic health records (commonly called "Meaningful Use").  Based almost exclusively on a smattering of technical glitches and software bugs, Relators allege in conclusory fashion that CHSPSC, its parent Community Health Systems, Inc. ("CHSI"), and 140 hospitals[2] defrauded the Government to obtain Meaningful Use incentive payments for the Hospitals.  But after more than a year of extensive investigation, the Government elected not to intervene.  Doc. No. 20.   Relators, however, chose to still proceed forward alone under 31 U.S.C. § 3730(b)(1), filing an amended Complaint on July 26, 2019.  Although the length of the Complaint grew from 211 to 306 paragraphs, the allegations of fraud remain conclusory and exceedingly general.

Relators fail to identify even a single false statement in any of the hundreds of Meaningful Use attestations that the Hospitals submitted to the government.  The Meaningful Use program required health care providers to attest only that they (1) used certified electronic health record ("EHR") technology and (2) met the applicable measures demonstrating they "meaningfully used" the software.  FAC ¶ 60.  Contrary to the Complaint's central thesis, nothing in the Meaningful

---

[1] References to the docket are abbreviated as "Doc. No."  All emphasis is added unless otherwise noted.  For the purposes of this motion, factual allegations in the Complaint are presumed to be true.

[2] CHSI is a holding company that does not engage in any business other than those activities associated with being a publicly traded stock company.  CHSPSC is a management company that provides services to subsidiary hospital operators which are owned (or leased) and operated by a separate and distinct legal entity.  The Complaint names as defendants 140 individual hospitals, most of which are current or former affiliates of CHSI and CHSPSC.  These affiliated-hospitals will be referred to herein as the "Hospitals" or a "Hospital."

1

Use program required hospitals to investigate whether the vendor's software should have been certified or to second-guess the certification issued by the government regulator. Nor did hospitals need to attest that the software worked flawlessly under all circumstances and never made a mistake. If those were the standards, no hospital would have ever attested and the entire purpose of the Meaningful Use program—namely, to gradually transition providers from paper records to electronic ones—would have been frustrated.

Judged against the actual program requirements, the allegations in the Complaint leave no question that the Hospitals fully complied with their Meaningful Use obligations. Each Hospital used certified software, and it met each of the usage measures required by Meaningful Use. Indeed, Relators do not contest that the software was, in fact, certified, and nowhere do Relators allege that the Hospitals failed to meet the usage percentages stated in their attestations. The Hospitals likewise fully satisfied their obligation to implement clinical decision support interventions by using electronic fall-risk assessments and order sets. Relators' allegations ignore the relevant Meaningful Use standards, cite the wrong standards, or simply invent new standards. But when one evaluates the attestations that the Hospitals made against the *actual* Meaningful Use standards they were required to meet, it is clear the Hospitals attested accurately and truthfully.

Relators also fail to plead the supposed fraud with particularity as Rule 9(b) requires. While they describe an assortment of software glitches that arose at various Hospitals at different points in the software rollout and provide a list of hundreds of attestations submitted by the Hospitals, Relators fail to plead a "nexus" linking those glitches to a false attestation. *U.S. ex rel. Fernandez v. Miami Cancer Inst.*, 2019 WL 1993513, at *3 (S.D. Fla. May 6, 2019). The software problems that Relators allege were often hospital-specific and quickly fixed. These technical problems arose in connection with the 2014 software upgrade required for Meaningful Use Stage 2, but that upgrade occurred months or even years after many of the Stage 1 attestations. Absent from the Complaint is the "who, what, where, when and how" to describe how the software problems translated into false attestations. Further, the Complaint is devoid of any allegation that anyone at CHSPSC ever believed that he or she was causing the submission of a false attestation.

It is certainly true that software bugs in development projects are inevitable, particularly when rolling out a new system across a large organization. CMS in fact recognized from the get-go that EHR technology was a developing area and that "allowances" therefore needed to be made "for downtime and other technical issues with certified EHR technology." 75 Fed. Reg. 1844, 1859/2 (2010). Admittedly, "technical issues" related to the EHR software may have caused many "physician[s] [to be] frustrat[ed] with the system" and some may have even believed that "it [was] an impediment to care, rather than an improvement." FAC ¶¶ 77, 90. But Congress and regulators deemed it vital that hospitals adopt certified software even if there were "technical issues," and CHSPSC and the Hospitals complied with the regulatory requirements. While Relators may believe those decisions to be unwise, the FCA does not govern technical quibbles or guarantee glitch-free software, no matter how much those glitches may "frustrat[e]" doctors.[3] Because Relators fail to plead any actual fraud in the attestations overseen by CHSPSC, their Complaint should be dismissed for failure to state a claim.

## BACKGROUND

### A.     The Meaningful Use Incentive Program

In 2009, Congress passed the HITECH Act. Among other things, the Act created the Meaningful Use incentive program to promote and expand the adoption of EHR. 75 Fed. Reg. 44,314, 44,316/1 (2010). That program paid incentives to doctors and hospitals that implemented and meaningfully used (hence the moniker) EHR technology. *Id.* at 44,314/1. While the technical requirements of the program are complex, the basic requirements for hospitals are straightforward. Hospitals could claim an incentive if they attested that (1) they used EHR software certified to federal standards ("certified EHR technology"), and (2) they met certain performance targets

---

[3] Complaints from health care professionals about the implementation of new software would hardly be unique to CHS; a nationwide poll of physicians reported widespread physician dissatisfaction with EHR systems—with nearly 50% of all physicians reporting that "using an EHR detracts from their clinical effectiveness" and 70% complaining about "interoperability deficiencies." Stanford Medicine, *How Doctors Feel About EHR* at 3, 7, https://med.stanford.edu/content/ dam/sm/ehr/documents/EHR-Poll-Presentation.pdf.

("objectives and measures").  42 C.F.R. § 495.8(b) (2014); *see also* 75 Fed. Reg. 2014, 2016/2 (2010) ("[T]o qualify for incentives, an . . . eligible hospital must both adopt Certified EHR Technology and demonstrate meaningful use of this technology."); FAC ¶ 60 (same).

1.    Certified EHR Technology

The HITECH Act established a comprehensive regulatory regime to review, test, and certify EHR software.  It established the Office of the National Coordinator for Health Information Technology ("ONC") and "charged [the ONC] with the responsibility of creating a voluntary certification program for electronic health record vendors and a program for accreditation of testing laboratories and certifying bodies."   FAC ¶ 4; *see also* 75 Fed. Reg. 36,158, 36,159/1-36,160/1 (2010).  Pursuant to that mandate, the ONC developed and implemented an initial set of certification criteria designed to "support the achievement of . . . meaningful use."  75 Fed. Reg. at 2019/1; *see also* 45 C.F.R. pt. 170 subpt. C (2011) (certification criteria).  The ONC required that all software seeking certification be tested based on those criteria by an independent ONC-authorized laboratory using ONC-approved testing procedures.  76 Fed. Reg. 1262, 1271/1, 1280/2-1281/1 (2011); *see also* FAC ¶ 4.  Based on the results of that testing, an ONC-authorized certification body would assess whether the EHR software met all of the applicable certification criteria and, if so, certify the software.  76 Fed. Reg. at 1271/1.

2.    Meaningful Use Objectives and Measures

Along with the requirement that they obtain certified software, hospitals also had to meet certain usage measures to qualify for an incentive payment.  *See* FAC ¶ 7.  Meaningful Use adopted a phased approach (spread over several "stages") that began modestly to account for limitations in the "available technology capabilities and provider [] experience" but was designed to "build[] up to a more robust definition of meaningful use as [EHR] technology and capabilities evolve[d]."  77 Fed. Reg. 53,968, 53,973/1 (2012); FAC ¶ 53.

Meaningful Use Stage 1 set the bar relatively low to incentivize providers to participate in the program, adopt EHR technology, and become familiar with EHR functionality.  *See* 75 Fed. Reg. at 44,321/2-3.  The usage measures generally were a function of how frequently providers in

4

a hospital performed certain tasks electronically.  For example, hospitals had to attest that they hit certain defined percentages for (a) entering medication orders electronically, (b) recording demographic information, vital signs, smoking status and other patient information electronically, and (c) providing patients with their file and discharge instructions electronically.  42 C.F.R. § 495.6(f)(1), (3)-(8), (11)-(12) (2014); *see also* Eligible Hospital Attestation Worksheet for Stage 1 of Meaningful Use[4] and Eligible Hospital Attestation Worksheet for Stage 2 of Meaningful Use[5] (collectively "CMS Attestation Worksheets").  In addition, hospitals needed to attest that they had implemented certain basic functions of the EHR software, including drug-drug and drug-allergy checks, clinical decision support, and software capabilities to protect patient information in the EHR software.  42 C.F.R. § 495.6(f)(2), (9)-(10), (13)-(14) (2014); CMS Attestation Worksheets. Finally, hospitals attested to meeting a certain number of optional criteria ("menu set objectives") that they selected from a list provided by CMS.  42 C.F.R. § 495.6(g) (2014).

The requirements and percentages ticked up considerably in Stage 2.  *See* 77 Fed. Reg. at 53,973/2.  Stage 2 made more objectives mandatory and reduced the number of optional menu set objectives.  FAC ¶ 56.[6]  It also required hospitals to meet higher usage percentages.  For example, in Stage 1 hospitals satisfied the electronic order criteria if 30% of patients had at least one medication order placed electronically (which translated to a tiny percentage of overall medication orders).  42 C.F.R. § 495.6(f)(1) (2014).  But in Stage 2, the required percentage for electronic orders increased to 60% of all medication orders plus 30% of laboratory and radiology orders.  *Id*. § 495.6(l)(1)(ii); *see* CMS Stage 1 vs. Stage 2 Comparison Tables for Eligible Hospitals.[7]

---

[4] https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/Hospital-Attestation-Worksheet.pdf.

[5] https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/Hospital_Attestation_Stage2Worksheet.pdf.

[6] In 2015, CMS modified Stage 2 to eliminate the concept of "menu set objectives" and require all hospitals to attest to a single set of standards.  FAC ¶ 57

[7] https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/Stage1vsStage2CompTablesforHospitals.pdf.

**B.      CHSPSC's Participation in the Meaningful Use Program**

Just as it was designed to do, the Meaningful Use program incentivized the Hospitals (and many other hospital systems) to transition to EHR technology.  CHSPSC implemented Medhost's 2011 edition software at various of its affiliated hospitals, and 78 of its hospitals used it to attest to Meaningful Use Stage 1.  FAC ¶ 85.  Beginning in late 2013, CHSPSC then engaged in a program to upgrade those hospitals to Medhost's 2014 edition software, which was certified as having capabilities sufficient to satisfy Stage 2.  *Id.*  At the same time, CHSPSC was continuing to implement the Medhost 2011 edition software at its other hospitals that had not yet attested to Meaningful Use Stage 1.  *Id.*

CHSPSC dedicated substantial resources to the rollout of the Medhost EHR technology to the Hospitals.  According to Relators, its Chief Information Officer "managed a large team from CHS's corporate-level operations and IT departments, including a deployment team that implemented Medhost's EHR software at CHS hospitals as well as a clinical applications team that was responsible for testing new software releases and working support tickets from the field."  FAC ¶ 86.  Those "teams were responsible for deploying EHRs at CHS hospitals and for ensuring that the hospitals were prepared to submit Meaningful Use attestations to the Government."  *Id*.

CHSPSC also had a separate team from Internal Audit that was responsible for ensuring that the Hospitals were correctly attesting to Meaningful Use.  This team was "charged with reporting Meaningful Use measures to CMS."  FAC ¶ 89.  It assembled the "Meaningful Use attestation packets," "monitor[ed] Meaningful Use compliance" and handled "operational aspects of the Medhost Meaningful Use reporting tool."  *Id*.  CHSPSC also "hosted regular Meaningful Use Governance meetings" where "CHS executive leadership discussed issues, risks, gaps, and challenges regarding Meaningful Use attestations."  *Id*. ¶ 87.

In January 2014, CHSI acquired Health Management Associates ("HMA"), another hospital system that operated hospitals in over a dozen states.  *See* FAC ¶ 255.  Sixty of those HMA hospitals ultimately submitted Meaningful Use attestations.  *Id*. ¶ 258.  Those attestations began as early as 2012—nearly two years before HMA's acquisition by CHSI.  *See id*. Ex. B.  Like the

6

legacy CHSI-affiliated Hospitals, the HMA hospitals had often used Medhost software (EDIS) in their emergency departments but used a number of different software programs in their inpatient units, including an HMA-developed nursing software called PULSE, medication programs called PatientKeeper and Medical Access Portal, and pharmacy software called Horizon Meds Manager, among others.  *Id*. ¶¶ 22, 262-63.  Stage 2 attestations for the former HMA hospitals did not begin until 2016.  *See id*. Ex. B.

## ARGUMENT

I.    **RELATORS FAIL TO STATE A CLAIM AGAINST CHSPSC BECAUSE THEY DO NOT PLEAD A FALSE ATTESTATION**

A.    **Each Hospital correctly attested that it used certified software, and not that the vendor's software *should have been* certified**

The primary thrust of Relators' allegations is that the EHR software used by the Hospitals "did not meet the requirements for certification as Certified EHR Technology."  FAC ¶ 10.  Relators spend well over 100 paragraphs detailing the various reasons why, in their opinion, the software fell short of meeting the certification criteria.  *See, e.g.*, *id*. ¶¶ 95-190, 203-215, 239-254 (alleging problems with software integration, medication order entry, e-prescribing, clinical decision support, auditing functions, and privacy controls).  Relators further allege CHSPSC and the Hospitals knew that the software "lacked functionality required for certification" and therefore should not have been certified.  *Id*. ¶¶ 12-16.  Because CHSPSC allegedly knew the "functional limitations" of the software, Relators conclude that it knowingly caused the Hospitals to submit "false attestations for incentive subsidies representing that the certified functionalities were met by the [EHR software]."  *Id*. ¶ 19; *see also, e.g.*, *id*. ¶¶ 16, 95, 293.

But those allegations fail to state a claim because each of the Hospitals was only required to attest that it *used* certified software, not that it had independently verified whether the software was properly certified.  42 C.F.R. § 495.8(b)(1)(i)(A) (2014).  In fact, none of the Hospitals could have made the representations Relators attribute to them—even if they wanted to—because the CMS web portal used for attestations only allowed a hospital to provide its "EHR Certification

Number" (a unique number that represents the certified software used for Meaningful Use).  *See* CMS Attestation User Guide for Eligible Hospitals ("CMS User Guide") at 10.[8]  The attestation form offered no place for a hospital to "represent[] that the certified functionalities" were met by the Medhost software or otherwise comment on the quality of the software, precisely because no such representations or comments were necessary.  Relators cannot invent a requirement that did not exist and then seek to hold the Hospitals accountable for failing to do something that was literally impossible to do.

Nothing in the Meaningful Use program required the Hospitals (or CHSPSC) to second-guess the ONC's certification of the software.  To the contrary, the ONC stressed that hospitals "*must be able to rely* on the certifications that are issued by ONC." 76 Fed. Reg. at 1281/3, 1282/3.  The ONC recognized that confirming software functionality was a job for regulators (not hospitals) because, as a practical matter, it would be "difficult for . . . hospitals"—which are not experts in either software design or regulatory certification—"to know whether the [software] they have adopted and implemented will support their achievement of meaningful use."  75 Fed. Reg. at 2022/1.  Once software was certified, hospitals could rely on the certification as an "assurance that the [software] will perform as described," and as "an indication of [its] capabilities and compliance with the certification criteria."  76 Fed. Reg. at 1271/1, 1282/3.  Even Relators concede that Medhost's certification "*enable[d] its customers to claim incentive payments* . . . provided they met the requirements for demonstrating Meaningful Use."  FAC ¶ 75.

Here, Relators tellingly do not—and cannot—allege that the Hospitals were using uncertified software.  Relators instead admit that "Medhost received certification" for the various versions of its software used by the Hospitals.  *Id*. ¶¶ 107-110, 131, 149-152, 204.  Relators likewise do not allege that PULSE and the other software used at the HMA hospitals were actually uncertified.  No matter how much Relators disagree with the ONC's decision to issue those certifications, they cannot dispute that the Hospitals told the truth when they attested to using

---

[8] https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/HospAttestationUserGuide.pdf.

software that was certified, by an independent regulatory body, to the ONC's criteria.  Because Meaningful Use required nothing more, Relators' false certification claims must fail.

Relators' allegations about improper integration between the Medhost EDIS (used in the emergency department) and the inpatient Enterprise program fail for the same reason, namely that the Hospitals' attestations made *no* representations whatsoever about software integration across different departments within a single hospital.  Far from requiring such attestations, the regulations made clear that CMS was "*not* requiring the certification of combinations of certified EHR Modules, just that the individual EHR Modules combined have each been certified to all applicable certification criteria in order for such a 'combination' to meet the definition of Certified EHR Technology." 75 Fed. Reg. at 2023/2.  Nor was there space on the attestation form for hospitals to make any representations about integration—CMS simply required hospitals to provide their EHR Certification number, which confirmed that all of the software used by the hospital was certified (whether as a Module or Complete EHR system).  *See* CMS User Guide at 10.  Because the Hospitals did not (and were not required to) make any attestation as to integration, any integration allegations necessarily fail to render the Hospitals' actual attestations false.[9]

Instead of identifying any false statement purportedly made by the Hospitals about the software's certification, Relators take the novel position that the Court can ignore the ONC's certification and retroactively declare the software uncertified because—in Relators' opinion—it "did not meet the requirements for certification as Certified EHR Technology." FAC ¶ 10; *see also, e.g.*, *id.* ¶ 95 ("Medhost's EHR technologies lacked the functionality required for the technology to be eligible for certification as certified EHR technology.").  But the FCA is not an invitation for private parties to second-guess regulatory decisions or a vehicle to punish regulatory

---

[9] Similarly, Relators' allegations about e-prescriptions (FAC ¶¶ 239-247) also fail because e-prescriptions were not required for health care providers to attest to Meaningful Use. While *software* certification required certain e-prescribing capabilities, 45 C.F.R. § 170.314(b)(3), e-prescribing was *not* an objective at all for hospitals in Stage 1 of Meaningful Use and was an *optional* objective for Stage 2, *see* 42 C.F.R. § 495.6(m)(4) (2014).  Tellingly, Relators do not allege that any Hospital actually opted to rely on that criteria for its Stage 2 attestation and therefore fail to plead that any of the Hospitals' attestations were false.

violations—it protects the government from *fraud*. *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016). No matter how fervently Relators disagree with the ONC's decision to certify, they cannot contest that the Hospitals were truthful in attesting to their use of certified software. Accordingly, Relators' allegations regarding CHSPSC's supposed knowledge of the "functional limitations" that should have precluded the Medhost or PULSE software being certified—which, again, comprise the bulk of the allegations in the Complaint—fail to state an FCA claim against CHSPSC and should be dismissed.

**B.      Each Hospital correctly attested that it met the required percentages of EHR use, and not that the EHR was flawless in every circumstance**

1.      Each Hospital attested to its EHR use meeting required Meaningful Use percentages, and Relators do not challenge the accuracy of those attestations

As required, each of the Hospitals attested that it met the percentage-measures for the core objectives and any menu set objectives used to satisfy that stage of Meaningful Use. Those measures generally required that a certain percentage of a given task be done in the EHR (*e.g.*, Stage 1 required at least one electronic medication order for 30% of a hospital's patients; Stage 2 required electronic entry for 60% of all medication orders). 42 C.F.R. § 495.6(f)(1), (l)(1) (2014). Critically, Relators nowhere contend that any of the Hospitals falsely attested to meeting any of those percentages during the five-year period covered by the Complaint. They do not allege that any Hospital falsely attested to meeting the percentages required for medication orders, vital signs, demographic data, diagnoses, medication lists, allergy lists, or any of the other objectives that required a specific percentage of use. Indeed, they are silent about those percentage measures, essentially conceding that the Hospitals' attestations about these percentages—which comprised the bulk of the statements in the attestation—were truthful and accurate.

2.      The alleged hodgepodge of software problems during the software implementation process does not render the Hospitals' attestations false

Instead of alleging specific false statements in the Hospitals' attestations, Relators throw a variety of software glitches at the wall in the hopes that something will stick. Although Relators make sweeping declarations about issues with the software's "accuracy," "safety" and "reliability,"

the actual glitches described in their Complaint arose at different hospitals at different times across the multi-year software implementation process and were quickly addressed.[10]  While unfortunate, some number of bugs and glitches are an unavoidable reality in software development, particularly in a complex field like healthcare.  But software bugs and technical glitches are not the stuff of a federal fraud claim, especially here given that CMS expressly provided "allowances" for "technical issues" that arose "with certified EHR software."  75 Fed. Reg. at 1859/2.

The Hospitals never attested that the Medhost EHR software worked flawlessly on every occasion or ruled out the possibility of bugs "under certain circumstances."  Demanding perfection for software used across hundreds of hospitals with tens of thousands of individual users would set an impossible goal.  Such software simply does not exist.  If that were the test, no software would ever have been certified and no hospital ever would have attested.  That would have stymied the entire goal of the Meaningful Use program—gradual adoption of EHR—and left patients worse off because of the dangers inherent in a system of paper medical records.

Of course, perfection was not the test.  Attestation required hospitals to hit specific usage percentages; it did not require any nebulous attestation as to accuracy or reliability.  Ensuring that the software had the required functionality and worked as designed was a job for the ONC and its certification process, not hospitals.  Again, the regulations are clear that hospitals "*must be able to rely* on the certifications that are issued by ONC."  76 Fed. Reg. at 1281/3, 1282/3.  To assess whether the software was sufficiently "reliable" or "accurate," the Court would have to engage in an impossible line drawing exercise for which there are no set standards—an undertaking that

---

[10] Virtually all of the technical problems Relators allege date from 2014, when CHSPSC and the Hospitals were in the process of upgrading to the 2014 edition software.  That is no surprise because the 2014 upgrade proved challenging for hospitals across the industry.  Recognizing that the upgrade was proving challenging, CMS responded by reducing the attestation period (from the full fiscal year to three months) to give providers more time to implement the upgraded software and also adopted the Flexibility Rule, which allowed providers to attest to the less challenging Stage 1 measures instead of Stage 2.  *See* 77 Fed. Reg. at 53,974/1-53,975/2; 79 Fed. Reg. 52,910, 52,912/2-52,913/3 (2014).

courts are technically ill-equipped to handle.  That is an inherently regulatory inquiry, which the Meaningful Use program properly delegated to the ONC.[11]

The regulatory scheme devised by CMS and ONC confirms that understanding.  CMS has frankly acknowledged that hospitals were "bound to experience challenges with the technology."[12] When such problems arose, ONC instructed hospitals to work with their vendors to resolve problems—including "issue[s] related to the product's certified capabilities."  Health IT Feedback Form.[13]  "If the developer/vendor [was] unable to resolve the issue and . . . the issue relates to the product's certified capabilities," then the ONC provided a vehicle for hospitals (and others) to provide feedback either to the ONC-Authorized Certification Body or to the ONC itself.  *Id.* Regardless of the avenue taken, the ONC made clear that the software's certification would remain valid as the vendor worked to identify and correct the technical problem.  76 Fed. Reg. at 1282/1-1285/1.  Relators are simply wrong in their conclusion that concerns about certified software's "accuracy," "reliability," and "safety" could, standing alone, render a hospital's attestation false.

Moreover, many of the problems identified by Relators involve software features that are not required by the Meaningful Use program.  These "add-ons" built into the Medhost software include the "Send Dose Now" feature and the "Physician's Favorites" feature.  FAC ¶¶ 160-164, 174-179.  Those features are not required for a hospital to attest to satisfying the Meaningful Use objectives and measures in either Stage 1 or Stage 2.  *See* 42 C.F.R. § 495.6 (2014).  While such

---

[11] Relators also try to dress up their technical complaints about the Medhost software by resorting to rhetoric about how these software issues "endanger[ed] patient[]" safety.  FAC ¶ 77.  Yet, a careful reading of the Complaint reveals that it lacks any factual allegations of *actual* patient harm. Discussion of possible safety concerns are constant at hospitals because nearly every interaction with a patient presents at least some potential safety risk.  Despite their hyperbolic prose, Relators do not allege a single patient suffered an adverse outcome due to the Medhost or PULSE software.
[12] Jon White, *Do you have a complaint about your EHR?  ONC has a new tool that might help* (Sept. 16, 2015), https://www.healthit.gov/buzz-blog/health-it/healthit-complaints.
[13] https://www.healthit.gov/form/healthit-feedback-form.

features may make the software more user friendly, claims that those bells-and-whistles are broken do not affect whether a hospital can attest to meeting Meaningful Use's requirements.

In any event, Relators readily acknowledge that CHSPSC employed enormous resources to quickly identify and remediate any software issues—they concede that CHSPSC quickly mobilized "critical issues calls" with CHSPSC and hospital executives to address those issues and issued advisory memoranda flagging issues for the Hospitals. *See, e.g.*, FAC ¶¶ 91-92. Dedicating resources and high-level personnel to fixing problems and ensuring compliance is not exactly a fraudster's *modus operandi*; such conduct reflects CHSPSC's efforts to satisfy the Meaningful Use requirements and attest in good faith. Given these defects and concessions, Relators' allegations of software problems fail to plead a plausible submission of a knowingly false attestation. *See, e.g.*, *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 410 (6th Cir. 2016) (alleged software problems fail to support claim of knowingly false attestations).

>  3.  Each Hospital correctly attested that it provided Clinical Decision Support as required by Meaningful Use

Relators make only one allegation that relates to the actual requirements needed for Meaningful Use attestation. According to Relators, the Hospitals did not satisfy the requirements for clinical decision support ("CDS") interventions because the electronic interventions adopted by them fall outside the regulatory definition. But Relators fundamentally misconstrue the CDS requirement. In fact, CMS provided hospitals with a capacious definition of CDS that was intended to give hospitals "significant leeway" to choose interventions best suited for their patients. 75 Fed. Reg. at 44,350/2 (expressly rejecting comments suggesting "a more limiting description"). The CDS that the Hospitals adopted fit well within the terms of the regulation.

>  i.  The fall-risk assessment uses the EHR to help health care providers determine care for a particular patient

In Stage 1, the Meaningful Use regulations required hospitals to adopt one CDS intervention. 42 C.F.R. § 495.6(f)(10)(ii) (2014). To satisfy that requirement, a number of the Hospitals implemented an electronic assessment to identify patients at a high risk for a fall and to

assign an appropriate care plan.  That fall-risk assessment was built into the EHR.  FAC ¶ 222.  To assess whether a patient required particularized care, nurses were electronically provided with a series of fall-risk-related questions to which the nurses assigned scores.  *Id*.  If the cumulative score of those questions exceeded 25, the EHR prompted the nurse to enter an appropriate care plan for the patient.  *Id*. ¶ 223.  Relators argue that the fall-risk assessment does not qualify as CDS because (1) it fails to meet the criteria required for CDS, and (2) the Hospitals lacked the ability to track compliance.  *Id*. ¶¶ 225-227.  Both arguments miss the mark.

Relators' first argument fails because it misconstrues the standard that the Hospitals attested to meeting.  Relying on the *software certification criteria*, Relators argue that the Hospitals failed to meet the regulatory requirements because the fall-risk assessment was not "automated, electronic . . . , [and] based on the data elements" from the problem list, medication list, demographics, and laboratory test results.  *Id*. ¶¶ 216-217.  But those are certification criteria that the *software developers* must meet—the ONC made plain that they "do *not* establish requirements for health care providers, such as . . . hospitals to follow."  75 Fed. Reg. at 2024/1.  In the actual hospital requirements, CMS granted hospitals "significant leeway" to pick the CDS that would best serve their patients and practices.  75 Fed. Reg. at 44,350/2.[14]  And CMS "encourage[d]" hospitals to consider meeting the CDS objective with "patient or disease specific documentation forms/templates that remind the provider to capture essential historical or physical exam findings for a patient with a certain condition."  77 Fed. Reg. at 53,997/1.  The electronic fall-risk assessment is just such a form/template.  CMS's regulatory guidance likewise noted that a "CDS tool could inform a provider that a patient has a reportable condition," like "*a fall,*" and "provide a template to ensure capture of all of the information necessary to complete reporting."  Clinical

[14] CMS' regulatory guidance stressed that "there is no definitive or comprehensive list of what can constitute CDS" and that "ONC and CMS broadly interpret CDS . . . and understand that there are a wide array of innovative and effective decision support tools available to providers."  CDS Tipsheet at 1-2.  "CDS encompasses a variety of tools including, but not limited to: computerized alerts and reminders for providers and patients; clinical guidelines; condition-specific order sets; focused patient data reports and summaries; documentation templates; diagnostic support; and contextually relevant reference information." *Id*.

14

Decision Support:  More Than Just 'Alerts' Tipsheet (July 2014) ("CDS Tipsheet") at 3.[15]  If electronically populating a form to report a fall satisfies the Meaningful Use requirement for CDS, there is no reason why electronically prompting a nurse for data to avoid a fall would not; if anything, the latter better cares for the Hospitals' patients by attempting to avoid falls, rather than just reporting them after the fact.

Relators' second argument fares no better.  Relators allege that the fall-risk assessment was flawed because the Hospitals "lacked the ability to track providers' compliance with the 'intervention' . . . which was also an objective required by CMS under MU1."  FAC ¶ 227.  This, again, misstates the Meaningful Use requirement.   While "track[ing] compliance" with CDS is a long-term objective of the EHR program, it was not a required measure in Stage 1.  *Compare* 42 C.F.R. § 495.6(f)(10)(i) (2014) (objective), *with id.* § 495.6(f)(10)(ii) (measure).  The Stage 1 Final Rule explained that CMS intentionally "did not include this aspect of the objective in the measure for Stage 1 of meaningful use" and, thus, hospitals are "not required to demonstrate . . . compliance efforts with the CDS recommendations or results for Stage 1."  75 Fed. Reg. at 44,351/2.

ii.  Condition-specific order sets use the EHR to help health care providers in providing care for particular patients

In Stage 2, the Meaningful Use measures required hospitals to adopt five CDS interventions.  42 C.F.R. § 495.6(l)(5)(ii)(A).  To satisfy that requirement, the Hospitals developed order sets tailored to specific clinical conditions.  FAC ¶ 233.  Relators again argue that the order sets did not qualify as CDS because they were "static and did not change or trigger alerts based on the patient's problem list, medication list, demographics, vital signs, or lab results," and the "EHR also did not suggest particular order sets to providers based on patient information."  *Id.* ¶ 234. But, yet again, Relators confuse the *software certification criteria* with the *Meaningful Use measures* that the Hospitals attested to meeting.  Like the fall-risk assessment, the tailored order sets fit easily within the "significant leeway" CMS afforded to providers to select appropriate CDS. 75 Fed. Reg. at 44,350/2.  And if there was ever any doubt, the administrative guidance puts it to

---

[15] https://www.healthit.gov/sites/default/files/ clinicaldecisionsupport_tipsheet.pdf.

rest.  That guidance expressly identifies "*order sets tailored for a particular condition, disease, or clinician preference*" as "types of CDS interventions consistent with HHS' broad definition."  CDS Tipsheet at 3.

## II.  RELATORS FAIL TO PLEAD FRAUD WITH PARTICULARITY AGAINST CHSPSC

FCA claims must be stated with particularity under Rule 9(b).  *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002).  That heightened pleading standard requires relators to plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen*, 290 F.3d at 1310 (internal quotation marks omitted).  Relators cannot use a general allegation that "improper practices took place everywhere [the defendant] does business" to avoid their burden of pleading specific facts about the allegedly fraudulent claims.  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005) (per curiam).  Absent allegations of the "specific details" related to the submission of the allegedly fraudulent claims, Rule 9(b) requires dismissal.  *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302-03 (11th Cir. 2010).

The Eleventh Circuit "rigidly enforces Rule 9(b)'s particularity requirement." *U.S. ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, 2014 WL 12284079, at *2 (S.D. Fla. June 23, 2014).  Steadfastly applying that strict standard may "make[] it hard for many persons to bring a *qui tam* suit," but that is by design to prevent "speculative suits" that allege only "guilt by association."  *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567 (11th Cir. 1994) (per curiam).  The Eleventh Circuit has stressed that Rule 9(b) serves an "important purpose . . . by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior."  *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (internal quotation marks omitted).  "[R]igid enforce[ment]" is "especially important" in the FCA context given the "quasi-criminal nature of

FCA violations" and the risk that a "relator's strong financial incentive . . . [will] precipitate the filing of frivolous suits." *Atkins*, 470 F.3d at 1360.

A.    **Relators fail to plead the Who, What, When, Where, and How that would link software bugs to false attestations**

Relators allege a variety of isolated complaints about the Medhost software, but Rule 9(b) requires them to also plead the factual details that link those supposed glitches to actual false attestations. *See Corsello*, 428 F.3d at 1013.[16]  Relators fail to do so, lacking any of the who, what, when, where, and how required by Rule 9(b).  Each attestation represented that a Hospital met over a dozen distinct Meaningful Use measures over a specific period (generally 90 days).  Which of the more than 500 attestations by the Hospitals here do Relators contend were false?  Who made the attestation?  What statements in the attestation(s) regarding measures or objectives do Relators contend were false?  How did the software problems alleged by Relators cause those statements to be false?  When did the software glitches arise and did they overlap with the critical 90-day reporting period used for attestation?  The Complaint leaves *all* of those questions unanswered. Indeed, Relators fail to allege facts that would link any of the software glitches to even one false attestation, much less every attestation that was ever submitted for a CHSI-affiliated hospital. Because Rule 9(b) requires more, the claims should be dismissed.  *Corsello*, 428 F.3d at 1013; *Clausen*, 290 F.3d at 1311; *Fernandez*, 2019 WL 1993513, at *3.

Instead of pleading facts about any specific attestation(s), Relators simply allege that all of the Hospitals' attestations were false and provide an exhibit that purports to list all of the Hospitals' attestations.  *See* FAC ¶¶ 16, 19 & Ex. B.  Even in cases of supposedly widespread fraud, Rule 9(b) requires particular factual allegations tied to specific claims, not just a conclusory allegation that all claims were false. *See U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d

---

[16] *See also Clausen*, 290 F.3d at 1311 (allegedly improper practices do not give rise to an FCA claim unless relator can show that "as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe"); *Fernandez*, 2019 WL 1993513, at *3 (quoting *U.S. ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1329 (S.D. Fla. 2017)) (requiring relators to plead "nexus" between improper practices and claims).

1365, 1369 (M.D. Fla. 2000); *see also Clausen*, 290 F.3d at 1311.  Relators' exhibit merely lumps together hundreds of attestations—each certifying compliance with over a dozen objectives and measures—from over a hundred different Hospitals attesting to different stages of Meaningful Use (and different menu set criteria within each stage) based on different reporting periods.  Rule 9(b) requires much, much more.  *Sanchez*, 596 F.3d at 1302-03.[17]

Many (if not the majority) of the software problems identified in the Complaint are hospital-specific issues and cannot be blindly generalized to hundreds of other CHSI-affiliated hospitals across the country that attested at different times for different stages of Meaningful Use with different procedures and software.  For example, an allegation that an Indiana facility had a problem sending pharmacy orders through one software application in March 2014 has no bearing on a problem with a different application at a Texas facility over a year later.  FAC ¶¶ 187-188.  And it certainly fails to support any inference that the same glitch impacted the other 138 Hospitals in every year they attested.  Rule 9(b) bars Relators from citing isolated software bugs and then simply assuming they must have impacted all the other Hospitals.  *See Corsello*, 428 F.3d at 1013.

The pleading defect is even more glaring when considering the total mismatch between Relators' factual allegations and the attestations submitted in 2012 and 2013.  The Complaint principally alleges that software problems *began in 2014*; it contains *no* allegations of any glitches in 2011 or 2012 and only a single glitch in 2013.  *See* FAC ¶¶ 88, 197.  Yet Exhibit B lists hundreds of attestations that the Hospitals submitted in 2012 and 2013.  Relators have not—and cannot— plead the specific facts demonstrating the required nexus between alleged software problems in 2014 and the attestations that the Hospitals submitted months or even years earlier.

---

[17] While this Circuit permits more general pleadings when the Relators have "first-hand knowledge of the defendants' billing practices," *U.S. ex rel. Mastej v. Health Mgmt. Assocs.*, 591 F. App'x 693, 704 (11th Cir. 2014), that is not the case here.  Relators allege that other CHSPSC employees were responsible for preparing and submitting the attestations; Relators had no role in that process and therefore cannot rely on "personal knowledge" to satisfy their burden of linking the alleged software flaws with the submission of actual false claims to the government.  *See Aquino*, 250 F. Supp. 3d at 1333-34.

Even as to the claims submitted after 2014, Relators' allegations still fail to plead that the timing of the software problems overlapped with the critical attestation period.  According to Relators, many of the glitches were identified and addressed *months* before the Hospitals attested for a given year.  For example, Relators allege that CHSPSC identified problems with the medical reconciliation on May 9, 2014 and fixed those problems by June 2014—more than four months before any of the Hospitals attested for 2014.[18]  *See* FAC ¶¶ 137-138 & Ex. B.  Indeed, the entire point of quickly identifying and addressing those bugs was to "ensur[e] that the hospitals were prepared to submit Meaningful Use attestations to the Government."  FAC ¶ 86.  Absent factual allegations showing that a software problem overlapped with the attestation period for any particular hospital, Relators' claims must fail.

### B.      Relators fail to sufficiently plead an FCA violation based on supposed issues with medical reconciliation at the HMA hospitals

Relators' claim that the HMA hospitals falsely attested to medical reconciliation fails for similar reasons.  According to Relators, the way that medical reconciliation was handled at those hospitals rendered them noncompliant with the reconciliation requirements for both Stage 1 and Stage 2.  FAC ¶¶ 265-271.  They are wrong on both accounts.

*First*, Relators are mistaken that medical reconciliation was required in Stage 1.  *See* FAC ¶¶ 266-267.  In fact, medical reconciliation was an *optional* "menu set objective" and hospitals could freely choose to select another menu set item if they were unable to attest to medical reconciliation. *See* 42 C.F.R. § 495.6(g)(6) (2014).  Relators' own exhibit indicates that *only three* of the HMA hospitals (Merit Health River Oaks, Merit Health Woman's Hospital, and Toppenish Community Hospital) actually attested to reconciliation in Stage 1.  *See* FAC, Ex. B at 31, 39.  For the other 57 HMA hospitals, alleged reconciliation issues are irrelevant to their Stage 1 attestations.

---

[18] Similarly, Relators fail to allege any link between problems relating to order sets identified in *March 2014* and the attestations submitted more than seven months later.  *See* FAC ¶¶ 194-202 & Ex. B.  Given that CHSPSC only required a "one to two week process to clean up" the order sets, *id.* ¶ 198, this problem was almost surely resolved long before the Hospitals began attesting in October 2014.

Even for the HMA hospitals that did attest based on medical reconciliation, Relators fail to sufficiently plead a claim.  Relators allege that the HMA hospitals could not meet the required percentage for reconciliation because "[p]hysicians could not electronically reconcile the clinical information in PULSE," the nursing software used in the HMA inpatient setting.  FAC ¶¶ 269-270.  But nothing in the regulations requires that reconciliation be performed only by doctors, over other healthcare professionals (like nurses).  And problems with inpatient reconciliation would render an attestation false only if they pushed the *overall hospital percentage* for all hospital settings (*e.g.*, the emergency department, outpatient procedures) below the required 50% threshold.  *See* 42 C.F.R. § 495.6(l)(10)(ii) (2014).  Relators do not allege that was the case at any of the HMA hospitals.  Their claims therefore fail to link the alleged software limitation to a false attestation.  *Corsello*, 428 F.3d at 1013; *Clausen*, 290 F.3d at 1311; *Fernandez*, 2019 WL 1993513, at *3.

## III. RELATORS FAIL TO PLAUSIBLY PLEAD WRONGFUL KNOWLEDGE AGAINST CHSPSC

To trigger FCA liability, Relators "must show that the defendant acted knowingly" or with "reckless disregard," rather than as a result of "innocent mistakes or simple negligence."  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015).  That scienter requirement is "rigorous."  *Escobar*, 136 S. Ct. at 2002.  "[K]nowledge is not shown by simply saying . . . that Defendants are saying something that is not true" or that they "should have done their job better."  *U.S. ex rel. Se. Carpenters Reg'l Council v. Fulton Cty., Georgia*, 2016 WL 4158392, at *11 (N.D. Ga. Aug. 5, 2016).  And although Rule 9(b) allows knowledge to be pled generally, it still requires Relators to plead "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."  *Herengracht Grp. LLC v. WM. Wrigley Jr. Co.*, 2011 WL 13174744, at *4 (S.D. Fla. Aug. 15, 2011).  "[B]are assertion[s]" and "legal conclusion[s]" will not suffice.  *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015).

Relators have not alleged that anyone at CHSPSC believed any attestation was false. There are no meetings, conversations, or emails where CHSPSC personnel are making incriminating statements about the falsity of the attestations.  The Complaint is entirely bereft of factual

20

allegations supporting a cover up or concealment on the part of CHSPSC.  To the contrary, Relators themselves assert that CHSPSC devoted "considerable resources" to addressing software problems and explain how a "large team" of CHSPSC employees, including "CHS executive leadership," worked hard to fix the glitches and bugs as they arose.  FAC ¶¶ 12, 86-87, 91-92.  Relators provide no reason to believe that those efforts were anything other than successful in resolving any technical problems.  And, more importantly, Relators allege no facts indicating that anyone at CHSPSC believed those software issues would prevent any of the Hospitals from truthfully attesting to satisfying Meaningful Use. Put simply, the Complaint fails to allege that anyone at CHSPSC believed any of the hundreds of attestations were false when submitted.

Relators' allegations relating to the HMA hospitals highlight their failure to plead wrongful knowledge.  *First*, the Complaint alleges *no facts* about the conduct of the HMA hospitals prior to the January 2014 merger with CHSI.  Any claims based on hospital attestations from 2012 and 2013 should therefore be dismissed.   *Second*, Relators rely on presentations by Accenture in December 2013 and January 2014 for their allegations about the post-merger attestations. FAC ¶¶ 272-275.  But these presentations *cut against* scienter.   Accenture (a consulting firm) analyzed HMA's IT systems (including its EHR system) and provided CHSPSC with a roadmap on how to meet MU Stage 2 requirements.  *Id*.[19]  That remedial plan was delivered nearly *two years* before any of the HMA hospitals attested to meeting Stage 2.  *See id*. Ex. B, at 14 (earliest Stage 2 attestation in January 2016).  That the HMA hospitals waited years to attest to Stage 2 (and therefore had more than ample time to implement the necessary software) militates against any inference that the attestations for these hospitals were intentionally false.  It would make no sense to pay a well-respected consultant for a plan on how to meet requirements going forward and wait years to attest if CHSPSC intended to just lie its way to Stage 2 incentive payments.  Relators'

---

[19] Accenture also reported that HMA hospitals *returned* $31 million in incentive payments, which is also inconsistent with intentional fraud.  It would be a strange fraud indeed if CHSPSC lied to get incentive payments but was also truthful enough to return them.

factual allegations never move their claim of fraudulent intent across the line from merely possible to plausible.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## IV.   RELATORS FAIL TO STATE A VIOLATION OF THE ANTI-KICKBACK STATUTE

The Anti-Kickback Statute ("AKS") prohibits the receipt of "any remuneration . . . in return for purchasing . . . or recommending purchasing . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b); *see also U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 362 (S.D.N.Y. 2014) (AKS bars "kickbacks in exchange for recommending the purchase of items reimbursed by a 'Federal health care program.'").  Relators primarily allege that Medhost violated the AKS by providing CHSPSC with free licenses for Medhost's financial software in an effort to induce CHSPSC to purchase licenses for Medhost's EHR software.  *See* FAC ¶¶ 281-288.

Those allegations fail to allege a violation of the AKS because the Meaningful Use incentive payments (the only federal health care payment at issue) did not reimburse CHSPSC for its purchase of the Medhost EHR software.  The "ambit of the [AKS]" is limited to items "*reimbursable* under Medicare or Medicaid."  71 Fed. Reg. 45,110, 45,113/2 (2006).  Here, the Hospitals' entitlement to an incentive payment, as well as the amount of the incentive payment, was not tied to the purchase of the EHR software.  Instead, a hospital could claim a payment only if it meaningfully *used* the software.  *See* FAC ¶ 60.  And, as Relators acknowledge, the amount of the incentive payments for eligible hospitals was "the product of three factors"—the number of discharges, the Medicare/Medicaid share percentage, and the year that the hospital began receiving incentive payments—that were unrelated to the cost of purchasing the EHR software.  *Id*. ¶ 62.[20] Indeed, the Meaningful Use incentive payments do not resemble reimbursement agreements.  Once a hospital proved that it meaningfully used EHR software, it received the full incentive payment

---

[20] The Complaint alleges that the incentive payments for critical access hospitals are partly based on the costs of the EHR software.  FAC ¶ 65.  But virtually all of the named Hospitals are *not* critical access hospitals, and the Complaint does not allege that the alleged free financial licenses induced purchases of EHR software by any critical access hospitals.

amount even if that amount greatly exceeded or was far less than the cost of purchasing the EHR software.[21]  Because no federal health care program paid to reimburse CHSPSC or the Hospitals for purchasing the EHR software, the AKS is inapplicable here.

Even if the AKS did apply, any claim based on the AKS still fails because Relators again fail to plead with particularity as Rule 9(b) requires.  Relators allege that Medhost provided "free licenses to at least 19 CHS hospitals."  FAC ¶ 281.  Which Hospitals got that software?  When did they get it?  Who was involved in the alleged agreement?  When was this agreement?  Was it a written agreement or oral?  And how do Relators know that the "free licenses" were "intended to induce [CHSPSC] to purchase EHR software?"  *Id*. ¶ 284.  Relators' threadbare allegations either leave those questions entirely unanswered or rely on general and conclusory claims that the information "was commonly known and discussed among CHS employees."  *Id*.  Such pleadings are patently insufficient under Rule 9(b).  *See Clausen*, 290 F.3d at 1310.[22]

Relators' allegations related to a supposed agreement to purchase equity in Medhost are, somehow, even more conclusory.  Relators allege that "CHS" agreed to purchase a separate Medhost surgical software (Perioperative Information Management System or "PIMS") and, as part of that purchase, also "entered into a side-agreement whereby CHS obtained equity in Medhost."  FAC ¶ 285.  But Relators do not allege any connection between PIMS and the Meaningful Use incentive payments.  Nor do Relators allege which CHS entity entered those agreements, the employees who negotiated those agreements, the terms of the "side agreement," or anything about either agreement that would remotely resemble a kickback.  Indeed, the Complaint concedes that none of the PIMS purchase documents that the Relators saw "included any reference to a $25 million equity exchange."  *Id*. ¶ 286.  Instead of providing details about the

---

[21] That the Meaningful Use incentive program would have subjected hospitals to *negative* payment adjustments for non-use of the software (FAC ¶ 64) further confirms that the incentive payments were to pay hospitals for meaningful use of the EHR software—not its purchase.

[22] The lack of specificity about this allegation is not surprising.  Even if this claim could survive, the evidence will clearly demonstrate that Medhost never provided licenses for financial software; rather, all such licenses were paid for by CHSPSC under its agreements with Medhost.

actual agreements or those involved in them, the Complaint relies exclusively on "discussions" that Relator Lewis claims to have had in which he claims to have been told by another employee that the then-CFO of CHSI insisted on completing the PIMS agreement to take advantage of the supposed equity purchase.[23]  *Id*.  But, again, Rule 9(b) requires pleadings of particular facts, not conclusory claims and second-hand speculation.  *See Clausen*, 290 F.3d at 1310.

In any event, the AKS claims should be dismissed because Relators fail to plead that CHSPSC acted "knowingly and willfully."  42 U.S.C. § 1320a-7b(b)(2).  "To plead FCA liability based on an AKS violation, [relators] must allege that defendants made kickbacks with the intent of inducing [the purchase of a reimbursable item], and defendants knowingly paid remuneration in exchange for [that purchase]."  *U.S. ex rel. Carmen Medrano v. Diabetic Care RX, LLC*, 2018 WL 6978633, at *2 (S.D. Fla. Nov. 30, 2018) (internal quotation marks omitted); *see also United States v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998) (pleading sufficient if the relator alleges that a defendant acted "with knowledge that his conduct was unlawful").  But rather than pleading *facts* that would show CHSPSC acted knowingly and willfully, Relators allege only that "it was commonly known and discussed among CHS employees" that Medhost "intended to induce CHS to continue doing business with Medhost."  FAC ¶ 284.  Those "bare assertion[s]" of rumor and hearsay are too barebone to support even an inference of wrongful intent.  *Lary*, 780 F.3d at 1107; *Herengracht*, 2011 WL 13174744, at *4 (Rule requires pleading of "sufficient underlying facts").

## V.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT IS AN IMPROPER SHOTGUN PLEADING

Even if Relators could state a claim (and they cannot), this Complaint should still be dismissed as an improper "shotgun pleading."  *See, e.g.*, *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015).  In the Eleventh Circuit, complaints are routinely dismissed if they "commit[] the sin of not separating into a different count each cause of action or

---

[23] Indeed, Relators do not even allege that they ever saw a copy of that supposed side-agreement or ever confirmed that it even exists.  Their allegations start and end with "discussions" that Relator Lewis claims to have had more than four years ago.  FAC ¶¶ 285-286.

claim for relief" or "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *Id*. at 1323 & nn.13-14 (collecting cases); *see also Blue Water Innovations, LLC v. Fettig*, 2019 WL 1904589, at *5 (S.D. Fla. Mar. 8, 2019) ("[C]omingling various theories of liability within individual counts . . . renders Plaintiff's Complaint an inappropriate basis upon which to assess its allegations.").

Here, the Complaint unloads with both barrels.  It both (1) combines four separate FCA claims—presentment of a false claim (31 U.S.C. § 3729(a)(1)(A)), submission of false records (*id.* § 3729(a)(1)(B))*,* reverse false claim (*id.* § 3729(a)(1)(G))*,* and conspiracy (*id.* § 3729(a)(1)(C))—within a single count, and (2) asserts those four claims against Medhost, CHSI, CHSPSC, and 140 different hospitals without differentiating between the "Defendants," even though the software vendor, corporate entities, and hospitals have distinct roles in Meaningful Use and the individual hospitals attested to different stages of Meaningful Use based on different objectives at different times using different software configurations.  *See* FAC ¶¶ 297-302. Consequently, it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief" against which defendants.  *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).  Either shotgun pleading "sin" standing alone merits dismissal.  *See Weiland*, 792 F.3d at 1322-24 & nn.13-14; *see also, e.g.*, *U.S. ex rel. Tirella v. Klausner Lumber One, LLC*, 2016 WL 7366891, at *3, report and recommendation adopted, 2016 WL 7338442 (M.D. Fla. Dec. 19, 2016) (dismissing shotgun pleading that "include[d] three distinct [FCA] claims within a single count").

## CONCLUSION

For the foregoing reasons, the claims against Defendant CHSPSC should be dismissed with prejudice.

Case No. 18-CV-20394-RNS

Dated: September 24, 2019

Respectfully submitted,

By: _/s/ Martin B. Goldberg_____
    Martin B. Goldberg

LASH & GOLDBERG LLP
Martin B. Goldberg
Florida Bar No. 0827029
Daryl L. Saylor, Jr.
Florida Bar No. 100376
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050
mgoldberg@lashgoldberg.com
dsaylor@lashgoldberg.com

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
Michael L. Waldman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Lauren M. Cassady (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mwaldman@robbinsrussell.com
barnold@robbinsrussell.com
lcassady@robbinsrussell.com

*Counsel for Defendant CHSPSC, LLC*

Case No. 18-CV-20394-RNS

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 24, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: */s/ Martin B. Goldberg*
Martin B. Goldberg

Case No. 18-CV-20394-RNS

**SERVICE LIST:**

David J. Chizewer (admitted *pro hac vice*)
David E. Morrison (admitted *pro hac vice*)
Harleen Kaur (*pro hac vice* anticipated)
Danielle K. Johnson (*pro hac vice* anticipated)
Juan C. Arguello (*pro hac vice* anticipated)
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 201-4000/Fax: (312) 863-7472
David.Chizewer@goldbergkohn.com
David.Morrison@goldbergkohn.com
Harleen.Kaur@goldbergkohn.com
Danielle.Johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com

Edward H. Arens (admitted *pro hac vice*)
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300 San
Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

Brandon L. Arnold (admitted *pro hac vice*)
Michael L. Waldman (admitted *pro hac vice*)
Lauren M. Cassady (admitted *pro hac vice*)
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber, LLP
2000 K Street NW, 4th Floor
Washington DC 20006
Tel: (202) 775-4500
barnold@robbinsrussell.com
mwaldman@robbinsrussell.com

Laura F. Laemmle-Weidenfeld
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 2001
Tel: (202) 879-3939
lweidenfeld@jonesday.com

Colette G. Matzzie (admitted *pro hac vice*)
Luke J. Diamond (admitted *pro hac vice*)
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue
NW Washington, DC 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com
ldiamond@phillipsandcohen.com

Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Erika Stephanie Whyte (FL Bar No. 91133)
JONES DAY
600 Brickell Ave., Suite 3300
Miami, FL 33131
Tel: (305) 714-9700
ewhyte@jonesday.com
obencomo@jonesday.com
ycabreracruz@jonesday.com

Jessica M. Sarkis
Stephen G. Sozio
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
Tel: (216) 586-3939
jsarkis@jonesday.com
sgsozio@jonesday.com

28