**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No. 18-20394-CIV-Scola/Torres

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DEREK LEWIS and JOEY NEIMAN, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| COMMUNITY HEALTH SYSTEMS, INC.; et al., | ) ) ) |
| Defendants. | ) ) ) |

**HOSPITAL DEFENDANTS' MOTION TO DISMISS
RELATORS' FIRST AMENDED COMPLAINT AND
<u>INCORPORATED MEMORANDUM OF LAW</u>**

LASH & GOLDBERG LLP
Martin B. Goldberg
Florida Bar No. 0827029
Daryl L. Saylor, Jr.
Florida Bar No. 100376
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
Michael L. Waldman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Lauren M. Cassady (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500

*Counsel for Hospital Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................... 2

ARGUMENT ..................................................................................................................... 5

I.      THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE
        A CLAIM ................................................................................................................ 5

II.     THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD
        FRAUD WITH PARTICULARITY ....................................................................... 6

        A.      Relators must plead fraud with particularity under Rule 9(b). ..................... 6

        B.      Relators improperly allege violations by undifferentiated "Defendants." ........ 6

        C.      For each Hospital Defendant, the Complaint fails to identify *who* was
                involved in the alleged fraud .......................................................................... 9

        D.      For each Hospital Defendant, the Complaint fails to identify *which*
                attestations were false. ................................................................................. 10

        E.      For each Hospital Defendant, the Complaint fails to identify *what* was
                false in any of the attestations submitted to the government. ..........................11

        F.      For each Hospital Defendant, the Complaint fails to identify *when* the
                false attestations were submitted. ................................................................. 13

        G.      For each Hospital Defendant, the Complaint fails to identify *where* the
                alleged fraud took place. ............................................................................... 14

        H.      For each Hospital Defendant, the Complaint fails to allege any facts to
                support a plausible inference of fraudulent intent .......................................... 15

        I.      Relators' Anti-Kickback Statute claim fails to identify the 'who,' 'what,'
                'where,' 'when,' and 'how' as to each of the Hospital Defendants ................. 17

CONCLUSION ................................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambrosia Coal & Constr. Co. v. Pages Morales*,
　482 F.3d 1309 (11th Cir. 2007) ....................................................................7, 9, 10

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)..........................................................................................16

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007)..........................................................................................16

*Brooks v. Blue Cross and Blue Shield of Fla., Inc.*,
　116 F.3d 1364 (11th Cir. 1997) .....................................................................9, 10

*Corsello v. Lincare, Inc.*,
　428 F.3d 1008 (11th Cir. 2005) ................................................................ *passim*

*Cutler v. Voya Fin., Inc.*,
　2019 WL 1112379 (S.D. Fla. Jan. 15, 2019) ......................................................18

*Jacobs v. Bank of America Corp.*,
　2017 WL 2361943 (S.D. Fla. Mar. 21, 2017)......................................................16

*Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC*,
　781 F.3d 1003 (8th Cir. 2015) ............................................................................7

*Swartz v. KPMG LLP*,
　476 F.3d 756 (9th Cir. 2007) ..............................................................................9

*Urquilla-Diaz v. Kaplan Univ.*,
　780 F.3d 1039 (11th Cir. 2015) ................................................................ *passim*

*U.S. ex rel. Aquino v. Univ. of Miami*,
　250 F. Supp. 3d 1319 (S.D. Fla. 2017) ...............................................................13

*U.S. ex rel. Atkins v. McInteer*,
　470 F.3d 1350 (11th Cir. 2006) .........................................................................13

*U.S. ex rel. Bingham v. Baycare Health Sys.*,
　2015 WL 4878456 (M.D. Fla. Aug. 14, 2015) ....................................................18

*U.S. ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*,
　No. 98-3127, 1999 WL 618018 (6th Cir. Aug. 5, 1999) ......................................10

*U.S. ex rel. Budike v. Northrop Grumman Corp*,
    No. 09-3799 (E.D. Pa. May 16, 2012) ..................................................................16

*U.S. ex rel. Butler v. Magellan Health Servs., Inc.*,
    101 F. Supp. 2d 1365 (M.D. Fla. 2000) ...............................................................11

*U.S. ex rel. Chase v. HPC Healthcare, Inc.*,
    723 F. App'x 783 (11th Cir. 2018) ...............................................................13, 15

*U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
    290 F.3d 1301 (11th Cir. 2002) ................................................................ *passim*

*U.S. ex rel. Fla. Soc'y of Anesthesiologists v. Choudhry*,
    262 F. Supp. 3d 1299 (M.D. Fla. 2017) ..............................................................17

*U.S. ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ...............................................................................16

*U.S. ex rel. Kozhukh v. Constellation Tech. Corp.*,
    64 F. Supp. 2d 1239 (M.D. Fla. 1999) .................................................................9

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
    245 F.3d 1048 (9th Cir. 2001) .............................................................................10

*U.S. ex rel. Robinson v. Northrop Corp.*,
    149 F.R.D. 142 (N.D. Ill. 1993) ...........................................................................10

*U.S. ex rel. Sanchez v. Lymphatx, Inc.*,
    596 F.3d 1300 (11th Cir. 2010) ...........................................................................12

*U.S. ex rel. Silingo v. WellPoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018) ............................................................................7, 9

*U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*,
    336 F.3d 375 (5th Cir. 2003) .........................................................................10, 16

*U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*,
    417 F.3d 450 (5th Cir. 2005) ...............................................................................16

*U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ...............................................................................16

*Weiland v. Palm Beach Cty. Sheriff's Office*,
    792 F.3d 1313 (11th Cir. 2015) .............................................................................7

*Zeta Mgmt. Corp. v. Parkside Heights Phase One, LLC*,
    2009 WL 10667566 (S.D. Fla. Jan. 13, 2009) ....................................................18

**Statutes, Regulations, and Rules**

31 U.S.C. § 3729 ................................................................................................ *passim*

31 U.S.C. § 3730 ........................................................................................................1

42 U.S.C. § 1320 ......................................................................................................17

42 C.F.R. § 495.6 (2011) .......................................................................................3, 5

42 C.F.R. § 495.6 (2014) ......................................................................................4, 13

42 C.F.R. § 495.8 (2011) ..........................................................................................3

Federal Rules of Civil Procedure 8 ........................................................................1, 7

Federal Rules of Civil Procedure 9 .................................................................. *passim*

Federal Rules of Civil Procedure 12 ..........................................................................1

**Other Authorities**

*Community Health Systems Completes Spin-off of Quorum Health Corporation*,
    Business Wire (Apr. 29, 2016) .......................................................................3

Pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), the Hospital Defendants[1] respectfully move to dismiss Relators Derek Lewis and Joey Neiman's ("Relators") First Amended Complaint ("Complaint" or "FAC"), Doc. No. 123, for failure to state a claim upon which relief may be granted.[2]   In support of this motion, the Hospital Defendants state as follows:

## PRELIMINARY STATEMENT

This is a False Claims Act ("FCA") *qui tam* action relating to the incentive program created by the Health Information Technology for Economic and Clinical Health ("HITECH") Act to promote and expand the adoption of electronic health records (commonly called "Meaningful Use").  Based almost exclusively on a smattering of technical glitches and software bugs, Relators allege in conclusory fashion that the Hospital Defendants defrauded the Government to obtain Meaningful Use incentive payments.  But after more than a year of extensive investigation, the Government elected not to intervene.  Doc. No. 20.  Relators, however, chose to still proceed forward alone under 31 U.S.C. § 3730(b)(1), filing the amended Complaint on July 26, 2019. Although the length of Relators' Complaint grew from 211 to 306 paragraphs, the allegations of fraud remain conclusory and exceedingly general.

Relators here fail to plead fraud with particularity against any of the 140 hospitals named as defendants.  The overwhelming majority of the Hospital Defendants appear ***only in the case caption***.  Far from pleading with the specificity required by Federal Rule of Civil Procedure 9(b), the Complaint makes ***no*** factual allegations against those hospitals.  And the handful of hospitals mentioned in the body of the Complaint (rather than just the caption) are referenced only in passing as Relators describe various software problems at "CHS" and supposed wrongdoing by "Defendants."  That will not do.  If Relators want to bring claims that 140 individual hospitals intentionally defrauded the government, Rule 9(b) requires that they allege "the details of [each of

---

[1] A full list of the "Hospital Defendants" is provided at Appendix A hereto.

[2] References to the docket are abbreviated as "Doc. No."  All emphasis is added unless otherwise noted.  For the purposes of this motion, factual allegations in the Complaint are presumed to be true.

the hospital defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015).  Relators may not end-run that basic pleading requirement by pointing the finger at the imagined monolith of "CHS" (or some conglomeration of unnamed "Defendants"), without a single allegation of wrongdoing by particular employees at one of the individual hospitals and an explanation of what the identified hospital employees actually did to advance the fraud.  In addition to the total failure to allege ***any action*** by the overwhelming majority of the hospitals, Relators also fail to make even a single factual allegation, plausible or otherwise, indicating that any hospital employee acted with the requisite wrongful intent to submit false claims.

Rule 9(b) ensures that defendants accused of fraud have a fair opportunity to defend themselves, by requiring plaintiffs to inform them precisely from *what* they must defend.  But here each of the Hospital Defendants is left completely in the dark as to what it did (as well as the who, where, when and how) that violated the FCA.  The claims against the Hospital Defendants should therefore be dismissed.

## BACKGROUND

The Hospital Defendants are hospitals named as defendants in the Complaint.  *See* Appendix A.  These hospitals, at some point during the relevant time period for purposes of the Complaint, were affiliated with Community Health Systems, Inc. ("CHSI").[3]  *See* FAC ¶ 32.  Each hospital is a separate legal entity, distinct from each other and from both CHSPSC (the corporate operating entity) and CHSI (the non-operating holding company).  Each hospital has its own board of directors and is run by its own management team, including individual CEOs and CFOs.  There is wide variation among the hospitals—they are scattered across the country in 27 states and vary in terms of size and market. Some are wholly owned or leased by subsidiaries of CHSI, while

---

[3] CHSI is a holding company that does not engage in any business other than those activities associated with being a publicly traded stock company. CHSPSC, LLC ("CHSPSC") is a management company that provides services to subsidiary hospital operators which are owned (or leased) and operated by a separate and distinct legal entity. The Complaint names as defendants 140 individual hospitals; all but a handful of those hospitals are affiliates of CHSI and CHSPSC.

others are joint ventures with physician investors.  Indeed, some were not affiliated with CHSI at all at times during the five-year period covered by the Complaint.  *See* FAC ¶¶ 22, 255, Ex. B (identifying attestations from 2012 to 2017).  Sixty of the Hospital Defendants were not affiliated with CHSI until its merger with Health Management Associates, Inc. ("HMA") in 2014.  *See* FAC ¶ 22, 255, Ex. A.  And a number of the hospitals ended their affiliation with CHSI during that period, including 33 hospitals which were spun off to a separate company, Quorum Health Corp. ("Quorum"), in 2016.  *See Community Health Systems Completes Spin-off of Quorum Health Corporation*, Business Wire (Apr. 29, 2016).[4]

Relators allege that each of the Hospital Defendants received payments based on a government incentive program designed to transition hospitals and doctors from paper records to electronic ones.  Under the Meaningful Use program, eligible hospitals were entitled to an incentive payment for deploying certified electronic health records ("EHR") technology and "meaningfully using" it in their health care practice.  42 C.F.R. § 495.8(b)(1)(i), (b)(2)(i) (2011).  To satisfy the "meaningful use" component, the program required hospitals to report the software usage percentage for specified tasks, *e.g.*, electronically handling medication orders or electronically transmitting summaries of care, as well as performing certain basic tasks, like clinical decision support and drug-drug and drug-allergy checks.  *See* 42 C.F.R. § 495.6(f) (2011) (Stage 1 mandatory criteria).  The program also provided hospitals with a list of optional objectives, with the hospitals allowed to choose which options they wished to use to satisfy Meaningful Use.  *See id.* § 495.6(g) (Stage 1 menu set objectives).  The Meaningful Use program proceeded in three stages, each with progressively higher objectives and measures for hospitals to achieve.  *See* FAC ¶¶ 53-60.[5]  Stage 1 started out easy to encourage participation in the program and build familiarity with EHR systems, but Stage 2 made compliance significantly more difficult

---

[4] www.businesswire.com/news/home/20160429006073/en/.

[5] For example, Stage 1 required only that more than 30% of all patients have at least one medication order entered electronically, while Stage 2 required 60% of all medication orders, 30% of all laboratory orders, and 30% of all radiology orders be entered electronically.  *Compare* 42 C.F.R. § 495.6(f)(1)(ii) (2014), *with id.* § 495.6(l)(1)(ii).

by making more objectives mandatory and requiring higher usage percentages to satisfy each of the objectives.

The Complaint alleges that, starting in 2013, CHSPSC began a company-wide effort to upgrade the certified EHR technology in all of its hospitals with the goal of obtaining Meaningful Use Stage 2 payments.  FAC ¶ 12.  But this was not a single centralized project where new EHR was adopted at all of the hospitals with the press of a button; rather, because the CHSI-affiliated hospitals were a collection of hospitals acquired, often one or two at a time, over three decades, each hospital posed its own separate software integration project.  The implementation of certified EHR software had to be done on a hospital-by-hospital basis, with application of the Medhost software taking place at the different hospitals on a rolling basis.  *See id.* ¶ 85.  Because CHSPSC had the expertise and economies of scale, teams of CHSPSC and Medhost personnel fanned out to work with the local hospital IT staff in implementing the certified EHR at each hospital.  *See id.* ¶¶ 86, 91.  Not surprisingly, some hospitals smoothly transitioned to the new software, while other hospitals ran into problems with the workings of the software or resistance from the medical staff. How each hospital responded to the implementation of the new software depended on their pre-existing software, the nature of the different departments and services at the hospital, and the receptivity of the hospital personnel.  *See, e.g.*, *id.* ¶¶ 195-196.

There also was a wide variation in how and when the Hospital Defendants implemented EHR technology and began attesting to Meaningful Use.  That variation began long before the 2013 upgrade effort (and the software glitches that Relators claim resulted from it).  Some of the hospitals attested to Stage 1 as early as May 2012, whereas others did not begin attesting until 2013 or even 2014.  *Compare id.*, Ex. B at 12, no. 44 (Grandbury Hospital Corporation first attested to Stage 1 in 2012), *with id.*, Ex. B at 5, no. 18 (Carlisle HMA attested to Stage 1 in 2014). Similarly, there was a wide variation in when the hospitals first attested to Stage 2 with some attesting as early as 2014, while others did not attest to Stage 2 until 2016.  *Compare id.*, Ex. B at 1, no. 3 (Anna Hospital Corp. attested to Stage 2 in 2014), *with id.*, no. 4 (ARMC LP attested to Stage 2 in 2016).

4

The basis for the attestations also differed depending on the hospital. The various Hospital Defendants used different software to meet the certified EHR technology requirement. *See* FAC, Ex. B (listing different types and versions of software). Relators allege that some used different versions of Medhost's Enterprise system without pairing it with other Medhost software; others used it in conjunction with versions of Medhost's EDIS system; still others used versions of the PULSE software developed by HMA, either alone or with various versions of Medhost's software. *See id*. The usage percentages also varied by hospital based on the number of times providers performed certain tasks (like entering medication orders or recording demographic information electronically) or how often a patient requested an electronic copy of his or her medical records. And the optional menu set criteria selected for attestation also varied based on the circumstances (and capabilities) of a particular hospital.

Relators are two individuals who allegedly worked in technology management for CHSPSC. *See* FAC ¶¶ 28-29. While both claim to have been involved in technical projects relating to the implementation of EHR software for CHSPSC, neither was ever employed by any of the Hospital Defendants. *Id.* Further, by their own admission, neither of the relators played any role in or had any knowledge of the Meaningful Use attestation process at any of the hospitals. *See id.* ¶ 89. It therefore is not surprising that the Complaint they filed has virtually no factual allegations about any action (much less a wrongful action) taken by individual hospital employees at any of the specific hospitals named in the Complaint.

## ARGUMENT

## I.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

The Hospital Defendants adopt and incorporate by reference the arguments set forth in CHSPSC's Memorandum of Law in Support of its Motion to Dismiss as to why the Complaint should be dismissed for failure to state a claim. As CHSPSC explains, the Relators misinterpret the Meaningful Use regulations and, in fact, fail to identify any false statement in the attestations

that the hospitals submitted to the United States.  Thus, for the reasons set out in CHSPSC's brief, the Complaint also should be dismissed as to the Hospital Defendants.

## II.  THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY

But even if Relators did state a claim (and they do not), their claims should still be dismissed because they fail to plead fraud with particularity against any of the Hospital Defendants.

### A.  Relators must plead fraud with particularity under Rule 9(b).

Claims of fraud under the FCA, like all fraud claims, are subject to a heightened pleading standard.  Under Rule 9(b) of the Federal Rules of Civil Procedure, Relators must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); *see U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309 (11th Cir. 2002). "[C]onclusory allegations" of fraud are not enough to survive a motion to dismiss; Relators must present "specific information about the actual submission of claims to the Government." *Clausen*, 290 F.3d at 1311. A complaint must "allege 'facts as to time, place, and substance of the defendant's alleged fraud,' particularly, 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Urquilla-Diaz*, 780 F.3d at 1051 (quoting *Clausen*, 290 F.3d at 1309).  In other words, a complaint must identify "the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Id.* at 1052 (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (per curiam)).

### B.  Relators improperly allege violations by undifferentiated "Defendants."

In keeping with its purpose of providing "fair notice," Rule 9(b) requires relators to distinguish between the various defendants and "inform each defendant of the nature of his alleged participation in the fraud." *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (quoting *Brooks v. Blue Cross and Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)).  As such, a complaint alleging fraud by multiple defendants must differentiate among them, with allegations particular to each defendant, in order to survive dismissal.

A complaint cannot "attribute[] fraudulent representations and conduct to multiple defendants generally, in a group pleading fashion." *Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015).  In an FCA case involving multiple defendants, "with different actors playing different parts, it is not enough to 'lump' together the dissimilar defendants and assert that 'everyone did everything.'" *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (quoting *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011)).  Indeed, even apart from the heightened pleading standards of Rule 9(b), pleadings that "assert[] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions" do not pass muster even under Rule 8.  *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015) (explaining that courts in this Circuit regularly dismiss such so-called "shotgun pleadings").

The Complaint utterly fails to satisfy any of these basic requirements with respect to each of the Hospital Defendants.  Virtually all of its allegations are directed vaguely at "Defendants" or refer to "CHS," without distinguishing among the 140 separate hospitals or CHSI and CHSPSC. *See generally* FAC.  The Complaint does not contain a single specific allegation against any individual hospital that can meet the pleading requirements of Rule 9(b).  None of the hospitals have any indication of what claims Relators seek to hold them liable for, nor what alleged facts support those claims, and so the Complaint must be dismissed as to each of the Hospital Defendants. *See Urquilla-Diaz*, 780 F.3d at 1051; *Clausen*, 290 F.3d at 1309.

The Complaint here is replete with broad allegations against "CHS" without the slightest attempt to distinguish which, if any, of the individual hospital defendants engaged in the targeted conduct.  For instance, Relators allege that "CHS deployed the combination of EDIS and Enterprise at numerous hospitals nationwide" and the poor integration of the two led "CHS" to "falsely attest[] to Meaningful Use knowing that EDIS and Enterprise did not meet the requirements of certified EHR technology." FAC ¶¶ 102-103.  This falls far short of satisfying Rule 9(b)'s pleading requirements—how can any hospital know whether it is one of the "numerous" defendants that has been accused of fraud based on this allegation?  As another

example, Relators allege that the Enterprise system had issues related to "the frequent use of unstructured medication entries at CHS hospitals." *Id.* ¶¶ 124-126. Relators cannot indiscriminately allege that *all of the Hospital Defendants* "frequently" used unstructured medication entries—not all of the hospitals even used the Enterprise software, let alone the same version of the software.

The list of such "shotgun" allegations purportedly made against all defendants—with no effort to differentiate between hospitals—goes on and on. *See, e.g.*, FAC ¶ 136 (describing ClinRec problems at *CHS facilities*"), ¶ 162 (describing ClinView issue "allowing *providers* to attempt to use a broken feature"), ¶ 196 (order sets with errors "were rolled out to *the hospitals*"). The section of the Complaint where Relators describe their FCA claim is a poster child for improper group pleading. It is tellingly entitled "*Defendants* Violated the False Claims Act." *Id.* at 91. In this section, Relators allege that "CHS" knew that the Medhost and PULSE EHR technology "did not satisfy Meaningful Use requirements." *Id.* ¶¶ 293-294. Relators also allege that "CHS," "CHS Hospitals," and "former-HMA hospitals" all "knowingly presented and caused the presentment of false claims" to the government. *Id.* Moreover, it is "Medhost and CHS" that "knowingly and willfully offered and accepted unlawful remuneration in violation of the AKS." *Id.* ¶ 295. There is no mention of any of the hospitals, no differentiating between the 140 hospitals, and no attempt to specify what any particular hospital did wrong. *See also id.* ¶¶ 297-306 (single count incorporates every allegation in the lengthy Complaint and alleges repeatedly that all "Defendants" violated the FCA).

If Relators wish to bring a fraud claim against 140 distinct defendants, their Complaint must conform to the requirements of Rule 9(b). They cannot assert that "everyone did everything," as their single claim of an FCA violation does. *See Silingo*, 904 F.3d at 677. They cannot "lump together" 140 defendants—each of which is a separate legal entity, operating a different hospital, run by different management teams, and using different combinations of EHR software. *See Ambrosia Coal*, 482 F.3d at 1317 (citing *Brooks*, 116 F.3d at 1381). And they cannot blindly accuse all of the Hospital Defendants of submitting false claims based on a few software integration

problems at a handful of hospitals, especially given that the hospitals attested at different times to different stages of Meaningful Use based on different criteria and related percentages. When, as here, a "Complaint is devoid of specific allegations with respect to the separate Defendants," *Brooks*, 116 F.3d at 1381, it "patently fail[s] to comply with Rule 9(b)." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (per curiam). That alone merits dismissal of the Complaint as against the Hospital Defendants.

<blockquote>C.   For each Hospital Defendant, the Complaint fails to identify *who* was involved in the alleged fraud.</blockquote>

Given Relators' abject failure to differentiate among the Hospital Defendants in their allegations, it is no surprise that Relators similarly fail to allege *who* at any individual hospital was involved in falsely attesting to their compliance with the Meaningful Use program. Each of the Hospital Defendants has hundreds, and, in some cases, thousands, of employees. If a hospital is being accused publicly of fraud, at the very least it is entitled to notice as to which of its employees engaged in the alleged wrongful conduct and what were the employees' improper actions. For that reason, Rule 9(b) requires, in part, that Relators include in their Complaint "the identities of the parties participating in the fraud." *U.S. ex rel. Kozhukh v. Constellation Tech. Corp.*, 64 F. Supp. 2d 1239, 1242 (M.D. Fla. 1999); *see also Corsello*, 428 F.3d at 1012 ("To state a claim under the False Claims Act with particularity, the complaint must allege . . . who engaged in [the allegedly fraudulent acts].").[6]

Yet Relators fail to identify *anyone* working for any of the Hospital Defendants who allegedly was aware of the alleged software problems and submitted the purported false attestations. Each Hospital Defendant is entitled to know what its role was and, in particular, who

---

[6] *See also U.S. ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*, No. 98-3127, 1999 WL 618018, at *2 (6th Cir. Aug. 5, 1999) (affirming Rule 9(b) dismissal of complaint that failed to specify "which employees of the defendants were engaged in the alleged fraudulent scheme"); *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 385 (5th Cir. 2003) (same); *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1050-51 (9th Cir. 2001) (same); *U.S. ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 145 (N.D. Ill. 1993) (same).

at the hospital acted improperly.  For the vast majority of hospitals, none of their employees are ever identified.  While there are a few stray references in the Complaint to an email or conversation with a hospital employee about a software problem, Relators do not allege that those employees were "responsible for making" the false attestation for that or any hospital.  *Ambrosia Coal*, 482 F.3d at 1317; *Brooks,* 116 F.3d at 1371.  The Complaint also is silent as to the employee(s) at each hospital who had knowledge that the attestation was false and how he or she obtained such knowledge.  The Hospital Defendants should not be left to guess which of their employees engaged in the acts that form the basis for the fraud claims against them.  Rule 9(b) requires that Relators identify which hospital employees knowingly engaged in the fraudulent conduct, and their failure to do so compels the dismissal of the FCA claims against the Hospital Defendants.  *See Corsello*, 428 F.3d at 1012; *see also supra* note 5.

> D.   For each Hospital Defendant, the Complaint fails to identify *which* attestations were false.

An FCA violation arises from "a false or fraudulent claim," 31 U.S.C. § 3729(a), and the submission of such a claim is "the *sine qua non* of a False Claims Act violation."  *Clausen*, 290 F.3d at 1311.  Detailing "a private scheme to defraud" to "support . . . vague allegations" that false claims were submitted is not sufficient to sustain a complaint under Rule 9(b).  *Corsello*, 428 F.3d at 1012-13; *see also Clausen*, 290 F.3d at 1311.  Relators' Complaint, while long on technical detail, is short on actual information about which claims were false.

Relators spend the vast majority of the Complaint airing technical grievances about Medhost's and PULSE's software, but fail to make the connection that is crucial for an FCA violation—that any of those alleged software problems actually resulted in a *false claim* from a specific hospital.  *See Clausen*, 290 F.3d at 1313 (complaint dismissed where plaintiff "failed to provide any additional information linking the . . . schemes to the submission of any actual claims").  Relators do not point to a single "specific fraudulent claim" in which any of the individual hospitals falsely attested to its compliance with the Meaningful Use program.  *See Corsello*, 428 F.3d at 1014.  Even if they had successfully identified flawed software practices,

"plead[ing] a fraudulent scheme of conduct" without pleading "specific occurrences of a false claim" is fatal to their Complaint. *U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d 1365, 1369 (M.D. Fla. 2000).

To be sure, Relators' Complaint includes a lengthy exhibit that purports to list all attestations ever submitted by the 140 hospitals. *See* FAC, Ex. B. But this is merely a list of attestations—it is not a list of *false* attestations. And Relators cannot simply generalize that, because of assorted software problems, every attestation submitted by every hospital in every year is necessarily false. *See Clausen*, 290 F.3d at 1311 ("conclusory allegations" are insufficient to make out an FCA violation). For example, in the case of the HMA hospitals, Exhibit B includes attestations that were made more than one year *before* CHSI purchased the attesting HMA hospitals in January 2014. *See, e.g.*, FAC, Ex. B at nos. 1, 2, 7, 11, 22, 24-26, 33, 35, 48-50, 52, 53, 57, 61, 62, 64, 66, 69-70, 83, 84, 87, 89, 90, 96-98, 102, 103, 104, 116,117, 121, 128, 129, 134, 136, 140. And for the hospitals spun off to Quorum Health Corporation in April 2016, Exhibit B lists attestations that occurred many months *after* they had left CHSI.[7] *See, e.g.*, FAC, Ex. B at nos. 3, 5, 9, 10, 13, 21, 27, 32, 37.

Relators must specify which of the more than 500 attestations listed on its Exhibit B were actually false and resulted in a false claim for incentive payments. Rule 9(b)'s requirements ensure that the Hospital Defendants do not have to guess. Having failed to identify which attestations by which hospitals were purportedly false, Relators' Complaint must be dismissed. *U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010) (per curiam); *Clausen*, 290 F.3d at 1314.

E.    For each Hospital Defendant, the Complaint fails to identify *what* was false in any of the attestations submitted to the government.

Even if Relators had identified the attestations that they allege were false (and, again, they do not), nothing in the Complaint adequately explains *what* precisely was false about those

---

[7] Nor does the Complaint contain a single particularized allegation of wrongdoing by those hospitals after the date of the spinoff.

attestations by the hospitals.  Rule 9(b) requires the alleged falsity of the claims to "be pleaded with particularity and not inferred from the circumstances."  *Corsello*, 428 F.3d at 1013.  Indeed, such an "assumption would 'strip all meaning from Rule 9(b)'s requirements of specificity.'"  *Id.* (quoting *Clausen*, 290 F.3d at 1312 n.21).  But inferring falsity from an assortment of software glitches is precisely what Relators ask this Court to do.

Nothing in the Complaint sufficiently alleges *which* hospitals' software failed to meet *which* regulatory requirements, much less how that alleged failure is linked to a single attestation submitted by a hospital.  For instance, Relators allege that Medhost's 2014 edition software had numerous issues with "Clinical Information Reconciliation" or "ClinRec," a process in the Medhost software that allows providers to "electronically reconcile the data that represent a patient's active medication, problem, and medication allergy list."  FAC ¶ 130.  They allege that "CHS facilities" encountered problems with the system creating new medication orders instead of continuing prior orders.  *See id.* ¶¶ 135-142.  Even accepting as true that such a software problem existed, where is the specific falsity?  Relators never explain what particular statement in which hospitals' attestations was rendered false by the ClinRec problems.  Is this an issue at Meaningful Use Stage 1 and, if so, which Stage 1 requirement is implicated and why?  Or does it relate to a Stage 2 representation and, if so, which Stage 2 requirement and why?[8]  And, as always, at which of the 140 hospitals did this ClinRec issue cause false attestations?  The Complaint is all technical software problems and sweeping contentions of false claims, with no effort to link the two by pointing to specific hospitals and specific statements in those hospitals' attestations that were false.

At a bare minimum, an FCA defendant is entitled to notice about what is false about its submissions to the United States.  The Complaint provides the Hospital Defendants with a list of all of their attestations and a laundry list of software glitches.  But it fails to plead a "nexus" that would connect the two and inform each hospital about what is false about its attestations, each of

---

[8] If Relators claim the alleged "ClinRec" software problem violated the requirements of the "Medication Reconciliation" objective, this is unavailing.  That objective was optional in Stage 1, and Relators do not allege that this problem caused any hospital to fall below the required percentage threshold in Stage 2.  *See* 42 C.F.R. § 495.6(g)(6), (l)(10) (2014); *see also* FAC ¶ 266.

which was made at a different time to satisfy different Meaningful Use stages using different software.  *See U.S. ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1329 (S.D. Fla. 2017); *see also U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006).  Absent this vital information, Relators' Complaint fails as to the Hospital Defendants under Rule 9(b).

F.  For each Hospital Defendant, the Complaint fails to identify *when* the false attestations were submitted.

Given that Relators have not identified the claims that were allegedly false, let alone who submitted them or why they were false, it is unsurprising that Relators similarly have not identified *when* a false claim was allegedly submitted.  This is yet another insurmountable defect.  *See Corsello*, 428 F.3d at 1012 ("the complaint must allege facts as to *time*, place, and substance of the defendant's alleged fraud") (internal quotation marks omitted); *see also U.S. ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790 (11th Cir. 2018) (complaint dismissed where plaintiff failed to "give examples of . . . when the falsifications occurred[] or when the fraudulent bills were submitted to Medicare").

The lack of specificity regarding the *when* is especially significant here.  The hospitals in question submitted different attestations based on different criteria and using different software over a five-year period—Relators simply cannot state a viable FCA claim by identifying a software glitch at one isolated point in time, from which the Court must infer that hundreds of different hospitals had the same glitch despite using different software and attesting at different time periods. *Corsello*, 428 F.3d at 1013.  And nowhere do Relators explain how an isolated glitch at one specific time could cause all of the attestations at all hospitals to become false, especially because many of those attestations occurred before Relators allege the glitch arose or were made after Relators concede it was fixed.  For example, in connection with the ClinRec allegations, Relators assert that CHSPSC identified the ClinRec issue in late April/early May 2014 and that Medhost deployed the software to fix the issue on June 11, 2014.  FAC ¶¶ 136, 138.  But only ***a single*** hospital (Tullahoma HMA LLC) submitted an attestation during that April-to-June window and it attested to Stage 1 (when medical reconciliation was optional).  *See id.* Ex. B at 36, no. 126.  Put differently, the

timing of the software bugs that Relators point to only serves to highlight how Relators have failed to link the alleged software bugs to an actual false attestation. This pattern reoccurs throughout the Complaint, with Relators identifying software bugs that were slated to be fixed within a few weeks or months while the attestations were not made until much later, sometimes even years later. *See, e.g.*, *id.* ¶ 120.

Even more glaring is the disconnect between the software glitches that Relators allege arose during the upgrade to 2014 edition software for Stage 2 and the attestations submitted months or even years earlier for Stage 1. *See id*. ¶¶ 88 *et seq*. Relators simply do not allege any software problems from prior to the beginning of that upgrade in late 2013. Yet, many hospital attestations listed by Relators pre-date this software upgrade, having been made in 2012 or the summer or fall of 2013. *See id.* Ex. B. Presumably, Relators are not alleging these Stage 1 attestations from 2012 and 2013 are FCA violations. But because of the Complaint's lack of particularity, this is unclear.

A similar timing issue concerns the hospitals that joined and left the CHSI system. The former HMA hospitals were not owned by CHSI until early 2014, while CHSI has not owned the now Quorum hospitals since April 2016. Yet, for both the HMA and Quorum hospitals, the Relators' list includes attestations from 2012 through 2017. Again, Relators presumably do not contend that these hospitals knowingly made false attestations before or after they were affiliated with CHSI, but it is impossible to know for certain given the Complaint's vagueness.

The bottom line is that the Complaint does not tell any individual Hospital Defendant *when* it was alleged to have submitted a false claim. The Hospital Defendants (and the Court) are left in the dark—the opposite of what Rule 9(b) demands. Dismissal is the appropriate response to that pleading failure. *Corsello*, 428 F.3d at 1012; *HPC Healthcare*, 723 F. App'x at 790.

G.    For each Hospital Defendant, the Complaint fails to identify *where* the alleged fraud took place.

Consistent with the rest of the Complaint, Relators do not allege *where* the alleged fraud took place. This is yet another element of FCA pleading in which Relators fall woefully short. *See Corsello*, 428 F.3d at 1013 (complaint dismissed where plaintiff made "vague allegations that

improper practices took place everywhere [defendant] does business throughout the statutory time period") (internal quotation marks omitted).  As noted above, the Relators rely on a broad and general allegation that "CHS" committed fraud at every hospital that submitted an attestation, rather than identifying which hospitals engaged in the fraudulent conduct and submitted false claims.  That will not do.  Rule 9(b) requires particular factual pleadings, not sweeping conclusory statements unconnected to allegation of fact.  Relators cannot evade their pleading obligation by simply relying on the crutch that the fraud occurred everywhere that "CHS" did business.  *Id.*  With no particularized allegations whatsoever about the locations where the Hospital Defendants committed fraud, the Complaint fails to meet Rule 9(b)'s heightened standard as to them.

> ### H. For each Hospital Defendant, the Complaint fails to allege any facts to support a plausible inference of fraudulent intent.

The FCA only creates liability for "knowingly" presenting a false or fraudulent claim.  31 U.S.C. § 3729(a).  "Although proof of a 'specific intent to defraud' is not required . . . the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence."  *Urquilla-Diaz*, 780 F3d at 1058.  While Rule 9(b) "permits knowledge to be averred generally, courts have often required plaintiffs to plead the factual basis which gives rise to reasonable inference of fraudulent intent."  *Jacobs v. Bank of America Corp.*, 2017 WL 2361943, at *10 (S.D. Fla. Mar. 21, 2017); *Willard*, 336 F.3d at 385 ("[I]n order to adequately plead scienter," a False Claims Act relator "must set forth specific facts that support an inference of fraud.").  Relators must make "specific allegations of underlying facts from which a court may reasonably infer that a *specific individual*" knew their claims were false.  *See Jacobs*, 2017 WL 2361943, at *10.  And such factual allegations must be "plausible on [their] face" in order to support a reasonable inference of fraud.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Where relators fail to make plausible allegations of fraudulent intent, courts have routinely dismissed FCA claims. *See, e.g.*, *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) (affirming dismissal of FCA claim where the complaint "fail[ed] to plead any *particular facts* showing that Bell Helicopter was aware of the

15

actions of its employees, that it had intentionally filed these false claims with the government, that it had purposefully withheld information about these charges, or that it intentionally failed to repay the government for the overcharges").[9]

Relators allege absolutely no facts regarding the intent of any person at any of the hospitals to make fraudulent claims. Far from alleging anything about the intent of any individuals at any of the hospitals, the Complaint lumps together all 140 hospitals as though they are a single defendant and then relies on vague allegations that they all knew about and suffered from the software issues. But, in reality, individual employees (not an undefined amalgam) actually submitted attestations and those attestations differed between hospitals based on the relevant stage of Meaningful Use, the optional objectives that the hospitals selected to meet, the different software programs (Medhost, PULSE, etc.) and versions of the software used, and the time that those attestations were made. Treating the corporate entities as a monolith for purposes of pleading is simply insufficient to make out a claim of fraud against each hospital defendant based on the knowledge of *particular employees*.

Nothing in the Complaint even suggests, let alone creates a plausible inference, that any employee of any individual hospital was knowingly involved in submitting false attestations. There are no facts from which one could infer that any hospital employee believed he or she was submitting a false claim. The Complaint is bereft of meetings, conversations, or emails indicating that anyone at any hospital was aware that the attestations he or she was submitting were false. To the extent the Complaint mentions a few specific hospitals, it merely alleges that certain software users had problems with aspects of the EHR technology at their hospital. *See, e.g.*, FAC ¶¶ 90, 125, 158, 172, 182. No allegation indicates that any of these hospital employees believed these isolated software issues (which were then fixed) prevented the hospital from submitting a

---

[9] *See also U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191-92 (5th Cir. 2009); *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379-80 (4th Cir. 2008); *U.S. ex rel. Budike v. Northrop Grumman Corp*, No. 09-3799 (E.D. Pa. May 16, 2012), ECF No. 31 (Order Granting Motion to Dismiss).

Meaningful Use attestation.  For each of the 140 hospitals, Relators were required to plead specific facts supporting a plausible inference of fraudulent intent on the part of someone at that hospital.  The Complaint's failure to do so is yet another reason for dismissal of the Complaint as against the Hospital Defendants.

I.      Relators' Anti-Kickback Statute claim fails to identify the 'who,' 'what,' 'where,' 'when,' and 'how' as to each of the Hospital Defendants.

The Anti-Kickback Statute ("AKS") prohibits, in relevant part, receiving "any remuneration . . . in return for purchasing . . . or recommending purchasing . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b).  An alleged violation of the AKS must be pleaded with particularity, and defendants are only liable if the violation is knowing and willful.  *See, e.g.*, *U.S. ex rel. Fla. Soc'y of Anesthesiologists v. Choudhry*, 262 F. Supp. 3d 1299, 1307 (M.D. Fla. 2017).  As with any other alleged FCA violation, relators alleging an AKS violation must plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  *U.S. ex rel. Bingham v. Baycare Health Sys.*, 2015 WL 4878456, at *4 (M.D. Fla. Aug. 14, 2015) (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009)).

Relators once again fail to allege "the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government" with respect to their AKS claim.  *Urquilla-Diaz*, 780 F.3d at 1052.  They merely allege that "Medhost provided free licenses to at least 19 CHS hospitals."  FAC ¶ 281.  *Not a single specific hospital is mentioned in relation to the alleged kickback scheme. Id.* ¶¶ 281-289. Which hospitals received free licenses?  Who were the employees at each hospital who participated in negotiating the agreement to receive free licenses?  When and where did each of the hospitals learn of the free licenses?  Which, if any, attestations

17

did each hospital submit that were false because of the free licenses?[10]   In short, what was any individual Hospital Defendant's actual involvement with the alleged kickbacks?   The Complaint answers none of these—it does not contain one single hospital-specific allegation that would inform each defendant of the "specific fraudulent acts that constitute" its role in the alleged kickback scheme.   *See Zeta Mgmt. Corp. v. Parkside Heights Phase One, LLC*, 2009 WL 10667566, at *2 (S.D. Fla. Jan. 13, 2009) (quoting *Brooks*, 116 F.3d at 1381); *see also Cutler v. Voya Fin., Inc.*, 2019 WL 1112379, at *4 (S.D. Fla. Jan. 15, 2019) (dismissing fraud claim with prejudice because allegations were not "remotely specific"), report and recommendation adopted, 2019 WL 1115885 (S.D. Fla. Feb. 5, 2019).   It is plain that the Anti-Kickback Statute claim is not pleaded with particularity against any of the Hospital Defendants.   Thus, those claims should likewise be dismissed.

---

[10] For example, the Complaint alleges that Medhost began to provide the free licenses "[n]o later than 2013."   FAC ¶ 281.   Does this mean that Relators are not alleging that the dozens of attestations made in 2012 are false?   What about the more than 100 attestations made in 2013?

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice as against each of the Hospital Defendants.

Dated: September 24, 2019                    Respectfully submitted,

By: /s/ Martin B. Goldberg
     Martin B. Goldberg

LASH & GOLDBERG LLP
Martin B. Goldberg
Florida Bar No. 0827029
Daryl L. Saylor
Florida Bar No. 100376
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050
mgoldberg@lashgoldberg.com
dsaylor@lashgoldberg.com

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
Michael L. Waldman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Lauren M. Cassady (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mwaldman@robbinsrussell.com
barnold@robbinsrussell.com
lcassady@robbinsrussell.com

*Counsel for Hospital Defendants*

19

### <u>CERTIFICATE OF SERVICE</u>

  I HEREBY CERTIFY that on September 24, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

      By: *<u>/s/ Martin B. Goldberg</u>*
        Martin B. Goldberg

**SERVICE LIST:**

David J. Chizewer (admitted *pro hac vice*)
David E. Morrison (admitted *pro hac vice*)
Harleen Kaur (*pro hac vice* anticipated)
Danielle K. Johnson (*pro hac vice* anticipated)
Juan C. Arguello (*pro hac vice* anticipated)
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 201-4000/Fax: (312) 863-7472
David.Chizewer@goldbergkohn.com
David.Morrison@goldbergkohn.com
Harleen.Kaur@goldbergkohn.com
Danielle.Johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com

Edward H. Arens (admitted *pro hac vice)*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300 San
Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

Brandon L. Arnold (admitted *pro hac vice*)
Michael L. Waldman (admitted *pro hac vice*)
Lauren M. Cassady (admitted *pro hac vice*)
Robbins, Russell, Englert, Orseck, Untereiner
& Sauber, LLP
2000 K Street NW, 4th Floor
Washington DC 20006
Tel: (202) 775-4500
barnold@robbinsrussell.com
mwaldman@robbinsrussell.com

Laura F. Laemmle-Weidenfeld
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 2001
Tel: (202) 879-3939
lweidenfeld@jonesday.com

Colette G. Matzzie (admitted *pro hac vice*)
Luke J. Diamond (admitted *pro hac vice*)
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue
NW Washington, DC 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com
ldiamond@phillipsandcohen.com

Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Erika Stephanie Whyte (FL Bar No. 91133)
JONES DAY
600 Brickell Ave., Suite 3300
Miami, FL 33131
Tel: (305) 714-9700
ewhyte@jonesday.com
obencomo@jonesday.com
ycabreracruz@jonesday.com

Jessica M. Sarkis
Stephen G. Sozio
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
Tel: (216) 586-3939
jsarkis@jonesday.com
sgsozio@jonesday.com