# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

Case No. 18-20394-CIV-Scola/Torres

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* DEREK LEWIS and JOEY NEIMAN, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| COMMUNITY HEALTH SYSTEMS, INC., et al. | ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS'/RELATORS' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS RELATORS' FIRST AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200

Edward Arens
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000

Colette G. Matzzie
Luke J. Diamond
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 833-4567

David J. Chizewer
David E. Morrison
Harleen Kaur
Danielle K. Johnson
Juan C. Arguello
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60565
Tel: (312) 201-4000

*Attorney's for Plaintiffs/Relators*

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

**INTRODUCTION** ................................................................................................ 1

**STATUTORY AND REGULATORY BACKGROUND** ................................. 6

I.     THE FALSE CLAIMS ACT ..................................................................... 6

II.    THE ANTI-KICKBACK STATUTE ....................................................... 7

III.   THE HITECH ACT .................................................................................. 8

**FACTS ASSUMED TO BE TRUE** .............................................................. 11

IV.   THE HITECH ACT CREATED A MULTI-BILLION DOLLAR MARKET FOR FEDERAL INCENTIVE PAYMENTS .................................................. 11

V.    MEDHOST FALSELY CERTIFIED ITS EHR SOFTWARE, WHICH FAILED TO MEET MULTIPLE REQUIREMENTS FOR CERTIFICATION ........................... 11

        A.     Medhost's EDIS And Enterprise Software Could Not Integrate Patient Information Electronically Over A Hospital Stay As Required For Meaningful Use Payments. ...................................................... 12

        B.     Medhost Falsely Certified That Its Software Could Perform Drug-Drug And Drug-Allergy Checks On Medication Orders. ................................. 14

        C.     Medhost Falsely Certified Its Software Met The Requirements For Clinical Information Reconciliation. ....................................................... 19

        D.     Medhost Falsely Certified Its Software Met E-Prescribing Requirements ........... 21

VI.   CHS FALSELY ATTESTED TO MEANINGFUL USE OF MEDHOST SOFTWARE TO CLAIM $385 MILLION IN FEDERAL SUBSIDIES TO WHICH IT WAS NOT ENTITLED ................................................................... 22

VII.  CHS CORPORATE FORCED THE FLAWED MEDHOST SOFTWARE ONTO ITS HOSPITALS. ............................................................................. 24

VIII. CHS'S PULSE SOFTWARE IMPLEMENTED AT THE CHS-HMA HOSPITALS COULD NOT EXCHANGE NECESSARY DATA BETWEEN HOSPITAL UNITS. .............................................................................. 26

**PROCEDURAL POSTURE** ......................................................................... 27

**LEGAL STANDARD** .................................................................................... 27

**ARGUMENT** ................................................................................................... 28

IX.   RELATORS SUFFICIENTLY ALLEGE THAT CHS SUBMITTED, AND MEDHOST CAUSED TO BE SUBMITTED, FALSE CLAIMS TO THE GOVERNMENT ................................................................................................ 28

        A.     Relators' Allegations Are Sufficient To Satisfy Rule 9(b). ................................. 28

1.  Relators Identified The Who, What, When, Where And How Of
    The False Claims.................................................................. 29

    a)  Relators Have Properly Alleged That False Claims Were
        Submitted To The Government. ...................................... 29

    b)  An Analysis Of FAC, Exhibit B Demonstrates That
        Relators Provide Ample Detail Of The False Claims.................. 32

    c)  Relators Have Identified Medhost's Fraudulent Conduct. ............ 34

    d)  The CHS Entities Engaged In The Same Fraudulent Acts. .......... 35

        i.   Resolving Corporate Veil Arguments Is
             Inappropriate At The Motion To Dismiss Stage.............. 35

        ii.  Relators Have Properly Pleaded That CHSI, The
             Hospital Defendants, And CHSPSC Engaged In A
             Wheel Conspiracy-Like Fraud............................... 38

        iii. Relators Exceeded The Legal Standard In
             Identifying Individuals Involved In The Fraudulent
             Scheme.................................................... 40

B.  Relators Have Alleged False Claims. .................................... 42

    1.  Medhost Cannot Rely On Passing Minimum Standard Tests Alone
        To Claim Certification. .............................................. 43

    2.  CHS Misrepresented That Its EHR Software Met The
        Requirements Necessary to Attest to Meaningful Use. ............... 45

    3.  Defendants' "Interoperability" Argument Is Inapposite To Relators'
        Allegation That Defendants Used, And Caused To Be Used, EHR
        Modules That Could Not Combine To Meet The Requirements For
        Meaningful Use...................................................... 48

    4.  Relators Allege That Medhost's Software Failed To Meet CPOE
        Requirements And That CHS Falsely Attested To This And Other
        Measures. .......................................................... 51

        a)  Medhost's Argument That There Is No Allegation That Its
            Software Failed To Meet CPOE Requirements Is Inapt........... 51

        b)  CHS Similarly Misses The Mark By Focusing Solely On
            Required Percentages.................................... 53

    5.  Relators Allege That Medhost Falsely Certified Its CDS Function
        And That CHS Falsely Attested To CDS Relying On Medhost's
        Flawed Software. ................................................... 53

    6.  Relators' Sufficiently Allege That Medhost's Falsely Certified E-
        Prescribe Function Caused False Attestations. ..................... 57

7.      Relators Sufficiently Allege That Medhost's Software Failed To Meet Security-Related Criteria And That Hospitals Attested To Security-Related Measures Relying On Medhost's Software. .................. 58

C.      Relators Have Alleged That Medhost's False Statements Were Material to the Government's Incentive Payment Decisions .................................... 61

D.      Relators Have Alleged That Defendants Acted With Improper Scienter. ............ 64

1.      The Court Should Reject Medhost's "Reasonable Interpretation" Argument. .................................................. 65

2.      The Court Should Reject The CHS Entities' "Glitches And Bugs" Argument. ................................................. 67

E.      Relators Have Met The Requirements To Establish A Cause Of Action Under The FCA .......................................................... 69

F.      Relators Have Sufficiently Alleged A Conspiracy To Violate The FCA. ............ 70

X.      RELATORS' KICKBACK THEORY SHOULD BE SUSTAINED. ............................ 71

REQUEST FOR HEARING ............................................................. 75

CONCLUSION ........................................................................... 76

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Ambrosia Coal & Constr. Co. v. Pages Morales*,
    482 F.3d 1309 (11th Cir. 2007) ............................................................. 41

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................... 27-28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................. 27

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ............................................................. 41

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ............................................................. 37

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*,
    931 F.2d 1472 (11th Cir. 1991) ............................................................. 65

*Cook Cty., Ill. v. United States ex rel. Chandler*,
    538 U.S. 119 (2003)............................................................................... 7

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) ........................................... 28, 31-32, 70

*Grand Union Co. v. United States*,
    696 F.2d 888 (11th Cir. 1983) .............................................................. 41

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019)......................................................... 72, 74

*Hill v. Morehouse Med. Assocs., Inc.*,
    No. 02–14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003)............... 42

*Hopper v. Solvay Pharm.*,
    588 F.3d 1318 (11th Cir. 2009) ............................................................ 29

*Jackson v. Okaloosa Cty., Fla.*,
    21 F.3d 1531 (11th Cir. 1994) .............................................................. 27

*Jacobs v. Bank of Am. Corp.*,
    No. 1:15-cv-24585-UU, 2017 WL 2361943 (S.D. Fla. Mar. 21, 2017) ...... 37, 68, 69

*Jacobs v. Bank of Am. Corp.*,
　　No. 1:15-cv-24585-UU, 2017 WL 2361944 (S.D. Fla. Apr. 27, 2017)................................. 68

*Kostoski v. Steiner Transocean, Ltd.*,
　　278 F.R.D. 695 (S.D. Fla. 2012) ............................................................................................ 65

*Magluta v. Samples*,
　　375 F.3d 1269 (11th Cir. 2004) .............................................................................................. 27

*MedPricer.com, Inc. v. Becton, Dixon & Co.*,
　　240 F. Supp. 3d 263 (D. Conn. 2017), adhered to on reconsideration,
　　No. 3:13-CV-1545 (MPS), 2017 WL 1234102 (D. Conn. Apr. 3, 2017) ............................... 73

*Rainwater v. United States*,
　　356 U.S. 590 (1958) ................................................................................................................ 7

*Rock Island, Ark. & La. R.R. v. United States*,
　　254 U.S. 141 (1920) ................................................................................................................ 7

*Safeco Ins. Co. of Am. v. Burr*,
　　551 U.S. 47 (2007) ................................................................................................................ 66

*Smith v. First Nat'l Bank of Atlanta*,
　　837 F.2d 1575 (11th Cir. 1988) .............................................................................................. 65

*Talib v. Skyway Commc'ns Holding Corp.*,
　　No. 805-cv-282T17TBM, 2005 WL 1610707 (M.D. Fla. July 7, 2005) ................................. 28

*Tello v. Dean Witter Reynolds, Inc.*,
　　494 F.3d 956 (11th Cir. 2007) ................................................................................................ 28

*United States ex rel. Atkins v. McInteer*,
　　470 F.3d 1350 (11th Cir. 2006) .............................................................................................. 27

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
　　501 F.3d 493 (6th Cir. 2007) .................................................................................................. 41

*United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*,
　　No. 98-3127, 1999 WL 618018 (6th Cir. Aug. 5, 1999) ......................................................... 41

*United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
　　No. 10-81634-CIV, 2014 WL 12284079 (S.D. Fla. June 23, 2014) ................................. 28, 74

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
　　86 F.3d 890 (9th Cir. 2017) .................................................................................................... 63

*United States ex rel. Chase v. HPC Healthcare, Inc.*,
　　723 F. App'x 783 (11th Cir. 2018) .......................................................................................... 34

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
   290 F.3d 1301 (11th Cir. 2002) ................................................ 28, 32

*United States ex rel. Cullins v. Astra, Inc.*,
   No. 09-60696-CIV, 2010 WL 625279 (S.D. Fla. Feb. 17, 2010) ............................ 37

*United States ex. rel. Doe v. Degregorio*,
   No. 8:03-cv-1813-T-27TGW, 2007 WL 9723390 (M.D. Fla. 2007) ........................ 34

*United States ex rel. Dye v. ATK Launch Sys., Inc.*,
   No. 1:06-CV-39 TS, 2008 WL 2074099 (D. Utah May 14, 2008) .................................... 43, 44

*United States ex rel. Heater v. Holy Cross Hosp., Inc.*,
   No. 03-62097-CIV-COHN/SNOW, 2006 WL 8432157 (S.D. Fla. Oct. 18, 2006)................. 70

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
   498 F. Supp. 2d 25 (D.D.C. 2007) ................................................ 36

*United States ex rel. King v. DSE, Inc.*,
   No. 8:08-cv-2416-T-23EAJ, 2011 WL 1884012 (M.D. Fla. 2011)......................... 34

*United States ex rel. Kozhukh v. Constellation Tech. Corp.*,
   64 F. Supp. 2d 1239 (M.D. Fla. 1999) ................................................ 40

*United States ex rel. Lockhart v. Gen. Dynamics Corp.*,
   529 F. Supp. 2d 1335 (N.D. Fla. 2007) ............................................. 32, 33

*United States ex rel. Matheny v. Medco Health Sols., Inc.*,
   671 F.3d 1217 (11th Cir. 2012) ............................................... 28, 42, 69

*United States ex rel. Mei Ling v. City of Los Angeles*,
   No. CV 11-974 PSG (JCX), 2018 WL 3814498 (C.D. Cal. July 25, 2018) ........................... 63

*United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
   276 F.3d 1032 (8th Cir. 2002) ................................................ 66

*United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*,
   688 F.3d 410 (8th Cir. 2012) ................................................ 63

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
   No. 09-22253-CIV, 2012 WL 2871264 (S.D. Fla. July 12, 2012) .................................... 30, 31

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
   857 F.3d 1148 (11th Cir. 2017) ................................................ 65, 66

*United States ex rel. Schaengold v. Mem'l Health, Inc.*,
   No. 4:11-cv-58, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014).................................... 36

*United States ex rel. Silingo v Wellpoint, Inc.*,
   904 F.3d 667 (9th Cir. 2018) .................................................................. 38, 42

*United States ex rel. Streck v. Bristol-Myers Squibb Co.*,
   No. 13-7547, 2018 WL 6300578 (E.D. Pa. Nov. 29, 2018) ................................ 66, 67

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) ................................................................. 42

*United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*,
   433 F.3d 1349 (11th Cir. 2005) ............................................................. 33, 42

*United States ex rel. White v. Gentiva Health Servs., Inc.*,
   No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223 (E.D. Tenn. June 25, 2014) .............. 35, 36

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
   659 F.3d 295 (3rd Cir. 2011) ................................................................... 7

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ............................................................................. 35

*United States v. Kaman Precision Prods.*,
   No. 6:09-cv-1911-Orl-18GJK, 2010 WL 11626636 (M.D. Fla. 2010) ..................... 30, 41

*United States v. Rogan*,
   517 F.3d 449 (7th Cir. 2008) ................................................................... 7

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ....................................................................... 61, 64

*Vibe Micro, Inc. v. Shabanets*,
   878 F.3d 1291 (11th Cir. 2018) ............................................................... 40

*Weiland v. Palm Beach Cty. Sheriff's Office*,
   792 F.3d 1313 (11th Cir. 2015) ............................................................. 39, 40

*Williams v. Obstfeld*,
   314 F.3d 1270 (11th Cir. 2002) ............................................................... 65

**Statutes**

31 U.S.C. § 3729(a)(1)(A) and (B) ............................................................. 6, 69

31 U.S.C. § 3729(a)(1)(B) ....................................................................... 70

31 U.S.C. § 3729(a)(1)(C) ......................................................................... 6

31 U.S.C. § 3729(a)(1)(G) .................................................................... 6, 34, 69

31 U.S.C. § 3729(b)(1) ............................................................................................... 65

31 U.S.C. § 3729(b)(1)(A) ............................................................................................ 6

31 U.S.C. § 3729(b)(1)(B) .............................................................................. 6, 65, 68

31 U.S.C. § 3729(b)(2) ................................................................................................. 6

31 U.S.C. § 3729(b)(4) ........................................................................................... 6, 61

42 U.S.C. § 300jj-11 .................................................................................................... 9

42 U.S.C. § 1320a-7b(b) ............................................................................................. 7

42 U.S.C. § 1320a-7b(b)(1) .................................................................................... 8, 72

42 U.S.C. § 1320a-7b(g) ......................................................................................... 8, 75

42 U.S.C. § 1320a-7b(h) .............................................................................................. 8

42 U.S.C. §§ 1395-1395kkk-1 ..................................................................................... 8

42 U.S.C. § 1396 .......................................................................................................... 8

Pub. L. 111-5, 123 Stat. 115 ........................................................................................ 8

Pub. L. 111-148, 124 Stat. 119 .................................................................................... 8

**Rules**

Fed. R. Evid. 201 ....................................................................................................... 37

Fed. R. Civ. P. Rule 9(b) ................................................................................. 28, 65, 69

**Regulations**

42 C.F.R. § 495.4 (Jan. 2014) .................................................................................... 45

42 C.F.R. § 495.6(d)-(e) (Jan. 2013) ................................................................... 54, 55

45 C.F.R. § 170.102 (Oct. 2014) ................................................................................ 46

45 C.F.R. § 170.102 (Aug. 2010) ............................................................................... 48

45 C.F.R. § 170.302(a) (Aug. 2010) ........................................................................... 18

45 C.F.R. § 170.304(a) (Aug. 2010) ........................................................................... 16

45 C.F.R. § 170.306(a) (Aug. 2010) ........................................................................... 16

45 C.F.R. § 170.306(c) (Aug. 2010) ............................................................. 54

45 C.F.R. § 170.314 (Oct. 2012) ................................................................... 9

45 C.F.R. § 170.314(a)(1) (Oct. 2012) ......................................................... 16

45 C.F.R. § 170.314(a)(2) (Oct. 2012) ......................................................... 18

45 C.F.R. § 170.314(a)(5)-(7) (Oct. 2014) ................................................... 49

45 C.F.R. § 170.314(a)(8) (Oct. 2012) ......................................................... 54

45 C.F.R. § 170.314(b)(3) (Oct. 2012) ......................................................... 22

45 C.F.R. § 170.314(b)(4) (Oct. 2012) ................................................... 19, 20

45 C.F.R. § 170.314(d)(1)-(6) (Oct. 2012) ................................................... 59

45 C.F.R. § 170.314(d)(2)(ii) (Oct. 2012) .................................................... 60

75 Fed. Reg. 44314-01, 44316 (July 28, 2010)
    (to be codified at 42 C.F.R. pts. 412, 413, 422 and 495)..................... 10, 57, 61, 72

76 Fed. Reg. 1262-01, 1271 (Jan. 7, 2011)
    (to be codified at 45 C.F.R. pt. 170) ................................................. 44, 47

77 Fed. Reg. 53968 (Sept. 4, 2012)
    (to be codified at 42 C.F.R. pts. 412, 413 and 495)............................. 57

77 Fed. Reg. 54163-01, 54165 (Sept. 4, 2012)
    (to be codified at 7 C.F.R. pt. 170) .................................................. 8, 45

81 Fed. Reg. 72404, 72411-12 (Oct. 19, 2016) ........................................... 47

Plaintiffs/Relators Derek Lewis ("Relator Lewis") and Joey Neiman ("Relator Neiman") (collectively "Plaintiffs" or "Relators") hereby submit this consolidated response in opposition to the four motions to dismiss the Relators' First Amended Complaint ("FAC") [ECF No. 123] filed by: (1) Defendant Medhost, Inc. ("Medhost") [ECF No. 129] (hereinafter "Medhost Mem."); (2) Defendant CHSPSC, LLC ("CHSPSC") [ECF No. 132] (hereinafter "CHSPSC Mem."); (3) Defendant Community Health Systems, Inc. ("CHSI") [ECF No. 134] (hereinafter "CHSI Mem."); and (4) the group of hospital defendants identified in ECF No. 133, and its Appendix A, as the "Hospital Defendants" (hereinafter "Hospital Mem.") (CHSPSC, CHSI and the Hospital Defendants are collectively referred to as "CHS" or the "CHS Entities" and collectively with Medhost, the "Defendants").

## **INTRODUCTION**

Since 2010, it has been a federal policy priority to achieve universal implementation of electronic health record ("EHR") systems in hospital and medical offices to improve quality of care, reduce the well–known risk of medical errors particularly in hospitals, and conserve financial resources. Taxpayer investment in EHR implementation over the past decade has been massive, with over $38 billion paid in federal subsidies to hospitals and providers. Hospitals and providers may choose from an array of complete and modular EHR systems with over 1,100 vendors participating in the market. To ensure that federal taxpayer money is only spent on EHR systems that provide hospitals with the capabilities they need to manage a patient's stay safely across departments and with multiple users, Congress required the Department of Health and Human Services ("HHS") to set technical and performance standards for vendors to certify compliance of their EHR software before their hospital and provider customers could seek subsidy payments for meaningfully using the vendor's software

("Meaningful Use"). Congress also required that hospitals and providers attest that they had used the software meaningfully, and across the course of a hospital stay, ensuring that federal money would not be paid to hospitals who could not truthfully demonstrate Meaningful Use with required metrics.

Like many programs, however, where federal spending is substantial and federal oversight limited, incentives existed to cut corners and rush software to market even where functionalities might not exist and to promise forthcoming capacities that might never materialize. Not surprisingly in such a large program with ongoing rapid technical changes, some vendors cheated and some hospitals lied to obtain federal dollars. These same vendors anticipated that eventually a patch would be implemented, a software tool repaired, or that workflows could be designed to overcome software limitations. Thus, Hospitals and providers justified seeking federal subsidies even for software they knew could risk patient safety or whose limitations made it impossible to maintain patient records the way the rules required. In many instances, the dollars available for the hospitals and the providers were too large to pass up. In recent years, recognizing that some software vendors obtained certifications without meeting federal standards for reliability and safety, the United States Department of Justice has pursued investigations and enforcement actions under the federal False Claims Act ("FCA") to recoup monies the federal government ("Government") paid where recipients should not have been eligible for payment. To date, those settlements have resulted in repayment by EHR vendors to

the United States Treasury of nearly $212.5 million.[1]  Enforcement in this area is ongoing and more settlements are predicted.[2]

        This *qui tam* case alleges that Defendants Medhost and CHS caused Medicare to pay hundreds of millions of dollars in incentive payments for implementation of EHR systems that were not eligible for federal subsidies. The FAC also alleges similar violations by CHS in seeking federal incentive payments for use of a home-grown EHR system ("Pulse"), which lacked required functions and safety features.[3]

        Defendants raise objections to the overall theory of the case as well as the details provided to allege fraud with particularity. Nonetheless, the theory of the case is quite simple: The CHS Entities presented, and Medhost caused to be presented, claims for federal subsidy payments under the Medicare Meaningful Use incentive program knowing that the EHR software systems being used did not meet performance requirements that were mandatory for the federal subsidy program. Relators do not deny that Medhost's products obtained certification. Relators do not deny that both Medhost's products and the Pulse software did perform some of

---

[1] *See* Colin R. Jennings, *DOJ Pursues More Electronic Health Records Cases, The National Law Review* (June 11, 2019), available at https://www.natlawreview.com/article/doj-pursues-more-electronic-health-records-cases.

[2] Jodi G. Daniel, Stephanie Willis, & Maya Uppaluru, *Allscripts Close to Reaching Deal with DOJ for Health IT Certification, Anti-Kickback Statute, and HIPPA Issues* (Aug. 16, 2019), available at https://www.cmhealthlaw.com/2019/08/allscripts-close-to-reaching-deal-with-doj-for-health-it-certification-anti-kickback-statute-and-hipaa-issues/; Heather Landi, *Allscripts reports $145M settlement agreement with DOJ* (Aug. 8, 2019), available at https://www.fiercehealthcare.com/tech/allscripts-reports-q2-results-including-145m-charge-for-potential-doj-settlement-over-practice.

[3] Industry News, *Health Management Associates Announces Restatement of Financial Statements* (Nov. 13, 2013), available at https://www.hitechanswers.net/hma-announces-restatement-financial-statements/ ("In October 2013, based on the results of an internal review, the Company determined that it had made an error in applying the requirements for certifying its EHR technology under these programs and, as a result, that 11 of the hospitals it had enrolled in the HCIT programs did not meet the "Meaningful Use" criteria necessary to qualify for HCIT payments.")

the functions as required by federal rules. However, significant problems with the software–problems that were material to federal payments including integration of electronic information across a patient's entire hospital stay and safe and reliable placement of medication orders within the hospital setting and at discharge–existed such that, if the Government knew of the truth of those allegations, payments would have been denied. Until very recently, neither Medhost nor its hospital customers have disclosed significant non-conformities with its software.[4]  As discussed herein, the FAC allegations state a claim for knowing presentation of a materially false claim for payment and payment thereof.

The allegations likewise meet the additional bar that fraud must be pleaded with sufficient particularity. Without question, that task is more challenging where, as here, claims for subsidy payments have been submitted by multiple hospitals for different software and different attestation periods. Nonetheless, in Exhibit B to the FAC, reattached to this brief as Exhibit 1, Relators provide the Court with a roadmap to track each hospital's false claim and an explanation of what is false, when the false claim was made, and the amount paid for the false claim (dollars listed). As far as "who" was involved in the fraud, Relators plead each hospital that submitted the false claims and the name and positions of those both at Medhost and CHS who were aware that the claims were false and presented to the Government. As Defendants well know, decisions were not made by individual hospital administrators who might well have chosen different vendors given a choice but as part of corporate initiatives. This ensures that CHS and its hospitals secured the largest amount of federal subsidy dollars, as was Defendants' shared goal. Knowledge need not be pleaded with specificity but it is pled here on the part of both companies

---

[4] On April 29, 2019, Medhost self-disclosed that "Developer self identified that RxNorm codes are not being transmitted in the electronic prescription." Certified Health IT Product List, available at https://chpl.healthit.gov/#/product/9671(last visited October 23, 2019).

-4-

and the many individuals who made decisions to move forward with false attestations to obtain federal funds.

A final point: Relators do not allege mere technical "glitches" and "programming bugs" as Defendants argue. The alleged deficiencies with the EHR systems precluded the software from enabling users to perform the functions required by law to claim federal subsidies, including essential hospital functions such as creating medication orders with properly calculated doses, maintaining a record of a patient's medication list for the duration of their hospital stay, and checking medication orders for contraindications based on a patient's medication and allergy history. Had HHS known, for example, that a cardiologist entering a medication order in PULSE could inadvertently "kill a patient" because the software would save the wrong drug, dose, or instructions, *see* FAC ¶ 278, HHS would not have paid providers for use of that software. That HHS created an administrative system for vendors to report and correct non-conformities in software in no way precludes FCA liability for federal monies wrongly paid. Rather, it simply underscores the importance that the Government attaches to safe and reliable software for EHR systems.

So too, with the CHS Entities, it should come as no surprise that the hospital system seeks to minimize the gravity of risks posed by Medhost's software to patients. Physicians, nurses, and other CHS employees and managers were well aware that they were putting patients at risk through unreliable and unsafe medication ordering and by not documenting clinical information electronically through the duration of a patient stay. CHS tried to jerry-rig solutions to address failures of the Medhost software, including broken Clinical Decision Support tools, but then concealed these deficiencies from the Medicare program in its

single-minded focus to obtain hundreds of millions in improper incentive payments by milestone dates it had set for its own financial bottom line.

For the reasons set forth herein, Defendants' motions to dismiss should be denied.

## STATUTORY AND REGULATORY BACKGROUND

## I.        THE FALSE CLAIMS ACT

The FCA imposes civil liability to the Government on any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the Government a false or fraudulent claim for payment or approval and (2) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, 31 U.S.C. § 3729(a)(l)(A) and (B); as well as (3) conspires to violate the FCA and (4) avoids or decreases an obligation to pay money to the Government, i*d.* at § 3729(a)(l)(C) and (G). The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that–(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest .... " *Id.* at § 3729(b)(2).

The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information–(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b)(1)(A). The FCA does not require proof of specific intent to defraud. *Id.* at § 3729(b)(l)(B). The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4).

The FCA is intended "to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003). "The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth. As Justice Holmes put it, '[m]en must turn square corners when they deal with the Government.'" *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008), quoting *Rock Island, Ark. & La. R.R. v. United States,* 254 U.S. 141, 143 (1920); *See also Rainwater v. United States*, 356 U.S. 590, 592 (1958) (the objective of Congress in enacting the FCA "was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made.").

## II.    THE ANTI-KICKBACK STATUTE

The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), prohibits any person from knowingly and willfully offering to pay any remuneration to another to induce the purchase, order, or recommendation of any good or item "for which payment may be made in whole or in part under a Federal health program."  The AKS is designed to ensure that federal health programs only reimburse for goods and services recommended or provided in the best interests of patients, rather than in the financial interests of health care providers. Compliance with the AKS is a material condition of payment under federal health programs. *See United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313 (3rd Cir. 2011) (stating that AKS is a condition of payment under Medicare). The Government is not obligated to pay for goods or services tainted by kickbacks.

Manufacturers of products paid for in whole or in part by federal healthcare programs may not offer or pay any remuneration, in cash or in kind, directly or indirectly, to

induce physicians or hospitals or others to order or recommend products paid for in whole or in part by Federal healthcare programs such as Medicare and Medicaid. 42 U.S.C. § 1320a-7b(b)(1).

The Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148, 124 Stat. 119 (2010), provides that claims resulting from violations of the AKS are false claims under the FCA: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). The PPACA also clarified the intent requirement for the AKS, and provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." *Id.* at § 1320a-7b(h).

## III.    THE HITECH ACT

The Government, acting through HHS, administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1 (Medicare), and administers grants to states for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.* (Medicaid). The United States, acting through HHS, also administers the Meaningful Use program and a certification program for EHR technology.

The American Reinvestment & Recovery Act (ARRA), Pub. L. 111-5, 123 Stat. 115, was enacted on February 17, 2009. ARRA included many measures to modernize our nation's infrastructure, one of which was the "Health Information Technology for Economic and Clinical Health ("HITECH") Act". Congress created the HITECH Act to "improve health care quality, safety, and efficiency through the promotion of HIT and electronic health information technology exchange." 77 Fed. Reg. 54163-01, 54165 (Sept. 4, 2012) (to be codified at 7 C.F.R. pt. 170). To that end, the HITECH Act established the Office of the National Coordinator for Health Information Technology ("ONC") and charged it with the responsibility of creating a

voluntary certification program for EHR vendors and a program for accreditation of testing laboratories and certifying bodies. 42 U.S.C. § 300jj-11. Over a series of five years, ONC adopted mandatory certification criteria for "certified health information technology." The certification program is intended to develop criteria to ensure that EHR systems would: (1) maintain patient health information in structured data; (2) require electronic ordering of labs, medication and radiology; (3) protect patient safety through drug-drug and drug-allergy interaction checks; (4) implement successive steps toward data portability and access to information for patients; and (5) protect patient health information through audit and security. *See* 45 C.F.R. § 170.314 (Oct. 4, 2012).

The HITECH Act also established the Medicare and Medicaid Incentive Programs for Meaningful Use of Certified EHR Technology ("CEHRT"). Cognizant that hospitals and physicians might be hesitant to transition to electronic systems, the incentive programs were intended to induce providers to purchase certified EHR technologies and to implement them within their hospitals or medical practices to ensure that the systems were used for recordkeeping, ordering and other clinical decision support, safely and efficiently. Beginning in 2011, Eligible Providers (hospitals, physicians and managed care organizations) could apply for federal subsidies if they could demonstrate Meaningful Use of certified EHRs. After 2015, Eligible Providers that had failed to adopt and implement EHR technology could be subject to downward adjustment of Medicaid and Medicaid program payments.

Congress authorized the Centers for Medicare and Medicaid Services ("CMS") to promulgate criteria for incentive payments for implementing EHR programs to ensure that Eligible Providers used certified technology in a "meaningful way." Over three successive steps (Stage 1, 2 and 3), CMS raised the bar for Eligible Providers by establishing measures and

objectives that Eligible Providers must meet to demonstrate that they were using EHR technology meaningfully within their hospital, physician practice, or managed care organization and, therefore, were entitled to claim incentive payments. Some of these measures required that certain functions be performed a minimum percentage of the time, in order to make sure Eligible Providers were not merely implementing CEHRT and then reverting back to traditional paper methods. For example, during Stage 2, CMS required that for all medication orders created, 60% of them must be electronic orders recorded through computerized provider order entry ("CPOE"). Underlying these percentage requirements was the need for every certified functionality to work accurately and reliably, so that Eligible Providers could use the EHR and know that the software was safely carrying out the provider's patient care plan.

        From the beginning, regulations under the HITECH Act have emphasized to vendors and providers alike that the purpose of the federal certification and subsidy program is to ensure that EHR systems perform functions that are intended to improve clinical practices and protect patients against medical error. ONC has emphasized that the rules are not intended simply for a vendor to demonstrate compliance with technical standards or specifications but "to promote the adoption and Meaningful Use of interoperable health information technology." 75 Fed. Reg. 44314-01, 44316 (July 28, 2010) (to be codified at 42 C.F.R. pts. 412, 413, 422 and 495). The 2010 Final Rule published by ONC "focuses heavily on establishing functionalities" in health information technology from "the onset of the program." *Id.* at 44321. "[A]ll of the functionalities" proposed by the HITECH Act "are considered crucial to maximize the value to the health care system." *Id.* This helps to ensure the rules can create certain functions in clinical practice "that improve patient care, the efficiency of the health care system and public and population health." *Id.* Accordingly, use of certified EHR technology and satisfaction of

applicable Meaningful Use objectives and measures are material to payment under the Meaningful Use program.

<u>**FACTS ASSUMED TO BE TRUE**</u>

### IV. THE HITECH ACT CREATED A MULTI-BILLION DOLLAR MARKET FOR FEDERAL INCENTIVE PAYMENTS.

As of October 2018, CMS has disbursed over $38 billion dollars to subsidize purchase and use of certified EHR technologies in hospitals and physician practices. FAC ¶ 7.[5] Not surprisingly, competition among vendors is fierce with over 1,100 EHR vendors offering EHR systems. FAC ¶ 5. To receive federal incentive payments, the Government requires the use of CEHRT to enable users to perform certain functions. FAC ¶¶ 56-60, 98-101, 106-108, 132, 145-150. Electronic health records vendors, including Medhost, eagerly sought certification of EHR technology. As part of the certification program, EHR vendors attest to ONC authorized certification bodies ("ACB") and accredited testing laboratories ("ATL") that their software meets the certification requirements established by ONC.

### V. MEDHOST FALSELY CERTIFIED ITS EHR SOFTWARE, WHICH FAILED TO MEET MULTIPLE REQUIREMENTS FOR CERTIFICATION.

Medhost developed and sold CEHRT to hospitals nationwide, including numerous hospitals owned and operated by CHS. Medhost's CEHRT, particularly when implemented at the CHS Entities' facilities, was substandard and dangerous, not merely "buggy," because many of the software's required functions could not be performed safely or even at all. FAC ¶¶ 113-114, 124, 128-130, 138-139, 157, 159, 162, 167, 173, 182. Medhost knew that its software failed to provide required functionality but sought certification of the software nonetheless. Medhost marketed its software to health care providers based on the certifications it received, causing

---

[5] The following facts that support Relators' claims are alleged in the Relators' FAC and are assumed to be true for purposes of resolving the Defendants' motions to dismiss.

those providers to claim incentive payments from the Government that the providers were ineligible to receive. FAC ¶ 9-11.

In certifying that its software met the requirements for Certified EHR Technology, Medhost misrepresented the ability of its software to regularly perform functions required for the software to be eligible for certification, including that the software perform required functions safely and reliably. FAC ¶ 75.

The flaws that exist and existed in Medhost's CEHRT reveal EHR modules that are not able to perform certain functions reliably as required by federal law. FAC ¶ 93. Some of these fundamental flaws are described in the fact section immediately below, and others are addressed further below in response to specific arguments raised by one or more of the Defendants. Suffice to say that, had Medhost not misrepresented the eligibility of its software for incentive payments, the Government would not have paid hospitals for Meaningful Use of that software.

**A.     Medhost's EDIS And Enterprise Software Could Not Integrate Patient Information Electronically Over A Hospital Stay As Required For Meaningful Use Payments.**

Medhost advertised to the public for many years that its EDIS product integrated seamlessly with its Enterprise software. FAC ¶ 81. Since at least 2010, Medhost has represented to hospitals that the two modules comprise a "fully integrated product." *Id.* In 2010, for example, Medhost announced that its merger with HMS would allow it to "develop an integrated emergency department system for the HMS enterprise-wide solution designed for community hospitals" and provide it with "opportunities within the HMS customer base, to offer a fully integrated product with a consistent look and feel and all the benefits of the MEDHOST user." *Id.*   Medhost used the word "integrated" to mean that its modules would share patient

information in Emergency Department to inpatient units so that a hospital could use these modules together to form a complete EHR.

Starting in 2011, EHR vendors marketing EHR systems for hospitals, and the hospitals themselves, were on notice that to receive Meaningful Use incentive payments, the hospital must attest that certain clinical information about patients was maintained electronically from admission, including admission through the emergency room to discharge of an inpatient. FAC ¶ 99. EHR vendors were not required to certify an interface between EHR modules, but hospital EHRs needed to be able to maintain problem lists, medication lists, and allergy lists electronically during a patient's entire hospital stay, and, separately, certain important information also needed to be transmittable to the next care setting in electronic form. *Id.*

In May 2015, Medhost's Vice President of Corporate Accounts Ken Williamson described Medhost's system at CHS as an "integrated approach."  Despite repeated promises by Medhost to CHS managers at the highest corporate levels, such integration between the emergency departments and the inpatient settings in dozens of CHS hospitals did not occur. FAC ¶ 81. CHS and Medhost knew that the inability to maintain patient information through a hospitalization prevented it from being able to perform the functions required of a certified EHR technology to be eligible for incentive payments under the Meaningful Use program. FAC ¶ 15.

One cause of this failure appears to be that the modules use different drug codification schemes. FAC ¶ 112. Enterprise refers to drugs using Medi-Span vocabulary, while EDIS refers to drugs using a codification scheme created by First Databank ("FD"). *Id.* There are multiple vocabularies that are designed to make this communication work, the best known being the non-proprietary Unified Medical System, RxNorm from the National Library of Medicine.

-13-

FAC ¶ 113. The purpose of these unifying languages is to prevent precisely the issues described in the FAC. *Id.*

Both Medi-Span and FD codification should have been mapped to RxNorm codes. FAC ¶ 113.  But instead of using RxNorm codes to transmit medication information, it appears that EDIS and Enterprise used mnemonics to attempt to match EDIS's FD codes to Enterprise's Medi-Span codes, a fundamentally flawed solution that caused interaction-checking to fail with stunning frequency. FAC ¶ 114. When a patient is admitted to a CHS emergency room, the emergency department will record the patient's home medications and allergies in EDIS, which assigns them FD codes. FAC ¶ 115. If the patient is admitted to the hospital, the hospital must import the patient's home medications and allergies from EDIS into Medhost Enterprise. FAC ¶ 115. Because Medhost Enterprise uses the Medi-Span codification scheme, Medhost created text mnemonics to translate the patient's FD codes into Medi-Span identifiers. FAC ¶ 116. It is this difficulty of matching FD codes to Medi-Span identifiers using mnemonics that Relators allege caused errors in which the drugs saved in EDIS for the patient were mismatched in Enterprise to different drugs, or to different units of measure or methods of administration. FAC ¶ 116.

This was not a software bug subject to a quick fix. It was two different software coding scheme flaws that affected transfer of information, drugs, and allergies.

## B.   Medhost Falsely Certified That Its Software Could Perform Drug-Drug And Drug-Allergy Checks On Medication Orders.

In addition to poor integration, the Medhost CEHRT modules lacked required functionalities. To meet the requirements for a certified EHR, the EHR must check all medication orders for drug-drug and drug-allergy interactions, which require that it automatically and electronically indicate to the user prior to completing and acting upon the medication order

any drug-drug and drug-allergy contraindications based on the patient's medication list and medication allergy list. FAC ¶ 104. The EHR must perform the drug interaction checks accurately, reliably, and safely. Medhost's EDIS and Enterprise software did not meet this requirement. *Id*. This essentially removed one of the most important safety functions of the CPOE for many medications and should have prevented attestation for Meaningful Use.

Basic drugs, such as aspirin, crossed from EDIS to Enterprise as unstructured data, causing significant safety concerns because unstructured data is not capable of being searched for drug-drug or drug-allergy interactions. Medhost Enterprise simply excludes unmatched codes from the medication and allergy lists it uses for drug interaction checks. FAC ¶¶ 121, 127. Due to this limitation and others, many of the providers who use Medhost's EHR regard it as substandard to other EHR systems that can conduct interaction checking or medication reconciliation regardless of discrepancies in dosage or routing. FAC ¶ 119.

Exhibit B to the FAC, reattached to this brief as Exhibit 1, is a list of the Hospital Defendants that submitted false claims for which Relators allege that requirements for software that would reliably place accurate medication orders and/or perform drug interaction checks were not met. An excerpt is provided below:

| Hospital Info | | | Software Used for Attestation w/ CHPL ID | | | Criteria Attested | | | | | Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name & NPI | Attestation Date | Stage | Enterprise | EDIS | PULSE | CPOE - Med | Drug Interaction | CDS | Protect PHI | Medicine Reconciliation | Amount Paid |
| ALLIANCE HEALTH PARTNERS, LLC, d/b/a MERIT HEALTH BATESVILLE  NPI: 1114150992 | 5/23/2013 | 1 | | EDIS 4.3 CHP-006964 | Pulse 11.1 CHP-008075 | | Y | Y | Y | | $1,197,439.14 |
| | 10/21/2014 | 1 | | EDIS v4.4 SR2 CHP-022199 | Pulse 14.2.3 CHP-024158 | | Y | Y | Y | | $712,541.64 |
| | 2/4/2016 | 2 | | EDIS v4.4 SR2 CHP-022199 | Pulse 14.2.3.3 CHP-024180 | Y | | Y | Y | Y | $475,027.76 |
| | 3/21/2017 | 2 | | EDIS v4.4 SR3 CHP-025549 | Pulse 15.2 CHP-028434 | Y | | Y | Y | Y | $191,630.38 |

As reflected above and in FAC Exhibit B, Relators have provided this Court with a detailed spreadsheet identifying for each Hospital Defendant the following information: (1) its specific NPI identification information, (2) specific attestation dates, (3) the particular Meaningful Use stage attested to on each attestation date, (4) the specific software (EDIS, Enterprise or PULSE), including software version, used on each attestation date, (5) the specific Meaningful Use objective attested to on each attestation date, and (6) the specific federal incentive payment received for each attestation date.

The second-to-last column titled "Criteria Attested" itself contains five different Meaningful Use objectives which Relators allege EDIS, Enterprise or PULSE lacked the necessary functionality to safely and reliably perform. The first criteria listed is "CPOE-Med." CHS needed to use certified EHR technology to meet any Meaningful Use objective, including in this example for CPOE-Med. Under the 2011 criteria, there were two regulations, 45 C.F.R.§ 170.304(a) (Aug. 27, 2010) and 45 C.F.R. § 170.306(a) (Aug. 27, 2010), that specified the requirements for CPOE, one for an ambulatory setting and the other for an inpatient setting. FAC ¶ 144. Both regulations required that, to be certified, an EHR was required to:

> Enable a user to electronically record, store, retrieve, and modify, at a minimum, the following order types: (1) Medications; (2) Laboratory; and (3) Radiology/imaging.

FAC ¶ 145. The 2014 edition of the criteria, 45 C.F.R. § 170.314(a)(1) (Oct. 4, 2012), required an EHR to:

> Enable a user to electronically record, change, and access the following order types, at a minimum: (i) Medications; (ii) Laboratory; and (iii) Diagnostic imaging.

FAC ¶ 146. Under both editions, medication orders must have been recorded in RxNorm, the standard specified in § 170.207(d)(2). FAC ¶ 147. Medhost certified that it could perform those functions accurately, reliably, and safely. FAC ¶¶ 148- 152.

In order to attest to Meaningful Use under "CPOE-Med", the certified EHR technology needed to meet a specific objective, and the provider had to use the certified software in a measurable manner. In Meaningful Use Stage 1, the objective set forth in the Federal Register was "Use CPOE for medication orders directly entered by any professional who can enter orders into the medical record per State, local and professional guidelines." FAC ¶ 55. The measure for the provider's Meaningful Use of the software was: "CHP-01956 More than 30% of medication orders created by the EP or authorized providers of the EH's or CAH's inpatient or emergency department (POS 21 or 23) during the EHR reporting period are recorded using CPOE." *Id*. The objectives and measures changed for CPOE-Med for Meaningful Use Stage 2. FAC ¶ 57.

Hospitals that attested using Medhost's software, including CHS hospitals, could not meet attestation measures for CPOE-Med because the Medhost certified EHR technology they used, as detailed in FAC Exhibit B, was not capable of recording medication orders in an accurate and reliable manner, as required for certification as CEHRT. Relators allege that the medication orders recorded through ClinView often do not reflect the order the doctor intended to enter, such as by containing a different dose, a different time for administration, or even a different medication altogether. Therefore the software was not reliable. If the software could not reliably enable users to record accurate medication orders, then it was ineligible for certification for CPOE. FAC ¶¶ 154, 157, 159, 162, 167, 173, 182.

The second criteria listed in the second-to-last column of FAC Exhibit B is "Drug Interaction."   In order for EHR technology to be certified to allow for "Drug Interaction," attestation, under the 2011 edition criteria, 45 C.F.R. § 170.302(a) (Aug. 27, 2010)  required:

> Complete EHRs or EHR Modules must include the capability to perform the following functions electronically, unless designated as optional . . . (a) Drug-drug, drug-allergy interaction checks—(1) Notifications. Automatically and electronically generate and indicate in real-time, notifications at the point of care for drug-drug and drug-allergy contraindications based on medication list, medication allergy list, and computerized provider order entry (CPOE).

FAC ¶105. The 2014 edition of the criteria, 45 C.F.R. § 170.314(a)(2) (Oct. 4, 2012), required:

> Complete EHRs or EHR Modules must include the capability to perform the following functions electronically, unless designated as optional . . . (2) Drug-drug, drug-allergy interaction checks–(i) Interventions: Before a medication order is completed and acted upon during computerized provider order entry (CPOE), interventions must automatically and electronically indicate to a user drug-drug and drug-allergy contraindications based on a patient's medication list and medication allergy list.

FAC ¶ 106. Medhost received certification under the 2011 and 2014 editions. FAC ¶¶ 107, 108.

In Meaningful Use Stage 1, the objective was "[i]mplement drug-drug and drug-allergy interaction checks."  FAC ¶ 55.  The Measure was "[t]he EP/EH/CAH has enabled this functionality for the entire EHR reporting period." *Id*. For Meaningful Use Stage 2, the Objective was "[u]se clinical decision support to improve performance on high-priority health conditions." FAC ¶ 57. The Measure was "[t]he EP, EH, or CAH has enabled and implemented the functionality for drug-drug and drug-allergy interaction checks for the entire EHR reporting period." *Id*.

Hospitals that attested using Medhost modules, including CHS hospitals, could not meet the measures and it appears this likely was because Medhost Enterprise uses a different codification scheme than EDIS, which means that drug-drug, drug-allergy interaction checks

-18-

could not be performed because the information entered into EDIS was not readable to Enterprise. *See* FAC ¶¶ 114-118. Due to the inability to communicate, medical providers had to manually "clean-up" information that was sent from EDIS to Enterprise. As such, the drug-drug, drug-allergy interaction checks were not safely and reliably done "automatically."

Further, Medhost's EHR is incapable of reliably creating PRN medication orders—orders to be administered "as needed." FAC ¶ 171. When a physician enters a PRN medication order that includes an expiration time for the order and a maximum number of doses, Medhost's EHR may terminate the order early (i.e., prior to the expiration date the physician chose) or fail to display the maximum number of doses. *Id*. This creates obvious patient safety concerns—for instance, with the use of opioid medications which are dangerous and frequently ordered PRN to minimize exposure where possible. Medhost acknowledged to CHS that the problem with PRN medication orders was a "limitation of the system." FAC ¶ 173. Yet, Medhost refused to fix the problem. *Id*. To the Relators' knowledge, Medhost had not corrected the problem as of late 2016, even though it continued to seek and receive certification for the CPOE criterion through 2016. *Id*.

**C.    Medhost Falsely Certified Its Software Met The Requirements For Clinical Information Reconciliation.**

Under the 2014 edition criteria, 45 C.F.R. § 170.314(b)(4) (Oct. 2012) provides that complete EHRs or EHR Modules must include the capability to "enable a user to electronically reconcile the data that represent a patient's active medication, problem, and medication allergy list." FAC ¶ 130. Clinical Information Reconciliation is the process of creating a complete and accurate list of a patient's current medications and comparing the list to those in the patient record or medication orders. FAC ¶ 132. This reconciliation is done to avoid medication errors such as omissions, duplications, dosing errors, or drug interactions. FAC ¶

132. The intent of medication reconciliation is an online process comparing multiple sources of information to produce a single source for better patient care. Problem list reconciliation is important because the ability to see all problems in one location promotes better care by improving diagnostic ordering decisions, diagnostic accuracy and treatment decisions.

Clinical Information Reconciliation should be done at every transition of care in which a new medication is ordered or an existing medication order is rewritten. FAC ¶ 133. "Transitions of care" refers to changes in practitioner or setting, like being transferred from a surgery unit to a general care unit, or being discharged from the hospital. FAC ¶ 133. If no Clinical Information Reconciliation process is in place, it may be easy for a specialty health care provider, focused on one component of care at a specific point in the patient's hospital stay, to overlook other aspects of the patient's health care needs at other points in the patient's stay. FAC ¶ 133.

Turning to FAC Exhibit B, the fifth criteria for attestation listed is "Medicine Reconciliation."  Medhost's Clinical Information Reconciliation software module was called "ClinRec." FAC ¶ 135. Under the 2014 edition criteria, 45 C.F.R. § 170.314(b)(4) (Oct. 2012) provides that complete EHRs or EHR Modules must include the capability to "enable a user to electronically reconcile the data that represent a patient's active medication, problem, and medication allergy list," a process known as Clinical Information Reconciliation. FAC ¶130. For each list type, the software must "[e]lectronically and simultaneously display (i.e., in a single view) the data from at least two list sources in a manner that allows a user to view the data and their attributes," "[e]nable a user to create a single reconciled list of medications, medication allergies, or problems," and "[e]nable a user to review and validate the accuracy of a final set of

-20-

data and, upon a user's confirmation, automatically update the list." *Id*. Medhost certified that it could perform those functions accurately, reliably, and safely. FAC ¶131.

In Meaningful Use Stage 1, the objective was "[t]he EP, EH, or CAH who receives a patient from another setting of care or provider of care or believes an encounter is relevant should perform medication reconciliation."  FAC ¶55. The Measure was "[t]he EP, EH or CAH performs medication reconciliation for more than 50% of transitions of care in which the patient is: [EH/CAH] admitted to the eligible hospital's or CAH's inpatient or emergency department (POS 21 or 23)." *Id*. For Meaningful Use Stage 2, the Objective was "[t]he EP, EH, or CAH who receives a patient from another setting of care or provider of care or believes an encounter is relevant should perform medication reconciliation."  FAC ¶57. The Measure was "[t]he EH or CAH performs medication reconciliation for more than 50% of transitions of care in which the patient is admitted to the eligible hospital's or CAH's inpatient or emergency department (POS 21 or 23)." *Id*.

Hospitals that attested could not meet measures with Medhost's ClinRec program because it could not accurately and automatically update the medicine lists. FAC ¶ 130. The failure of the technology was made obvious when creating new orders when a physician selected to "continue" a medication the Enterprise software was unable to reconcile home medications imported from EDIS, and at discharge the clinical reconciliation screen sometimes contained the brand name and generic name of the same drug. FAC ¶ 136-141. All of these failures posed serious health risks, and manual workarounds were created since the technology could not function. FAC ¶¶ 137, 138.

### D.    Medhost Falsely Certified Its Software Met E-Prescribing Requirements.

To obtain certification for its software for electronic prescribing—the generation and transmission of prescriptions electronically from the hospital to a pharmacy—Medhost was

required to "[e]nable a user to electronically create prescriptions and prescription-related information for electronic transmission in accordance with" two standards: NCPDP SCRIPT version 10.6 and RxNorm." 45 C.F.R. § 170.314(b)(3) (Oct. 2012). Medhost Enterprise did not enable users to create and transmit electronic prescriptions in accordance with ONC requirements. FAC ¶ 243. When users created a prescription electronically using Medhost Enterprise, the information in that prescription often would not cross over to DrFirst and thus be transmitted to the pharmacy. *Id.* In some cases, the information that crossed over to DrFirst did not reflect the information in the prescription the user had created. *Id.* Because the prescription a user created would not necessarily reflect the prescription transmitted to the pharmacy, Medhost Enterprise lacked the functionality necessary to be eligible for certification for e-prescribing. *Id.*

Yet beginning on June 13, 2013, Medhost sought and received certification of multiple versions of Enterprise for the e-prescribing function. FAC ¶ 241.

## VI.   CHS FALSELY ATTESTED TO MEANINGFUL USE OF MEDHOST SOFTWARE TO CLAIM $385 MILLION IN FEDERAL SUBSIDIES TO WHICH IT WAS NOT ENTITLED.

Medhost and CHS were both aware of the functional limitations with the Medhost EHR technology throughout 2013, 2014 and 2015. FAC ¶ 19. Nonetheless, Defendants submitted, or caused to be submitted, false attestations for incentive subsidies representing that the certified functionalities were met:  Medhost represented that its Emergency Room software (EDIS) and inpatient hospital software (Enterprise) modules could seamlessly integrate information, and CHS attested that its hospitals met the required Meaningful Use objectives and measures when implementing the Medhost software modules. *Id.* The functional limitations, flaws, and lack of reliability with the Medhost software and CHS's implementation of the software, however, should have made the CHS hospitals ineligible for Meaningful Use incentive payments. FAC ¶ 21.

CHS disregarded the inadequate functionality of the Medhost certified software because it was unwilling to delay claiming funds under the Meaningful Use program. FAC ¶ 17. In particular, prior to attesting to Meaningful Use of Medhost's software, CHS knew that Medhost's software lacked functionality required for the software to be eligible for certification and thus a basis for seeking incentive payments in at least four main areas: (1) inability to transfer required data between emergency room and inpatient settings; (2) performing certain drug-drug and drug-allergy interaction checks; (3) performing Clinical Information Reconciliation; and (4) transmitting medication orders in RxNorm. FAC ¶ 14. Each of these issues were well known during the relevant time period by CHSI officers and employees responsible for implementing Medhost's software at its hospitals. Indeed, from 2013 until at least 2016, CHS regularly communicated with Medhost about the inadequate functionality of the Medhost software. *Id.*

CHS was one of Medhost's largest corporate customers. FAC ¶ 12. Starting in 2013, the CHS Entities undertook a company-wide effort at the corporate level to implement certified EHR technology in its hospitals with the goal of obtaining Meaningful Use incentive payments. *Id.* CHS expended considerable resources at the corporate level to implement the EHR systems in its many hospitals as quickly as possible to obtain hundreds of millions in Meaningful Use funds. *Id.* Specifically, the CHS Entities submitted and Medhost caused the CHS Entities to submit over $385 million in false claims to HHS for federal incentive payments through the EHR Incentive Programs. FAC ¶¶ 2, 76.

Beginning in 2012, CHS implemented Medhost's 2011 Edition software and attested to Meaningful Use at 78 hospitals during the Stage 1 reporting period. FAC ¶ 85. CHS referred to the hospitals that it caused to implement the inferior Medhost software as "Tier 1"

hospitals. FAC ¶ 29. In late 2013, CHS began to implement Medhost's 2014 Edition software at the hospitals that had used the 2011 Edition for Stage 1, while concurrently implementing 2011 Edition software at hospitals that had not attested to Meaningful Use in Stage 1. FAC ¶ 85. CHS represented to the Government that its hospitals met the objectives and measures for Meaningful Use of certified EHR technology based on their use of Medhost's software. Based on those representations, CHS received over $385 million in Meaningful Use incentive payments. FAC ¶ 76.

## VII.   CHS CORPORATE FORCED THE FLAWED MEDHOST SOFTWARE ONTO ITS HOSPITALS.

CHS's decision to use the Medhost software at certain of its hospitals was made at the CHS corporate level. It was a corporate directive; the selection of software vendors was not done at the hospital level. CHS Senior Vice President and Chief Information Officer Manish Shah and CHS Chief Medical Information Officer Anwar Hussain both were involved with CHS's implementation of Medhost software and aware of its problems. FAC ¶¶ 86-88, 233. The senior CHS executive responsible for the implementation project was CHS Senior Vice President and Chief Information Officer Gary Seay. FAC ¶ 86, 259. Mr. Seay managed a large team from CHS's corporate-level clinical operations and IT departments, including a deployment team that implemented Medhost's EHR software at CHS hospitals, as well as a clinical applications team that was responsible for testing new software releases and working support tickets from the field. FAC ¶ 86. The team charged with reporting Meaningful Use measures to CMS also was centralized at the CHS corporate level. FAC ¶¶ 87, 89. The team consisted of CHS Director of Internal Audit and Compliance Kristi Meyer along with her associates, CHS Director of Clinical Informatics Connie Senseney and CHS Senior Director of Operations Meagan Strawhacker. FAC ¶¶ 87, 89. Ms. Meyer would assemble Meaningful Use attestation packets at the CHS corporate

level. FAC ¶ 89. Once assembled by CHS corporate, the packets were then sent to hospital CFOs before being passed on to CMS for attestation. *Id*. Ms. Strawhacker was responsible for monitoring Meaningful Use compliance at the CHS corporate level, and Ms. Senseney was responsible for the operational aspects of the Medhost Meaningful Use reporting tool—again at the CHS corporate level. *Id*.

Throughout 2014 and 2015, CHS employees discovered that required functions were missing or broken in Medhost's software. FAC ¶ 88. Soon after the Medhost rollout began, doctors and hospital administrators began to report that the updated Medhost software was not able to perform, and that the fundamental flaws with the Medhost system were putting the safety of CHS patients at risk. FAC ¶ 90. CHS instituted weekly "critical issues" calls to discuss the problems the hospitals were experiencing with Medhost's EHR. FAC ¶ 91. The calls were led by corporate-level executives, including Director of Clinical Systems Gary Fritz and CHS Senior Manager of Physician Tools Tim Moore, and included IT and clinical informatics personnel from each of the CHS hospitals. FAC ¶ 91.

In conjunction with the calls, CHS issued regular advisory memoranda to the hospitals. FAC ¶ 92. Many of the advisories came from CHS Chief Medical Information Officer Anwar Hussein as well as CHS Vice President and Chief Nursing Officer Pam Rudisill. *Id*. The advisories warned of serious, unresolved problems with the Medhost EHR software and instructed CHS hospitals to implement additional safety checks because of them. *Id*.

CHS also was treated as one corporate account by Medhost. For example, when Medhost learned of physician comments, its Vice President of Corporate Accounts Ken Williamson would raise issues with CHS's corporate level Chief Quality Officer, Lynn Simon. In or around May 2015, Mr. Williamson complained to Ms. Simon that CHS's corporate level

physician, Dr. Jay Stepansky, allegedly told CHS hospitals that Medhost was not up to the quality level of another vendor, Cerner, causing a staff member to ask why their hospital was not getting Cerner instead of Medhost. Mr. Williamson also complained to Ms. Simon that another CHS corporate level doctor, a Dr. Starmer, allegedly stated to many Tier 1 hospitals that they "do not want Medhost". CHS's Chief Quality Officer performed damage control at the corporate level to address Medhost's corporate level complaints—all reflecting that the CHS-Medhost relationship was a corporate initiative at the corporate level, with the Hospital Defendants merely serving as the spokes of the wheel.[6]

## VIII.   CHS'S PULSE SOFTWARE IMPLEMENTED AT THE CHS-HMA HOSPITALS COULD NOT EXCHANGE NECESSARY DATA BETWEEN HOSPITAL UNITS.

CHS also knowingly misrepresented its eligibility for Meaningful Use incentive payments for sixty hospitals that CHS acquired through a merger with Health Management Associates ("HMA"). FAC ¶ 22. These sixty hospitals used a modular EHR technology known as PULSE, which HMA had developed itself. *Id*. The PULSE EHR modules at these sixty hospitals could not transfer data to the other CHS proprietary and Medhost EHR modules used in the hospital, as was necessary to maintain a patient's problem list, allergy list, and medication list throughout the patient's entire hospitalization. FAC ¶¶ 22, 78, 260-264. Rather, the HMA hospitals relied on printing clinical information and re-entering it when patients transferred from one unit to another. FAC ¶¶ 260-261. CHS knowingly and repeatedly misrepresented to the Government that the CHS hospitals using Medhost and PULSE met all required Meaningful Use objectives and measures and were eligible for Meaningful Use incentive payments. FAC ¶ 23. The Government would not have made Meaningful Use subsidy payments to the CHS hospitals that used the Medhost or the PULSE software if it had known of the flaws with the software and

---

[6] The information referenced in this paragraph is contained in an email in Relators' possession. Relators can amend the complaint to add these allegations if the Court deems that necessary.

problems with implementation of the software that resulted in failure to perform required functions. FAC ¶ 24.

## PROCEDURAL POSTURE

On January 31, 2018, Relators filed their original Complaint. ECF No. 1. On March 12, 2019, the Government filed its Notice Of The United States That It Is Not Intervening At This Time, indicating that its "investigation has not been completed . . ." ECF No. 20.[7] On March 13, 2019, the Complaint was unsealed. ECF No. 21. On July 26, 2019, Relators filed the FAC. ECF No. 123. Although the United States has not intervened in this action, it remains the real party in interest. *Id.*[8]

## LEGAL STANDARD

In reviewing a motion to dismiss, courts "accept the facts of the complaint as true and view them in the light most favorable to the nonmoving party." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004). Further, "we accept as true the facts stated in the complaint and all reasonable inferences therefrom." *Jackson v. Okaloosa Cty., Fla.,* 21 F.3d 1531, 1534 (11th Cir. 1994). "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta*, 375 F.3d at 1273 (internal quotations omitted). The allegations need only "be enough to raise a right to relief above the speculative level" such that a claim to relief "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v.*

---

[7] Defendants' representation to the Court that the Government has declined to intervene is not an accurate statement.

[8] As the Eleventh Circuit has held, the government's decision not to intervene in a FCA case is not a commentary on the merits of a case or an indication of government disinterest. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) (noting that the government's declination does not suggest that "the evidence of wrong doing [was] insufficient or the *qui tam* relator's allegations for fraud [were] without merit").

*Iqbal*, 556 U.S. 662, 663 (2009). "[T]he issue is not whether the plaintiff will ultimately emerge victorious, but whether the claimant is entitled to offer evidence to support the claims." *Talib v. Skyway Commc'ns Holding Corp.*, No. 805-cv-282T17TBM, 2005 WL 1610707, at *3 (M.D. Fla. July 7, 2005) (denying defendants' motion to dismiss).

## ARGUMENT

## IX. RELATORS SUFFICIENTLY ALLEGE THAT CHS SUBMITTED, AND MEDHOST CAUSED TO BE SUBMITTED, FALSE CLAIMS TO THE GOVERNMENT.

### A. Relators' Allegations Are Sufficient To Satisfy Rule 9(b).

Relators' allegations satisfy Rule 9(b) as they provided the who, what, when, where, and how of the false claims submitted by Medhost and CHS. A FCA complaint must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002). However, the Eleventh Circuit has cautioned that "[t]he application of Rule 9(b) . . . must not abrogate the concept of notice pleading." *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007). Ultimately, the purpose underlying the Rule 9(b) requirement is to "alert[ ] defendants to the precise misconduct with which they are charged and protect[ ] defendants against spurious charges." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (quotations omitted). To satisfy Rule 9(b), a FCA complaint must detail the who, what, when, where and how of the fraud. *United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 10-81634-CIV, 2014 WL 12284079, at *1 (S.D. Fla. June 23, 2014) (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)).

      1.    *Relators Identified The Who, What, When, Where And How Of The False Claims.*

Medhost, CHSI, CHS, and Defendant Hospitals contend that Relators failed to identify with particularity the CHS Meaningful Use attestations that constitute false claims submitted to the Government. Medhost Mem., ECF No. 129, at 9; CHSPSC Mem., ECF No. 132, at 16-19; CHSI Mem., ECF No. 134, at 11; Hospital Mem., ECF No. 133, at 6, 10-15. Relying on *Clausen*, *Corsello*, and *Hopper v. Solvay Pharm.,* 588 F.3d 1318, 1326 (11th Cir. 2009), Defendants assert that FAC Exhibit B does nothing more than list a five-year period of hospital attestations without identifying which attestations were false, which criteria was falsely attested to, and how the attestations were false. This is simply not true.

      a)    *Relators Have Properly Alleged That False Claims Were Submitted To The Government.*

As a threshold manner, Relators allege that "[e]very claim for payment submitted to the Government for incentive payments for use of EHR software that does not [meet] the requirements for Certified EHR Technology or Meaningful Use requirements is a false or fraudulent claim in violation of the FCA." FAC ¶ 292. Relators further allege that "[b]eginning in 2012, CHS represented to the Government that dozens of its hospitals met the objectives and measures for Meaningful Use of certified EHR technology based on their use of Medhost's software. Based on those representations, CHS received over $385 million in Meaningful Use incentive payments between 2012 and 2014." FAC ¶ 76. Exhibit B then (1) identifies each CHS hospital that claimed Meaningful Use subsidies by attesting to Meaningful Use based on relevant Medhost or PULSE software; (2) the date of each claim; (3) the relevant certification criteria the hospital attested to for each claim; and (4) the amount the Government paid the hospital from the claim.

For example, the FAC alleges that despite certifying to Drummond that it could perform these operations reliably and safely, Medhost's EHR was "incapable of recording medication orders" and "was ineligible for certification for CPOE." FAC ¶ 154. The FAC identifies the specific EHR software at issue, including EDIS v4.4 SR2, which Medhost certified on March 20, 2014. FAC ¶¶ 108, 150. In the first entry on page one of Exhibit B, the FAC identifies: (1) that Alliance Health Partners, LLC, d/b/a Merit Health Batesville ("Merit Health") (the "who" and "where"); (2) attested to Meaningful Use criteria for CPOE-Med using Medhost EDIS v4.4 SR2 CHP-022199 (the "what" and "how"); (3) on February 4, 2016 (the "when"), nearly two years after Medhost had certified the software. Exhibit B further shows that Merit Health's single attestation yielded a payment of $475,027.76 from the Government.

Similar details provided for this sample false claim are repeated throughout the FAC and Exhibit B for scores of additional false claims. Thus, Relators provide more than sufficient detail in the FAC for Defendants to be put on notice as to who, what, when, where, and how they caused a false claim to be submitted to the Government. *See United States v. Kaman Precision Prods.*, No. 6:09-cv-1911-Orl-18GJK, 2010 WL 11626636, at *4 (M.D. Fla. 2010) (finding the government "has plead[ed] allegations of fraud with particularity" when it "identifies four distinct claims, who made them, the dates they were made, and how they were misleading.")

The FAC's detailed allegations, combined with Exhibit B's identification of specific false claims that were submitted to the Government and the amounts paid to each hospital based on those claims, is more than sufficient to survive a motion to dismiss. *See United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264, at **5–6 (S.D. Fla. July 12, 2012). In *Osheroff*, the relator used the defendant's public filings to reflect the revenues received from Medicare and Medicaid to provide thousands of sample

claims the defendants submitted to and were paid by CMS. *Id*. at *6. The defendants argued that the complaint's exhibit was "not sufficiently particular" because it did not identify "*who* at [defendant] allegedly submitted a claim for payment, does not state *where* the claim was submitted, and does not specify *what* the claim said." *Id*. at *5 (emphasis added). The District Court rejected this argument, finding "the allegations that [Defendant] was paid by Medicare and Medicaid together with the specific information provided in [Defendant's] public filings and Exhibit F do not require the Court to make unwarranted inferences about the submission of claims. *Id*. at *6 Thus, the court concluded that the relator sufficiently alleged that claims were presented to an agent of the United States.

As in *Osheroff*, Relators submitted an exhibit to the FAC, Exhibit B, which combines publicly available data regarding Governmental payments for Meaningful Use along with the dates of attestation, the CHS facility at issue, the specific Meaningful Use function CHS attested to, and which Medhost EHR technology was used as the basis for the attestation. The FAC also provides the attestation requirements and the certification dates and requirements, in addition to details about how these requirements were not met. *See* Section IX(B) below. FAC Exhibit B serves to answer the who, what, when, where, and is a backstop as to the how in showing how Medhost and CHS hospitals submitted false claims.

Indeed, the FAC includes far more detail regarding Medhost and the CHS entities involvement in presenting false claims to the Government than the relator in *Corsello*, on which Medhost relies (Medhost Mem., ECF No. 129, at 8), where the district court had dismissed a complaint that included only vague allegations that improper practices took place "everywhere [the defendant] does business" and failed to provide any factual basis to conclude fraudulent claims were ever actually submitted to the government in violation of the FCA. *Corsello*, 428

F.3d at 1013. Medhost's reliance on *Clausen* is similarly misplaced. In *Clausen*, the district court dismissed the relator's case because he "merely offers conclusory statements, and does not adequately allege when—or even if—the schemes were brought to fruition. He merely alleged that 'these practices resulted in the submission of false claims for payment to the United States.'" 290 F.3d at 1312.

        b)    *An Analysis Of FAC, Exhibit B Demonstrates That Relators Provide Ample Detail Of The False Claims.*

Despite the detailed and thorough allegations in the FAC, Medhost argues that "Relators were not in a position that would have given them first-hand knowledge of crucial details, [and thus] their attempt to invent a fraudulent scheme falls well short of what Rule 9(b) requires."  Medhost Mem., ECF 129 at 10, 11. Yet the FAC is replete with allegations based on Relators' personal knowledge and sets forth the reasons why Medhost's EHR software lacked the capability to, and did not, meet the requisite Government standards. Relators' knowledge is reliable as they were involved with the implementation of Medhost's EHR technology at CHS hospitals as CHS IT professionals and either witnessed, or were involved in discussions about, the failures of Medhost's EHR technology to meet the certification standards causing CHS to not be able to implement the EHR technology to meet Government attestation requirements. *See* FAC at ¶¶ 28, 29, 93, 244.

The reliability of Relators' claims directly rebuts the Defendants' contention that the FAC is inappropriately premised on pure conjecture. *See* Medhost Mem., ECF No. 129, at 10–11. For example, in *United States ex rel. Lockhart v. Gen. Dynamics Corp.*, the relator brought a FCA claim against General Dynamics alleging that it failed to perform required quality control tests on ammunition propellant as mandated by governing contracts with the military. 529 F. Supp. 2d 1335, 1336 (N.D. Fla. 2007). The defendant moved to dismiss the complaint on

Rule 9(b) grounds. In analyzing the sufficiency of the complaint, the court reviewed controlling Eleventh Circuit case law, including *Atkins*, *Corsello, and Clausen*, finding that "[t]he most critical distinction in these cases may be the sufficiency of the complaint's allegation of a reliable basis for the relator's assertion that fraud has in fact occurred. In the cases in which the complaint was held deficient, the complaint left open the possibility that the relator was proceeding based on conjecture—that he did not have a reliable basis for the allegation of fraud." *Id.* at 1341. The court then discussed the indicators of reliability in the relator's claim, finding the complaint sufficiently reliable because the relator was actively engaged in the process of manufacturing the propellant for the military contract, and knew required tests were not done because he would have been the person to perform them. *Id.*

As in *Lockhart*, Relators' claims are reliable, not mere conjecture, due to Relators' direct and personal involvement in the implementation of CHS software and their resulting understanding of the systemic flaws in the EHR technology that demonstrate why it was incapable of meeting the Government's functional requirements for certified software, and the attestation requirements for Meaningful Use. FAC ¶¶ 93, 201, 208, 210, 233, 235, 244, 254, 276, 286.  Relators have direct knowledge of the problems CHS faced with implementing Medhost's EHR technology given their direct engagement in the process of implementing the EHR technology at CHS hospitals. *Id*. Relators further know, from their personal experience and observation by virtue of their "insider" status at CHS, that Medhost's EHR technology was not capable of meeting the certification requirements, that it failed to perform the required functions at CHS hospitals, and that Medhost was unable to fix the EHR technology to perform those functions. *Id*; *see also United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) ("This is not a case like [*Clausen*], in which a 'corporate outsider'

made speculative assertions that claims 'must have been submitted, were likely submitted or should have been submitted to the Government'").

c)      *Relators Have Identified Medhost's Fraudulent Conduct.*

Finally, the FAC thoroughly details how Medhost's EHR modules, which were the basis of CHS's attestations of CPOE-Med, Drug Interaction, CDS, Protect PHI, and Medicine Reconciliation, were not capable and did not meet the functional requirements for certification. *See* Section IX(B) below. Medhost knew that the technology did not enable users to perform the required functions but nonetheless represented to Drummond that its EHR technology was capable of performing those functions. FAC ¶¶ 11, 50, 95, 290. Relators also provided the statutory requirements for certification, the dates that they were certified, and the versions of Medhost's EHR technology that was used by CHS to attest. FAC ¶¶ 55, 57, 107-110, 131, 149-152, 204, 241. Relators further allege with detail the reasons why each listed certification was false. FAC ¶¶ 111-129, 136-142, 155-156, 157-159, 160-164, 165-170, 171-173, 205-215, 221-229, 230-238, 243-247. CHS's attestations were false because Medhost fraudulently obtained its certification, CHS could not attest without using certified EHR technology, and because CHS did not actually meet the required Meaningful Use measures. FAC ¶¶ 76, 77. Thus, Relators allege that Medhost "caused" false claims to be presented in violation of 31 U.S.C. § 3729(a)(1)(G). *See United States ex rel. King v. DSE, Inc.*, No. 8:08-cv-2416-T-23EAJ, 2011 WL 1884012, at **1-3 (M.D. Fla. 2011); *United States ex rel. Doe v. Degregorio*, No. 8:03-cv-1813-T-27TGW, 2007 WL 9723390, at **5-6 (M.D. Fla. 2007); *Cf. United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790 (11th Cir. 2018), *cert. denied sub nom. United States ex rel. Chase v. Chapters Health Sys., Inc.*, 139 S. Ct. 69 (2018) (dismissing relator's claim because "[relator's] complaint does not include specific examples of the conduct she describes or allege the submission of any specific fraudulent claim. Neither does Ms. Chase allege the basis of her

-34-

knowledge of the defendants' fraudulent billing practices—a process she was far removed from as a social worker.").

       d)     *The CHS Entities Engaged In The Same Fraudulent Acts.*

CHSI, CHSPSC, and Hospital Defendants assert that the FAC is deficient because it lacks sufficient detail regarding who participated in the fraud and/or that Relators improperly group CHSI, CHSPSC, and Hospital Defendants together in the pleadings. These arguments center on the "who" portion of Rule 9(b) and as such are addressed together.[9]

       i.     *Resolving Corporate Veil Arguments Is Inappropriate At The Motion To Dismiss Stage.*

First, CHSI rolls out a blame-shifting argument that a parent corporation is not liable for the acts of its subsidiary, relying on *United States v. Bestfoods*, 524 U.S. 51 (1998), and its progeny. CHSI Mem., ECF No. 134, at 6-8. Any inquiry into the relative culpability of CHSI, as opposed to its affiliates, is simply not appropriate at the motion to dismiss stage. While a corporate parent can be held liable for the actions of its subsidiary under theories of agency, control, or alter-ego/piercing, the inquiry is fact specific and should not be resolved on a motion to dismiss. Rule 9(b) does not apply to the scenario where the parent company and its subsidiaries all participated in a fraud. *See United States ex rel. White v. Gentiva Health Servs., Inc.*, No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223, at *16 (E.D. Tenn. June 25, 2014) ("Whether these employees perpetrating a fraud against the government were employees of [the defendant] or employees of one of [the defendant]'s subsidiaries is a question of fact inappropriate for a motion to dismiss under Rule 12(b)(6)."). Indeed, even at the summary judgment stage, evidence of a corporate parent's direct involvement in the subsidiary's FCA

_____

[9] CHSPSC styles the purported flaw in the FAC as a Rule 9(b) "who" issue, while CHSI and the Hospital Defendants each style the same flaw as a "shotgun pleading" issue. CHSPSC Mem., ECF No. 134, at 17-18; CHSI Mem., ECF No. 132, at 9-11; Hospital Mem., ECF No. 133, at 6-9.

violation need not be "overwhelming"; there need only be "some evidence" that "may not be strong," but that forms part of a "larger mosaic that creates genuine issues of material fact on this point." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 63 (D.D.C. 2007). Corporate form cannot shield the parent from liability if the parent "itself participated in submitting a false claim or causing one to be submitted, in concert with [the subsidiary], even though the corporate distinction between the two were still observed." *Id.*

        In any event, Relators' direct allegations regarding the CHS Entities are more than enough to defeat CHSI's motion to dismiss. *See United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *14 (S.D. Ga. Dec. 8, 2014) (quoting *Hockett*, 498 F. Supp. 2d 25 at 62) ("Even absent allegations that the circumstances warrant veil piercing, [defendants] may 'be held liable if [they were] directly involved in submitting false claims or causing them to be submitted to the government.'")); *see also White*, 2014 WL 2893223, at *16 (defendant "forgets the basic axiom that, in a motion to dismiss, the plaintiff's allegations are accepted as true. [Relator] has made direct allegations against [the defendant]. She alleged a number of individuals holding different job titles within [the defendant's] organization executed several fraudulent schemes.").

        Relators contend that CHS was a Medhost corporate account, CHSI corporate selected which of its hospitals would receive Medhost software products as opposed to other vendors' products, CHSI corporate employees were responsible for the implementation of the Medhost software at the hospital level, and CHSI corporate employees then caused the hospitals to each individually attest to Meaningful Use to the Government so the CHS Entities could receive the $385 million in incentive payments. *See* FAC ¶¶ 85-92, 232-233, 288. Indeed, in its

2012 10-K,[10] CHSI admitted that it caused "our hospital facilities" to implement EHR technology and that "[w]e anticipate recognizing incentive reimbursement" as "we are able to implement the certified EHR technology . . ." Cmty. Health Sys., Inc., Annual Report (Form 10-K), 50 (February 27, 2013). CHS may contend that CHSI's 10-K cannot be used to establish *which* corporate entity/entities implemented the EHR technology, as the royal "we" is used throughout the report to denote CHSI and its subsidiaries, without attributing activity to any particular entity. This only proves the point: Relators allege that the scheme was controlled at the corporate level. Indeed, the FAC allegations go well beyond pointing to CHSI's mere "awareness" of wrongdoing, but alleges that at the corporate level, CHS devised and implemented (and according to its 10-K, funded), the fraudulent scheme to submit Meaningful Use attestations to receive incentive reimbursement payments related to Medicare or Medicaid incentives.

Finally, there is no basis for CHSI's contention, premised on *United States ex rel. Cullins v. Astra, Inc.*, No. 09-60696-CIV, 2010 WL 625279, at *3 (S.D. Fla. Feb. 17, 2010), that Relators "failed to allege that CHSI caused any hospital to submit a false claim to the government." *See* CHSI Mem., ECF No. 134, at 14. CHSI's reliance on *Astra* is surprising, as it is easily distinguishable. In *Astra*, the court found the false claim was submitted to the government *before* the defendant was alleged to have taken *any* action. Thus, the defendant could not have *caused* the filing of the false claim. *Astra*, 2010 WL 625279 at *3. Of course, here, Relators allege that the attestations constitute false claims, and they were only filed after

---

[10] In resolving a motion to dismiss, this Court may take "judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Jacobs v. Bank of Am. Corp.*, No. 1:15-cv-24585-UU, 2017 WL 2361943, at *4 (S.D. Fla. Mar. 21, 2017) (citing Fed. R. Evid. 201; *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir. 1999)). Accordingly, judicial notice of CHSI's 2012 10-K report is appropriate.

CHSI devised to obtain as much EHR incentive compensation as it could from the Government, selected Medhost software at the corporate level, forced certain of its hospitals to use Medhost software even when objections were raised, took responsibility for implementing the flawed Medhost software at the hospitals, and then finally told the hospitals when they could attest to Meaningful Use by using the very same Medhost software. CHSI can hardly claim that it did *nothing* before the Hospital Defendants submitted the Meaningful Use attestations to the Government for reimbursement based on their implementation of the fundamentally flawed Medhost software.

      ii.    *Relators Have Properly Pleaded That CHSI, The Hospital Defendants, And CHSPSC Engaged In A Wheel Conspiracy-Like Fraud.*

Second, there is no merit to CHSI's and Hospital Defendants claims that the FAC is deficient because Relators merely allege that "everyone did everything."  CHSI Mem., ECF No. 134, at 10; Hospital Mem., ECF No. 133, at 7. Their reliance on *United States ex rel. Silingo v Wellpoint*, *Inc.*, 904 F.3d 667, 677 (9th Cir. 2018), is baffling. There, the appellate court found that when a relator alleged a "wheel conspiracy-like fraud", as Relators do here, then any "parallel actions of the 'spokes' can be addressed by collective allegations." *Id.* at 678. When each of the spokes act in the same way, as the Hospital Defendants are alleged to have done here, then they "miss the mark when they implore us to consider that they are 'unrelated, dissimilar defendants with no relevant business connections to one another. . . ." *Id*. Instead, when the spokes have "largely 'alleged to have engaged in precisely the same conduct,' then there was no reason (and no way) for [the relator] to differentiate among those allegations that are common to the group." *Id*. Thus, the Ninth Circuit reversed the dismissal of the complaint, finding that the relator's "charges of factually false claims, express false certifications, and false records should not have been dismissed due to her use of group allegations." *Id*. *Silingo* is squarely on point,

fully supportive of Relators' allegations in this case, and should serve as the basis to deny each of the CHS Entities' motions to dismiss.

The Court should likewise reject the various CHS Entities' overlapping contentions that the FAC is a "shotgun pleading" that violates Rule 8, particularly when none of the motions to dismiss are brought under Rule 8. *See* CHSI Mem., ECF No. 134, at 2, 9-11 (citing *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015); Hospital Mem., ECF No. 133, at 7-8 (same). Relying on *Weiland*, CHSPSC contends that it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." CHSPSC Mem., ECF No. 132, at 25.

*Weiland* provides little cover for the CHS Entities. As *Weiland* makes clear, Rule 8 provides an exceptionally low pleading hurdle. 792 F.3d at 1325 (finding that "[a] dismissal under Rules 8(a)2 and 10(b) is appropriate where it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.") (emphasis in original) (internal quotation and citation omitted). Applying this lax standard, the Eleventh Circuit made the following finding that is equally applicable here: "whatever their faults, these two counts are informative enough to permit a court to readily determine if they state a claim upon which relief can be granted." *Id.* at 1326 (holding that "the district court abused its discretion when it dismissed [plaintiff's] count one and count three . . . on the grounds that those counts did not comply with Rule 8(a)(2) and 10(b).") Likewise, after reviewing the FAC, this Court should conclude that the FAC is "informative enough" for this Court to find that Relator's counts state a claim upon which relief can be granted.

Moreover, the FAC sufficiently organizes a complex set of issues to put each Defendant on notice of the specific claim it faces. In *Weiland*, the Eleventh Circuit found the

amended complaint's organization was sufficient to put the defendants on notice of the specific claims against them. *Id*. at 1326-27. There, the complaint's fact section was organized into three subsections, each with headings and allegations that adequately put the defendants on notice of the specific claims against them and the factual allegations that supported those claims. *Id*. at 1325. As in *Weiland*, the FAC is broken into distinct subsections that provide detailed allegations as to the factual predicate for how the FCA was violated here. If, however, the Court grants any of the motions to dismiss on "shotgun" pleading grounds, then Relators respectfully request that the Court grant them leave to replead their allegations to overcome any pleading deficiency. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018).

        *iii.*   *Relators Exceeded The Legal Standard In Identifying Individuals Involved In The Fraudulent Scheme.*

Third, CHSPSC, CHSI, and Hospital Defendants each claim that Relators need to identify individuals who partook in the fraudulent scheme. *See* CHSPSC Mem., ECF No. 132, at 17; CHSI Mem., ECF No. 134, at 3, 12-14; Hospital Mem., ECF No. 133, at 9-10. More specifically, the Hospital Defendants cite *Corsello* and *United States ex rel. Kozhukh v. Constellation Tech. Corp.*, 64 F. Supp. 2d 1239 (M.D. Fla. 1999), for the proposition that Relators are required to identify the specific defendant employees who participated in the fraud. Hospital Mem., ECF No. 133, at 9. Neither case, however, stands for that proposition.

In *Corsello*, the Eleventh Circuit did not comment, or base its affirmance of the complaint's dismissal, on whether the relator alleged, or did not allege, which employees participated in the fraud. In *Kozhukh*, the court rejected the FCA defendant's motion to dismiss in its entirety, holding that the relator had adequately pleaded the time, place, content and "parties participating" in a single-defendant fraud; the fact that relator provided names of individual

-40-

participants was not deemed to be dispositive.[11]  The additional cases the Hospital Defendants

cited in footnote six are not directly on point. Hospital Mem., ECF No. 133, at 9. Indeed, the first

case they cite, and the only one that provides a descriptive parenthetical, *United States ex rel.*

*Branhan v. Mercy Health Sys. of Sw. Ohio*, No. 98-3127, 1999 WL 618018, at *2 (6th Cir. Aug.

5, 1999), is of no consequence as that Sixth Circuit decision has subsequently been determined to

be nothing more than non-binding dicta. *See United States ex rel. Bledsoe v. Cmty. Health Sys.,*

*Inc.*, 501 F.3d 493, 507 (6th Cir. 2007). Even more damning is that the Sixth Circuit

subsequently held in *Bledsoe* that, "[w]e refuse, however, to read *Branhan* as establishing a

requirement that the identity of employees within a corporate defendant is a necessary element of

a FCA violation." *Id.*

        *Bledsoe* is well-aligned with Eleventh Circuit precedent. "[T]he Eleventh Circuit

has held that it is erroneous to focus solely on the certifying employee's knowledge." *Kaman*

*Precision Prods.*, 2010 WL 11626636 at *5 (citing *Grand Union Co. v. United States*, 696 F.2d

888, 890-91 (11th Cir. 1983) (reversing summary judgment decision for FCA defendant and

holding that even though the set of employees who knowingly permitted fraudulent transactions

to occur did not include the employee who actually certified the transaction to the government,

"[t]his was enough to impute knowledge to the corporation, regardless of whether the certifying

employee was aware of the other employees' wrongdoing.")) Moreover, the Eleventh Circuit is

"more tolerant toward complaints that leave out some particularities of the submissions of a false

---

[11] To bolster their weak FCA authority, the Hospital Defendants then cite two RICO cases,
*Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007) and
*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997), that
merely require a delineation among individual RICO defendants as to which part of an alleged
RICO scheme each defendant was responsible for. Neither case requires such a delineation for
non-party employees of RICO defendants, and neither has any import for claims brought under
the FCA.

claim if the complaint also alleges . . . participation in the fraudulent conduct." *Matheny*, 671 F.3d at 1230 (citing *Walker*, 433 F.3d at 1360); *see also Hill v. Morehouse Med. Assocs., Inc.*, No. 02–14429, 2003 WL 22019936, at *3, *5 (11th Cir. Aug. 15, 2003) (observing that "Rule 9(b)'s heightened pleading standard may be applied less stringently . . . when specific factual information [about the fraud] is peculiarly within the defendant's knowledge or control" and where the relator pled sufficient facts, based on her involvement in the fraudulent conduct, to provide "the indicia of reliability that is necessary in a complaint alleging a fraudulent billing scheme") (quotations omitted).

In any event, Relators in this case *have* alleged the identities of individual CHS participants in the fraud. *See* FAC ¶¶ 86-89, 91, 92, 137, 190, 199, 215, 228, 233, 245, 259, 276, 279, 280, 286-288. The fact that those individuals work primarily for the corporate CHS, not the Hospital Defendants, does not defeat Relators' claims against the Hospital Defendants who submitted the false claims and were merely "spokes" of the "wheel" of Medhost's and CHS's centralized fraud. *Silingo*, 904 F.3d at 677–78 (citing *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016)). Thus, Relators have more than adequately pleaded their claim. If Relators discover more facts in discovery that further elaborate on CHS's corporate shell game, they can amend the pleadings to conform to the facts.

**B.      Relators Have Alleged False Claims.**

Medhost and the CHS Entities each argue that Relators have not alleged anything false about the CHS Entities' attestations. Medhost Mem., ECF No. 129, at 11-12; CHSPSC Mem., ECF No. 132, at 7-15; CHSI Mem., ECF No. 134, at 15 (incorporating CHSPSC's arguments); Hospital Mem., ECF No. 133, at 5 (same). Relators respond to the Defendants' arguments in turn below.

-42-

1. *Medhost Cannot Rely On Passing Minimum Standard Tests Alone To Claim Certification.*

Medhost claims that Relators fail to identify anything false about CHS's Meaningful Use attestation because: (1) the Hospital Defendants used Medhost's certified technology, and (2) Relators do not allege that the Hospital Defendants lied when attesting that they had met the Meaningful Use objectives and measures. Medhost Mem., ECF No. 129, at 11-12. Medhost cites to the Code of Federal Regulations to support its first point, summarizing that 42 C.F.R. § 495.40(a) "stat[es] that eligible hospitals must attest to how they 'used certified EHR technology.'" *Id*. at 11. Based on the quoted language, Medhost claims that CHS's attestations were truthful. Medhost Mem., ECF No. 129, at 11.

Medhost's argument falls wide of the mark by not squarely addressing Relators' allegation that Medhost's EHR should not have been certified. FAC ¶¶ 50, 75, 95, 111, 136, 154, 173, 180. Medhost's position is that once an EHR technology passes a base-level test, even if by fraudulent means, CHS can use the fraudulently certified technology to attest, despite not being able to meaningfully use the software as the Government intended. This simply is not the standard. The Court need not look any further than the Government's Complaint In Intervention in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS (D. Vt.), attached hereto as Exhibit 2, in which the Government intervened, and ultimately settled an FCA claim, against another EHR vendor despite the fact that the vendor's EHR technology had been certified by a certifying body.

Indeed, simply passing a certifying test is not sufficient to prevent a false claim. *United States ex rel. Dye v. ATK Launch Sys., Inc.*, No. 1:06-CV-39 TS, 2008 WL 2074099, at *3 (D. Utah May 14, 2008). In *ATK*, the defendant argued that it did not submit a false claim because the government did not allege that its product, a flare, failed to meet a specific

-43-

certification test standard (in conformance with a safety test that measured the flare when dropped at a specific "clocking orientation" of ten feet). *Id.* at *3. The functional purpose of the certification safety test was to purchase flares that would not ignite when dropped at wing height, regardless of the actual degree at which the flare was angled when dropped (*i.e.*, to prevent flares that are dropped by mistake from exploding). ATK argued in its motion to dismiss that so long as the flares passed the certification test, there could be no false claim even if the flares could explode if dropped at a slightly different "clocking orientation" than specified in the test. Wisely, ATK abandoned that position at oral argument, conceding that the flares were too sensitive to meet the functional purpose of the certification test. *Id.* at *2. It would be nonsensical to argue that ATK could deliver flares that would ignite when dropped in every orientation except the one tested since the purpose of the safety test was to determine if the flares would harm the personnel that used them when put into actual use.

Similarly here, ONC has recognized that "there is a distinct difference between the 'testing' and 'certification' of a Complete EHR and/or EHR Module." 76 Fed. Reg. 1262-01, 1271 (Jan. 7, 2011) (to be codified at 45 C.F.R. pt. 170). "We described 'testing' as the process used to determine the degree to which a Complete EHR or EHR Module can meet specific, predefined, measurable, and quantitative requirements. . . . In contrast, we described 'certification' as the assessment (and subsequent assertion) made by an organization, once it has analyzed the quantitative results rendered from testing *along with other qualitative factors*, that a Complete EHR or EHR Module has met all of the applicable certification criteria adopted by the Secretary." *Id.* (emphasis added). Testing is therefore not the end of the inquiry.

As in *ATK*, Medhost, by seeking certification and claiming certification, made a claim that its EHR technology could safely and reliably meet the standards for CEHRT. FAC ¶¶

50, 75, 95, 111, 136, 154, 173, 180. Medhost even continues to pursue the "good house-keeping seal of approval" argument ATK later abandoned:  so long as Medhost's EHR passed a base-line test, it could not be party to a false claim even if its software knowingly could not perform the functional purpose for which it was being tested, safely and reliably. Relators allege, with substantial detail, all of the ways that Medhost's EHR technology did not perform certain functions for which they were certified. Thus, the mere fact that Medhost's software was certified by Drummond does not preclude Medhost from being held liable for causing a false claim to be submitted to the Government.

2.    *CHS Misrepresented That Its EHR Software Met The Requirements Necessary to Attest to Meaningful Use.*

CHSPSC takes the position that each attesting hospital was "only required to attest that it *used* certified software" and that essentially nothing further was required of its hospitals, an argument that CHSI and the Hospital Defendants both incorporate in their respective memoranda of law. *See* CHSPSC Mem., ECF No. 132, at 7-8. CHSPSC cites 42 C.F.R. § 495.8(b)(1)(i)(A) (2014) in support of its position, which states that the eligible hospital must attest that it "[u]sed certified EHR and specify the technology used."  Defendants leave out, however, that a "certified EHR" is defined not only as software that has been "certified under the ONC Health IT Certification Program," but that also meets the definition of a "Base EHR" and has "been certified to the certification criteria that are necessary to be a Meaningful EHR User." *See* 42 C.F.R. § 495.4 (Jan. 2014) (defining CEHRT); *see also* 77 Fed. Reg. 54163-01 at 54164 ("In order to have EHR technology that meets the CEHRT definition for FY and CY 2014 and subsequent years, EPs, EHs, and CAHs must have EHR technology certified to the 2014 Edition EHR certification criteria *that meets the Base EHR definition* . . . as well as the additional EHR technology certified to the 2014 Edition EHR certification criteria necessary to meet the

Meaningful Use objectives and measures . . . ) (emphasis added). A "Base EHR" is an EHR that meets specific performance requirements, such as including "patient demographic and clinical health information, such as medical history and problem lists" and having the capacity "[t]o exchange electronic health information with, and integrate such information from other sources," "provide clinical decision support," and "support physician order entry."  45 C.F.R. § 170.102 (Oct. 2014). In attesting to Meaningful Use, then, hospitals represent both that the software has been certified and that the software meets the requirements of a Base EHR, including maintaining problem lists, providing clinical decision support, and supporting CPOE. The FAC alleges that Medhost's software did not meet those requirements and that CHS submitted attestations knowing the software did not meet those requirements. *See* FAC at ¶¶ 32–33. Consequently, the FAC alleges that Defendants made or caused false statements in their attestations, and submitted or caused the submission of false claims for Meaningful Use subsidies based on the use of Medhost's software.

Because certified EHR technology entails more than bearing the stamp of ONC certification, Defendants' argument that "[n]othing in the Meaningful Use program required [users] to second-guess the ONC's certification of the software" is beside the point. *See, e.g.*, CHSPSC Mem., ECF No. 132, at 9. Even if a software developer has obtained ONC certification for its software, an Eligible Provider cannot attest to Meaningful Use knowing the software is incapable of meeting the requirements of a Base EHR.

There is similarly no merit to CHSPSC's contention that it could attest to Meaningful Use without regard to the "accuracy or reliability" of its software. CHSPSC Mem., ECF No. 132, at 11. To the contrary, it has been a requirement from the beginning of the HITECH Act that CEHRT be able to perform required specifications and capabilities, including

those of a Base EHR, in an "accurate and reliable manner . . . including in a manner that does not contribute to serious risks to public health or safety or other outcomes inconsistent with the National Coordinator's responsibilities [under the statute]."  FAC ¶ 71 (quoting 81 Fed. Reg. 72404, 72411-12 (Oct. 19, 2016). The FAC alleges that CHS knew its EHR software could not perform required specifications and capabilities in an accurate and reliable manner—indeed, CHS employees worried the software would kill patients FAC ¶ 278—but attested nonetheless that the software performed the specifications and capabilities of a Base EHR. Those attestations were false under the FCA.

CHSPSC also argues that, "[o]nce software was certified, hospitals could rely on the certification as an 'assurance that the [software] will perform as described,' and as 'an indication of [its] capabilities and compliance with the certification criteria.' 76 Fed. Reg. at 1271/1, 1282/3." CHSPSC Mem., ECF No. 132, at 8. The full quote from the Federal Register is:

> We further stated that the act of certification typically promotes confidence in the quality of a product (and the Complete EHR or EHR Module developer that produced it), offers assurance that the product will perform as described, and helps consumers to differentiate which products have met specific criteria from others that have not.

76 Fed. Reg. 1262-01, at 1271. While ONC understandably viewed certification as a way to signal that software meets the requirements, ONC did not concede or even suggest that hospitals can rely on certification to the exclusion of all other considerations. Rather, ONC created a certification to set standards and promote confidence that the product would perform as described by the vendor and meet quality standards for use in healthcare settings. Again, ONC did not release hospitals from the requirement to actually perform the functions required to meet the objectives and measures to which they are attesting. Relators have alleged in detail the many ways that CHS did not meet the measures it attested to, as is further outlined in Section IX(B) below.

3.     *Defendants' "Interoperability" Argument Is Inapposite To Relators' Allegation That Defendants Used, And Caused To Be Used, EHR Modules That Could Not Combine To Meet The Requirements For Meaningful Use.*

Next, Defendants all argue that their representations regarding Medhost's software, and their claims for payment based on that software, were not false because Relators have not alleged that the software failed to meet certification criteria. Common to each argument is the assertion that Relators' claims hinge on an "interoperability" requirement that Defendants believe does not exist. Medhost Mem., ECF No. 129, at 12-13; CHSPSC Mem., ECF No. 132, at 9; CHSI Mem., ECF No. 134, at 15 (incorporating CHSPSC's arguments); Hospital Mem., ECF No. 133, at 5 (same). Relators respond to the parties' arguments in turn below. Defendants are incorrect.

Relators allege in the FAC that Medhost's two modules, EDIS and Enterprise—both of which were created by Medhost and were advertised to Medhost's customers as fully integrated with each other—did not integrate patient information as required to be eligible for Meaningful Use incentive payments. *See* FAC at ¶¶ 81, 101-103. Under Meaningful Use rules, hospitals could only attest for payments by relying on a combination of certified EHR modules only if "the resultant combination also meets the requirements included in the definition of a qualified EHR." 45 C.F.R. § 170.102 (Aug. 2010); FAC at ¶ 98. A qualified EHR (later renamed a "base EHR") is an EHR that, among other things, "[i]ncludes patient demographic and clinical health information, such as medical history and problem lists" and "[h]as the capacity" "[t]o provide clinical decision support and "[t]o support physician order entry."  45 CFR § 170.102 (Aug. 2010). Thus, to attest to Meaningful Use based on multiple Meaningful Use modules, the Eligible Provider must represent that its selection of EHR modules are capable of maintaining patient information (such as medication lists) throughout their hospital stay, among other requirements.

-48-

The FAC lays out multiple ways that Medhost's software modules were not capable of being used in a way that would meet the definition of a qualified EHR. For example, three core criteria for meeting the definition of a qualified EHR were that the EHR must "[e]nable a user to electronically record, change, and access a patient's" problem list, active medication list, and active medication allergy list "[f]or the duration of an entire hospitalization." 45 C.F.R. §170.314(a)(5)-(7) (Oct. 14, 2014). *See* FAC at ¶¶ 99, 130-142. Relators give many examples of specific instances of medications and allergies, in particular, not transferring between EDIS, which operated in hospitals' emergency rooms, and Enterprise, which operated in the hospitals' inpatient settings, when implemented at CHS Hospitals. *See* FAC at ¶¶ 116-119, 121-125 (discussing medication transfer issues between EDIS and Enterprise causing a failure in drug-drug and drug-allergy interaction checking); FAC at ¶ 120 (discussing the need to manually enter allergies because Medhost's software was incapable of transferring the data from EDIS to Enterprise).

The failure to transfer such information prevented the combination of EDIS and Enterprise from meeting the requirements of a qualified EHR, as required for CHS to be eligible for Meaningful Use subsidies. Similarly, CHS's combination of PULSE with other EHR modules such as EDIS, PatientKeeper, and Horizon Meds Manager in ex-HMA hospitals did not meet the requirements of a qualified EHR because it could not transfer required patient information between the inpatient setting using PULSE and other hospital units. FAC at ¶¶ 260–64. Relators properly allege that the CHS Entities knew that their EHR modules could not be used in combination to meet the definition of a qualified EHR, yet falsely attested that they met the requirements and claimed Meaningful Use subsidies to which they were not entitled, in violation of the FCA. FAC ¶ 96.

With respect to Medhost, Relators allege that Medhost "knew, or had ample reason to know, that a hospital that deployed EDIS and Enterprise would use both systems to store information on patients who received services in the emergency department and were subsequently admitted to the hospital" and Medhost "knew that EDIS and Enterprise were not integrated." FAC ¶¶ 101, 102. Because EDIS and Enterprise could not work together in a way that would allow hospitals to truthfully attest that their EHR met the definition of a "qualified EHR," Medhost knowingly caused its customers to submit false attestations to receive Meaningful Use funds. The FAC sufficiently pleads facts that support this allegation and that allegation states a claim for violating the FCA. To the extent that Medhost contests Relators' factual position, the appropriate time to address such an issue would be at summary judgment or trial. Medhost's attacks on the merits of Relators' position does not show that Relators' actions were not pleaded appropriately. As such, the Court should deny Medhost's motion to dismiss.

Defendants deflect the weakness of their position by inappropriately focusing on ONC's discussion of its goals of enhancing "interoperability." Medhost Mem., ECF No. 129, at 12; CHSPSC Mem., ECF No. 132, at 9; CHSI Mem., ECF No. 134, at 15 (incorporating CHSPSC's arguments); Hospital Mem., ECF No. 133, at 5 (same). The "interoperability" rules the Defendants cite, however, address transmission of patient information between EHR systems created by different developers located at different hospital systems, not the requirements in 45 C.F.R. § 170.102 governing each attesting hospital that relies on multiple EHR modules. *See* Medhost Mem., ECF No. 129, at 12. Defendants' arguments are therefore inapposite: the FAC does not address interoperability requirements or suggest that Medhost's software modules were flawed because they were not compatible with software modules in other hospital systems. Rather, the FAC addresses the lack of integration of Medhost's *own* software modules with one

another within the *same* hospital, meaning important patient information was not shared between units within the same hospital, which implicates core Meaningful Use measures as well as clinical care.

    4.    *Relators Allege That Medhost's Software Failed To Meet CPOE Requirements And That CHS Falsely Attested To This And Other Measures.*

    a)    *Medhost's Argument That There Is No Allegation That Its Software Failed To Meet CPOE Requirements Is Inapt.*

Medhost argues that ONC's standards for CPOE require that the software enable a user to electronically record, change, and access medication orders and that "[t]here is no allegation that MEDHOST's software failed this requirement." Medhost Mem., ECF No. 129, at 13. But the FAC, in fact, makes these specific allegations.

Relators allege that Medhost's EHR technology is incapable of recording medication orders in an accurate and reliable manner and that it is a requirement that certified EHRs be able to perform CPOE in an accurate and reliable manner. FAC ¶¶ 71, 154. Medhost argues that ONC's language stating that software must perform CPOE in an "accurate and reliable manner" only concerns the reliability of *certified* capabilities. Medhost contends that certain functions discussed in the FAC—such as weight-based dosing and physician favorites— were not *certified* functions. Medhost acknowledges, as it must, that ONC views uncertified functionalities as relevant to the extent that they "interact with certified capabilities," which is precisely what Relators allege. Relators allege that Medhost had several applications that allowed users to record electronic medication orders, such as PhysDoc and ClinView. FAC ¶ 153. Within these applications, the ability to record a medication order was bundled together with features that purported to calculate weight-based doses, place an order immediately via a "send a dose now" option, record PRN or "as needed" medication orders, and create a list of

"Physician's Favorites" for quickly ordering common medications, among other features. However, these features miscalculated doses, did not deliver orders in the time frame they were requested, failed to accurately record PRN medication orders, and failed to record medication orders altogether under some circumstances, among other problems. These flaws directly affected users' ability to record medication orders in an accurate and reliable manner, and therefore interacted with the certified capability of CPOE. FAC ¶¶ 155, 157, 160, 165, 171, 174.

Finally, Medhost argues that because Relators do not allege that the Hospital Defendants fell short of the threshold that required hospitals to use CPOE for at least 60% of medication orders, Relators have not alleged a false attestation. This position ignores the Relators' central point: if an EHR cannot perform CPOE in a safe manner to begin with, then it does not matter whether or not it is used 60% of the time.

An analogous situation is tax software. Users of TurboTax software rely on TurboTax to correctly calculate their taxes every time they use it, in order to avoid tax penalties. Users can decide how often to use TurboTax, but when they use the software, it must be able to accurately calculate the correct tax due in a reliable manner. Moreover, if TurboTax promises that it will prompt users with questions that will allow the user to claim every eligible deduction, and the user relies on this representation in preparing his or her tax return, TurboTax must actually be able to do so. The same principle applies here. Medhost software was required to reliably perform CPOE. When Medhost added on features to the base CPOE function that providers then relied on to record medication orders, Medhost was obligated to ensure that these features functioned reliably. Relators' allegations do not touch on how frequently CPOE was or was not used because Relators allege that the CPOE was not capable of functioning safely or reliably. If a medication order cannot be recorded *correctly*, it cannot be said to have been

recorded at all. Therefore, it does not matter if the Hospital Defendants were using CPOE 60% or even 100% of the time. CHS's attestations claiming to meet the objective for CPOE while relying on Medhost's fundamentally deficient software were knowingly false.

        b)    *CHS Similarly Misses The Mark By Focusing Solely On Required Percentages.*

CHSPSC similarly takes the position that because each of the Hospital Defendants attested that they met the correct percentage-measures for the measures they attested to, CHS necessarily satisfied Meaningful Use. *See* CHSPSC Mem., ECF No. 132, at 10-12. CHSI and the Hospital Defendants incorporate this argument into their own respective memoranda. *See* CHSI Mem., ECF No. 134, at 15; Hospital Mem., ECF No. 133, at 5. As with Medhost's motion to dismiss, this argument falls flat. A hospital cannot have its eligible professionals go through the motions of recording electronic orders in its EHR, for example, when the hospital knows that those orders will in, all likelihood, be recorded incorrectly, and then claim that because they "recorded" orders 60% of the time, they meaningfully used their EHR. The purpose of the objectives and measures are thwarted when the underlying function a hospital is attesting to does not work. Such an approach does not satisfy ONC's requirements, and Relators' allegations sufficiently plead facts to support this position.

        5.    *Relators Allege That Medhost Falsely Certified Its CDS Function And That CHS Falsely Attested To CDS Relying On Medhost's Flawed Software.*

The Defendants assert incorrectly that Relators' allegation that they misrepresented their use of CDS does not establish false claims because the problems do not relate to certification criteria or Meaningful Use attestations. *See* Medhost Mem., ECF No. 129, at 14–15; CHSI Mem., ECF No. 134, at 15; Hospital Mem., ECF No. 133, at 5. To attest to Meaningful Use, a user must demonstrate the implementation of "automated, electronic clinical

decision support rules (in addition to drug-drug and drug-allergy contraindication checking) based on the data elements included in: problem list; medication list; demographics; and laboratory test results."  45 C.F.R. § 170.306(c) (Aug. 2010); 45 C.F.R. § 170.314(a)(8) (Oct. 2012) (requiring the capacity to select CDS interventions "based on each one and at least one combination of the following data: (A) Problem list; (B) Medication list; (C) Medication allergy list; (D) Demographic; (E) Laboratory tests and values/results; and (F) Vital signs"); 42 C.F.R. § 495.6(d)-(e) (Jan. 2013). CMS has explained that CDS "*builds upon the foundation of an EHR* to provide persons involved in care processes with general and *person-specific information*, intelligently filtered and organized, at appropriate times, to enhance health and health care."[12] Under this definition, an Eligible Provider does not satisfy the CDS measure unless the CDS uses person-specific data from the base EHR—*e.g.,* a patient's problem list, allergy list, and medication list. Relators sufficiently allege that Defendants misrepresented that they met these requirements in claiming Meaningful User subsidies.

First, with respect to Medhost, Relators allege that: (1) "the CDS rules in Enterprise had completely stopped functioning around August 14, 2014"; (2) that the same issue occurred in October 2014, November 2014, and December 2014; and (3) that Medhost knew its CDS functionality did not work, yet continued to certify and re-certify its software regardless of known flaws. FAC ¶¶ 208, 212-215. Therefore, Relators have alleged that Medhost's CDS function did not work *at all* and accordingly that Medhost's software did not meet ONC's CDS criteria. Relators have also clearly alleged that Medhost knowingly and falsely certified to this criteria at the same time the software failed to work. FAC ¶ 220.

---

[12]                                                        https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/Stage2_EPCore_6_ClinicalDecisionSupport.pdf (emphasis added).

Moreover, Relators have alleged that CHS submitted false attestations relying on Medhost's software as to CDS. FAC Exhibit B provides in detail the various Hospital Defendants that attested to CDS and which software they relied on to do so. As Exhibit B reflects, these hospitals relied on Medhost's Enterprise or EDIS software in their attestations. In the FAC, Relators allege that Medhost knew its CDS functionality did not work and knew that hospitals would and did rely on Medhost's software to attest to CDS—a core measure—regardless. And yet, Medhost could not or would not fix the problem, and continued to certify and re-certify that its deficient software met ONC's CDS requirements. Thus, Relators have sufficiently pleaded that Medhost caused false attestations to be submitted to the Government, and therefore should be held liable under the FCA.

Medhost argues, however, that Relators' allegation that Medhost's software was unable to track when and whether the CDS rules were enabled is irrelevant, as that was not a requirement by ONC. Medhost Mem., ECF No. 129, at 15. While the 2011 Meaningful Use objective did require hospitals to "[i]mplement one clinical decision support rule relevant to specialty or high clinical priority *along with the ability to track compliance with that rule*" (42 C.F.R. § 495.6(d)-(e) (Jan. 2013) (emphasis added), there was no such requirement under the 2014 edition of Meaningful Use. Relators' allegations regarding Medhost's inability to track whether CDS rules were firing do not bear directly on certification criteria for the 2014 edition; rather, they support the remaining allegations—that Medhost's Enterprise software could not reliably perform CDS and could not even determine when its CDS functionality was or was not working, which led to the problem recurring over and over again without Medhost being able to address it. FAC ¶¶ 207, 208, 215.

Second, with respect to the CHS Entities, Relators allege that CHS failed to meaningfully use CDS and misrepresented that failure in its Meaningful Use attestations. In particular, Relators allege that CHS's implementation of its fall-risk assessment relied on manual data entry and did not use computable information about the patient from the EHR, such as data from the problem list or medication list, and therefore did not meet the Meaningful Use objective for CDS. FAC ¶ 221–29. Relators also allege that CHS knew that the fall-risk assessment did not meet Meaningful Use, and that it attested to this measure nonetheless. FAC ¶¶ 226 – 229.

Similarly, Relators have sufficiently alleged that CHS's use of its static order sets did not meet Meaningful Use measures. FAC ¶¶ 230–38. CHSPSC attempts to skirt the issue by referring to guidance that identifies "order sets tailored for a particular condition, disease, or clinician preference" as a type of CDS intervention consistent with the requirements for CDS Meaningful Use. *See* CHSPSC Mem., ECF No. 132, at 16. However, Relators allege that CHS's use of its own *static* order sets were the problem—not that the use of order sets in general cannot meet CDS requirements. Some order sets can use computable patient data and adjust the recommended orders specifically for a given patient based on that data. For example, an order set might remove an order for the influenza vaccine based on a patient's known allergy to eggs as indicated on the patient's medication allergy list. *See* FAC at ¶ 234. Such order sets would comply with the Meaningful Use measure because they use patient data from the EHR to provide intelligently filtered information that a provider can use to enhance the patient's health care. *Id.* CHS's order sets did not have such capabilities. Rather, providers would have to identify a condition manually, such as diabetes, and then manually choose the order set for diabetes from a drop-down list of available order sets. The order set would then have static information about steps to take for patients with diabetes. These static order sets that the Hospital Defendants relied

on did not use computable patient-specific data from the EHR—they were simply an electronic version of a static form to which the providers had access.

CHS's argument that the use of patient-specific information in CDS is a requirement that only "software developers must meet" is incorrect. CHSPSC Mem., ECF No. 132, at 14. There is no separate definition of "Clinical Decision Support" in the Meaningful Use regulations to support CHS's argument and, to the contrary, CMS has expressly linked the requirement for demonstrating Meaningful Use with the certification criteria for CDS. *See* 77 Fed. Reg. 53968, 53996 (Sept. 4, 2012) (to be codified at 42 C.F.R. pts. 412, 413 and 495) ("ONC standards and certification criteria . . . includes further information regarding the criteria necessary to implement CDS in CEHRT for Stage 2 of Meaningful Use."). Moreover, CMS expressly made CDS a "core" objective beginning in 2010 because CDS "uses the information collected as structured data included in the core set," including patient problem and medication lists. 75 Fed. Reg. 44314-01, at 44351. While CMS gave providers leeway to decide what type of CDS to implement, it did not waive the basic requirement that CDS use patient-specific information stored in the EHR.

Relators have therefore sufficiently alleged that Medhost and CHS did not meet the Meaningful Use measures for Clinical Decision Support and accordingly submitted false attestations to the Government

6.    *Relators' Sufficiently Allege That Medhost's Falsely Certified E-Prescribe Function Caused False Attestations.*

Medhost challenges the Relators' e-prescribing allegation FAC ¶¶239-247 with a perfunctory argument that CHS's decision not to rely on its deficient e-prescribing function "necessarily precludes any claim against Medhost," apparently on the assumption that if CHS did not attest to Meaningful Use based on the function, no other hospitals did either. Medhost Mem.,

ECF No. 129, at 15. The assumption is unfounded. CMS has reported[13] that multiple hospitals attested to this Meaningful Use objective relying on Medhost's e-prescribe function. For example, Relators are aware from CMS's Public Use Files[14] of at least the following attestations as to ONC's e-prescribe measure relying on Medhost Enterprise:

| Hospital | State | NPI | Attestation Success Date | EHR Certification Number |
|---|---|---|---|---|
| Trinidad Area Health Association | CO | 1184616740 | 2/3/2017 | 0014EHT5ZXR0WKS |
| County Of Clay | IL | 1184655136 | 5/31/2016 | 1314E01PD0S3EAB |
| Hamilton County Hospital District | TX | 1326037607 | 3/4/2016 | 1314E01QOTDHEAZ |
| Hamilton County Hospital District | TX | 1326037607 | 3/21/2017 | 0014E6BQB36GRE7 |
| Cottage Hospital | NH | 1528162799 | 1/4/2016 | 1314E01RCQHKEAH |
| Grant Memorial Hospital | WV | 1598763666 | 2/9/2016 | 1314E01PQXBEEAT |
| Madison County Memorial Hospital | IA | 1831104611 | 3/7/2016 | 1314E01RO5NBEAD |

Based on these attestations that were submitted based on the use of Medhost's flawed e-prescribe software, Relators have sufficiently alleged that Medhost knowingly caused false claims to be presented to the Government related to e-prescribing.

> 7.     *Relators Sufficiently Allege That Medhost's Software Failed To Meet Security-Related Criteria And That Hospitals Attested To Security-Related Measures Relying On Medhost's Software.*

Medhost argues that Relators do not allege that a single Hospital Defendant ever addressed any security-related criteria as part of a Meaningful Use attestation, nor that the

---

[13] Relators will amend the complaint to plead these facts, if necessary.

[14] The *CMS Medicare EHR Incentive Program Eligible Hospitals PUF* is an eligible hospital-level file in which each record provides the hospital type together with each hospital's responses to the Meaningful Use core and menu measures, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/PUF.html. The details of hospitals' attestations, including which software was utilized, are available through the ONC at https://dashboard.healthit.gov/datadashboard/documentation/ehr-products-mu-attestation-data-documentation.php.

hospitals were required to attest to security-related criteria in order to receive Meaningful Use incentives. However, FAC Exhibit B provides a detailed list of the Hospital Defendants that did, in fact, attest to the "Protect PHI" criteria. "PHI" is an acronym known in the healthcare industry that stands for "protected health information."   CMS's objective to "protect electronic health information" was Core Measure 13 in the 2014 Edition of Meaningful Use, and the corresponding software certification requirements were 45 C.F.R. §170.314(d)(1)-(6) (Oct. 4, 2012), which encompass "[a]uditable events and tamper-resistance."[15]   Therefore, Relators have alleged that certain of the Hospital Defendants attested to a core measure regarding software security relying on Medhost's deficient software, which was falsely certified as to the auditable events and tamper-resistance criteria. FAC ¶¶ 253, 254.

Medhost further argues that Drummond's certification of Medhost's software as to the auditable events and tamper-resistance criteria was appropriate because Medhost's software had the *capability* to perform audit logging and protect the audit log to prevent tampering. Medhost's position is that if an EHR allows all users to access, view, and modify patient data and do so without an audit record in implementation, that is acceptable so long as the software has the *capability* to restrict access to specific credentials and to record actions. Medhost directly contradicts the allegations in the FAC:  Relators allege that "Medhost's software . . . under some circumstances lacks *any capability* to log or audit such actions." FAC at ¶ 251 (emphasis added). As such, Medhost's argument is not appropriate at the motion to dismiss stage.

Additionally, Medhost's argument misconstrues an ONC requirement for the auditable events and tamper resistance criteria. The regulation provides that EHR technology

---

[15] *See* CMS publication "Eligible Professional Meaningful Use Core Measures–Measure 13 of 13" (2014 Definition), available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/15_Core_ProtectElectronicHealthInformation.pdf.

"must be set by default" to perform audit logging. 45 C.F.R. § 170.314(d)(2)(ii) (Oct. 4, 2012). Relators allege that Medhost's data tables were configured with a setting that granted all users access to view and change the data, and that any access or changes made to data tables using this access method would not be captured by Medhost's audit logging. FAC ¶¶ 252, 253. As such, Medhost's software did not meet the requirement that EHR software default to logging changes made to health information. Relators have sufficiently pleaded facts that, when taken as true, establish that Medhost's software fell short of ONC criteria and thus could serve as the basis for a false claim submitted to the Government.

Medhost misses the mark further when contending that "Relators allege that MEDHOST learned about these flaws in October 2014." Medhost Mem., ECF No. 129, at 16. Relators allege that Medhost knew about the issue "*no later than* October 2014." FAC ¶ 254 (emphasis added). Medhost argues that, because it certified Enterprise 2014 R1 before October 2014 (in February 2014), then Medhost cannot have falsely certified the software, as it did not learn of the problem until after certification was complete. First, this argument overlooks the fact that Medhost certified many versions of its Enterprise software to the 2014 Edition of this criteria *after* October 2014. *See* FAC, Exhibit B. Merely pulling one certification date for one version of the Enterprise software hardly serves as a basis for dismissing the FAC. Moreover, as the software developer, Medhost inherently knew of its software's capabilities and limitations. Relators' allegations make clear that the software flaw was part of its basic design—Medhost's utilization of back-end servers allowed users to view and modify electronic health information, and not track those changes under certain circumstances. FAC ¶¶ 250, 251. Medhost programmed the software this way and yet certified its software repeatedly as to the auditable events criteria regardless of its functional flaws.

**C.   Relators Have Alleged That Medhost's False Statements Were Material to the Government's Incentive Payment Decisions**

Medhost's argument that submission of a fraudulent Meaningful Use attestation is not material to the Government's decision to award incentive payment is without merit. Medhost Mem., ECF No. 129, at 16-18. Under the FCA, claims are materially false where they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); see also *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). Here, Relators allege that Medhost misrepresented the ability of its software to perform functions necessary for eligibility for certification, including the requirement that the software perform certified functions and functions affecting certified functions safely and reliably. *See* FAC ¶¶ 75-93. Relators also allege that Medhost's misrepresentations about its software—both directly to CHS and other customers, and to its certifying body, Drummond—concerned capabilities material to payment under the Medicare Meaningful Use incentive payment program. See FAC ¶¶ 24.

Since the inception of the Meaningful Use EHR incentive program in 2010, it has been understood that software flaws result in false attestations and can result in provider liability for recoupment of federal payments.. *See*, e.g., 75 Fed. Reg. 44314-01, at 44468 ("We will conduct selected compliance reviews of EPs, eligible hospitals, and qualified CAHs who register for the incentive programs and of recipients of incentive payments for the Meaningful Use of certified EHR technology. The reviews will validate provider eligibility through their Meaningful Use attestations including verification of Meaningful Use and would also review components of the payment formulas. We will identify and recoup overpayments made under the incentive payment programs that result from incorrect or fraudulent attestations, quality measures, cost data, patient data, or any other submission required to establish eligibility or to

qualify for a payment.") (emphasis added). Moreover, that the United States has sought recoupment of Meaningful Use funds from two EHR vendors for causing providers to submit false claims under circumstances similar to those present in this case makes clear that liability is not restricted to providers. See, e.g., attached Exhibits 2 and 3 (complaints in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS (D. Vt.), and *United States v. Greenway Health, LLC*, Case No. 2:19-cv-00020 (D. Vt.)). In both the eClinicalWorks and Greenway complaints and settlements, the United States Department of Justice used the FCA to allege that an EHR vendor's false certification of an electronic medical record system could be material to payment under the FCA and that monies paid to providers under the Meaningful Use Incentive program could be recouped directly from the vendor. Id. Therefore, contrary to Medhost's position, the Government demonstrated that it regards violations of the certification requirements for health IT, and concomitant false attestations to the Meaningful Use program, whether or not submitted knowingly by the hospital or health provider, to be material violations of the FCA. While Medhost attempts to countermand the regulatory and antecedent that establish materiality, its arguments can be swiftly dismissed.

First, Medhost argues that the false claims at issue cannot be material to payment because the Government has created an administrative process for software vendors to make modifications on an ongoing basis, where the vendor works directly with its customers to rectify problems and determines if non-conformities are so serious that the software's certification may be suspended or withdrawn. Medhost Mem., ECF No. 129, at 17. However, the FCA does not provide an exception to liability based on the existence of parallel administrative mechanisms–here, the ONC decertification and the Meaningful Use audit processes.. On the contrary, "Congress intended to allow the government to choose among a variety of remedies, both

statutory and administrative, to combat fraud." *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 415 (8th Cir. 2012); see also *United States ex rel. Campie v. Gilead Sciences, Inc.*, 86 F.3d 890, 905 (9th Cir. 2017) ("Just as it is not the purpose of the False Claims Act to ensure regulatory compliance, it is not the FDA's purpose to prevent fraud on the government's fisc."); *United States ex rel. Mei Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCX), 2018 WL 3814498, at *14 (C.D. Cal. July 25, 2018), reconsideration denied, No. CV 11-974 PSG (JCX), 2018 WL 6177255 (C.D. Cal. Nov. 9, 2018) (holding that "the FCA does not contain an exception for a remedial scheme" where the agency had "latitude in terms of accepting or remedying noncompliant actions," and "[i]n general, the first step toward remediation is voluntary compliance."). Such a position would preclude enforcement in a wide variety of federal programs. Indeed, given the United States' continued use of the FCA against health IT software vendors, Medhost's proposition is unfounded. If anything, HHS's allowance of two separate administrative enforcement mechanisms to ensure safe and reliable health IT software and to avoid overpayments and fraud in the Meaningful Use incentive program only underscores the materiality of the alleged violations.

Second, Medhost argues a lack of materiality because the Government permitted some hospitals to attest using software that, though previously certified, had known defects. Yet, Medhost relies on guidance from HHS's EHR Incentive Program that undercuts its argument. In that guidance, HHS concluded that (1) flawed software had resulted in certain providers submitting incorrect "attestation information," viz., the metrics reflecting a provider's use of a software and (2) the providers would have likely met Meaningful Use payment criteria with updated software that correctly calculated attestation information. Those facts are wholly different from the case at hand. Here, the allegations go to the software's core functionalities e.g.,

maintaining patient lists and medication lists and recording medication orders accurately. Medhost's flawed functions are not simple calculator errors within the EHR that merely track a provider's use of the software and generate "attestation information."  Here, Medhost's software malfunctions went to fundamental features that had to be turned on and operating at all times. Also, HHS noted that the reason it did not audit the providers was because their technology had been updated and the agency anticipated that most providers would still be eligible for funds. Fairly read, Medicare's admonition to hospitals and providers that overpayments made under the Meaningful Use incentive payment programs resulting from incorrect or fraudulent attestations will be recouped, supports Relator's allegations that false claims in this context are material to payment. *See Escobar*, 136 S. Ct. at 2001-2004 (explaining holistic analysis to determine materiality including consideration of the underlying statutory or regulatory system). There is no evidence that Congress or the federal agencies intended to allow for Meaningful Use incentive payments to be made to providers where both providers and vendors know of significant non-conformities central to the requirements for certified EHR software and clinical use including patient safety.

### D.      Relators Have Alleged That Defendants Acted With Improper Scienter.

Relators have alleged with sufficient factual detail that Medhost, CHSI, CHSPSC and Hospital Defendants "knowingly and willfully" submitted or caused to submit false claims to HHS for federal incentive payments through the EHR Incentive Programs. FAC ¶¶ 2, 75, 95. Because "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Relators' allegations are sufficient to survive a motion to dismiss. Fed. R. Civ. P. 9(b).

Nonetheless, Medhost, CHSPSC and Hospital Defendants attempt to attack the FAC by arguing that Relators failed to sufficiently allege that Defendants acted with improper

scienter. *See* Medhost Mem., ECF No. 129, at 18-20; CHSPSC Mem., ECF No. 132, at 20-22; Hospital Mem., ECF No. 133, at 15-17. The FCA "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Instead, the FCA requires only that the defendant have "actual knowledge of the [relevant] information; act[] in deliberate ignorance of the truth or falsity of the information; or act[] in reckless disregard of the truth or falsity of the information." 31 U.S.C. 3729(b)(1)(B).

   In general, the existence of knowledge or intent is a question of fact for the factfinder, to be determined after trial. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991). Indeed, in order to grant a defendant summary judgment, despite the question of knowledge or intent, the relator must fail to indicate that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim. *See Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir. 2002) (*citing Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1580 (11th Cir. 1988)). Given that issues of intent or knowledge are difficult to achieve at the summary judgment phase, this Court should decline Defendants' invitation to assess the factual question of Defendants' intent on a motion to dismiss. *See Kostoski v. Steiner Transocean, Ltd.*, 278 F.R.D. 695, 698 (S.D. Fla. 2012) ("An individual's state of mind cannot in any event be determined on a motion to dismiss.").

   1. *The Court Should Reject Medhost's "Reasonable Interpretation" Argument.*

   Medhost suggests that it did not have improper scienter because its interpretation of the regulations at issue was "certainly reasonable."  Medhost Mem., ECF No. 129, at 19. To support this claim, Medhost distorts the holding in *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017), which considered and rejected the argument Medhost raises here. In *Phalp*, the Eleventh Circuit held that the argument "that a finding of

-65-

scienter can be precluded by a defendant's identification of a reasonable interpretation of an ambiguous regulation that would have permitted its conduct is *erroneous*." *Phalp*, 857 F.3d at 1155 (emphasis added). The appellate court left no doubt that it was gutting the argument Medhost makes here: "under the district court's legal interpretation, a defendant could avoid liability by relying on a 'reasonable' interpretation of an ambiguous regulation manufactured *post hoc*, despite having actual knowledge of a different authoritative interpretation. However, scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable." *Id.* (citing *United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053-54 (8th Cir. 2002)).

Medhost cannot overcome the *Phalp* opinion's binding circuit precedent by turning to *Safeco*, which decided the question before the Court on the understanding that the defendant, at the time of its unlawful conduct, had actually relied on a reasonable (though erroneous) interpretation of the law. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007). It did not hold that defendants can rely on an ambiguity manufactured *post hoc*, an outcome *Phalp* that would not permit either. Medhost's argument regarding the scienter standard (that a defendant can escape liability merely by offering a "reasonable" interpretation of a regulatory requirement) would have significant adverse effects on the Government's ability to combat fraud in federal programs. Such a result would be inconsistent with Congress's intent to reach both intentional efforts to deceive and "ostrich-like" behavior–which is why it has been soundly rejected by the Eleventh Circuit.

Both *Safeco* and *Phalp* were decided at summary judgment and call for a factual inquiry that is inapposite on a motion to dismiss. *See United States ex rel. Streck v. Bristol-Myers Squibb Co.*, No. 13-7547, 2018 WL 6300578, at *12 (E.D. Pa. Nov. 29, 2018), clarified on denial of

reconsideration, 370 F. Supp. 3d 491 (E.D. Pa. 2019) ("Because this inquiry turns on the determination of facts, a court should not resolve an FCA claim at the motion to dismiss stage where the plaintiff plausibly alleges that the defendant proceeded with its interpretation in the face of contrary guidance." (citation omitted)). Relators have plainly alleged scienter at the pleading stage, alleging in the FAC that Medhost's actions violated the pertinent regulations and that Medhost knew its actions violated the regulations. Correctly applying *Phalp* to this case should lead the Court to deny Medhost's motion to dismiss.

Medhost's additional argument about its knowledge of materiality is also without merit, as is discussed in Section IX(C) above. As such, Medhost's argument that its "reasonable" interpretation precludes finding that it had necessary scienter is due no weight, is improper at this stage of the case, and should be rejected outright. Medhost Mem., ECF No. 129, at 19-20.

2.      *The Court Should Reject The CHS Entities' "Glitches And Bugs" Argument.*

CHSPSC and Hospital Defendants also claim that they lacked the improper scienter required under the FCA. CHSPSC Mem., ECF No. 132, at 20-22; Hospital Mem., ECF No. 133, at 15-17. CHSPSC criticizes the FAC for failing to allege that: (1) CHS's efforts to fix the "glitches and bugs" were unsuccessful, and (2) anyone at CHS believed the "glitches and bugs" would prevent any Hospital Defendants from truthfully attesting to satisfying Meaningful Use. *See* CHSPSC Mem., ECF No. 132, at 21. Once again, CHSPSC and the Hospital Defendants cannot put words into Relators' mouths—they must litigate their motions to dismiss based on the FAC's allegations and all reasonable inferences that can be drawn from them.

Relators did not bring a FCA case premised on "glitches and bugs" in Medhost's software. Instead, Relators clearly allege, and provide detail to support, that "CHS knew that Medhost's software lacked functionality required for certification and its own ability to attest to

-67-

Meaningful Use."  FAC ¶ 13. Relators also provide specific information demonstrating that CHSI employees knew the limitations of Medhost's EHR software. FAC ¶¶ 13, 14, 21, 22, 87, 88, 90, 91. Relators similarly allege that the HMA hospitals also could not truthfully attest to successfully satisfying Meaningful Use. FAC ¶ 22, 255-280. If Defendants can in good faith assert a "glitches and bugs" defense to the FAC, it will need to do so at trial.[16]

Finally, the Court should reject the Hospital Defendants' claim that "Relators allege absolutely no facts regarding the intent of any person at any of the hospitals to make fraudulent claims."  Hospital Mem., ECF No. 133, at 16. Relators do not need to plead fraudulent intent, but merely that the Hospital Defendants acted either with "actual knowledge," "deliberate ignorance," or "reckless disregard." 31 U.S.C. 3729(b)(1)(B). Relators allege such reckless or deliberate acts:  "Soon after the Medhost rollout began, doctors and hospital administrators began to report that the updated Medhost software was not able to perform required functions accurately and reliably, and that the inadequate functionality was putting the safety of CHS patients at risk." Relators also provide examples to support this allegation. FAC ¶¶ 90, 91. These allegations against CHSPSC and Hospital Defendants are more than sufficient to survive their motions to dismiss.

Accordingly, the Hospital Defendants' reliance on *Jacobs*, 2017 WL 2361943 at *10,[17] is misplaced. *See* Hospital Mem., ECF No. 133, at 15. If the Court is to take anything from *Jacobs*, it is that the court held that, at least for purposes of deciding the defendants' motion

---

[16] The fact that EHR Technology may have had bugs is not inconsistent with a FCA violation. For example, the Government's Complaint In Intervention in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS, attached as Exhibit 2,  alleged at paragraph 9 that the relator "alleged in his *qui tam* complaint that bugs and problems with ECW's software rendered it ineligible for incentive payments."

[17] *Jacobs* was modified on reconsideration. *See Jacobs v. Bank of Am. Corp.*, No. 1:15-cv-24585-UU, 2017 WL 2361944 (S.D. Fla. Apr. 27, 2017).

to dismiss, the relator's complaint "satisfies the pleading requirements concerning Defendants' knowledge under *Iqbal* and *Twombly* and Rule 9(b), as it alleges facts that give rise to a 'reasonable inference'" concerning the defendants' conduct. *Id.* at *11 (citing *Matheny*, 671 F.3d at 1224, for the proposition that "at the pleading stage in a False Claims Act case, 'knowledge, and other conditions of a person's mind may be alleged generally'"). Recognizing the appropriate standard at issue, the court held that the "[p]laintiff's allegations are enough, at the motion to dismiss stage, to plausibly allege" the FCA claim. *Id.* at *9. Any lesson to be gleaned from *Jacobs* is that this Court should find at a minimum, at this preliminary motion to dismiss stage, that Relators "plausibly allege" enough to support their FCA claims, drawing all reasonable inferences in their favor.

      **E.**    **Relators Have Met The Requirements To Establish A Cause Of Action Under The FCA.**

      The FCA imposes liability on anyone who: (1) knowingly presents, or causes to be presented, to an officer or employee of the Government a false or fraudulent claim for payment or approval; and (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A) and (B). As detailed above, Relators have sufficiently alleged that CHS knowingly presented false claims to the Government and that Medhost knowingly caused false claims to be presented to the Government, therefore satisfying the requirements of § 3729(a)(1)(A). Relators have also alleged that CHS and Medhost made or used, or caused to be made or used, false records material to a false claim satisfying the requirements of § 3729(a)(1)(B).[18] Medhost contends that Relators'

---

[18] In satisfying the requirements of § 3729(a)(1)(A) and (B), Relators have also satisfied the requirements of § 3729(a)(1)(G), because the only difference between those sections is the payment mechanism: § 3729(a)(1)(G) refers to a financial benefit in the form of improperly avoiding or decreasing financial obligations to the Government, rather than receiving financial payouts.

allegations, even if true, do not give rise to FCA liability under § 3729(a)(1)(B) because "Relators never allege what these supposed 'misrepresentations' and 'false statements' by MEDHOST were." Medhost Mem., ECF No. 129, at 20.

However, Medhost's argument ignores the FAC's straightforward allegations. Relators allege that Medhost fraudulently certified software that it knew it could not perform necessary functions, and then marketed its software to health care providers based on the certifications it received, causing those providers to claim incentive payments from the Government that they were not eligible to receive. *See, e.g.,* FAC ¶¶ at 10, 11, 15, 19, 75-77, 95, 96, 103. Throughout, the FAC identifies the specific regulatory requirements that Medhost falsely certified to meeting. *See, e.g.*, FAC ¶ 240-41 (stating the regulatory requirement for e-prescribing and Medhost's certifications to meeting that requirement). Medhost's false certifications and subsequent marketing of its products to health care providers as certified software are false records and statements material to CHS's false claims, and properly form the basis for Relators' claims under § 3729(a)(1)(B).

**F.      Relators Have Sufficiently Alleged A Conspiracy To Violate The FCA.**

In order to plead that Defendants conspired to violate the FCA, Relators must allege: (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim. *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, No. 03-62097-CIV-COHN/SNOW, 2006 WL 8432157, at *8 (S.D. Fla. Oct. 18, 2006), amended on reconsideration in part based on issue of intra-corporate conspiracy doctrine, 2007 WL 9700731 (S.D. Fla. Jan. 3, 2007), citing *Corsello*, 428 F.3d at 1014.

Here, the FAC contains sufficient allegations from which the Court may reasonably infer that: (1) Medhost and CHS had a plan with each other to submit false attestations to the Government in order to receive incentive payments; (2) both CHS and Medhost took steps in furtherance of the plan; and (3) they ultimately caused the submission of false claims to Government healthcare programs, which the Government paid out. For example, Relators allege that Medhost and CHS worked closely together to attempt to address software and deployment problems that they knew were dangerous and would and did hinder CHS's ability to truthfully attest to Meaningful Use. *See* FAC at ¶ 91 (discussing CHS and Medhost's weekly "critical issues" calls). Relators also allege that CHS and Medhost both knew that dangerous flaws were not fixed during critical attestation periods. *See* FAC at ¶¶ 10, 136, 168, 208,  213, 277. Relators allege that CHS knew that Medhost's certified software was flawed, and that Medhost knew CHS's attestations were not truthful. *See* FAC at ¶¶ 13, 15, 96. The FAC alleges that, nonetheless, CHS continued to accept and rely on Medhost's deficient software, and Medhost continued to support CHS in its efforts to submit false attestations, and together they knowingly allowed CHS to collect hundreds of millions of dollars of incentive payments to which CHS was not entitled. *See* FAC at ¶¶ 95, 201, 213, 214, 232, 233, 237, 238, 271, 291. These allegations are more than sufficient to allege an actionable conspiracy among Medhost and the CHS Entities to violate the FCA.

## X.      RELATORS' KICKBACK THEORY SHOULD BE SUSTAINED.

Medhost and CHS argue that they are not liable under the AKS because the AKS focuses on the items that are "reimbursable" by a "federal health care program."  Medhost Mem., ECF No. 129, at 22-23; CHSPSC Mem., ECF No. 132, at 22-23. CHSPSC argues that its purchase of EHR software was merely the conduit for the payment of Meaningful Use Incentive payments for the use of the EHR. CHSPSC Mem., ECF No. 132, at 23. In other words,

-71-

Defendants argue that because federal funds did not directly pay for the EHR software, they are not liable for violating the AKS. The AKS is not so narrowly construed.

The AKS's plain terms impose liability on a direct or indirect payment of remuneration to induce hospitals, among others, to order products paid for in whole or in part by federal healthcare programs such as Medicare and Medicaid. 42 U.S.C. § 1320a–7b(b)(1). Relators allege that CHS purchased the Medhost CEHRT in exchange for Medhost providing CHS with free financial software and that HHS subsequently paid CHS $385 million for purchasing and using Medhost's CEHRT. There is simply no merit to CHS's argument that "no federal health care program paid to reimburse [CHS] for purchasing the EHR software." CHSPSC Mem., ECF No. 122, at 23. Indeed, HHS expressly contemplated that "providers who would like to qualify as Meaningful Users of EHRs will need to purchase certified EHR technology." 75 Fed. Reg. 44314-01, at 44545. Nor is there any requirement, as CHS suggests, that the amount of Government's payment be related to the cost of purchasing the software, CHSPSC Mem., ECF No. 132, at 22, as the AKS applies to products the Government pays for "in whole or in part."[19]

Furthermore, contrary to Defendants' assertions, courts have found AKS violations even where federal funds did not reimburse the immediate item that was arranged for or purchased as part of the inducement. For example, in *Guilfoile v. Shields*, 913 F.3d 178, 192 (1st Cir. 2019), the First Circuit held that a group of specialty pharmacy services companies' payments to a financial advisor to hospitals for referring those hospitals violated the AKS. The First Circuit noted that the kickback scheme fell within the AKS even though there was a "distance between the Integrated Entity's [the specialty pharmacy service company] payments to Greene [the

---

[19] Even then, HHS calculated the amount of the incentive payments so that "adopting entities will achieve dollar savings at least equal to their total costs," including purchase costs. 75 Fed. Reg. 44314-01, at 44545.

financial advisor] to capture the hospital contracts and the submission of claims to federal insurance programs, which is the unmistakable objective of the contracts." *Id.* at 193. Similarly, in *MedPricer.com, Inc. v. Becton, Dixon & Co.*, 240 F. Supp. 3d 263 (D. Conn. 2017), adhered to on reconsideration, No. 3:13-CV-1545 (MPS), 2017 WL 1234102 (D. Conn. Apr. 3, 2017), the court found an AKS violation where an operator of an auction website, MedPricer.com, was paid a commission for sales transacted on its website. In that case, a supplier of syringes and medical supplies to hospitals argued that the fees paid to MedPricer.com violated the AKS. The court rejected defendant MedPricer.com's argument that its scheme fell outside the AKS because "syringes are typically not separately reimbursable by a federal health care program and that hospitals are reimbursed for providing a service, not for the equipment included in doing so." *Id.* 273. The court reasoned that "this does not foreclose a showing that 'payment may be made' under a federal health care program." *Id.*

As in *Guilfoile* and *MedPricer.com*, the arrangement between Medhost and CHS did not require the direct purchase of an item or service with federal funds to lead to an AKS violation. Relators allege that CHS purchased the Medhost CEHRT in exchange for Medhost providing CHS with free financial software. Just like the use of syringes in *MedPricer.com*, CHS used the EHR software in providing services that would be reimbursable by a federal health care program. Moreover, like the kickback scheme in *Guilfoile*, while the initial purchase of the EHR software did not expend federal funds, CHS's "unmistakable objective" was to obtain federal dollars distributed through the federal Meaningful Use Incentive Program for its purchase and use of EHR software. Thus, the Medhost-CHS software *quid pro quo* scheme falls within the "heartland of what the AKS is intended to prevent – the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care

programs." *Guilfoile*, 913 F.3d at 192–93. Notably, in other false claim cases involving EHRs and Meaningful Use payments, the Government and OIG have pursued AKS violations. *See, e.g.*, attached Exhibits 2 and 3 (complaints in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS (D. Vt.), and *United States v. Greenway Health, LLC*, Case No. 2:19-cv-00020 (D. Vt.)).

Moreover, Relators' allegations concerning the AKS violation also satisfy Rule 9(b). As more fully discussed in Section IX(A), to satisfy Rule 9(b), a FCA complaint must detail the who, what, when, where and how of the fraud. *Med-Care*, 2014 WL 12284079, at *1. With respect to the discount scheme here, Relators alleged the substance of the scheme, to wit, that Medhost offered its financial software, Medhost Financials, for free to CHS to induce CHS to purchase Medhost's Enterprise EHR packages (the what). FAC ¶¶ 281, 283, 284.  In addition, Relators allege the time and place (the when and the where) of the discount scheme by stating that the scheme was initiated "at the same time" Medhost "expanded the Medhost Enterprise software suite to include Medhost's clinical package."  FAC ¶ 283. Relators further allege that Steve Hernandez, CHS's Senior Director of Information Systems (the who), was responsible for the final pricing, and that Relators—who worked as Hernandez's direct reports—were directly aware of discussions among CHS employees that the Medhost free software was meant as an inducement to purchase the Enterprise software (the how). FAC ¶ 284.

Similarly, as to the equity scheme, Relators allege that in exchange for Medhost's offer to provide it with $25 million in equity, CHS agreed to pay $25 million to Medhost to convert ten Tier-1 facilities to Medhost software and to purchase the PIMS software (the what and how). FAC ¶ 285. Moreover, this purchase and exchange took place in September 2015 (the when). *Id.* Relators described how Relator Lewis spoke with Doug Hanson about the purchase of

PIMS and conversion of the facilities to Medhost, and Hanson informed Lewis that Larry Cash "was interested in executing" the agreement to obtain the $25 million in Medhost equity (the who). FAC ¶ 286. Thus, Relators have sufficiently pled facts to satisfy Rule 9(b).

Under the AKS, "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. § 1320a-7b(g). Here, as discussed above, CHS submitted—and Medhost caused to be submitted—claims, that both knew would be false, attesting to compliance with Meaningful Use requirements in order to receive Meaningful Use incentive payments. As described, CHS received $385 million in Meaningful Use incentive payments for those submitted claims. CHS submitted those claims based on its purchase and then use of Medhost's substandard EHR software—purchases it made to complete the *quid pro quo* arrangement where Medhost initially provided free financial software. Moreover, Relators' allegations make clear that Medhost knowingly "offered" and CHS "knew" the purpose of the offer of the free software was to induce CHS to purchase the EHR software. FAC ¶¶ 283, 284. Accordingly, the FAC adequately alleges facts sufficient to plead an AKS violation.

## **REQUEST FOR HEARING**

This case presents important allegations concerning the expenditure of hundreds of millions of dollars in federal subsidy payments for implementation of electronic health record systems in dozens of hospitals. Oral argument will assist the Court in evaluating the sufficiency of Relator's pleading in this context. Relators anticipate that thirty minutes will be sufficient for each party.

## **CONCLUSION**

For the foregoing reasons, Relators respectfully request that this Court enter an order denying the four motions to dismiss filed by the Defendants, ECF Nos. 129, 132, 133, and 134, and entering any such further relief this Court deems equitable and just.

Dated: October 24, 2019

Respectfully submitted,

PLAINTIFF/RELATORS DEREK LEWIS and JOEY NEIMAN

/s/ Jeffrey W. Dickstein
Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com


Colette G. Matzzie*
Luke J. Diamond
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com
ldiamond@phillipsandcohen.com


Edward Arens*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

David J. Chizewer*
David E. Morrison*
Harleen Kaur
Danielle K. Johnson
Juan C. Arguello
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60565
Tel: (312) 201-4000
Fax: (312) 863-7472
David.chizewer@goldbergkohn.com
David.morrison@goldbergkohn.com
Harleen.kaur@goldbergkohn.com
Danielle.johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com

*Admitted Pro Hac Vice