UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-20394-SCOLA

UNITED STATES OF AMERICA ex rel.
DEREK LEWIS and JOEY NEIMAN,
    Plaintiffs,

v.

COMMUNITY HEALTH SYSTEMS, INC.; et al.

    Defendants.

False Claims Act
[31 U.S.C. §§ 3729-31]

_____/

## UNITED STATES' STATEMENT OF INTEREST

Pursuant to 28 U.S.C. § 517, the United States submits the following statement of interest to address two matters raised in defendants' CHSPSC, LLC's ("CHS") and Medhost Inc.'s ("Medhost") respective motions to dismiss. ECF Nos. 129 & 132. First, the United States' decision regarding intervention in a *qui tam* action is not a comment on the merits of a relator's claims. Second, conduct surrounding the purchase or acquisition of electronic health record ("EHR") technology can be subject to the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).

**I.   The United States' Notice Regarding Intervention Is Not A Comment on the Relators' Allegations**

In its motion to dismiss, Medhost states that "the government notified the Court that, after investigating the allegations, it was declining to intervene in the case." ECF No. 129 at 7. This is not quite accurate. The Court had earlier notified the government that it would not extend the seal beyond March 12, 2019. On March 12, 2019, the government notified the Court that its investigation had not been completed and it was unable to decide whether to proceed with the

action. ECF No. 20.  Accordingly, the United States notified the Court that it was not intervening at that time.  *Id.*  However, even when the United States has declined to intervene, courts generally "do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the *qui tam* relator's allegations for fraud to be without merit.  In any given case, the government may have a host of reasons for not pursuing a claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006).

**II.      Meaningful Use Incentive Payments Implicate the Anti-Kickback Statute**

The United States takes no position as to whether the specific facts alleged in relators' First Amended Complaint adequately plead a violation of the AKS under Rule 9(b) of the Federal Rules of Civil Procedure.  However, CHS and Medhost advance a sweeping argument that the AKS does not apply to payments under the Medicare and Medicaid EHR Incentive Programs (also known as the "Meaningful Use program") because such payments do not constitute dollar-for-dollar reimbursement for the purchase of Medhost's EHR software.  *See* ECF No. 132, at 23 ("Because no federal health care program paid to reimburse CHSPSC or the Hospitals for purchasing the EHR software, the AKS is inapplicable here."); ECF No. 129, at 23 ("What matters is whether the software purchased by CHS is an item 'for which *payment may be made* in whole or in part under a Federal Health care program' . . . and whether the federal government *actually paid* for the software that CHS purchased'") (italics in original).  These efforts by Medhost to distance its EHR software from the incentive payments that Medicare and Medicaid made to providers who attested to using that EHR software are unavailing.

The Centers for Medicare and Medicaid Services (CMS) administers the Medicare program and jointly administers the Medicaid programs with the states.  CMS makes payments

2

under the Meaningful Use Program using taxpayer dollars from the same federal trust fund through which it reimburses all Medicare providers for services provided to Medicare beneficiaries. *E.g.*, 42 U.S.C. § 1395ww(n)(1) (providing for EHR Meaningful Use incentive payments to eligible hospitals to be paid from the federal hospital insurance trust fund); Medicare and Medicaid Programs; Electronic Health Record Incentive Program; Final Rule, 75 Fed. Reg. 44314, 44316-17 (July 28, 2010) (identifying statutory bases for Medicare and Medicaid EHR incentive programs). CMS makes these payments in the form of upward adjustments to the standard payments providers ordinarily receive for services they provide under the Medicare and Medicaid programs. For most of the time period relevant to the relators' complaint, eligible professionals who participated in the Medicare EHR incentive payment program received a 75 percent increase in their allowed charges for all services billed to Medicare up to the applicable cap for a calendar year.[1] *See* 42 U.S.C. § 1395w-4(o)(1). The incentive payments are analogous to other contexts in which the Secretary of the Department of Health and Human Services is authorized to recognize the costs of new medical services and technologies in setting the reimbursement. For example, under 42 U.S.C. § 1395ww(d)(5)(K) and 42 C.F.R. § 412.87(b), the Secretary can provide additional payments under the Inpatient Prospective Payment System ("IPPS") if, among other things, a service or technology substantially improves the diagnosis or treatment of Medicare beneficiaries. *See* 42 C.F.R. § 412.87(b)(1). Such "additional payment" is meant to "adequately reflect[] the estimated average cost of such service or technology." 42 U.S.C. § 1395ww(d)(5)(K)(ii)(III). Thus, the payments made under the EHR Meaningful Use program are "made in whole or in part under a Federal

---

[1] In later years, eligible professionals who did not demonstrate that they were meaningful users of certified EHR technology would receive a downward adjustment on their fee schedule. *E.g.*, 75 Fed. Reg. at 44316; *see also id.* at 44546 (noting "significant Medicare payment reductions" for entities that did not demonstrate meaningful use of EHR technology after the fifth year).

health care program." 42 U.S.C. § 1320a-7b(b); *id.* at (f) (defining "Federal health care program" as (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government . . . .").

Defendants' suggestion that the AKS should not apply to the Meaningful Use program because the incentive payments that healthcare providers receive do not constitute a dollar-for-dollar reimbursement for the costs associated with purchasing EHR technology is contradicted by the law. In many other contexts, Courts have recognized the application of the AKS to payments by federal healthcare programs that are intended to cover a bundle of costs incurred by providers. For example, Medicare pays hospitals a flat fee for inpatient hospital care under the IPPS. 42 U.S.C. § 1395ww(d). The IPPS payments are based on diagnostic categories called Diagnostic Related Groups (DRGs), which are based in part upon the operating costs of hospitals for each DRG. *See, e.g.*, FY 2012 IPPS Final Rule, 76 Fed. Reg. 51476, 51557-59, 51562 (Aug. 18, 2011). Thus, while CMS does not separately reimburse hospitals for the cost of implantable medical devices used in medical procedures, the agency considers those costs in calculating the DRG for procedures involving those devices. *Id.* at 51559, 51562; *see also Appalachian Reg'l Healthcare, Inc. v. Shalala*, 131 F.3d 1050, 1053 (D.C. Cir. 1997) ("A PPS payment is instead in full satisfaction of the bundle of covered items and services provided during a single inpatient hospital stay. It is certainly in some sense payment for each of the individual items or services that compose the bundle "). Courts have found that device manufacturers that pay kickbacks to physicians to use their devices in procedures reimbursed by CMS through the IPPS can face liability under the AKS. *See United States ex rel. Hutcheson v. Blackstone Med.*, 647 F.3d 377, 394-95 (1st Cir. 2011); *see also United States ex rel. Simpson v. Bayer Corp.*, 376 F. Supp. 3d

392, 403-04 (D.N.J. 2019) (referring to "over ten FCA actions resulting in settlements that arose from claims for procedures including items like surgical supplies and medical devices tainted by kickbacks that, like Trasylol, were not 'specifically referenced on claims submissions'").

In this case, the Meaningful Use incentive payments – paid for "under a Federal health care program" – are intended to cover the costs associated with "the adoption, implementation, upgrade, or meaningful use of [EHR] technology." *See* 75 Fed. Reg. at 44446. The costs associated with "adoption" and "implementation" plainly include the costs of purchasing an EHR. Indeed, in establishing the appropriate payment level that eligible providers should receive, the Secretary was directed to study the "costs associated with the purchase, initial implementation, and upgrade of certified EHR technology." *Id.* at 44492; *see also id.* at 44546 ("The costs for implementation and complying with the criteria of meaningful use could lead to higher operational expenses. However, we believe that the combination of payment incentives and long-term overall gains in efficiency will compensate for the initial expenditures.").

The regulations set forth in 42 C.F.R. Part 495 further reflect that offsetting the cost of acquiring an EHR technology is one purpose for which the Meaningful Use incentive payments are provided. *See* 42 C.F.R. § 495.106(b) ("A qualifying [Critical Access Hospital] receives an incentive payment for its reasonable costs incurred for the purchase of certified EHR technology"); *id.* § 495.308(a) (Medicaid incentive payments in the first year are "intended to offset the costs associated with the initial adoption, implementation or upgrade of certified [EHR] technology"). Moreover, regulations implementing and providing for Medicaid payments explicitly condition payments to compliance with the AKS. *See id.* § 495.368(d) ("States must comply with all Federal laws and regulations designed to prevent fraud, waste, and abuse, including . . . the anti-kickback statute").

Accordingly, the United States respectfully requests the Court consider these views as it takes defendants' motions under advisement.

Dated:  November 7, 2019    Respectfully Submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    *s/ Matthew J. Feeley*
Matthew J. Feeley
Assistant United States Attorney
Southern District of Florida
Fla. Bar. No. 0012908
99 N.E. 4th Street
Miami, Florida 33132
Telephone: (305) 961-9235
Facsimile: (305) 530-7139
Email: matthew.feeley@usdoj.gov

ANDY J. MAO
EDWARD C. CROOKE
GORDON E. SHEMIN
Attorneys, Civil Division
Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 305-4880
E-mail: gordon.e.shemin@usdoj.gov

*Attorneys for United States of America*

## **CERTIFICATE OF SERVICE**

I certify that on November 7, 2019, I caused to be electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which sent notice of such filing to all counsel of record.

*s/ Matthew J. Feeley*____
Matthew J. Feeley