# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

Case No. 18-20394-CIV-Scola/Torres

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>DEREK LEWIS and JOEY NEIMAN,<br><br>            Plaintiffs,<br><br>      v.<br><br>COMMUNITY HEALTH SYSTEMS, INC.,<br>et al.,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>/ |

## DEFENDANT CHSPSC, LLC'S REPLY IN SUPPORT OF ITS
## MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT

LASH & GOLDBERG LLP
Martin B. Goldberg
Florida Bar No. 0827029
Daryl L. Saylor
Florida Bar No. 100376
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
Michael L. Waldman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Lauren M. Cassady (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

*Counsel for Defendant CHSPSC, LLC*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT .................................................................................1

I.     RELATORS FAIL TO PLEAD THAT CHSPSC SUBMITTED A FALSE CLAIM ...........2

       A.     The hospitals correctly attested to using certified software, and Meaningful Use required nothing more.......................................................................2

       B.     The hospitals correctly attested to meeting the required measures of EHR use, not that the EHR software was flawless in every circumstance ...............7

       C.     Each hospital correctly attested that it provided Clinical Decision Support ............9

II.     RELATORS FAIL TO PLEAD FRAUD WITH PARTICULARITY AGAINST CHSPSC ...................................................................................................10

III.    RELATORS FAIL TO PLAUSIBLY PLEAD WRONGFUL KNOWLEDGE AGAINST CHSPSC ......................................................................................12

IV.    RELATORS FAIL TO STATE AN ANTI-KICKBACK STATUTE VIOLATION...........14

V.     THE COMPLAINT IS AN IMPROPER SHOTGUN PLEADING....................................15

CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 13, 15

*Bright v. Thomas*,
  754 F. App'x 783 (11th Cir. 2018) ......................................................................... 13, 15

*Corsello v. Lincare, Inc.*,
  428 F.3d 1008 (11th Cir. 2005) ..................................................................................... 10

*Gore v. Jacobs Eng'g Grp.*,
  706 F. App'x 981 (11th Cir. 2017) ................................................................................ 14

*Guilfoile v. Shields*,
  913 F.3d 178 (1st Cir. 2019) ......................................................................................... 14

*Hill v. Morehouse Med. Assocs., Inc.*,
  2003 WL 22019936 (11th Cir. Aug. 15, 2003) .............................................................. 12

*Kohli v. Pembroke Lakes Mall, LLC*,
  2017 WL 4863089 (S.D. Fla. Oct. 26, 2017) ................................................................ 14

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
  780 F.3d 1101 (11th Cir. 2015) ..................................................................................... 15

*MedPricer.com v. Becton, Dixon & Co.*,
  240 F. Supp. 3d 263 (D. Conn. 2017) ........................................................................... 14

*NACS v. Bd. of Governors of the Fed. Reserve Sys.*,
  746 F.3d 474 (D.C. Cir. 2014) ......................................................................................... 6

*Urquilla-Diaz v. Kaplan Univ.*,
  780 F.3d 1039 (11th Cir. 2015) ..................................................................................... 13

*U.S. ex rel. Aquino v. Univ. of Miami*,
  250 F. Supp. 3d 1319 (S.D. Fla. 2017) .......................................................................... 12

*U.S. ex rel. Atkins v. McInteer*,
  470 F.3d 1350 (11th Cir. 2006) ..................................................................................... 12

*U.S. ex rel. Barrett v. Beauty Basics, Inc.*,
  2015 WL 3650960 (N.D. Ala. June 11, 2015) ........................................................... 13, 15

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*U.S. ex rel. Clausen v. Lab. Corp. of Am.*,
  290 F.3d 1301 (11th Cir. 2002) ................................................................ 12

*U.S. ex rel. Fernandez v. Miami Cancer Inst.*,
  2019 WL 1993513 (S.D. Fla. May 6, 2019) ......................................... 10

*U.S. ex rel. Headen v. Adams & Assocs., Inc.*,
  2017 WL 6017775 (N.D. Ala. Dec. 5, 2017) ........................................ 13

*U.S. ex rel. Matheny v. Medco Health Sols., Inc.*,
  671 F.3d 1217 (11th Cir. 2012) ................................................................ 12

*U.S. ex rel. Osheroff v. Tenet Healthcare*,
  2012 WL 2871264 (S.D. Fla. July 12, 2012) ........................................ 12

*U.S. ex rel. Walker v. R&F Properties of Lake Cty., Inc.*,
  433 F.3d 1349 (11th Cir. 2005) ................................................................ 12

*Whitman v. Am. Trucking Associations, Inc.*,
  531 U.S. 457 (2001) ...................................................................................... 6

**Statutes, Regulations, and Rules**

33 U.S.C. § 1311(b)(2)(A) .............................................................................. 2

42 U.S.C. § 300jj(1) ......................................................................................... 5

42 U.S.C. § 1320a-7b(b) ................................................................................ 14

42 U.S.C. § 7412(g)(2) .................................................................................... 3

42 C.F.R. § 413.9 ............................................................................................. 14

42 C.F.R. § 495.4 (2015) ................................................................................. 4

42 C.F.R. § 495.6 (2014) ............................................................................ 9, 10

42 C.F.R. § 495.8 (2014) ......................................................................... 2, 3, 5

45 C.F.R. § 170.102 (2012) ............................................................................. 4

45 C.F.R. § 170.306 (2010) ............................................................................. 9

45 C.F.R. § 170.314 (2012) ............................................................................. 9

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

75 Fed. Reg. 2014 (2010) ........................................................................ 3, 6, 7, 8, 9

75 Fed. Reg. 44,314 (2010) ......................................................................... 7, 9, 10

76 Fed. Reg. 1262 (2011) ..................................................................................... 7

77 Fed. Reg. 13,832 (2012) .............................................................................. 4, 5

77 Fed. Reg. 53,968 (2012) ............................................................................. 9, 10

77 Fed. Reg. 54,163 (2012) .............................................................................. 4, 5

80 Fed. Reg. 62,762 (2015) .................................................................................. 5

Federal Rules of Civil Procedure 9 ................................................................ *passim*

**Other Authorities**

Clinical Decision Support:  More Than Just 'Alerts' Tipsheet (July 2014), https://
    www.healthit.gov/sites/default/files/clinicaldecisionsupport_tipsheet.pdf ........................... 10

CHPL, Medhost Enterprise Version 2014 R1 (Aug. 28, 2014),
    https://tinyurl.com/y4pukch9 ..................................................................................... 6

CMS, Certified EHR Technology FAQ No. 12657, https://tinyurl.com/yyqo8hw9 ..................... 7

Complaint, *United States v. Greenway Health, LLC*,
    No. 2:19-CV-00020 (D. Vt.) ...................................................................................... 5

Complaint, *U.S. ex rel. Delaney v. eClinicalWorks LLC.*,
    No. 2:15-CV-00095 (D. Vt.) ...................................................................................... 5

Kelly P. Erb, *TurboTax Glitch Led to $216 Million Tax Bill for Thrift Store
    Worker*, Forbes, Sept. 17, 2019, https://tinyurl.com/yy879e3b ........................................ 7

Federal Plain Language Guidelines, https://tinyurl.com/yyyed5vk .......................................... 6

Health IT; Implementation Specifications, and Certification Criteria: EHR
    Technology, 2014 Edition, No. HHS-OS-2012-004,
    https://tinyurl.com/y5ecukco ...................................................................................... 5

Industry News, *HMA Announces Restatement of Financial Statements* (Nov. 13,
    2013), https://www.hitechanswers.net/hma-announces-restatement-financial-
    statements/ ....................................................................................................... 13

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Medicare and Medicaid Programs; EHR Incentive Program-Stage 3,
   No. CMS-2015-0033, https://tinyurl.com/y3sdjvov ............................................................5

Office of the Federal Register, Document Drafting Handbook (Aug. 2019),
   https://tinyurl.com/yxcdjnrn .............................................................................................6

ONC, *Generation of CMS EHR Certification ID*, https://tinyurl.com/yyfrnwxj ...........................3

ONC, Proposed Rule Standards & Certification Criteria 2014 Ed.,
   https://tinyurl.com/y44ozm58 ...........................................................................................4

## PRELIMINARY STATEMENT[1]

The Meaningful Use program required hospitals to attest that they used certified software and that they met certain usage percentage measures. Relators concede that the software used by the hospitals here was certified. And they do not contest the accuracy of the percentage usage figures that the hospitals reported. They therefore fail to state a claim against CHSPSC.

Instead, Relators focus on representations that the hospitals did not and were not required to make. Their principal allegation is that the Medhost software should not have been certified. But the hospitals never said it should; to the contrary, they could not have said so because the form used for attestation provided no place for such a representation to be made. Instead, the hospitals relied on the certifications issued by the Office of the National Coordinator for Health Information Technology's ("ONC") authorized certification body (here, Drummond Group), just as the ONC said they could. Relators only claim otherwise by distorting the text of the regulation beyond recognition and adopting an interpretation that was never mentioned by the regulators, the thousands of pages of rulemaking materials, or the thousands of comments received on those rules. The Meaningful Use rules only required providers to attest that the software was certified—not to vouch for the certification, nor to represent that the software was either perfect or top-of-the-line. Relators do not—and cannot—allege that the software here was uncertified, and so their claims against CHSPSC should be dismissed.

In any event, the Complaint would still fail because its allegations, while lengthy, are exceedingly conclusory and general. Relators must plead with particularity under Rule 9(b). But Relators do not explain how the hodgepodge of software glitches that litter the Complaint caused even a single hospital to fall below the required measures for Meaningful Use. Nor do they allege any *facts* suggesting that anyone at CHSPSC knew that even a single hospital was out of compliance but chose to attest anyway. To the contrary, their allegations only serve to highlight that CHSPSC dedicated considerable resources to getting Meaningful Use right and its employees

---

[1] Capitalized terms have the same meaning as in CHSPSC's motion to dismiss, Doc. No. 132 ("CHSPSC Mot."). All emphasis is added.

worked exceptionally hard to fix any problems that arose during implementation.

Relators' kickback theory should likewise be dismissed.  The incentive payments here were not made to "purchase" software; they were payments for the *use* of software.  Purchase was neither a necessary nor sufficient condition for payment.  In any event, the kickback allegations are even more threadbare and conclusory.  Relators allege scant *facts* on the kickback claim and instead rely on vague rumors and bare assertions of wrongdoing.  So that theory must fail too.

## I.   RELATORS FAIL TO PLEAD THAT CHSPSC SUBMITTED A FALSE CLAIM

### A.   The hospitals correctly attested to using certified software, and Meaningful Use required nothing more

Relators do not identify a single false statement that any of the hospitals made about the software that they used for Meaningful Use.  As required by Meaningful Use, each hospital attested that it "[u]sed certified EHR" software and "specif[ied] the technology used." 42 C.F.R. § 495.8(b) (2014).  Relators do not—and cannot—allege that either representation was false.  To the contrary, Relators frankly and repeatedly concede that the "software was certified" here.  Relators' Opposition, Doc. No. 137 ("Opp.") 45; *see also, e.g.*, *id.* at 3 ("Medhost's products obtained certification."); FAC ¶¶ 107-110, 131, 149-152, 204 (alleging "Medhost received certification" for various versions of its software).  That should be the end of the false certification claims.

Despite the fact that the hospitals truthfully attested to using certified software, Relators continue to insist that those attestations were false because "Medhost's EHR *should* not have been certified," citing a laundry list of supposed problems and limitations in the software.  Opp. 43.  And they repeatedly stress that, in their view, Medhost's software was "inferior" and "substandard to other EHR systems."  *Id.* at 11, 15, 23, 75.  Even if those allegations were true (and for this motion CHSPSC assumes that they are), Relators' claims still fail.

*First*, Relators' attacks on the quality of Medhost's software vis-à-vis other vendors are irrelevant.  Unlike some other regulatory regimes, Meaningful Use did not (and does not) require providers to use the "best available" technology.[2]  Instead of mandating that all providers use the

---

[2]  *Compare* 42 C.F.R. § 495.8(b) (requiring "certified" software), *with* 33 U.S.C. § 1311(b)(2)(A)

software it deemed "best," ONC explained its intention was to create a "competitive marketplace" that would allow providers "to choose from a variety of offerings" that met its certification criteria. 75 Fed. Reg. 2014, 2023/1 (2010).  Providers were therefore able to "choose" whether their practices needed top-of-the-line software or if more budget friendly options would do just as well.

*Second*, Relators are flat wrong that the Meaningful Use regulations required hospitals to represent "that its EHR software met the [certification] requirements."  Opp. 45-47.  The Meaningful Use regulations only required hospitals to attest that they "used certified EHR" software.  42 C.F.R. § 495.8(b) (2014).  It did not require hospitals to look behind the certification and give an independent assessment of whether the software "should have been certified."  And the hospitals did not make any such representations in the attestations that they actually submitted to the government.  Indeed, as CHSPSC pointed out in its motion, it would have been *impossible* for the hospitals to represent that the software "should have been certified" or that the software possessed all the functionalities for certification because the CMS web portal used for attestations only permitted hospitals to provide a unique identifying number[3] identifying the certified software that they used—nothing more and nothing less.  *See* CHSPSC Mot. 7-8.

Relators offer no serious response.  They do not dispute that § 495.8 only required hospitals to attest that they "used certified EHR" software.  And they are entirely silent on the impossibility point—Relators, tellingly, do not contend that the attestation form allowed hospitals to make the representations that they now attribute to them.  Instead, as a last-ditch effort, they attempt to shoehorn their "should not have been certified" theory into the definition of "certified EHR technology."  Opp. 45-46.  Starting in 2014, "certified EHR technology" was defined as:

> EHR technology . . . certified under the ONC Health IT Certification Program that meets one of the following:  (i) [t]he 2014 Edition Base EHR definition and has

---

(requiring use of "best available technology" under Clean Water Act), *and* 42 U.S.C. § 7412(g)(2) (requiring use of "maximum achievable control technology" under Clean Air Act).

[3] Providers generated that number by selecting the certified software they used from the Certified Health IT Product List ("CHPL") website.  *See* ONC, *Generation of CMS EHR Certification ID* at 2, https://tinyurl.com/yyfrnwxj.

been certified to the certification criteria that are necessary to be a Meaningful EHR User . . . , (ii) [certain enumerated certification criteria], [or] (iii) [t]he definition for 2018 subsequent years.

42 C.F.R. § 495.4 (2015).[4]  Relying on that definition, Relators argue that when hospitals attested that they "used certified EHR technology," they were actually representing (whether they knew it or not) "both that the software has been certified" *and* independently vouching that the software has the functions to "meet[] the requirements of a Base EHR," Opp. 46, or so the theory goes.

As an initial matter, Relators offer no explanation for how a definitional amendment that became effective in 2014 could have rendered hundreds of pre-2014 attestations false.  In addition, Relators' new definitional theory flips the actual regulation on its ear.  Far from seeking to impose a burdensome new verification requirement on providers, this definitional amendment aimed to *reduce* the burden on providers by giving them more "flexibility" to pick software that had been certified to the providers' particular needs.  *See* 77 Fed. Reg. 54,163, 54,257/2 (2012).  The regulations previously defined "certified EHR technology" as software that was certified to *"all* applicable certification criteria."  45 C.F.R. § 170.102 (2012).  That all-or-nothing definition resulted in many providers paying for features that they would never use—dentists, for example, had to buy EHR software that could submit immunization records even though they do not administer vaccines (and therefore are excused from the vaccine-related Meaningful Use objectives).  *See* 77 Fed. Reg. 13,832, 13,864/2 (2012).  The language on which Relators now rely was intended to curb some of that wasteful spending by setting a baseline that all certified software must meet (the Base EHR), but otherwise allowing software to be "certified to [the] certification criteria that [the providers] would need/use to demonstrate [Meaningful Use]."  77 Fed. Reg. at 54,257/1; *see also id*. at 54,164/2-3.[5]

Until now, there has never been any indication that anyone read that definition to impose

---

[4]  Although Relators purport to cite the January 2014 version of this section, the "Base EHR" language upon which they rely was not added to § 495.4 until December 2015.  However, similar language in the ONC regulations became effective in 2014.  *See* 45 C.F.R. § 170.102 (2012).

[5]  *See also* ONC, Proposed Rule Standards & Certification Criteria 2014 Ed. at 7, 11, 15-16, 20-22 (illustrations depicting how the new definition changed the required certification criteria from all to potentially less than all) https://tinyurl.com/y44ozm58.

an expansive new burden on providers to independently verify the functionality of certified software.  ONC never even hinted at such a notion in either its proposal announcing the definitional amendment or the final rule implementing it.  *See* 77 Fed. Reg. 13,832 (proposed rule); 77 Fed. Reg. 54,163 (final rule).  CMS was likewise silent when it adopted that language into the Meaningful Use regulations.  *See* 80 Fed. Reg. 62,762 (2015).  Nor does it appear to have been mentioned in any of the 450 public comments on the ONC proposed rule or the 1,800 comments on the CMS proposal.[6]  There also are no CMS manuals, publications, or guidance discussing this purported new obligation on providers to second-guess the functionality of certified software.  CHSPSC is not aware of any industry or academic source who maintains that providers are obligated to independently verify functionality.  Nor are there any administrative rulings, enforcement actions, or False Claims Act lawsuits based on this so-called obligation.[7]  At least to CHSPSC's knowledge, no one other than Relators has ever suggested such a reading of Meaningful Use.[8]  So even if Relators were correct about this strained statutory interpretation (and they are not), their claims still should be dismissed because they do not allege that anyone at CHSPSC or the hospitals shared this understanding of the Meaningful Use regulations but attested anyway.

In any event, Relators give no reason to think that CMS engaged "in a high-stakes game of hide-and-seek" with hundreds of thousands of doctors and hospitals by writing a substantive provision (42 C.F.R. § 495.8) that merely required "use[]" of certified software but "embedding a substantially different and . . . much more costly requirement in the [regulation's] definitions

---

[6]  Health IT; Implementation Specifications, and Certification Criteria: EHR Technology, 2014 Edition, No. HHS-OS-2012-004, https://tinyurl.com/y5ecukco; Medicare and Medicaid Programs; EHR Incentive Program-Stage 3, No. CMS-2015-0033, https://tinyurl.com/y3sdjvov.

[7]  Relators trumpet the Government's intervention and settlements in *U.S. ex rel. Delaney v. eClinicalWorks LLC.*, No. 2:15-CV-0095 (D. Vt.) and *United States v. Greenway Health, LLC*, No. 2:19-CV-00020 (D. Vt.). *See* Opp. 43, 62. Yet, both cases were brought against only the software vendors. CHSPSC is not aware of any FCA case against a provider relating to Meaningful Use.

[8]  That should come as no surprise because the *statutory* language that ONC and CMS interpreted in these rules defines "certified EHR technology" as software that "is certified pursuant to [the ONC certification program] as meeting [the ONC's certification] standards." 42 U.S.C. § 300jj(1).

section." *See NACS v. Bd. of Governors of the Fed. Reserve Sys.*, 746 F.3d 474, 494 (D.C. Cir. 2014).  Regulators generally do not "hide elephants in mouseholes."  *Cf. Whitman v. Am. Trucking Associations, Inc.*, 531 U.S. 457, 468 (2001).  That is doubly true when the "mousehole" is a definitional section; indeed, the Federal Register's own drafting rules repeatedly instruct agencies "not [to] include substantive regulatory provisions in a definition."[9]  Accordingly, Relators' attempt to read its "should not have been certified" theory of liability into the definitions must fail.

In a similar vein, Relators argue that the hospital attestations falsely represented that Medhost's "Emergency Room software (EDIS) and inpatient hospital software (Enterprise) modules[10] could seamlessly integrate information."  Opp. 22, 48-50.  Relators insist that such representations are necessary "to attest to Meaningful Use based on multiple Meaningful Use modules," *id*. at 48, but their *ipse dixit* does not make it so.  As CHSPSC's motion explained, these integration allegations must fail because CMS clearly stated in the rulemaking that it was "*not* requiring the certification of combinations of certified EHR Modules, just that the individual EHR Modules combined have each been certified to all applicable certification criteria in order for such a 'combination' to meet the definition of Certified EHR Technology."  CHSPSC Mot. 9 (quoting 75 Fed. Reg. at 2023/2).  And Relators, again, ignore the fact that the attestation form did not require any representations regarding the integration of certified modules—in fact, hospitals *could not* have made any representations about integration even if they wanted to because the CMS web portal provided no room for any such commentary.  *See id.*  Relators may find those points inconvenient, but they cannot stave off dismissal by simply pretending they do not exist.[11]

---

[9]  Office of the Federal Register, Document Drafting Handbook (Aug. 2019) at 2-27, 3-33 to 3-34, https://tinyurl.com/yxcdjnrn; *see also* Federal Plain Language Guidelines ("Never include regulatory or substantive material in definitions."), https://tinyurl.com/yyyed5vk.

[10]  Relators' argument seems to wrongly assume that Enterprise was certified as an EHR Module. But the ONC plainly certified it as a Complete EHR, not a module.  *See* CHPL, https://tinyurl.com/y4pukch9.  In any event, Relators' argument fails because, as explained *infra*, the hospitals did not make (and CMS did not require) any representations about software integration.

[11]  Instead of actually addressing CHSPSC's arguments, Relators dismiss them out of hand because, according to Relators, CHSPSC "inappropriately focus[ed]" on "interoperability rules" instead of "integration."  Opp. 50.  That argument is passing strange.  The interoperability rules

Next, Relators chide CHSPSC for arguing that hospitals can conclusively "rely on certification" when the ONC never "even suggest[ed]" such a notion. Opp. 47. But the ONC's regulations repeatedly stressed that hospitals "***must be able to rely*** on the certifications." 76 Fed. Reg. 1262, 1282/3 (2011); *see also* 75 Fed. Reg. at 2022/1 ("[H]ospitals can be assured that once they adopt and implement Certified EHR Technology, it includes, at a minimum, the . . . capabilities required to support their achievement of . . . meaningful use . . . ."); CHSPSC Mot. 8. As CMS made abundantly clear, providers could rely on the certification because "certified EHR technology will *always* be able to support achievement of the [Meaningful Use] measure[s] by including the necessary functionalities." 75 Fed. Reg. 44,314, 44,331/2 (2010). Indeed, even if a hospital *knows* that its software has been decertified, it "can still use that product to attest" for any "EHR reporting period ended before the decertification occurred."[12] Here, both the Medhost and Pulse software were and remain fully certified and, accordingly, the hospitals (and CHSPSC) were entitled to rely on those validly issued certifications in their attestations.

### B. The hospitals correctly attested to meeting the required measures of EHR use, not that the EHR software was flawless in every circumstance

Each of the Hospitals truthfully attested that it met the required percentage-measures necessary to satisfy Meaningful Use. Relators do not allege otherwise. Instead, Relators argue that the percentages are irrelevant because "[u]nderlying those percentage requirements was the need for every certified functionality to work accurately and reliably." Opp. 10, 51-53. Analogizing to tax software, Relators argue that users of TurboTax "rely on [it] to correctly calculate their taxes *every time*" and "TurboTax must actually be able to do so."[13] *Id.* at 52.

---

that Relators reference are discussed nowhere in CHSPSC's motion and the word "interoperability" appears only once—in a quotation in a footnote. *See* CHSPSC Mot. 3 n.3. By contrast, the relevant page of CHSPSC's motion (correctly cited in Relator's opposition) uses the term "integration" five times. Opp. 50 (citing CHSPSC Mot. 9).

[12]  CMS, Certified EHR Technology FAQ No. 12657, https://tinyurl.com/yyqo8hw9.

[13]  While TurboTax surely appreciates the vote of confidence, Relators' claim that TurboTax gets it right "every time" is also mistaken. Less than six weeks ago, a thrift store worker, who makes $10 an hour, received a $216-million tax bill because of a "TurboTax glitch." https://tinyurl.com/yy879e3b.

According to Relators, the "same principle" applies to EHR software and if the software cannot record every order correctly then it should be treated as if it recorded no orders at all. *Id.*

But, again, Relators seek to distract with overheated rhetoric and hyperbolic claims about patient safety.[14]  That misdirection seeks to obscure that Relators did not allege that the hospitals attested that the Medhost software worked perfectly "every time."  No matter how many times Relators repeat their mantra that the software had to be "accurate and reliable," *e.g.*, Opp. 47, they never point to any regulation requiring *the hospitals* to attest that the software passed any quality control tests or otherwise met any measure of reliability or accuracy.[15]  Relators also cannot point to any CMS manuals, publications, or guidance, nor do they cite to any industry or academic materials, that place a reliability or accuracy requirement on *providers* using certified software. Relators likewise fail to identify a single administrative ruling, enforcement action, or FCA lawsuit that relies on this "reliability or accuracy" theory against a hospital.  And, again, Relators cannot point to any place on the attestation form where a hospital makes a representation regarding the reliability or accuracy of certified software.  That is because no such requirement exists.

Indeed, Relators cannot even say how "accurate" is accurate enough or how "reliable" is reliable enough.  Other than insisting that the software get it right every time without fail (an obviously impossible goal that no software or hospital could meet), Relators identify no standard for the Court to apply.  The Court would therefore be left at sea in evaluating Relators' nebulous "accuracy and reliability" allegations.  *See* CHSPSC Mot. 11-12.  Apart from the fact that such a line-drawing exercise is inherently regulatory—not judicial—it would also fail to state a false claim because hospitals cannot knowingly lie about crossing a line that has yet to be drawn.

---

[14]  In its Motion to Dismiss, CHSPSC noted that the Relators' Complaint never alleges any *actual* patient harm.  CHSPSC Mot. 12 n.11.  Notably, the Opposition does not dispute this.

[15]  That is not to say that Meaningful Use had no guardrails to prevent inaccurate, unreliable, or unsafe software from coming to market.  To the contrary, that was the point of certification.  The ONC stressed to providers that "Certified EHR Technology *will* possess the capabilities that can assist any health care provider to improve the quality, safety and efficiency of the care they deliver."  75 Fed. Reg. at 2015/2-3.  And even Relators admit, albeit reluctantly, that the point of certification was to give providers assurance "that the product would perform as described by the vendor and meet quality standards for use in healthcare settings."  Opp. 47.

### C.      Each hospital correctly attested that it provided Clinical Decision Support

Each hospital attested to providing one clinical decision support ("CDS") intervention in Stage 1 and five CDS interventions in Stage 2 as required by Meaningful Use.  *See* 42 C.F.R. § 495.6(f)(10), (l)(5) (2014).  The interventions that the hospitals chose to implement—a fall-risk assessment in Stage 1 and condition-specific order sets in Stage 2—fit comfortably within the "significant" leeway that CMS afforded providers to choose interventions that were best suited for their practices and patients.  75 Fed. Reg. at 44,350/2; *see also* CHSPSC Mot. 13-16.

Relators nevertheless contend that the hospitals' CDS attestations were false.  *First*, Relators argue that the CDS interventions used here fall outside the regulatory definition. According to Relators, providers do not satisfy the CDS measure unless the CDS "uses person-specific data from" certain specified sources.  Opp. 54.  Relators, however, cite to regulations that govern software certification and *not* Meaningful Use provider attestations.  *See id.* (citing 45 C.F.R. § 170.306(c) (2010), 45 C.F.R. § 170.314(a)(8) (2012)).  Although Relators insist these requirements must also apply to the attestations because "there is no separate definition of 'Clinical Decision Support' in the Meaningful Use regulations," Opp. 57, that argument is meritless.  The ONC could not have been plainer in stating that the *software certification* requirements "do not establish requirements for health care providers, such as . . . hospitals to follow."  75 Fed. Reg. at 2024/1.  True—that leaves the CDS requirements for Meaningful Use somewhat undefined.  But that is by design.  In drafting the CDS requirements, CMS intentionally retained an open-ended description to "allow a provider significant leeway in determining [appropriate] clinical decision support."  75 Fed. Reg. at 44,350/2.  While "nearly half of the commenters mentioning clinical decision support suggested that the term needed additional clarification," CMS refused to "add[] a more limiting description" because it "believe[d] that [the selection of CDS] is best left to the provider taking into account their workflow and patient population."  *Id.*[16]

---

[16]  Relators contend that a cross-reference imported the "patient-specific data" requirement for software certification into Meaningful Use.  Opp. 57 (quoting 77 Fed. Reg. 53,968, 53,995/3 (2012)).  If, as Relators claim, CMS had intended to cull out any CDS that did not use "patient-specific" data, presumably CMS would have said so explicitly rather than hoping that a coy cross-

*Second*, Relators argue that the hospitals' CDS attestations were false because Medhost's "CDS functionality did not work."  Opp. 55.  The Meaningful Use regulations only required hospitals to "implement [] clinical decision support interventions."  42 C.F.R. § 495.6(l)(5)(ii)(A) (2014); *id*. § 495.6(f)(10)(ii).  Consistent with the "significant leeway" afforded to providers, CMS did not require providers to use the built-in CDS functionality to meet that goal; instead, providers were free to use other methods including "external system[s]" so long as "such systems [] "interact with [the] certified EHR technology."  CDS Tipsheet at 3.  Relators do not—and cannot—allege that the CDS interventions here (fall-risk assessment and condition-specific order sets) do not interact with the Medhost EHR.  Their "functionality" argument therefore must fail too.

*Finally*, Relators halfheartedly argue that Meaningful Use "require[d] hospitals to . . . track compliance with" the CDS.  Op. 55.  But, as CHSPSC explained in its motion, CMS specifically excluded the "track compliance" language from the measure that hospitals were required to meet.[17] CHSPSC Mot. 15 (quoting 42 C.F.R. § 495.6(f)(10)(ii) (2014)).  And, if that were not clear enough, CMS also expressly instructed that hospitals are "*not required* to demonstrate . . . compliance efforts with [] CDS."  *Id*. (quoting 75 Fed. Reg. at 44,351/2).  Relators offer no response to those arguments, essentially conceding the point.

## II.    RELATORS FAIL TO PLEAD FRAUD WITH PARTICULARITY AGAINST CHSPSC

To satisfy Rule 9(b), Relators cannot just allege various software problems and provide a list of attestations; instead, they must plead a factual nexus that links the supposed software problems to particular false attestations.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam); *U.S. ex rel. Fernandez v. Miami Cancer Inst.*, 2019 WL 1993513, at *3

---

citation would do the trick.  Such a cramped interpretation of CDS also is impossible to square with the next two pages of the Federal Register in which CMS included a host of non-patient-specific items in a list of acceptable CDS interventions, including "documentation templates," "pre-specified order sets," and "disease specific order sets."  77 Fed. Reg. at 53,996/2, 53,997/1.

[17]   To the extent that Relators argue that "track[ing] compliance" was required by the objective, that arguments fails too.  CMS has repeatedly made clear that "achievement of the measure *always* equates to achievement of the objective."  75 Fed. Reg. at 44,331/2.

(S.D. Fla. May 6, 2019).  The Complaint alleges that, during the rollout of Stage 2 software in "*2014 and 2015*," the hospitals encountered a hodgepodge of bugs and problems with the Medhost software, including glitches with the CPOE system "under certain circumstances,"[18] claims that certain hospitals had problems of one sort or another,[19] certain supposedly broken bells-and-whistles,[20] an order set mapping issue that supposedly would take a week or two to "clean up,"[21] and certain features that Relators claim would have made the software better.[22]  But, critically, Relators failed to plead *any* examples of problems prior to the 2014 rollout and failed to provide the necessary detail about the problems that they contend began in 2014—*e.g.*, details identifying the "circumstances" under which the software would malfunction, when the malfunctions occurred, the frequency of the problems, whether CHSPSC (or the hospitals) were able to remedy those problems, or how those problems caused any—much less all—of the hospitals' attestations to be false.  CHSPSC Mot. 17-19.

Relators offer no real explanation for how these supposed software problems caused any statement on a hospital's attestation form to be false.  Indeed, Relators seem to fall back on their contention that the software "fail[ed] . . . to meet the certification standards" and therefore "should not have been certified" in the first place.  *See* Opp. 32, 43; *see also id*. at 67-68 ("Relators did not bring a FCA case premised on 'glitches and bugs' in Medhost's software" but instead allege that "Medhost's software lacked functionality required for certification."); *id*. at 23 (Software "lacked functionality required . . . to be eligible for certification.").  As explained, *supra*, such allegations fail to state a claim against CHSPSC because Meaningful Use only required the hospitals to attest that they used certified software and not that the software should have been certified.

Relators attempt to end-run that pleading requirement by pointing to the list of attestations

---

[18]  *See, e.g.*, FAC ¶¶ 155-159, 180-84 (alleging problems "under certain circumstances" with weight-based dosing, "medication name mismatch," and drug verification).

[19]  *See* FAC ¶¶ 187-190 (problems with pharmacy orders at two hospitals and IV packs at a third).

[20]  *See* FAC ¶¶ 160-164 ("Send Dose Now"), 171-179 (PRN orders and "Physician's Favorites").

[21]  FAC ¶¶ 193-202.

[22]  *See, e.g.*, FAC ¶¶ 165-170 (software should have used more dynamic weight-based dosing).

attached to their complaint. Yet, Exhibit B merely lists "every claim" submitted by a CHSPSC-affiliated hospital that used Medhost or Pulse software. *See* Opp. 29-30. Nothing on Exhibit B identifies what statement was purportedly false in the hospital attestations or explains why it was false. As to any of the hundreds of attestations, Exhibit B does not put CHSPSC on notice about "the details of [CHSPSC's] allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). Relators have failed to provide the critical link or "nexus" to connect the attestations to the alleged software problems, and thus their Complaint fails to satisfy their pleading burden under Rule 9(b).[23]

Finally, Relators argue that the pleading standard should be relaxed because they had "direct and personal involvement." Opp. 32-34; *see also id.* 41-42. While the Eleventh Circuit will allow a case to proceed where there is "clear indicia of reliability," it sets a "high bar" for such a finding that requires "firsthand knowledge of a defendant's actual submission of false claims." *U.S. ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1332, 1334 (S.D. Fla. 2017) (concluding "manager and decision-maker" who was not involved with the claim submission process had insufficient knowledge); *see also U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (same).[24] Here, Relators have specifically pled that they had no involvement with the attestation process. Opp. 24-25. Therefore, they fall well short of clearing that "high bar."

## III.  RELATORS FAIL TO PLAUSIBLY PLEAD WRONGFUL KNOWLEDGE AGAINST CHSPSC

To state a claim under the FCA, Relators must plead *facts* that would "show that the

---

[23]  Relators rely heavily on *U.S. ex rel. Osheroff v. Tenet Healthcare*, 2012 WL 2871264 (S.D. Fla. July 12, 2012), but *Osheroff* is entirely irrelevant—the issue discussed in the cited portion of that case is whether the relators had sufficiently alleged the *submission* of any claim at all. *Id.* at *5-6. Here, no one disputes that the hospitals submitted attestations; the question is whether Relators have alleged the critical link demonstrating the falsity of those attestations. They have not.

[24]  The cases Relators cite are therefore easily distinguishable. *See Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *5 (11th Cir. Aug. 15, 2003) (per curiam) (relator employed in the "billing and coding department"); *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1220 (11th Cir. 2012) (relators employed by accounting department); *U.S. ex rel. Walker v. R&F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (nurse relator personally billed her time using a doctor's code).

defendant acted knowingly" or with "reckless disregard," rather than as a result of "innocent mistakes or simple negligence." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015); *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009); *U.S. ex rel. Headen v. Adams & Assocs., Inc.*, 2017 WL 6017775, at *10 n.17 (N.D. Ala. Dec. 5, 2017).

Relators fail to meet that pleading burden. They do not allege that anyone at CHSPSC believed that any of the attestations were false, they do not allege any incriminating meetings, conversations, or emails, and they do not allege any facts supporting a cover up. To the contrary, Relators' factual allegations *cut against* scienter. In their Complaint (and again in their Opposition), Relators detail how CHSPSC devoted "considerable resources" and staffed a "large team" including "CHS executive leadership" to "address software and deployment problems." FAC ¶¶ 12, 86-87, 91-92; Opp. 25, 71. And the Opposition highlights that the HMA hospitals voluntarily *repaid* over $30 million in Meaningful Use incentive payments after an internal review revealed that certain hospitals did not meet the attestation criteria. Opp. 3 n.3.[25] That utter lack of factual allegations should result in dismissal.

Relator's "response" only serves to prove CHSPSC's point.[26] The two paragraphs of the Complaint they cite allege that there were reports of "physician frustration" with the software in 2014. Opp. 68 (citing FAC ¶¶ 90-91). As described in those paragraphs, those "reports" consisted of *two* emails from a single Indiana hospital on *two* days in July 2014 reporting problems with new Stage 2 software that had just recently been "rolled out" to that hospital. *See* FAC ¶ 88. That is woefully insufficient. The FCA requires Relators to plead "facts creating an inference that the individual(s) who submitted the alleged false [attestations] to the government did so with knowledge of their falsity." *U.S. ex rel. Barrett v. Beauty Basics, Inc.*, 2015 WL 3650960, at *5 (N.D. Ala. June 11, 2015). These "reports" of "frustration" with software issues at one hospital do

---

[25]  Citing Industry News, *HMA Announces Restatement of Financial Statements* (Nov. 13, 2013), https://www.hitechanswers.net/hma-announces-restatement-financial-statements/.

[26]  To the extent Relators contend that scienter cannot be considered on a motion to dismiss, *see* Opp. 65, that argument is frivolous. *See Iqbal*, 556 U.S. at 680-681; *see also Bright v. Thomas*, 754 F. App'x 783, 787 (11th Cir. 2018) (per curiam); *Barrett*, 2015 WL 3650960, at *5.

not show knowledge of falsity or fraud.  As an initial matter, Relators offer no explanation of how such "reports" from 2014 could support an inference that hundreds of *pre-2014* attestations were knowingly false.  Relators also fail to explain how physician dissatisfaction rendered false any statement in the hospital attestations. And far from even hinting that "every" attestation was false, nothing in either report even gestures in the direction of Meaningful Use.[27]

## IV.     RELATORS FAIL TO STATE AN ANTI-KICKBACK STATUTE VIOLATION

To argue against dismissal of their kickback theory, Relators resort to badly distorting CHSPSC's actual argument.  CHSPSC is *not* arguing that the claim should be dismissed because "federal funds did not directly pay for the EHR software."  Opp. 71-72.  The AKS is inapplicable because the incentives here were not a payment "to purchase" EHR software; they were payments for *using* EHR software.[28]  42 U.S.C. § 1320a-7b(b).  Hospitals could receive those payments even if they developed their own software (as Relators contend HMA did) in lieu of a "purchase."  And they are entitled to receive the full payment amount regardless of the software's actual cost, which would be an exceedingly strange way to handle "reimbursement."  *Cf.* 42 C.F.R. § 413.9 (requiring "[a]ll payments to providers of [Medicare] services [to] be based on the reasonable cost").

In any event, even if the AKS did apply, Relators' AKS allegations would still fail because they are inadequately pled.  Relators' only response to CHSPSC's Rule 9(b) arguments is to insist

---

[27]   CHSPSC moved to dismiss Relators' allegations related to the HMA hospitals raising two arguments: (1) the Complaint failed to link supposed problems with medical reconciliation to a false attestation, and (2) it failed to plead any facts supporting its claim of scienter.  CHSPSC Mot. 19-21.  Relators responded with silence; indeed, only *three paragraphs* of Relators' 80-page opposition brief even mention HMA, and all three simply parrot the insufficient allegations from the Complaint without anywhere addressing CHSPSC's motions for dismissal.  Opp. 26, 49, 68.  Relators' claims related to the HMA hospitals should therefore be deemed abandoned.  *See Kohli v. Pembroke Lakes Mall, LLC*, 2017 WL 4863089, at *2 (S.D. Fla. Oct. 26, 2017); *see also Gore v. Jacobs Eng'g Grp.*, 706 F. App'x 981, 985-86 (11th Cir. 2017) (per curiam).

[28]   The cases Relators cite are not to the contrary.  Both concern the purchase of goods that would likely be eventually repaid using federal funds.  *MedPricer.com v. Becton, Dixon & Co.*, 240 F. Supp. 3d 263, 273 & n.10 (D. Conn. 2017) (purchase of medical equipment, primarily syringes); *Guilfoile v. Shields*, 913 F.3d 178, 183-84, 191-93 (1st Cir. 2019) (specialty pharmacy company paying consultant to secure contracts with hospitals).

that merely claiming the existence of some agreement for free software with otherwise unknown terms involving unnamed hospitals agreed to by unnamed parties at an unknown date[29] that may have been oral or may have been written and that Relators learned about from unnamed sources and "common knowledge" is good enough.  Opp. 74; *see also* FAC ¶¶ 283-84.  And, somehow Relators believe that the allegations about a supposed equity arrangement pass muster when they explicitly state they never saw any such agreement and claim to have only heard about it through office gossip.  *See* FAC ¶¶ 285-86; Opp. 74-75.  Such vague claims based on second- or third-hand rumors fail to satisfy the particularity requirements of Rule 9(b).

The AKS claims should also be dismissed because Relators fail to plead *facts* supporting scienter.  CHSPSC Mot. 24.  In response, Relators make the brazen claim that a bare assertion that "CHS knew the purpose of the offer of the free software" is enough. Opp. 75.  *Iqbal* says otherwise. 556 U.S. at 680-81; *see also Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1107 (11th Cir. 2015); *Bright*, 754 F. App'x at 787; *Barrett*, 2015 WL 3650960, at *5.

## V.    THE COMPLAINT IS AN IMPROPER SHOTGUN PLEADING

Even if Relators could state a claim (and they cannot), the Complaint should still be dismissed as an improper shotgun pleading because the Complaint both fails to distinguish between the various defendants and alleges all four substantive FCA claims in a single count.  *See* CHSPSC Mot. 24-25.

## CONCLUSION

For the reasons set forth above and in its opening brief, Defendant CHSPSC's motion to dismiss should be granted and Relators' claims against CHSPSC should be dismissed with prejudice.

---

[29]   Relators' claim that Medhost "initiated" the "free" software scheme "at the same time it expanded the Medhost Enterprise software suite," FAC ¶ 283, but tellingly cannot assign even a rough date to those events and cannot identify the date of the supposed agreement.

Case No. 18-20394-CIV-Scola/Torres

Dated: November 7, 2019

Respectfully submitted,

By:  /s/ Martin B. Goldberg
     Martin B. Goldberg

LASH & GOLDBERG LLP
Martin B. Goldberg
Florida Bar No. 0827029
Daryl L. Saylor
Florida Bar No. 100376
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131-2158
Telephone: (305) 347-4040
Facsimile: (305) 347-4050
mgoldberg@lashgoldberg.com
dsaylor@lashgoldberg.com

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
Michael L. Waldman (*pro hac vice*)
Brandon L. Arnold (*pro hac vice*)
Lauren M. Cassady (*pro hac vice*)
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mwaldman@robbinsrussell.com
barnold@robbinsrussell.com
lcassady@robbinsrussell.com

*Counsel for Defendant CHSPSC, LLC*

Case No. 18-20394-CIV-Scola/Torres

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 7, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ Martin B. Goldberg   
Martin B. Goldberg

**SERVICE LIST:**

Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne BlVd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Colette G. Matzzie (admitted *pro hac vice*)
Luke J. Diamond (*pro hac vice* anticipated)
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue,
NW Washington, DC 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com

Edward H. Arens (admitted *pro hac vice)*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300 San Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

David J. Chizewer (*pro hac vice* anticipated)
David E. Morrison (admitted *pro hac vice*)
Harleen Kaur (*pro hac vice* anticipated)
Danielle K. Johnson (*pro hac vice* anticipated)
Juan C. Arguello (*pro hac vice* anticipated)
GOLDBERG KOHN LTD.

17

55 E. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 201-4000
Fax: (312) 863-7472
David.Chizewer@goldbergkohn.com
David.Morrison@goldbergkohn.com
Harleen.Kaur@goldbergkohn.com
Danielle.Johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com