**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 18-20394-CIV-Scola/Torres

UNITED STATES OF AMERICA *ex rel.*　　　)
DEREK LEWIS and JOEY NEIMAN,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiffs,　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
COMMUNITY HEALTH SYSTEMS, INC.,　　　)
et al.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　　　　　)
　　　　　　　　　　　　　　　　　　　)

**PLAINTIFFS'/RELATORS' AMENDED CONSOLIDATED RESPONSE IN**
**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS RELATORS' FIRST**
**AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200

Edward Arens
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000

Colette G. Matzzie
Luke J. Diamond
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 833-4567

David J. Chizewer
David E. Morrison
Harleen Kaur
Danielle K. Johnson
Juan C. Arguello
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60565
Tel: (312) 201-4000

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

FACTS ASSUMED TO BE TRUE ....................................................................................... 3

I.     THE HITECH ACT CREATED A MULTI-BILLION DOLLAR MARKET FOR FEDERAL INCENTIVE PAYMENTS ................................................................... 3

II.    MEDHOST FALSELY CERTIFIED ITS EHR SOFTWARE, WHICH FAILED TO MEET MULTIPLE REQUIREMENTS FOR CERTIFICATION ............................ 4

    A.    Medhost's EDIS And Enterprise Software Could Not Integrate Patient Information Electronically Over A Hospital Stay As Required For Meaningful Use Payments. ........................................................................ 4

    B.    Medhost Falsely Certified That Its Software Could Perform Drug-Drug And Drug-Allergy Checks On Medication Orders. ............................................ 5

    C.    Medhost Falsely Certified Its Software Met The Requirements For Clinical Information Reconciliation. .................................................................. 5

    D.    Medhost Falsely Certified Its Software Met E-Prescribing Requirements ............. 6

III.    CHS FALSELY ATTESTED TO MEANINGFUL USE OF MEDHOST SOFTWARE TO CLAIM $385 MILLION IN FEDERAL SUBSIDIES. ....................... 6

IV.    CHS CORPORATE FORCED THE FLAWED MEDHOST SOFTWARE ONTO ITS HOSPITALS. ............................................................................................ 6

V.    CHS'S PULSE SOFTWARE IMPLEMENTED AT THE CHS-HMA HOSPITALS COULD NOT EXCHANGE NECESSARY DATA BETWEEN HOSPITAL UNITS. ........................................................................................... 7

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

VI.    RELATORS SUFFICIENTLY ALLEGE THAT CHS SUBMITTED, AND MEDHOST CAUSED TO BE SUBMITTED, FALSE CLAIMS TO THE GOVERNMENT .................................................................................................. 8

    A.    Relators' Allegations Are Sufficient To Satisfy Rule 9(b). ................................. 8

        1.    *Relators Identified The Who, What, When, Where And How Of The False Claims.* ........................................................................................ 9

            a)    *Relators Have Properly Alleged That False Claims Were Submitted To The Government.* ...................................................... 9

            b)    *Relators' Claims Are Reliable.* .................................................... 11

            c)    *Relators Have Identified Medhost's Fraudulent Conduct.* ........... 13

            d)    *The CHS Entities Engaged In The Same Fraudulent Acts.* ............ 13

    i.  *Resolving Corporate Veil Arguments Is*
      *Inappropriate At The Motion To Dismiss Stage.* .............. 13

    ii.  *Relators Have Properly Pleaded That CHSI, The*
      *Hospital Defendants, And CHSPSC Engaged In A*
      *Wheel Conspiracy-Like Fraud.* ........................................ 16

    iii. *Relators Exceeded The Legal Standard In*
      *Identifying Individuals Involved In The Fraudulent*
      *Scheme.* .......................................................................... 18

B. Relators Have Alleged False Claims. ................................................. 20

 1. *Defendants' "Interoperability" Argument Is Inapposite To Relators'*
  *Allegation That Defendants Used, And Caused To Be Used, EHR*
  *Modules That Could Not Combine To Meet The Requirements For*
  *Meaningful Use.* ................................................................. 24

 2. *Relators Allege That Medhost's Software Failed To Meet CPOE*
  *Requirements And That CHS Falsely Attested To This And Other*
  *Measures.* .......................................................................... 26

  a) *Medhost's Argument That There Is No Allegation That Its*
   *Software Failed To Meet CPOE Requirements Is Inapt.* .............. 26

  b) *Meaningful Use Payments are Contingent on the Use of*
   *Eligible Software, Not Solely Meeting Required Use*
   *Percentages.* .................................................................. 27

 3. *Relators Allege That Medhost Falsely Certified Its CDS Function*
  *And That CHS Falsely Attested To CDS Relying On Medhost's*
  *Flawed Software.* ................................................................ 28

 4. *Relators' Sufficiently Allege That Medhost's Falsely Certified E-*
  *Prescribe Function Caused False Attestations.* ........................................ 31

 5. *Relators Sufficiently Allege That Medhost's Software Failed To*
  *Meet Security-Related Criteria And That Hospitals Attested To*
  *Security-Related Measures Relying On Medhost's Software.* ................... 32

C. Relators Have Alleged That Medhost's False Statements Were Material To
 The Government's Incentive Payment Decisions. ................................................. 33

D. Relators Have Alleged That Defendants Acted With Improper Scienter. ........... 37

 1. *The Court Should Reject Medhost's "Reasonable Interpretation"*
  *Argument.* .......................................................................... 38

 2. *The Court Should Reject The CHS Entities' "Glitches And Bugs"*
  *Argument.* .......................................................................... 39

E. Relators Have Met The Requirements Of 31 U.S.C. § 3729(a)(1)(A) And
 (B). .......................................................................... 41

F. Relators Have Sufficiently Alleged A Conspiracy To Violate The FCA. ........... 42

VII.    RELATORS' KICKBACK THEORY SHOULD BE SUSTAINED. .............................. 43

**REQUEST FOR HEARING** ................................................................................................ 47

**CONCLUSION** ................................................................................................................... 47

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Ambrosia Coal & Constr. Co. v. Pages Morales*,
    482 F.3d 1309 (11th Cir. 2007) ............................................................ 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................ 8, 41

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................ 8, 41

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ............................................................ 18

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) ............................................................ 15

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*,
    931 F.2d 1472 (11th Cir. 1991) ............................................................ 37

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) .......................................... 8, 9, 11, 18, 42

*Grand Union Co. v. United States*,
    696 F.2d 888 (11th Cir. 1983) ............................................................. 19

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019)........................................................... 44, 45

*Hill v. Morehouse Med. Assocs., Inc.*,
    No. 02–14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003)............................. 19,

*Hopper v. Solvay Pharm.*,
    588 F.3d 1318 (11th Cir. 2009) ............................................................. 9

*Jackson v. Okaloosa Cty., Fla.*,
    21 F.3d 1531 (11th Cir. 1994) ............................................................... 7

*Jacobs v. Bank of Am. Corp.*,
    No. 1:15-cv-24585-UU, 2017 WL 2361943 (S.D. Fla. Mar. 21, 2017) .............. 15, 40, 41

*Jacobs v. Bank of Am. Corp.*,
    No. 1:15-cv-24585-UU, 2017 WL 2361944 (S.D. Fla. Apr. 27, 2017)................... 40

*Kostoski v. Steiner Transocean, Ltd.*,
   278 F.R.D. 695 (S.D. Fla. 2012) .................................................................................. 37-38

*Magluta v. Samples*,
   375 F.3d 1269 (11th Cir. 2004) ..................................................................................... 7

*MedPricer.com, Inc. v. Becton, Dixon & Co.*,
   240 F. Supp. 3d 263 (D. Conn. 2017),
   adhered to on reconsideration, No. 3:13-CV-1545 (MPS),
   2017 WL 1234102 (D. Conn. Apr. 3, 2017) ....................................................... 44-45

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ................................................................................................ 38, 39

*Smith v. First Nat'l Bank of Atlanta*,
   837 F.2d 1575 (11th Cir. 1988) .................................................................................. 37

*Talib v. Skyway Commc'ns Holding Corp.*,
   No. 805-cv-282T17TBM, 2005 WL 1610707 (M.D. Fla. July 7, 2005) ................... 8

*Tello v. Dean Witter Reynolds, Inc.*,
   494 F.3d 956 (11th Cir. 2007) ..................................................................................... 8

*United States ex rel. Atkins v. McInteer*,
   407 F.3d 1350  (11th Cir. 2006) .......................................................................... 11-12

*United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
   501 F.3d 493 (6th Cir. 2007) ..................................................................................... 19

*United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*,
   No. 98-3127, 1999 WL 618018 (6th Cir. Aug. 5, 1999) ........................................... 19

*United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
   No. 10-81634-CIV, 2014 WL 12284079 (S.D. Fla. June 23, 2014) ............................ 8

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
   86 F.3d 890 (9th Cir. 2017) ...................................................................................... 35

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
   290 F.3d 1301 (11th Cir. 2002) ...................................................................... 8, 9, 11

*United States ex rel. Cullins v. Astra, Inc.*,
   No. 09-60696-CIV, 2010 WL 625279 (S.D. Fla. Feb. 17, 2010) .............................. 15

*United States ex rel. Dye v. ATK Launch Systems, Inc.*,
   No. 1:06-CV-39 TS, 2008 WL 2074099 (D. Utah May 14, 2008) ........................... 22

*United States ex rel. Heater v. Holy Cross Hosp., Inc.*,
No. 03-62097-CIV-COHN/SNOW, 2006 WL 8432157 (S.D. Fla. Oct. 18, 2006),
amended on reconsideration in part based on issue of intra-corporate conspiracy doctrine,
2007 WL 9700731 (S.D. Fla. Jan. 3, 2007), citing *Corsello*, 428 F.3d at 1014. ..................... 42

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*,
498 F. Supp. 2d 25 (D.D.C. 2007) ...................................................................... 14

*United States ex rel. Kozhukh v. Constellation Tech. Corp.*,
64 F. Supp. 2d 1239 (M.D. Fla. 1999) ................................................................. 18

*United States ex rel. Lockhart v. Gen. Dynamics Corp.*,
529 F. Supp. 2d 1335 (N.D. Fla. 2007) ........................................................... 11, 12

*United States ex rel. Matheny v. Medco Health Sols., Inc.*,
671 F.3d 1217 (11th Cir. 2012) ....................................................................... 8, 19

*United States ex rel. Mei Ling v. City of Los Angeles*,
No. CV 11-974 PSG (JCX), 2018 WL 3814498 (C.D. Cal. July 25, 2018),
reconsideration denied, No. CV 11-974 PSG (JCX),
2018 WL 6177255 (C.D. Cal. Nov. 9, 2018) ........................................................ 35

*United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
276 F.3d 1032 (8th Cir. 2002) ......................................................................... 38

*United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*,
688 F.3d 410 (8th Cir. 2012) .......................................................................... 35

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
No. 09-22253-CIV, 2012 WL 2871264 (S.D. Fla. July 12, 2012) .................................... 10, 11

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
857 F.3d 1148 (11th Cir. 2017) ...................................................................... 38, 39

*United States ex rel. Schaengold v. Mem'l Health, Inc.*,
No. 4:11-cv-58, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ......................................... 14

*United States ex rel. Silingo v Wellpoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ....................................................................... 16, 19

*United States ex rel. Streck v. Bristol-Myers Squibb Co.*,
No. 13-7547, 2018 WL 6300578 (E.D. Pa. Nov. 29, 2018),
clarified on denial of reconsideration, 370 F. Supp. 3d 491 (E.D. Pa. 2019) ......................... 39

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) ........................................................................ 19

*United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*,
  433 F.3d 1349 (11th Cir. 2005) ...................................................................... 12, 19

*United States ex rel. White v. Gentiva Health Servs., Inc.*,
  No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223 (E.D. Tenn. June 25, 2014) ....................... 14

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ..................................................................................... 13

*United States v. Kaman Precision Prods.*,
  No. 6:09-cv-1911-Orl-18GJK, 2010 WL 11626636 (M.D. Fla. 2010) ........................... 10, 19

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  136 S. Ct. 1989 (2016) .............................................................................. 33, 34

*Vibe Micro, Inc. v. Shabanets*,
  878 F.3d 1291 (11th Cir. 2018) .......................................................................... 47

*Weiland v. Palm Beach Cty. Sheriff's Office*,
  792 F.3d 1313 (11th Cir. 2015) ....................................................................... 17, 18

*Williams v. Obstfeld*,
  314 F.3d 1270 (11th Cir. 2002) .......................................................................... 37

**Statutes**

31 U.S.C. § 3729(a)(1)(A) and (B) ........................................................................ 41

31 U.S.C. § 3729(a)(1)(A) ................................................................................ 41

31 U.S.C. § 3729(a)(1)(B) ............................................................................. 41, 42

31.U.S.C. § 3729(a)(1)(G) ................................................................................ 41

31 U.S.C. § 3729(b)(1)(B) ............................................................................ 37, 40

31 U.S.C. § 3729(b)(1) .................................................................................. 37

31 U.S.C. § 3729(b)(4) ................................................................................ 33-34

42 U.S.C. § 1320a-7b(b)(1) ............................................................................... 44

42 U.S.C. § 1320a-7b(g) ............................................................................... 46-47

Pub L. 111-5, 123 Stat. 115 ............................................................................... 3

**Rules**

Fed. R. Evid. 201 ....................................................................................... 15

Fed. R. Civ. P. 9(b) ........................................................................................................... passim

## Regulations

42 C.F.R. § 495.4 (Jan. 2014) ............................................................................................. 20, 23

42 C.F.R. § 495.6(d)-(e) (Jan. 2013) ........................................................................................ 28

45 C.F.R. § 170.102 (Aug. 2010) .............................................................................................. 24

45 C.F.R. § 170.102 (Oct. 14, 2014) .................................................................................... 21, 26

45 C.F.R. § 170.306(c) (Aug. 2010) .......................................................................................... 28

45 C.F.R. § 170.314 (Oct. 2012) ................................................................................................. 3

45 C.F.R. § 170.314(a)(5)-(7) (Oct. 2014) ................................................................................. 25

45 C.F.R. § 170.314(a)(8) (Oct. 2012) ....................................................................................... 28

45 C.F.R. § 170.314(b)(3) (Oct. 2012) ......................................................................................... 6

45 C.F.R. § 170.314(b)(4) (Oct. 2012) ......................................................................................... 5

45 C.F.R. § 170.314(d)(1)-(6) (Oct. 2012) ................................................................................. 32

45 C.F.R. § 170.314(d)(2)(ii) (Oct. 2012) .................................................................................. 33

75 Fed. Reg. 44314-01 (July 28, 2010)
   (to be codified at 42 C.F.R. pts. 412, 413, 422 and 495) ............................................. 30, 34, 44

77 Fed. Reg. 53968 (Sept. 4, 2012)
   (to be codified at 42 C.F.R. pts. 412, 413 and 495) ................................................................ 30

77 Fed. Reg. 54163-01 (Sept. 4, 2012) ................................................................................... 3, 20

81 Fed. Reg. 72404 (Oct. 19, 2016) .......................................................................................... 23

Plaintiffs/Relators Derek Lewis ("Relator Lewis") and Joey Neiman ("Relator Neiman") (collectively "Plaintiffs" or "Relators") submit this consolidated response in opposition to the defendants' motions to dismiss[1] the Relators' First Amended Complaint ("FAC") [ECF No. 123].[2]

## INTRODUCTION

This *qui tam* case alleges that Defendants Medhost and CHS caused Medicare to pay hundreds of millions of dollars in incentive payments for implementation of electronic health record ("EHR") systems that were not eligible for federal subsidies. The FAC also alleges similar violations by CHS in seeking federal incentive payments for use of a home-grown EHR system ("Pulse"), which lacked required functions and safety features.

Defendants raise objections to the overall theory of the case as well as the details provided to allege fraud with particularity. The theory of the case is simple: the CHS Entities presented, and Medhost caused to be presented, claims for federal subsidy payments under the Medicare "Meaningful Use" incentive program knowing that the EHR software systems being used did not meet mandatory requirements for the federal subsidy program. Significant problems with the software—problems that are material to federal payments—include failure to integrate certain required electronic information about a patient across the patient's entire hospital stay from admission to discharge and failures with electronic ordering of medications within the

---

[1] Medhost, Inc. ("Medhost") [ECF No. 129] (hereinafter "Medhost Mem."); CHSPSC, LLC ("CHSPSC") [ECF No. 132] (hereinafter "CHSPSC Mem."); Community Health Systems, Inc. ("CHSI") [ECF No. 134] (hereinafter "CHSI Mem."); and the group of hospital defendants identified in ECF No. 133, and its Appendix A, as the "Hospital Defendants" (hereinafter "Hospital Mem.") (CHSPSC, CHSI and the Hospital Defendants are collectively referred to as "CHS" or the "CHS Entities" and collectively with Medhost, the "Defendants").

[2] On January 31, 2018, Relators filed their original Complaint. [ECF No. 1.] On March 12, 2019, the Government filed its Notice Of The United States That It Is Not Intervening At This Time, indicating that its "investigation has not been completed . . ." [ECF No. 20.] On July 26, 2019, Relators filed the FAC. [ECF No. 123.]

hospital and at discharge. These failures are material to payment under the federal subsidy program and, if the Government knew the truth, would warrant denial or recoupment of subsidy payments.

The allegations meet the additional requirement to plead fraud with particularity under Federal Rule of Civil Procedure 9(b). FAC Exhibit B identifies each false claim by each hospital and includes an explanation of what is false, when the false claim was made, and the amount paid for the false claim (dollars listed). As far as pleading "who" was involved with fraudulent conduct, Relators plead each hospital that submitted the false claims and the name of the positions of those at Medhost and CHS who were aware that the claims were false.

Defendants' additional arguments do not merit the FAC's dismissal or even amendment. Relators do not allege mere technical "glitches" and "programming bugs" as Defendants argue. The EHR systems' alleged deficiencies precluded the Medhost software from enabling users to perform functions required by law to claim federal subsidies, including essential hospital functions such as creating medication orders with properly calculated doses, maintaining a record of a patient's medication list for the duration of their hospital stay, and checking medication orders for contraindications based on a patient's medication and allergy history. These failures were well-known by both CHS and Medhost employees and managers but, until recently, neither Medhost nor not any of its hospital customers had disclosed significant non-conformities with the software.[3]

The allegations state a claim under the False Claims Act and plead fraud with sufficient particularity for Defendants to respond. The motions to dismiss should be denied.

---

[3] On April 29, 2019, Medhost self-disclosed that "Developer self identified that RxNorm codes are not being transmitted in the electronic prescription." Certified Health IT Product List, available at https://chpl.healthit.gov/#/product/9671(last visited October 23, 2019).

## FACTS ASSUMED TO BE TRUE

I.    **THE HITECH ACT CREATED A MULTI-BILLION DOLLAR MARKET FOR FEDERAL INCENTIVE PAYMENTS.**

The American Reinvestment & Recovery Act (ARRA), Pub L. 111-5, 123 Stat. 115, enacted in February 2009, included many measures to modernize our nation's infrastructure including the "Health Information Technology for Economic and Clinical Health ("HITECH") Act," which was intended "to improve health care quality, safety and efficiency through the promotion of HIT and electronic health information technology exchange." 77 Fed. Reg. 54163-01, 54165 (Sept. 4, 2012). The HITECH Act established the Office of the National Coordinator for Health Information Technology ("ONC") to, among other things, develop criteria to ensure that EHR systems would: (1) maintain patient health information in structured data, (2) require electronic ordering of labs, medication and radiology; (3) protect patient safety through drug-drug and drug-allergy interaction checks; (4) implement successive steps toward data portability and access to information for patients; and (5) protect patient health information through audit and security. 45 C.F.R. § 170.314 (Oct. 2012). The HITECH Act also established the Medicare and Medicaid Incentive Programs for Meaningful Use of Certified Electronic Health Record Technology to incentivize hospitals and providers to use certified EHR technologies ("CEHRT") "in a meaningful way" as defined by federal law. As of October 2018, the Centers for Medicare and Medicaid Services ("CMS") had disbursed over $38 billion dollars to subsidize purchase and use of CEHRT in hospitals and physician practices subject to required attestation that the hospital or provider has used the technology to perform required functions. FAC ¶¶ 7, 56-60, 98-101, 106-108, 132, 145-150. Since the first set of HITECH regulations promulgated in 2010, the purpose of the technical and performance standards has been to improve clinical practice and reduce medical error as well as improve efficiency.

## II.     MEDHOST FALSELY CERTIFIED ITS EHR SOFTWARE, WHICH FAILED TO MEET MULTIPLE REQUIREMENTS FOR CERTIFICATION.

Medhost's CEHRT, particularly when implemented at the CHS Entities' facilities, was substandard and dangerous, not merely "buggy," because many of the software's required functions could not be performed safely or even at all. FAC ¶¶ 113-114, 124, 128-130, 138-139, 157, 159, 162, 167, 173, 182. Medhost knew that its software failed to provide required functionality and misrepresented its software's ability to regularly perform functions required for the software to be eligible for certification, including that the software perform required functions safely and reliably. FAC ¶¶ 9-11, 73-75.

### A.     Medhost's EDIS And Enterprise Software Could Not Integrate Patient Information Electronically Over A Hospital Stay As Required For Meaningful Use Payments.

Starting in 2011, EHR vendors marketing EHR systems for hospitals, and the hospitals themselves, were on notice that to receive Meaningful Use incentive payments, the hospital must attest that certain clinical information about patients was maintained electronically from admission, including admission through the emergency room to discharge of an inpatient. FAC ¶ 99. Since at least 2010, Medhost advertised to the public for many years that its EDIS product (its emergency department module) and its Enterprise software (its inpatient module) together comprised a "fully integrated product." FAC ¶ 81. Despite Medhost's promises, integration between the emergency departments and the inpatient settings in dozens of CHS hospitals did not occur. FAC ¶ 81. One major cause of this failure is that the modules use different drug codification schemes or vocabularies (one by Medi Span and one by First Databank). FAC ¶ 112-116. This was not a software bug subject to a quick fix, but a decision not to use unifying languages between the two modules that affected integration of patient information, ordering of drugs, and checking for drug allergy and drug-drug interactions.

**B.    Medhost Falsely Certified That Its Software Could Perform Drug-Drug And Drug-Allergy Checks On Medication Orders.**

The Medhost CEHRT modules also lacked required functionalities to check all medication orders for drug-drug and drug-allergy interactions, which require that it automatically and electronically indicate to the user, prior to completing and acting upon the medication order, any drug-drug and drug-allergy contraindications based on the patient's medication list and medication allergy list. FAC ¶ 104. The EHR must perform the drug interaction checks accurately, reliably, and safely. Medhost's EDIS and Enterprise software did not meet this requirement. *Id*. This essentially removed one of the most important safety functions of the CPOE for many medications and should have prevented attestation for Meaningful Use. FAC ¶¶ 55, 57, 105-108, 114-119, 121, 127, 145-152, 154, 157, 159, 162, 167, 171, 173, 182. Due to this limitation and others, many of the providers who use Medhost's EHR regard it as substandard to other EHR systems. FAC ¶ 119.

**C.    Medhost Falsely Certified Its Software Met The Requirements For Clinical Information Reconciliation.**

Clinical Information Reconciliation is the process of creating a complete and accurate list of a patient's current medications and comparing the list to those in the patient record or medication orders. *See* 45 C.F.R. § 170.314(b)(4) (Oct. 2012); *see also* FAC ¶ 130-132. Clinical Information Reconciliation should be done at every transition of care (like being transferred from a surgery unit to a general care unit), in which a new medication is ordered or an existing medication order is rewritten and must be done to avoid medication errors. FAC ¶ 133. Medhost's Clinical Information Reconciliation software module is called "ClinRec." FAC ¶ 135. There are specific measurements for Meaningful Use compliance. FAC ¶¶ 55-57. Hospitals that attested could not meet measures with ClinRec because it could not accurately and automatically update the medicine lists. FAC ¶¶ 130, 136-141. This posed serious health risks,

and manual workarounds were created since the technology could not function. FAC ¶¶ 137, 138.

### D. Medhost Falsely Certified Its Software Met E-Prescribing Requirements.

Medhost Enterprise did not enable users to create and transmit electronic prescriptions in accordance with E-Prescribing requirements to "electronically create prescriptions . . . for electronic transmission in accordance with two standards: NCPDP Script Version 10.6 and RX Norm." 45 C.F.R. § 170.314(b)(3) (Oct. 2012); *see also* FAC ¶ 240. Yet beginning on June 13, 2013, Medhost sought and received certification of multiple versions of Enterprise for the e-prescribing function. FAC ¶ 241.

## III. CHS FALSELY ATTESTED TO MEANINGFUL USE OF MEDHOST SOFTWARE TO CLAIM $385 MILLION IN FEDERAL SUBSIDIES.

Medhost and CHS were both aware of the functional limitations with the Medhost EHR technology throughout 2013, 2014 and 2015. FAC ¶ 19. Nonetheless, the CHS Entities undertook a company-wide effort at the corporate level to implement CEHRT in its hospitals with the goal of obtaining $385 million in Meaningful Use incentive payments even if they were not entitled to payment. FAC ¶¶ 2, 12, 14, 17, 19, 21, 29, 76, 85.

## IV. CHS CORPORATE FORCED THE FLAWED MEDHOST SOFTWARE ONTO ITS HOSPITALS.

CHS's decision to use Medhost's software at certain of its hospitals was made at the CHS corporate level, not the hospital level. Relators allege the specific CHS executives responsible for implementation of Medhost software and aware of its problems, as well as those involved with software implementation, deployment, and attestation within CHS's corporate-level clinical operations and the IT departments. FAC ¶¶ 86-89, 233, 259. Throughout 2014 and 2015, CHS employees discovered that required functions were missing or broken in Medhost's software, and regularly communicated those failures to Medhost. FAC ¶ 88-92. CHS issued

regular advisory memoranda to the hospitals, warning of serious and unresolved problems with the Medhost EHR modules and instructing CHS hospitals to implement additional safety checks, often from CHS Chief Medical Information Officer Anwar Hussein as well as CHS Vice President and Chief Nursing Officer Pam Rudisill. *Id.*

## V. CHS'S PULSE SOFTWARE IMPLEMENTED AT THE CHS-HMA HOSPITALS COULD NOT EXCHANGE NECESSARY DATA BETWEEN HOSPITAL UNITS.

CHS also knowingly misrepresented its eligibility for Meaningful Use incentive payments for sixty hospitals that CHS acquired through a merger with Health Management Associates ("HMA"). FAC ¶ 22. These sixty hospitals used a modular EHR technology known as PULSE, which HMA had developed itself. *Id.* The PULSE EHR modules at these sixty hospitals could not transfer data electronically to the other CHS proprietary and Medhost EHR modules used in the hospital, as was necessary to maintain a patient's problem list, allergy list, and medication list throughout the patient's entire hospitalization. FAC ¶¶ 22, 23, 78, 260-264. CHS knowingly misrepresented to the Government that the CHS hospitals using PULSE met all required Meaningful Use objectives and measures and were eligible for incentive payments. *Id.*

## LEGAL STANDARD

In reviewing a motion to dismiss, courts "accept the facts of the complaint as true and view them in the light most favorable to the nonmoving party." *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004). Further, "we accept as true the facts stated in the complaint and all reasonable inferences therefrom." *Jackson v. Okaloosa Cty., Fla.,* 21 F.3d 1531, 1534 (11th Cir. 1994). "Dismissal pursuant to Rule 12(b)(6) is not appropriate unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Magluta*, 375 F.3d at 1273 (internal quotations omitted). The allegations need only "be enough to raise a right to relief above the speculative level" such that a claim to

relief "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "[T]he issue is not whether the plaintiff will ultimately emerge victorious, but whether the claimant is entitled to offer evidence to support the claims." *Talib v. Skyway Commc'ns Holding Corp.*, No. 805-cv-282T17TBM, 2005 WL 1610707, at *3 (M.D. Fla. July 7, 2005) (denying defendants' motion to dismiss).

## ARGUMENT

## VI.   RELATORS SUFFICIENTLY ALLEGE THAT CHS SUBMITTED, AND MEDHOST CAUSED TO BE SUBMITTED, FALSE CLAIMS TO THE GOVERNMENT.

### A.   Relators' Allegations Are Sufficient To Satisfy Rule 9(b).

A FCA complaint must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002). However, the Eleventh Circuit has cautioned that "[t]he application of Rule 9(b) . . . must not abrogate the concept of notice pleading." *Tello v. Dean Witter Reynolds, Inc.*, 494 F.3d 956, 972 (11th Cir. 2007). Ultimately, the purpose underlying the Rule 9(b) requirement is to "alert[ ] defendants to the precise misconduct with which they are charged and protect[ ] defendants against spurious charges." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (quotations omitted). To satisfy Rule 9(b), a FCA complaint must detail the who, what, when, where and how of the fraud. *United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 10-81634-CIV, 2014 WL 12284079, at *1 (S.D. Fla. June 23, 2014) (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)).

      1.     *Relators Identified The Who, What, When, Where And How Of The False Claims.*

Medhost, CHSI, CHS, and Defendant Hospitals contend that Relators failed to identify with particularity the CHS Meaningful Use attestations that constitute false claims submitted to the Government. Medhost Mem., ECF No. 129, at 9; CHSPSC Mem., ECF No. 132, at 16-19; CHSI Mem., ECF No. 134, at 11; Hospital Mem., ECF No. 133, at 6, 10-15. Relying on *Clausen*, *Corsello*, and *Hopper v. Solvay Pharm.*, 588 F.3d 1318, 1326 (11th Cir. 2009), Defendants assert that FAC Exhibit B does nothing more than list a five-year period of hospital attestations without identifying which attestations were false, which criteria was falsely attested to, and how the attestations were false. This is not true.

      a)     *Relators Have Properly Alleged That False Claims Were Submitted To The Government.*

As a threshold matter, Relators allege that "[e]very claim for payment submitted to the Government for incentive payments for use of EHR software that does not [meet] the requirements for Certified EHR Technology or Meaningful Use requirements is a false or fraudulent claim in violation of the FCA." FAC ¶ 292. Relators further allege that "CHS represented to the Government that dozens of its hospitals met the objectives and measures for Meaningful Use of certified EHR technology based on their use of Medhost's software. Based on those representations, CHS received over $385 million in Meaningful Use incentive payments . . . ." FAC ¶ 76. Exhibit B then: (1) identifies each CHS hospital that claimed Meaningful Use subsidies by attesting to Meaningful Use based on relevant Medhost or PULSE software; (2) the date of each claim; (3) the relevant certification criteria the hospital attested to meeting for each claim; and (4) the amount the Government paid the hospital from the claim.

      For example, the FAC alleges that despite certifying to Drummond that it could perform these operations reliably and safely, Medhost's EHR was "incapable of recording

medication orders" and "was ineligible for certification for CPOE." FAC ¶ 154. The FAC identifies the specific EHR software at issue, including EDIS v4.4 SR2, which Medhost certified on March 20, 2014. FAC ¶¶ 108, 150. In the first entry on page one of Exhibit B, the FAC identifies: (1) that Alliance Health Partners, LLC, d/b/a Merit Health Batesville ("Merit Health") (the "who" and "where"); (2) attested to Meaningful Use criteria for CPOE-Med using Medhost EDIS v4.4 SR2 CHP-022199 (the "what" and "how"); (3) on February 4, 2016 (the "when"), nearly two years after Medhost had certified the software. Exhibit B further shows that Merit Health's single attestation yielded a payment of $475,027.76 from the Government.

     Similar details provided for this sample false claim are repeated throughout the FAC and Exhibit B for scores of additional false claims. Thus, Relators provide more than sufficient detail in the FAC for Defendants to be put on notice as to who, what, when, where, and how they caused a false claim to be submitted to the Government. In *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, the defendants similarly argued that an exhibit identifying revenues that the defendants had received from Medicare and Medicaid was "not sufficiently particular" because it did not identify "*who* at [defendant] allegedly submitted a claim for payment, does not state *where* the claim was submitted, and does not specify *what* the claim said." No. 09-22253-CIV, 2012 WL 2871264, at **5–6 (S.D. Fla. July 12, 2012) (emphasis added). The district court rejected the argument, finding "the allegations that [Defendant] was paid by Medicare and Medicaid together with the specific information provided in [Defendant's] public filings and Exhibit F do not require the Court to make unwarranted inferences about the submission of claims." *Id*. at *6. Thus, the court concluded that the relator sufficiently alleged that claims were presented to the Government. *See also United States v. Kaman Precision Prods.*, No. 6:09-cv-1911-Orl-18GJK, 2010 WL 11626636, at *4 (M.D. Fla. 2010). As in

*Osheroff*, Relators submitted an exhibit to the FAC, Exhibit B, which combines publicly available data regarding Governmental payments for Meaningful Use along with the dates of attestation, the CHS facility at issue, the specific Meaningful Use function CHS attested to, and which Medhost EHR technology was used as the basis for the attestation.

Indeed, the FAC includes far more detail regarding Medhost and the CHS Entities' involvement in presenting false claims to the Government than the relator in *Corsello*, on which Medhost relies (Medhost Mem., ECF No. 129, at 8), where the district court had dismissed a complaint that included only vague allegations that improper practices took place "everywhere [the defendant] does business" and failed to provide any factual basis to conclude fraudulent claims were ever actually submitted to the government in violation of the FCA. *Corsello*, 428 F.3d at 1013. Medhost's reliance on *Clausen* is similarly misplaced. In *Clausen*, the district court dismissed the relator's case because he "merely offers conclusory statements, and does not adequately allege when—or even if—the schemes were brought to fruition." 290 F.3d at 1312. The payment records in Exhibit B alone foreclose such a result here.

### b)   *Relators' Claims Are Reliable.*

Despite the detailed and thorough allegations in the FAC, Medhost argues that "Relators were not in a position that would have given them first-hand knowledge of crucial details, [and thus] their attempt to invent a fraudulent scheme falls well short of what Rule 9(b) requires." Medhost Mem., ECF 129 at 10, 11. Not so. In *United States ex rel. Lockhart v. Gen. Dynamics Corp.*, the relator brought a FCA claim against General Dynamics alleging that it failed to perform required quality control tests on ammunition propellant as mandated by governing contracts with the military. 529 F. Supp. 2d 1335, 1336 (N.D. Fla. 2007). In analyzing the sufficiency of the complaint under Rule 9(b), the court reviewed controlling Eleventh Circuit case law, including *Corsello, Clausen*, and *United States ex rel. Atkins v. McInteer*, 407 F.3d

1350 (11th Cir. 2006), finding that "[t]he most critical distinction in these cases may be the sufficiency of the complaint's allegation of a reliable basis for the relator's assertion that fraud has in fact occurred. In the cases in which the complaint was held deficient, the complaint left open the possibility that the relator was proceeding based on conjecture—that he did not have a reliable basis for the allegation of fraud." *Lockhart*, 529 F. Supp. 2d at 1341. The court then found the complaint sufficiently reliable because the relator was actively engaged in the process of manufacturing the propellant for the military contract, and knew required tests were not done because he would have been the person to perform them. *Id.*

As in *Lockhart*, Relators' claims are reliable, not mere conjecture, due to Relators' direct and personal involvement in the implementation of CHS software and their resulting understanding of the systemic flaws in the EHR technology that demonstrate why it was incapable of meeting the Government's functional requirements for certified software, and the attestation requirements for Meaningful Use. The FAC is replete with allegations based on the personal knowledge of the Relators, who were involved with the implementation of Medhost's EHR technology at CHS hospitals as CHS IT professionals and either witnessed, or were involved in discussions about, the failures of Medhost's EHR technology to meet the certification standards causing CHS to not be able to implement the EHR technology to meet Government attestation requirements. *See* FAC ¶¶ 93, 201, 208, 210, 233, 235, 244, 254, 276, 286. The reliability of Relators' claims directly rebuts the Defendants' contention that the FAC is inappropriately premised on pure conjecture. *See also United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) ("This is not a case like [*Clausen*], in which a 'corporate outsider' made speculative assertions that claims 'must have been submitted, were likely submitted or should have been submitted to the Government'").

-12-

c) *Relators Have Identified Medhost's Fraudulent Conduct.*

Finally, the FAC thoroughly details how Medhost's EHR modules, which were the basis of CHS's attestations of having performed CPOE, drug-allergy and drug-drug interaction checking, CDS, protected health information safeguards, and clinical reconciliation, were not capable and did not meet the functional requirements for certification. *See* Section VI(B), *infra*. Medhost knew that the technology did not enable users to perform the required functions but nonetheless represented to Drummond that its EHR technology was capable of performing those functions. FAC ¶¶ 11, 50, 95, 290. Relators also provided the statutory requirements for certification, the dates that they were certified, and the versions of Medhost's EHR technology that was used by CHS to attest. FAC ¶¶ 55, 57, 107-110, 131, 149-152, 204, 241. Relators further allege with detail the reasons why each listed certification was false. FAC ¶¶ 111-129, 136-142, 155-156, 157-159, 160-164, 165-170, 171-173, 205-215, 221-229, 230-238, 243-247.

d) *The CHS Entities Engaged In The Same Fraudulent Acts.*

CHSI, CHSPSC, and Hospital Defendants assert that the FAC is deficient because it lacks sufficient detail regarding who participated in the fraud and/or that Relators improperly group CHSI, CHSPSC, and Hospital Defendants together in the pleadings. These arguments center on the "who" portion of Rule 9(b) and as such are addressed together.[4]

i. *Resolving Corporate Veil Arguments Is Inappropriate At The Motion To Dismiss Stage.*

First, CHSI rolls out a blame-shifting argument that a parent corporation is not liable for the acts of its subsidiary, relying on *United States v. Bestfoods*, 524 U.S. 51 (1998), and

---

[4] CHSPSC styles the purported flaw in the FAC as a Rule 9(b) "who" issue, while CHSI and the Hospital Defendants each style the same flaw as a "shotgun pleading" issue. CHSPSC Mem., ECF No. 134, at 17-18; CHSI Mem., ECF No. 132, at 9-11; Hospital Mem., ECF No. 133, at 6-9.

its progeny. CHSI Mem., ECF No. 134, at 6-8. Any inquiry into the relative culpability of CHSI, as opposed to its affiliates, is simply not appropriate at the motion to dismiss stage. While a corporate parent can be held liable for the actions of its subsidiary under theories of agency, control, or alter-ego/piercing, the inquiry is fact specific and should not be resolved on a motion to dismiss. Rule 9(b) does not apply to the scenario where the parent company and its subsidiaries all participated in a fraud. *See United States ex rel. White v. Gentiva Health Servs., Inc.*, No. 3:10-CV-394-PLR-CCS, 2014 WL 2893223, at *16 (E.D. Tenn. June 25, 2014). Indeed, even at the summary judgment stage, evidence of a corporate parent's direct involvement in the subsidiary's FCA violation need not be "overwhelming"; there need only be "some evidence" that "may not be strong," but that forms part of a "larger mosaic that creates genuine issues of material fact on this point." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 63 (D.D.C. 2007). Corporate form cannot shield the parent from liability if the parent "itself participated in submitting a false claim or causing one to be submitted, in concert with [the subsidiary] . . . ." *Id.* Relators' direct allegations regarding the CHS Entities are more than enough to defeat CHSI's motion to dismiss. *See United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 6908856, at *14 (S.D. Ga. Dec. 8, 2014); *see also White*, 2014 WL 2893223, at *16.

Relators contend that CHS was a Medhost corporate account, CHSI corporate selected which of its hospitals would receive Medhost software products as opposed to other vendors' products, CHSI corporate employees were responsible for the implementation of the Medhost software at the hospital level, and CHSI corporate employees then caused the hospitals to each individually attest to Meaningful Use to the Government so the CHS Entities could receive $385 million in incentive payments. *See* FAC ¶¶ 85-92, 232-233, 288. Indeed, in its 2012

10-K,[5] CHSI admitted that it caused "our hospital facilities" to implement EHR technology and that "[w]e anticipate recognizing incentive reimbursement" as "we are able to implement the certified EHR technology . . ." Cmty. Health Sys., Inc., Annual Report (Form 10-K), 50 (February 27, 2013). CHS may contend that CHSI's 10-K cannot be used to establish *which* corporate entity/entities implemented the EHR technology, as the royal "we" is used throughout the report to denote CHSI and its subsidiaries, without attributing activity to any particular entity. This only proves the point: Relators allege that the scheme was controlled at the corporate level. Indeed, the FAC allegations go well beyond pointing to CHSI's mere "awareness" of wrongdoing, but alleges that at the corporate level, CHS devised and implemented (and according to its 10-K, funded), the fraudulent scheme to submit Meaningful Use attestations to receive incentive reimbursement payments related to Medicare or Medicaid incentives.

Finally, there is no basis for CHSI's contention, premised on *United States ex rel. Cullins v. Astra, Inc*., No. 09-60696-CIV, 2010 WL 625279, at *3 (S.D. Fla. Feb. 17, 2010), that Relators "failed to allege that CHSI caused any hospital to submit a false claim to the government." *See* CHSI Mem., ECF No. 134, at 14. CHSI's reliance on *Astra* is surprising, as it is easily distinguishable. In *Astra*, the court found the false claim was submitted to the government *before* the defendant was alleged to have taken *any* action. Thus, the defendant could not have *caused* the filing of the false claim. *Astra*, 2010 WL 625279 at *3. Of course, here, Relators allege that the attestations constitute false claims, and they were only filed after CHSI devised to obtain as much EHR incentive compensation as it could from the Government,

---

[5] In resolving a motion to dismiss, this Court may take "judicial notice of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Jacobs v. Bank of Am. Corp.*, No. 1:15-cv-24585-UU, 2017 WL 2361943, at *4 (S.D. Fla. Mar. 21, 2017) (citing Fed. R. Evid. 201; *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir. 1999)). Accordingly, judicial notice of CHSI's 2012 10-K report is appropriate.

selected Medhost software at the corporate level, forced certain of its hospitals to use Medhost software even when objections were raised, took responsibility for implementing the flawed Medhost software at the hospitals, and then finally told the hospitals when they could attest to Meaningful Use by using the very same Medhost software. CHSI can hardly claim that it did *nothing* before the Hospital Defendants submitted the Meaningful Use attestations to the Government for reimbursement based on their implementation of the fundamentally flawed Medhost software.

     ii. *Relators Have Properly Pleaded That CHSI, The Hospital Defendants, And CHSPSC Engaged In A Wheel Conspiracy-Like Fraud.*

   Second, there is no merit to CHSI's and Hospital Defendants claims that the FAC is deficient because Relators merely allege that "everyone did everything." CHSI Mem., ECF No. 134, at 10; Hospital Mem., ECF No. 133, at 7. Their reliance on *United States ex rel. Silingo v Wellpoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018), is baffling. There, the appellate court found that when a relator alleged a "wheel conspiracy-like fraud", as Relators do here, then any "parallel actions of the 'spokes' can be addressed by collective allegations." *Id.* at 678. When each of the spokes act in the same way, as the Hospital Defendants are alleged to have done here, then they "miss the mark when they implore us to consider that they are 'unrelated, dissimilar defendants with no relevant business connections to one another. . . ." *Id*. Instead, when the spokes have "largely 'alleged to have engaged in precisely the same conduct,' then there was no reason (and no way) for [the relator] to differentiate among those allegations that are common to the group." *Id*. In *Silingo*, the Ninth Circuit reversed the dismissal of the complaint, finding that the relator's charges of false claims should not have been dismissed due to her use of group allegations. *Id*. *Silingo* is squarely on point, fully supportive of Relators' allegations in this case, and should serve as the basis to deny each of the CHS Entities' motions to dismiss.

The Court should likewise reject the various CHS Entities' overlapping contentions that the FAC is a "shotgun pleading" that violates Rule 8, particularly when none of the motions to dismiss are brought under Rule 8. *See* CHSI Mem., ECF No. 134, at 2, 9-11 (citing *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015)); Hospital Mem., ECF No. 133, at 7-8 (same). Relying on *Weiland*, CHSPSC contends that it is "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." CHSPSC Mem., ECF No. 132, at 25.

*Weiland* provides little cover for the CHS Entities. As *Weiland* makes clear, Rule 8 provides an exceptionally low pleading hurdle. 792 F.3d at 1325 (finding that "[a] dismissal under Rules 8(a)2 and 10(b) is appropriate where it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.") (emphasis in original) (internal quotation and citation omitted). Applying this lax standard, the Eleventh Circuit made the following finding that is equally applicable here: "whatever their faults, these two counts are informative enough to permit a court to readily determine if they state a claim upon which relief can be granted." *Id.* at 1326 (holding that "the district court abused its discretion when it dismissed [plaintiff's] count one and count three . . . on the grounds that those counts did not comply with Rule 8(a)(2) and 10(b)."). Likewise, after reviewing the FAC, this Court should conclude that the FAC is "informative enough" for this Court to find that Relators' counts state a claim upon which relief can be granted.

Moreover, the FAC sufficiently organizes a complex set of issues to put each Defendant on notice of the specific claim it faces. In *Weiland*, the Eleventh Circuit found the amended complaint's organization was sufficient to put the defendants on notice of the specific claims against them. *Id*. at 1326-27. There, the complaint's fact section was organized into three

subsections, each with headings and allegations that adequately put the defendants on notice of the specific claims against them and the factual allegations that supported those claims. *Id.* at 1325. As in *Weiland*, the FAC is broken into distinct subsections that provide detailed allegations as to the factual predicate for how the FCA was violated here.

     iii. *Relators Exceeded The Legal Standard In Identifying Individuals Involved In The Fraudulent Scheme.*

    Third, CHSPSC, CHSI, and Hospital Defendants each claim that Relators need to identify individuals who partook in the fraudulent scheme. *See* CHSPSC Mem., ECF No. 132, at 17; CHSI Mem., ECF No. 134, at 3, 12-14; Hospital Mem., ECF No. 133, at 9-10. More specifically, the Hospital Defendants cite *Corsello* and *United States ex rel. Kozhukh v. Constellation Tech. Corp.*, 64 F. Supp. 2d 1239 (M.D. Fla. 1999), for the proposition that Relators are required to identify the specific defendant employees who participated in the fraud. Hospital Mem., ECF No. 133, at 9. Neither case, however, stands for that proposition.[6]

    In *Corsello*, the Eleventh Circuit did not comment, or base its affirmance of the complaint's dismissal, on whether the relator alleged which employees participated in the fraud. In *Kozhukh*, the court rejected the FCA defendant's motion to dismiss in its entirety, holding that the relator had adequately pleaded the time, place, content and "parties participating" in a single-defendant fraud; the fact that relator provided names of individual participants was not deemed to be dispositive. The additional cases the Hospital Defendants cited in footnote six are not directly on point. Hospital Mem., ECF No. 133, at 9. The Sixth Circuit has held that the language

---

[6] To bolster their weak FCA authority, Hospital Defendants then cite two RICO cases, *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir. 2007) and *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997), that merely require a delineation among individual RICO defendants as to which part of an alleged RICO scheme each defendant was responsible for. Neither case requires such a delineation for non-party employees of RICO defendants, and neither has any import for claims brought under the FCA.

in *United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio*, No. 98-3127, 1999 WL 618018, at *2 (6th Cir. Aug. 5, 1999), is non-binding dicta. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 507 (6th Cir. 2007) ("[w]e refuse, however, to read *Branhan* as establishing a requirement that the identity of employees within a corporate defendant is a necessary element of a FCA violation.").

       *Bledsoe* is well-aligned with Eleventh Circuit precedent. "[T]he Eleventh Circuit has held that it is erroneous to focus solely on the certifying employee's knowledge." *Kaman Precision Prods.*, 2010 WL 11626636 at *5 (citing *Grand Union Co. v. United States*, 696 F.2d 888, 890-91 (11th Cir. 1983). Moreover, the Eleventh Circuit is "more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges . . . participation in the fraudulent conduct." *Matheny*, 671 F.3d at 1230 (citing *Walker*, 433 F.3d at 1360); *see also Hill v. Morehouse Med. Assocs., Inc.*, No. 02–14429, 2003 WL 22019936, at *3, *5 (11th Cir. Aug. 15, 2003).

       In any event, Relators in this case *have* alleged the identities of individual CHS participants in the fraud. *See* FAC ¶¶ 86-89, 91, 92, 137, 190, 199, 215, 228, 233, 245, 259, 276, 279, 280, 286-288. The fact that those individuals work primarily for the corporate CHS, not the Hospital Defendants, does not defeat Relators' claims against the Hospital Defendants who submitted the false claims and were merely "spokes" of the "wheel" of Medhost's and CHS's centralized fraud. *Silingo*, 904 F.3d at 677–78 (citing *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161 (9th Cir. 2016)). Thus, Relators have more than adequately pleaded their claim. If Relators discover more facts in discovery that further elaborate on CHS's corporate shell game, they can amend the pleadings to conform to the facts.

###### B.  Relators Have Alleged False Claims.

Medhost and the CHS Entities each argue that Relators have not alleged anything false about the CHS Entities' attestations. Medhost Mem., ECF No. 129, at 11-12; CHSPSC Mem., ECF No. 132, at 7-15; CHSI Mem., ECF No. 134, at 15 (incorporating CHSPSC's arguments); Hospital Mem., ECF No. 133, at 5 (same). Medhost claims that Relators fail to identify anything false about CHS's Meaningful Use attestation because: (1) the Hospital Defendants used Medhost's certified technology, and (2) Relators do not allege that the Hospital Defendants lied when attesting that they had met the Meaningful Use objectives and measures. Medhost Mem., ECF No. 129, at 11-12. Similarly, CHSPSC takes the position that each attesting hospital was "only required to attest that it *used* certified software" and that essentially nothing further was required of its hospitals, an argument that CHSI and the Hospital Defendants both incorporate in their respective memoranda of law.  *See* CHSPSC Mem., ECF No. 132, at 7-8.

Defendants are incorrect. To claim payment under the Meaningful Use program, an eligible hospital must attest that it "[u]sed certified EHR and specify the technology used."  A "certified EHR" is defined not only as software that has been "certified under the ONC Health IT Certification Program," but that also meets the definition of a "Base EHR" and has "been certified to the certification criteria that are necessary to be a Meaningful EHR User." *See* 42 C.F.R. § 495.4 (Jan. 2014) (defining CEHRT); *see also* 77 Fed. Reg. 54163-01 at 54164 ("In order to have EHR technology that meets the CEHRT definition . . . [Eligible Providers] must have EHR technology certified to the 2014 Edition EHR certification criteria *that meets the Base EHR definition* . . . .) (emphasis added). A "Base EHR" is an EHR that meets specific performance requirements, such as including "patient demographic and clinical health information, such as medical history and problem lists" and having the capacity "[t]o exchange electronic health information with, and integrate such information from other sources," "provide

clinical decision support," and "support physician order entry."  45 C.F.R. § 170.102 (Oct. 14, 2014).  In attesting to Meaningful Use, hospitals represent both that the software has been certified and that the software meets the requirements of a Base EHR, including maintaining problem lists, providing clinical decision support, and supporting CPOE.

Relators allege that Medhost misrepresented that its EHR was capable of performing functions required for the software to be eligible for certification. *See* FAC ¶¶ 75, 77. Relators allege that Medhost, by misrepresenting that its software met the requirements for certification, caused CHS and other healthcare providers to claim incentive payments from CMS for software that was ineligible for such payments. *See* FAC ¶ 75.  Relators further allege that had the Government known the software did not meet the requirements necessary for certification, it would not have paid CHS's and the providers' claims. FAC ¶¶ 75, 79. Consequently, the FAC properly alleges that Defendants made or caused false statements in their attestations, and submitted or caused the submission of false claims for Meaningful Use subsidies, based on the use of Medhost's software.

Because certified EHR technology entails more than bearing the stamp of ONC certification, Defendants' argument that "[n]othing in the Meaningful Use program required [users] to second-guess the ONC's certification of the software" is beside the point. *See, e.g.*, CHSPSC Mem., ECF No. 132, at 9. Even if a software developer has obtained ONC certification for its software, an Eligible Provider cannot attest to Meaningful Use based on software that is incapable of meeting the requirements of a Base EHR. The Court need not look any further than the Government's Complaint In Intervention in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS (D. Vt.), attached hereto as Exhibit 1, in which the

Government intervened, and ultimately settled a FCA claim, against another EHR vendor despite the fact that the vendor's EHR technology had been certified by a certifying body.

There is no merit to Medhost's argument that once an EHR technology passes a base-level test, even if by fraudulent means, hospitals can attest to Meaningful Use despite not being able to meaningfully use the software as the Government intended. Simply passing a certifying test is not sufficient to prevent a false claim when the product in question does not meet the Government's requirements. In *United States ex rel. Dye v. ATK Launch Systems, Inc.*, No. 1:06-CV-39 TS, 2008 WL 2074099 (D. Utah May 14, 2008), the defendant argued that it did not submit a false claim because the government did not allege that its product, a flare, failed to meet a specific certification test standard (in conformance with a safety test that measured the flare when dropped from ten feet at a specific "clocking orientation"). *Id.* at *3. The test assessed whether the flares were capable of meeting a safety requirement that they not ignite when dropped from ten feet. ATK argued in its motion to dismiss that so long as the flares passed the certification test, there could be no false claim even if the flares could explode if dropped from 10 feet at a slightly different "clocking orientation" than specified in the test. Wisely, ATK abandoned that position at oral argument, conceding that the flares were too sensitive to meet the functional purpose of the certification test. *Id.* at *2.

As in *ATK*, Medhost, by seeking certification and claiming certification, made a claim that its EHR technology could safely and reliably meet the standards for CEHRT. FAC ¶¶ 50, 75, 95, 111, 136, 154, 173, 180. Relators allege, with substantial detail, all of the ways that Medhost's EHR technology did not perform certain functions for which they were certified. Because Medhost's software did not meet the requirements that were the subject to the certification tests, the mere fact that Medhost's software was certified by Drummond does not

preclude Medhost from being held liable for causing a false claim to be submitted to the Government.

CHSPSC is similarly wrong to contend that it could attest to Meaningful Use without regard to the "accuracy or reliability" of its software. CHSPSC Mem., ECF No. 132, at 11. To the contrary, it has been a requirement from the beginning of the HITECH Act that CEHRT be able to perform required specifications and capabilities, including those of a Base EHR, in an "accurate and reliable manner . . . including in a manner that does not contribute to serious risks to public health or safety or other outcomes inconsistent with the National Coordinator's responsibilities [under the statute]."  FAC ¶ 71 (quoting 81 Fed. Reg. 72404, 72411-12 (Oct. 19, 2016)). The FAC alleges that CHS knew its EHR software could not perform required specifications and capabilities in an accurate and reliable manner—indeed, CHS employees worried the software would kill patients FAC ¶ 278—but attested nonetheless that the software performed the specifications and capabilities of a Base EHR. Those attestations were false under the FCA.

CHSPSC also argues incorrectly that, "[o]nce software was certified, hospitals could rely on the certification as an 'assurance that the [software] will perform as described,' and as 'an indication of [its] capabilities and compliance with the certification criteria.' 76 Fed. Reg. at 1271/1, 1282/3." CHSPSC Mem., ECF No. 132, at 8. While ONC understandably viewed certification as a way to signal that software meets the requirements, ONC did not concede or even suggest that hospitals can rely on certification to the exclusion of CMS's additional requirements for attestation set forth in 42 C.F.R. § 495.4. Rather, ONC created a certification to set standards and promote confidence that the product would perform as described by the vendor

and meet quality standards for use in healthcare settings. Relators have alleged in detail the many ways that CHS did not meet the measures it attested to, as is further outlined below.

1.    *Defendants' "Interoperability" Argument Is Inapposite To Relators' Allegation That Defendants Used, And Caused To Be Used, EHR Modules That Could Not Combine To Meet The Requirements For Meaningful Use.*

Next, Defendants argue that their representations regarding Medhost's software, and their claims for payment based on that software, were not false because Relators have not alleged that the software failed to meet certification criteria. Common to each argument is the assertion that Relators' claims hinge on an "interoperability" requirement that Defendants believe does not exist. Medhost Mem., ECF No. 129, at 12-13; CHSPSC Mem., ECF No. 132, at 9; CHSI Mem., ECF No. 134, at 15 (incorporating CHSPSC's arguments); Hospital Mem., ECF No. 133, at 5 (same).

Defendants are incorrect. Under Meaningful Use rules, hospitals could attest for payments by relying on a combination of certified EHR modules only if "the resultant combination also meets the requirements included in the definition of a qualified EHR." 45 C.F.R. § 170.102 (Aug. 2010); FAC ¶ 98. A qualified EHR (later renamed a "Base EHR") is an EHR that, among other things, "[i]ncludes patient demographic and clinical health information, such as medical history and problem lists" and "[h]as the capacity" "[t]o provide clinical decision support and "[t]o support physician order entry." 45 CFR § 170.102 (Aug. 2010).

Relators allege in the FAC that Medhost's two modules, EDIS and Enterprise— both of which were created by Medhost and were advertised to Medhost's customers as fully integrated with each other—did not integrate patient information as required to be eligible for Meaningful Use incentive payments. *See* FAC ¶¶ 81, 101-103. The FAC lays out multiple ways that Medhost's software modules were not capable of being used in a way that would meet the definition of a qualified EHR. For example, three core criteria for meeting the definition of a

qualified EHR were that the EHR must "[e]nable a user to electronically record, change, and access a patient's" problem list, active medication list, and active medication allergy list "[f]or the duration of an entire hospitalization." 45 C.F.R. § 170.314(a)(5)-(7) (Oct. 2014). *See* FAC ¶¶ 99, 130-142. Relators give many examples of specific instances of medications and allergies, in particular, not transferring between EDIS, which operated in hospitals' emergency rooms, and Enterprise, which operated in the hospitals' inpatient settings, when implemented at CHS Hospitals. *See* FAC ¶¶ 116-119, 120, 121-125.

The failure to integrate such clinical information about patients within a hospital stay prevented the combination of EDIS and Enterprise from meeting the requirements of a qualified EHR. Similarly, CHS's combination of PULSE with other EHR modules such as EDIS, PatientKeeper, and Horizon Meds Manager in ex-HMA hospitals did not meet the requirements of a qualified EHR because it could not integrate electronically required patient information between the inpatient setting using PULSE and other hospital units. FAC ¶¶ 260–64. Moreover, Relators allege that Medhost "knew, or had ample reason to know, that a hospital that deployed EDIS and Enterprise would use both systems to store information on patients who received services in the emergency department and were subsequently admitted to the hospital" and Medhost "knew that EDIS and Enterprise were not integrated." FAC ¶¶ 101, 102. Because EDIS and Enterprise could not work together in a way that would allow hospitals to truthfully attest that their EHR met the definition of a "qualified EHR," Medhost knowingly caused its customers to submit false attestations to receive Meaningful Use funds.

To the extent that Medhost contests Relators' factual position, the appropriate time to address such an issue would be at summary judgment or trial. Medhost's attacks on the merits of Relators' position does not show that Relators' actions were not pleaded appropriately.

The ONC "interoperability" regulations on which Defendants rely are inapposite. *See* Medhost Mem., ECF No. 129, at 12; CHSPSC Mem., ECF No. 132, at 9; CHSI Mem., ECF No. 134, at 15; Hospital Mem., ECF No. 133, at 5. The "interoperability" rules address transmission of patient information between EHR systems at different hospitals or other care systems, and are distinct from the requirements in 45 C.F.R. § 170.102 (Oct. 14, 2014) governing each attesting hospital that relies on multiple EHR modules. The FAC does not address interoperability requirements or suggest that Medhost's software modules were flawed because they were not compatible with software modules in use at other hospital systems. Rather, the FAC addresses the lack of integration of software modules within the *same* hospitals, which implicates core Meaningful Use measures as well as clinical care.

> 2. *Relators Allege That Medhost's Software Failed To Meet CPOE Requirements And That CHS Falsely Attested To This And Other Measures.*

> > a) *Medhost's Argument That There Is No Allegation That Its Software Failed To Meet CPOE Requirements Is Inapt.*

Medhost argues that ONC's standards for CPOE require that the software enable a user to electronically record, change, and access medication orders and that "[t]here is no allegation that MEDHOST's software failed this requirement." Medhost Mem., ECF No. 129, at 13. But the FAC, in fact, makes these specific allegations.

Relators allege that Medhost's EHR technology is incapable of recording medication orders in an accurate and reliable manner and that it is a requirement that certified EHRs be able to perform CPOE in an accurate and reliable manner. FAC ¶¶ 71, 154. Medhost argues that ONC's language stating that software must perform CPOE in an "accurate and reliable manner" only concerns the reliability of *certified* capabilities. Medhost contends that certain functions discussed in the FAC—such as weight-based dosing and physician favorites—

were not *certified* functions. However, Medhost acknowledges, as it must, that ONC views uncertified functionalities as relevant to the extent that they "interact with certified capabilities," which is precisely what Relators allege. Relators allege that Medhost had several applications that allowed users to record electronic medication orders, such as PhysDoc and ClinView. FAC ¶ 153. Within these applications, the ability to record a medication order was bundled together with features that purported to calculate weight-based doses, place an order immediately via a "send a dose now" option, record PRN or "as needed" medication orders, and create a list of "Physician's Favorites" for quickly ordering common medications, among other features. The FAC alleges that those features miscalculated doses, did not deliver orders in the time frame they were requested, failed to accurately record PRN medication orders, and failed to record medication orders altogether under some circumstances, among other problems. These flaws directly affected users' ability to record medication orders, and therefore interacted with and were part of the certified capability of CPOE. FAC ¶¶ 155, 157, 160, 165, 171, 174.

   b)   *Meaningful Use Payments are Contingent on the Use of Eligible Software, Not Solely Meeting Required Use Percentages.*

Medhost and CHSPSC argue incorrectly that because each of the Hospital Defendants attested that they met the correct percentage-measures for the measures they attested to, CHS necessarily satisfied Meaningful Use. *See* Medhost Mem., ECF No. 129, at 14; CHSPSC Mem., ECF No. 132, at 10-12; *see also* CHSI Mem., ECF No. 134, at 15; Hospital Mem., ECF No. 133, at 5. This argument falls flat. A hospital cannot go through the motions of recording electronic orders in its EHR, for example, when the hospital knows that those orders will, in all likelihood, be recorded incorrectly, and then claim that because they "recorded" orders 60% of the time, they meaningfully used their EHR. The purpose of the objectives and measures are thwarted when the underlying function a hospital is attesting to does not work. Such an approach

does not satisfy federal subsidy requirements, and Relators' allegations sufficiently plead facts to support this position.

3.   *Relators Allege That Medhost Falsely Certified Its CDS Function And That CHS Falsely Attested To CDS Relying On Medhost's Flawed Software.*

Defendants' assertion that problems with the CDS application cannot state a claim for submission of false claims is wrong. *See* Medhost Mem., ECF No. 129, at 14–15; CHSI Mem., ECF No. 134, at 15; Hospital Mem., ECF No. 133, at 5. To attest to Meaningful Use, a user must demonstrate the implementation of "automated, electronic clinical decision support rules . . . based on the data elements included in: problem list; medication list; demographics; and laboratory test results."  45 C.F.R. § 170.306(c) (Aug. 2010); 45 C.F.R. § 170.314(a)(8) (Oct. 2012); 42 C.F.R. § 495.6(d)-(e) (Jan. 2013). CMS has explained that CDS "*builds upon the foundation of an EHR* to provide persons involved in care processes with general and *person-specific information*, intelligently filtered and organized, at appropriate times, to enhance health and health care."[7] (Emphasis added.) Under this definition, an Eligible Provider does not satisfy the CDS measure unless the CDS uses person-specific data from the base EHR—*e.g.,* a patient's problem list, allergy list, and medication list.

The FAC sufficiently alleges that Defendants' conduct resulted in false claims for violation of CDS requirements for Meaningful Use subsidies. Specifically, with respect to Medhost, Relators allege that: (1) "the CDS rules in Enterprise had completely stopped functioning around August 14, 2014"; (2) that the same issue occurred in October 2014, November 2014, and December 2014; and (3) that Medhost knew its CDS functionality did not work, yet continued to certify and re-certify its software regardless of known flaws. FAC ¶¶ 208,

---

[7] https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/Stage2_EPCore_6_ClinicalDecisionSupport.pdf (emphasis added).

212-215. The allegation is that Medhost's CDS function did not work *at all* and accordingly that Medhost's software could not perform the functions to qualify for subsidy payments. Relators also allege that Medhost knowingly and falsely certified to this criteria at the same time the software failed to work. FAC ¶ 220. Relators allege that CHS submitted false attestations concerning the CDS function. FAC Exhibit B provides in detail the various Hospital Defendants that attested to CDS and which software they relied on to do so.

Medhost's argument that it is irrelevant that the software was unable to track when and whether the CDS rules were enabled misses the point. Medhost Mem., ECF No. 129, at 15. What matters is that Medhost's Enterprise software could not reliably perform CDS and could not even determine when its CDS functionality was or was not working, which led to the problem recurring over and over again without Medhost being able to address it, and this caused false claims to be submitted for federal subsidy payments. FAC ¶¶ 207, 208, 215.

With respect to the CHS Entities, Relators allege that CHS failed to meaningfully use CDS and misrepresented that failure in its Meaningful Use attestations. In particular, Relators allege that CHS's implementation of its fall-risk assessment relied on manual data entry and did not use computable information about the patient from the EHR, such as data from the problem list or medication list, and therefore did not meet the Meaningful Use objective for CDS. FAC ¶ 221–29. Relators also allege that CHS knew that the fall-risk assessment did not meet Meaningful Use, and that it attested to this measure nonetheless. FAC ¶¶ 226 – 229.

Similarly, Relators have sufficiently alleged that CHS's use of its static order sets did not meet Meaningful Use measures. FAC ¶¶ 230–38. CHSPSC attempts to skirt the issue by referring to guidance that identifies "order sets tailored for a particular condition, disease, or clinician preference" as a type of CDS intervention consistent with the requirements for CDS

Meaningful Use. *See* CHSPSC Mem., ECF No. 132, at 16. However, Relators allege that CHS's use of its own *static* order sets were the problem—not that the use of order sets in general cannot meet CDS requirements. Some order sets can use computable patient data and adjust the recommended orders for a given patient based on that data, such as by removing an order for the influenza vaccine based on a patient's known allergy to eggs as indicated on the patient's medication allergy list. *See* FAC ¶ 234. Such order sets would comply with the Meaningful Use measure because they use patient data from the EHR to provide intelligently filtered information that a provider can use to enhance the patient's health care. *Id.* CHS's order sets did not have such capabilities. Rather, providers would have to identify a condition manually, such as diabetes, and then manually choose the order set for diabetes from a drop-down list of available order sets. The order set would then have static information about steps to take for patients with diabetes. These static order sets that the Hospital Defendants relied on did not use computable patient-specific data from the EHR—they were simply an electronic version of a static form to which the providers had access.

CHS's argument that the use of patient-specific information in CDS is a requirement that only "software developers must meet" is incorrect. CHSPSC Mem., ECF No. 132, at 14. CMS has expressly linked the requirement for demonstrating Meaningful Use with the certification criteria for CDS. *See* 77 Fed. Reg. 53968, 53996 (Sept. 4, 2012) (to be codified at 42 C.F.R. pts. 412, 413 and 495). And, since 2010 CMS has expressly made CDS a "core" objective because CDS "uses the information collected as structured data included in the core set," including patient problem and medication lists. 75 Fed. Reg. 44314-01, 44351 (July 28, 2010) (to be codified at 42 C.F.R. pts. 412, 413, 422 and 495). While CMS gave providers leeway to decide what type of CDS to implement, it did not waive the requirement that CDS use

patient-specific information stored in the EHR. Relators have therefore sufficiently alleged that Medhost and CHS did not meet the Meaningful Use measures for Clinical Decision Support and accordingly submitted false attestations to the Government

4.      *Relators' Sufficiently Allege That Medhost's Falsely Certified E-Prescribe Function Caused False Attestations.*

Medhost challenges the Relators' e-prescribing allegation FAC ¶¶ 239-247 with a perfunctory argument that CHS's decision not to rely on its deficient e-prescribing function "necessarily precludes any claim against Medhost," apparently on the assumption that if CHS did not attest to Meaningful Use based on the function, no other hospitals did either. Medhost Mem., ECF No. 129, at 15. The assumption is unfounded. CMS has reported[8] that multiple hospitals attested to this Meaningful Use objective relying on Medhost's e-prescribe function. For example, Relators are aware from CMS's Public Use Files[9] of at least the following attestations as to ONC's e-prescribe measure relying on Medhost Enterprise:

| Hospital | State | NPI | Attestation Success Date | EHR Certification Number |
|---|---|---|---|---|
| Trinidad Area Health Association | CO | 1184616740 | 2/3/2017 | 0014EHT5ZXR0WKS |
| County Of Clay | IL | 1184655136 | 5/31/2016 | 1314E01PD0S3EAB |
| Hamilton County Hospital District | TX | 1326037607 | 3/4/2016 | 1314E01QOTDHEAZ |
| Hamilton County Hospital District | TX | 1326037607 | 3/21/2017 | 0014E6BQB36GRE7 |
| Cottage Hospital | NH | 1528162799 | 1/4/2016 | 1314E01RCQHKEAH |
| Grant Memorial Hospital | WV | 1598763666 | 2/9/2016 | 1314E01PQXBEEAT |

---

[8] Relators will amend the complaint to plead these facts, if necessary.

[9] The *CMS Medicare EHR Incentive Program Eligible Hospitals PUF* is an eligible hospital-level file in which each record provides the hospital type together with each hospital's responses to the Meaningful Use core and menu measures, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/PUF.html. The details of hospitals' attestations, including which software was utilized, are available through the ONC at https://dashboard.healthit.gov/datadashboard/documentation/ehr-products-mu-attestation-data-documentation.php.

| Hospital | State | NPI | Attestation Success Date | EHR Certification Number |
|---|---|---|---|---|
| Madison County Memorial Hospital | IA | 1831104611 | 3/7/2016 | 1314E01RO5NBEAD |

Based on these attestations that were submitted based on the use of Medhost's flawed e-prescribe software, Relators have sufficiently alleged that Medhost knowingly caused false claims to be presented to the Government related to e-prescribing.

5.     *Relators Sufficiently Allege That Medhost's Software Failed To Meet Security-Related Criteria And That Hospitals Attested To Security-Related Measures Relying On Medhost's Software.*

Medhost's argument that Relators do not allege that a single Hospital Defendant ever addressed any security-related criteria as part of a Meaningful Use attestation, nor that the hospitals were required to attest to security-related criteria in order to receive Meaningful Use incentives, misses the point. FAC Exhibit B provides a detailed list of the Hospital Defendants that did, in fact, attest to the criteria for protected health information, or "PHI." CMS's objective to "protect electronic health information" was required under the 2014 Edition of Meaningful Use, and the corresponding software certification requirements were 45 C.F.R. § 170.314(d)(1)-(6) (Oct. 2012), which encompass "[a]uditable events and tamper-resistance."[10] Relators have alleged that certain of the Hospital Defendants attested to a core measure regarding software security relying on Medhost's software and that the software was falsely certified as to the auditable events and tamper-resistance criteria. FAC ¶¶ 253, 254.

Medhost further argues that Drummond's certification of Medhost's software was appropriate because Medhost's software had the *capability* to perform audit logging and protect

---

[10] *See* CMS publication "Eligible Professional Meaningful Use Core Measures–Measure 13 of 13" (2014 Definition), available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/15_Core_ProtectElectronicHealthInformation.pdf.

the audit log from tampering. However, Medhost's argument simply contradicts the allegations in the FAC on factual grounds: Relators allege that "Medhost's software . . . under some circumstances lacks *any capability* to log or audit such actions." FAC ¶ 251 (emphasis added). Medhost similarly misreads the FAC in arguing that it cannot be liable because "Relators allege that MEDHOST learned about these flaws in October 2014." Medhost Mem., ECF No. 129, at 16. Relators allege that Medhost knew about the issue "*no later than* October 2014." FAC ¶ 254 (emphasis added). As such, Medhost's arguments are not appropriate on a motion to dismiss.

Additionally, Medhost's argument misconstrues a federal requirement for the auditable events and tamper resistance criteria. The regulation provides that EHR technology "must be set by default" to perform audit logging. 45 C.F.R. § 170.314(d)(2)(ii) (Oct. 2012). Relators allege that Medhost's data tables were configured with a setting that granted all users access to view and change the data, and that any access or changes made to data tables using this access method would not be captured by Medhost's audit logging. FAC ¶¶ 252, 253. As such, Medhost's software did not meet the requirement that EHR software default to log changes made to health information.

### C. Relators Have Alleged That Medhost's False Statements Were Material To The Government's Incentive Payment Decisions.

Medhost's argument that submission of a fraudulent Meaningful Use attestation is not material to the Government's decision to award incentive payment is without merit. Medhost Mem., ECF No. 129, at 16-18. Under the FCA, claims are materially false where they have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). Here, Relators allege that Medhost misrepresented the ability of its software to perform functions necessary for eligibility for certification, including the

requirement that the software perform certified functions and functions affecting certified functions safely and reliably. *See* FAC ¶¶ 75-93. Relators also allege that Medhost's misrepresentations about its software—both directly to CHS and other customers, and to its certifying body, Drummond—concerned capabilities material to payment under the Medicare Meaningful Use incentive payment program. *See* FAC ¶ 24.

Since the inception of the Meaningful Use EHR incentive program in 2010, it has been understood that software flaws can result in false attestations and provider liability for recoupment of federal payments. *See, e.g.,* 75 Fed. Reg. 44314-01, at 44468 ("We will conduct selected compliance reviews . . . of recipients of incentive payments for the Meaningful Use of certified EHR technology. . . . We will identify and recoup overpayments made under the incentive payment programs that result from incorrect or fraudulent attestations . . . ."). Fairly read, Medicare's admonition to hospitals and providers that overpayments made under the Meaningful Use incentive payment programs resulting from incorrect or fraudulent attestations will be recouped supports Relator's allegations that false claims in this context are material to payment. *See Escobar*, 136 S. Ct. at 2001-2004 (explaining holistic analysis to determine materiality including consideration of the underlying statutory or regulatory system).

Moreover, that the United States has sought recoupment of Meaningful Use funds from two EHR vendors for causing providers to submit false claims under circumstances similar to those present in this case makes clear that liability is not restricted to providers. *See, e.g.,* attached Exhibits 1 and 2 (complaints in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS (D. Vt.), and *United States v. Greenway Health, LLC*, Case No. 2:19-cv-00020 (D. Vt.)). In both the *eClinicalWorks* and *Greenway* complaints and settlements, the United States Department of Justice used the FCA to allege that an EHR vendor's false

certification of an electronic medical record system could be material to payment under the FCA and that monies paid to providers under the Meaningful Use incentive program could be recouped directly from the vendor. *Id*. Therefore, contrary to Medhost's position, the Government demonstrated that it regards violations of the certification requirements for health IT, and concomitant false attestations to the Meaningful Use program, whether or not submitted knowingly by the hospital or health provider, to be material violations of the FCA. While Medhost attempts to countermand the regulatory and antecedent that establish materiality, its arguments can be swiftly dismissed.

First, Medhost argues that the false claims at issue cannot be material to payment because the Government has created an administrative process for software vendors to make modifications on an ongoing basis, where the vendor works directly with its customers to rectify problems and determines if non-conformities are so serious that the software's certification may be suspended or withdrawn. Medhost Mem., ECF No. 129, at 17. However, the FCA does not provide an exception to liability based on the existence of parallel administrative mechanisms— here, the ONC decertification and the Meaningful Use audit processes. On the contrary, "Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." *United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 415 (8th Cir. 2012); *see also United States ex rel. Campie v. Gilead Sciences, Inc.*, 86 F.3d 890, 905 (9th Cir. 2017); *United States ex rel. Mei Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCX), 2018 WL 3814498, at *14 (C.D. Cal. July 25, 2018), reconsideration denied, No. CV 11-974 PSG (JCX), 2018 WL 6177255 (C.D. Cal. Nov. 9, 2018). Such a position would preclude enforcement in a wide variety of federal programs. Indeed, given the United States' continued use of the FCA against health IT software vendors,

Medhost's proposition is unfounded. If anything, the Department of Health and Human Services' ("HHS") allowance of two separate administrative enforcement mechanisms to ensure safe and reliable health IT software and to avoid overpayments and fraud in the Meaningful Use incentive program only underscores the materiality of the alleged violations.

Second, Medhost argues a lack of materiality because the Government permitted some hospitals to attest using software that, though previously certified, had known defects. Yet, Medhost relies on guidance from HHS's EHR Incentive Program that undercuts its argument. Medhost Mem., ECF No. 129, at 18. In that guidance, HHS concluded that: (1) flawed software had resulted in certain providers submitting incorrect "attestation information," viz., the metrics reflecting a provider's use of a software; and (2) the providers would have likely met Meaningful Use payment criteria with updated software that correctly calculated attestation information. Those facts are wholly different from the case at hand. Here, the allegations go to the software's core functionalities, *e.g.,* maintaining patient lists and medication lists and recording medication orders accurately. Medhost's flawed functions are not simple calculator errors within the EHR that merely track a provider's use of the software and generate "attestation information." Here, Medhost's software malfunctions went to fundamental features that had to be turned on and operating at all times. Also, HHS noted that the reason it did not audit the providers was because their technology had been updated and the agency anticipated that most providers would still be eligible for funds. There is no evidence that Congress or the federal agencies intended to allow for Meaningful Use incentive payments to be made to providers where both providers and vendors know of significant non-conformities central to the requirements for certified EHR software.

**D.      Relators Have Alleged That Defendants Acted With Improper Scienter.**

Relators have alleged with sufficient factual detail that Medhost, CHSI, CHSPSC and Hospital Defendants "knowingly and willfully" submitted or caused to submit false claims to HHS for federal incentive payments through the EHR Incentive Programs. FAC ¶¶ 2, 75, 95. Because "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Relators' allegations are sufficient to survive a motion to dismiss. Fed. R. Civ. P. 9(b).

Nonetheless, Medhost, CHSPSC and Hospital Defendants attempt to attack the FAC by arguing that Relators failed to sufficiently allege that Defendants acted with improper scienter. *See* Medhost Mem., ECF No. 129, at 18-20; CHSPSC Mem., ECF No. 132, at 20-22; Hospital Mem., ECF No. 133, at 15-17. The FCA "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). Instead, the FCA requires only that the defendant have "actual knowledge of the [relevant] information; act[] in deliberate ignorance of the truth or falsity of the information; or act[] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(B).

In general, the existence of knowledge or intent is a question of fact for the factfinder, to be determined after trial. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991). Indeed, in order to grant a defendant summary judgment, despite the question of knowledge or intent, the relator must fail to indicate that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim. *See Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir. 2002) (*citing Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1580 (11th Cir. 1988)). Given that issues of intent or knowledge are difficult to achieve at the summary judgment phase, this Court should decline Defendants' invitation to assess the factual question of Defendants' intent on a motion to dismiss. *See Kostoski v. Steiner*

*Transocean, Ltd.*, 278 F.R.D. 695, 698 (S.D. Fla. 2012) ("An individual's state of mind cannot in any event be determined on a motion to dismiss.").

1. *The Court Should Reject Medhost's "Reasonable Interpretation" Argument.*

Medhost suggests that it did not have improper scienter because its interpretation of the regulations at issue was "certainly reasonable." Medhost Mem., ECF No. 129, at 19. To support this claim, Medhost distorts the holding in *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017), which considered and rejected the argument Medhost raises here. In *Phalp*, the Eleventh Circuit held that the argument "that a finding of scienter can be precluded by a defendant's identification of a reasonable interpretation of an ambiguous regulation that would have permitted its conduct is *erroneous*." 857 F.3d at 1155 (emphasis added). The appellate court left no doubt that it was gutting the argument Medhost makes here: "under the district court's legal interpretation, a defendant could avoid liability by relying on a 'reasonable' interpretation of an ambiguous regulation manufactured *post hoc*, despite having actual knowledge of a different authoritative interpretation. However, scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable." *Id.* (citing *United States ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053-54 (8th Cir. 2002)).

Medhost cannot overcome the *Phalp* opinion's binding circuit precedent by turning to *Safeco*, which decided the question before the Court on the understanding that the defendant, at the time of its unlawful conduct, had actually relied on a reasonable (though erroneous) interpretation of the law. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007). It did not hold that defendants can rely on an ambiguity manufactured *post hoc*, an outcome that *Phalp* would not permit either. Medhost's argument regarding the scienter standard (that a

defendant can escape liability merely by offering a "reasonable" interpretation of a regulatory requirement) would have significant adverse effects on the Government's ability to combat fraud in federal programs. Such a result would be inconsistent with Congress's intent to reach both intentional efforts to deceive and "ostrich-like" behavior—which is why it has been soundly rejected by the Eleventh Circuit.

Both *Safeco* and *Phalp* were decided at summary judgment and call for a factual inquiry that is inapposite on a motion to dismiss. *See United States ex rel. Streck v. Bristol-Myers Squibb Co.*, No. 13-7547, 2018 WL 6300578, at *12 (E.D. Pa. Nov. 29, 2018), clarified on denial of reconsideration, 370 F. Supp. 3d 491 (E.D. Pa. 2019). Relators have plainly alleged scienter at the pleading stage, alleging in the FAC that Medhost's actions violated the pertinent regulations and that Medhost knew its actions violated the regulations. Correctly applying *Phalp* to this case should lead the Court to deny Medhost's motion to dismiss.

Medhost's additional argument about its knowledge of materiality is also without merit, as is discussed in Section VI(C), *supra*. As such, Medhost's argument that its "reasonable" interpretation precludes finding that it had necessary scienter is due no weight, is improper at this stage of the case, and should be rejected outright.

2.   *The Court Should Reject The CHS Entities' "Glitches And Bugs" Argument.*

CHSPSC and Hospital Defendants also claim that they lacked the improper scienter required under the FCA and that the FAC does not allege that: (1) CHS's efforts to fix the "glitches and bugs" were unsuccessful, and (2) anyone at CHS believed the "glitches and bugs" would prevent any Hospital Defendants from truthfully attesting to satisfying Meaningful Use requirements. *See* CHSPSC Mem., ECF No. 132, at 20-22; Hospital Mem., ECF No. 133, at 15-17. Once again, CHSPSC and Hospital Defendants cannot put words into Relators' mouths—

they must litigate their motions to dismiss based on the FAC's allegations and all reasonable inferences that can be drawn from them.

Relators did not bring a FCA case premised on "glitches and bugs" in Medhost's software. Instead, Relators clearly allege, and provide detail to support, that "CHS knew that Medhost's software lacked functionality required for certification and its own ability to attest to Meaningful Use." FAC ¶ 13. Relators also provide specific information demonstrating that CHSI employees knew the limitations of Medhost's EHR software. *See* FAC ¶¶ 13, 14, 21, 22, 87, 88, 90, 91. Relators similarly allege that the HMA hospitals also could not truthfully attest to successfully satisfying Meaningful Use. *See* FAC ¶ 22, 255-280. If Defendants can in good faith assert a "glitches and bugs" defense to the FAC, they will need to do so at trial.[11]

Finally, the Court should reject Hospital Defendants' claim that "Relators allege absolutely no facts regarding the intent of any person at any of the hospitals to make fraudulent claims." Hospital Mem., ECF No. 133, at 16. Relators do not need to plead fraudulent intent, but merely that Hospital Defendants acted either with "actual knowledge," "deliberate ignorance," or "reckless disregard." 31 U.S.C. § 3729(b)(1)(B). Relators allege such reckless or deliberate acts. *See* FAC ¶¶ 90, 91. These allegations against CHSPSC and Hospital Defendants are more than sufficient to survive their motions to dismiss.

For these reasons, Hospital Defendants' reliance on *Jacobs*, 2017 WL 2361943 at *10,[12] is misplaced. *See* Hospital Mem., ECF No. 133, at 15. In *Jacobs*, the court held that, at

---

[11] The fact that EHR Technology may have had bugs is not inconsistent with a FCA violation. For example, the Government's Complaint In Intervention in *United States ex rel. Delaney v. Eclinical Works, LLC*, Case No. 2:15-CV-00095-WKS, attached as Exhibit 1, alleged at paragraph 9 that the relator "alleged in his *qui tam* complaint that bugs and problems with ECW's software rendered it ineligible for incentive payments."

[12] *Jacobs* was modified on reconsideration. *See Jacobs v. Bank of Am. Corp.*, No. 1:15-cv-24585-UU, 2017 WL 2361944 (S.D. Fla. Apr. 27, 2017).

least for purposes of deciding the defendants' motion to dismiss, the relator's complaint "satisfies the pleading requirements concerning Defendants' knowledge under *Iqbal* and *Twombly* and Rule 9(b), as it alleges facts that give rise to a 'reasonable inference'" concerning the defendants' conduct. *Jacobs*, 2017 WL 2361943 at *11. Any lesson to be gleaned from *Jacobs* is that this Court should find at a minimum, at this preliminary motion to dismiss stage, that Relators "plausibly allege" enough to support their FCA claims, drawing all reasonable inferences in their favor.

### E.  Relators Have Met The Requirements Of 31 U.S.C. § 3729(a)(1)(A) And (B).

The FCA imposes liability on anyone who: (1) knowingly presents, or causes to be presented, to an officer or employee of the Government a false or fraudulent claim for payment or approval; and (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A) and (B). As detailed above, Relators have sufficiently alleged that CHS knowingly presented false claims to the Government and that Medhost knowingly caused false claims to be presented to the Government, therefore satisfying the requirements of § 3729(a)(1)(A). Relators have also alleged that CHS and Medhost made or used, or caused to be made or used, false records material to a false claim satisfying the requirements of § 3729(a)(1)(B).[13] Medhost contends that Relators' allegations, even if true, do not give rise to FCA liability under § 3729(a)(1)(B) because "Relators never allege what these supposed 'misrepresentations' and 'false statements' by MEDHOST were." Medhost Mem., ECF No. 129, at 20.

---

[13] In satisfying the requirements of § 3729(a)(1)(A) and (B), Relators have also satisfied the requirements of § 3729(a)(1)(G), because the only difference between those sections is the payment mechanism: § 3729(a)(1)(G) refers to a financial benefit in the form of improperly avoiding or decreasing financial obligations to the Government, rather than receiving financial payouts.

However, Medhost's argument ignores the FAC's straightforward allegations. Relators allege that Medhost fraudulently certified software that it knew it could not perform necessary functions, and then marketed its software to health care providers based on the certifications it received, causing those providers to claim incentive payments from the Government that they were not eligible to receive. *See, e.g.,* FAC ¶¶ 10, 11, 15, 19, 75-77, 95, 96, 103. Throughout, the FAC identifies the specific regulatory requirements that Medhost falsely certified to meeting. *See, e.g.*, FAC ¶¶ 240-41. Medhost's false certifications and subsequent marketing of its products to health care providers as certified software are false records and statements material to CHS's false claims, and properly form the basis for Relators' claims under § 3729(a)(1)(B).

**F.**      **Relators Have Sufficiently Alleged A Conspiracy To Violate The FCA.**

In order to plead that Defendants conspired to violate the FCA, Relators must allege: (1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim. *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, No. 03-62097-CIV-COHN/SNOW, 2006 WL 8432157, at *8 (S.D. Fla. Oct. 18, 2006), amended on reconsideration in part based on issue of intra-corporate conspiracy doctrine, 2007 WL 9700731 (S.D. Fla. Jan. 3, 2007), citing *Corsello*, 428 F.3d at 1014.

Here, the FAC contains sufficient allegations from which the Court may reasonably infer that: (1) Medhost and CHS had a plan with each other to submit false attestations to the Government in order to receive incentive payments; (2) both CHS and Medhost took steps in furtherance of the plan; and (3) they ultimately caused the submission of false claims to Government healthcare programs, which the Government paid out. For example,

-42-

Relators allege that Medhost and CHS worked closely together to attempt to address software and deployment problems that they knew were dangerous and would and did hinder CHS's ability to truthfully attest to Meaningful Use. *See* FAC ¶ 91 (discussing CHS and Medhost's weekly "critical issues" calls). Relators also allege that CHS and Medhost both knew that dangerous flaws were not fixed during critical attestation periods. *See* FAC ¶¶ 10, 136, 168, 208, 213, 277. Relators allege that CHS knew that Medhost's certified software was flawed, and that Medhost knew CHS's attestations were not truthful. *See* FAC ¶¶ 13, 15, 96. The FAC alleges that, nonetheless, CHS continued to accept and rely on Medhost's deficient software, and Medhost continued to support CHS in its efforts to submit false attestations, and together they knowingly allowed CHS to collect hundreds of millions of dollars of incentive payments to which CHS was not entitled. *See* FAC at ¶¶ 95, 201, 213, 214, 232, 233, 237, 238, 271, 291. These allegations are more than sufficient to allege an actionable conspiracy among Medhost and the CHS Entities to violate the FCA.

## VII.    RELATORS' KICKBACK THEORY SHOULD BE SUSTAINED.

Finally, Medhost and CHS argue that they are not liable under the Anti-Kickback Statute ("AKS") because the AKS focuses on the items that are "reimbursable" by a "federal health care program."  Medhost Mem., ECF No. 129, at 22-23; CHSPSC Mem., ECF No. 132, at 22-23. CHSPSC argues that its purchase of EHR software was merely the conduit for the payment of Meaningful Use incentive payments for the use of the EHR. CHSPSC Mem., ECF No. 132, at 23. In other words, Defendants argue that because federal funds did not directly pay for the EHR software, they are not liable for violating the AKS. The AKS is not so narrowly construed.

The AKS's plain terms impose liability on a direct or indirect payment of remuneration to induce hospitals, among others, to order products paid for in whole or in part by

federal healthcare programs such as Medicare and Medicaid. 42 U.S.C. § 1320a–7b(b)(1). Relators allege that CHS purchased the Medhost CEHRT in exchange for Medhost providing CHS with free financial software and that HHS subsequently paid CHS $385 million for purchasing and using Medhost's CEHRT. There is simply no merit to CHS's argument that "no federal health care program paid to reimburse [CHS] for purchasing the EHR software." CHSPSC Mem., ECF No. 122, at 23. Indeed, HHS expressly contemplated that "providers who would like to qualify as Meaningful Users of EHRs will need to purchase certified EHR technology." 75 Fed. Reg. 44314-01, at 44545. Nor is there any requirement, as CHS suggests, that the amount of Government's payment be related to the cost of purchasing the software, CHSPSC Mem., ECF No. 132, at 22, as the AKS applies to products the Government pays for "in whole or in part."[14]

Furthermore, contrary to Defendants' assertions, courts have found AKS violations even where federal funds did not reimburse the immediate item that was arranged for or purchased as part of the inducement. For example, in *Guilfoile v. Shields*, 913 F.3d 178, 192 (1st Cir. 2019), the First Circuit held that a group of specialty pharmacy services companies' payments to a financial advisor to hospitals for referring those hospitals violated the AKS. The First Circuit noted that the kickback scheme fell within the AKS even though there was a "distance between the Integrated Entity's [the specialty pharmacy service company] payments to Greene [the financial advisor] to capture the hospital contracts and the submission of claims to federal insurance programs, which is the unmistakable objective of the contracts." *Id.* at 193. Similarly, in *MedPricer.com, Inc. v. Becton, Dixon & Co.*, 240 F. Supp. 3d 263 (D. Conn. 2017),

---

[14] Even then, HHS calculated the amount of the incentive payments so that "adopting entities will achieve dollar savings at least equal to their total costs," including purchase costs. 75 Fed. Reg. 44314-01, at 44545.

adhered to on reconsideration, No. 3:13-CV-1545 (MPS), 2017 WL 1234102 (D. Conn. Apr. 3, 2017), the court found an AKS violation where an operator of an auction website, MedPricer.com, was paid a commission for sales transacted on its website. The court rejected defendant MedPricer.com's argument that its scheme fell outside the AKS because "syringes are typically not separately reimbursable by a federal health care program and that hospitals are reimbursed for providing a service, not for the equipment included in doing so." *Id.* 273. The court reasoned that "this does not foreclose a showing that 'payment may be made' under a federal health care program." *Id.*

As in *Guilfoile* and *MedPricer.com*, the arrangement between Medhost and CHS did not require the direct purchase of an item or service with federal funds to lead to an AKS violation. Relators allege that CHS purchased the Medhost CEHRT in exchange for Medhost providing CHS with free financial software. Just like the use of syringes in *MedPricer.com*, CHS used the EHR software in providing services that would be reimbursable by a federal health care program. Moreover, like the kickback scheme in *Guilfoile*, while the initial purchase of the EHR software did not expend federal funds, CHS's "unmistakable objective" was to obtain federal dollars distributed through the federal Meaningful Use incentive program for its purchase and use of EHR software. Thus, the Medhost-CHS software *quid pro quo* scheme falls within the "heartland of what the AKS is intended to prevent – the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care programs." *Guilfoile*, 913 F.3d at 192–93. Notably, in other false claim cases involving EHRs and Meaningful Use payments, the Government and OIG have pursued AKS violations. *See, e.g.*, attached Exhibits 1 and 2 (complaints in *United States ex rel. Delaney v. Eclinical Works,*

*LLC*, Case No. 2:15-CV-00095-WKS (D. Vt.), and *United States v. Greenway Health, LLC*, Case No. 2:19-cv-00020 (D. Vt.)).

Moreover, Relators' allegations concerning the AKS violation also satisfy Rule 9(b). With respect to the discount scheme here, Relators alleged the substance of the scheme, to wit, that Medhost offered its financial software, Medhost Financials, for free to CHS to induce CHS to purchase Medhost's Enterprise EHR packages (the what). FAC ¶¶ 281, 283, 284. In addition, Relators allege the time and place (the when and the where) of the discount scheme by stating that the scheme was initiated "at the same time" Medhost "expanded the Medhost Enterprise software suite to include Medhost's clinical package." FAC ¶ 283. Relators further allege that Steve Hernandez, CHS's Senior Director of Information Systems (the who), was responsible for the final pricing, and that Relators—who worked as Hernandez's direct reports— were directly aware of discussions among CHS employees that the Medhost free software was meant as an inducement to purchase the Enterprise software (the how). FAC ¶ 284.

Similarly, as to the equity scheme, Relators allege that in exchange for Medhost's offer to provide it with $25 million in equity, CHS agreed to pay $25 million to Medhost to convert ten Tier-1 facilities to Medhost software and to purchase the PIMS software (the what and how). FAC ¶ 285. Moreover, this purchase and exchange took place in September 2015 (the when). *Id.* Relators described how Relator Lewis spoke with Doug Hanson about the purchase of PIMS and conversion of the facilities to Medhost, and Hanson informed Lewis that Larry Cash "was interested in executing" the agreement to obtain the $25 million in Medhost equity (the who). FAC ¶ 286. Thus, Relators have sufficiently pled facts to satisfy Rule 9(b).

Under the AKS, "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of" the FCA. 42 U.S.C. §

1320a-7b(g). Here, as discussed above, CHS submitted—and Medhost caused to be submitted—claims, that both knew would be false, attesting to compliance with Meaningful Use requirements in order to receive Meaningful Use incentive payments. As described, CHS received $385 million in Meaningful Use incentive payments for those submitted claims. CHS submitted those claims based on its purchase and then use of Medhost's substandard EHR software—purchases it made to complete the *quid pro quo* arrangement where Medhost initially provided free financial software. Moreover, Relators' allegations make clear that Medhost knowingly "offered" and CHS "knew" the purpose of the offer of the free software was to induce CHS to purchase the EHR software. FAC ¶¶ 283, 284. Accordingly, the FAC adequately alleges facts sufficient to plead an AKS violation.

## REQUEST FOR HEARING

This case presents important allegations concerning the expenditure of hundreds of millions of dollars in federal subsidy payments for implementation of electronic health record systems in dozens of hospitals. Oral argument will assist the Court in evaluating the sufficiency of Relator's pleading in this context. Relators anticipate that thirty minutes will be sufficient for each party.

## CONCLUSION

For the foregoing reasons, Relators respectfully request that this Court enter an order denying the four motions to dismiss filed by the Defendants, ECF Nos. 129, 132, 133, and 134, and entering any such further relief this Court deems equitable and just.[15]

---

[15] If the Court grants any of the motions to dismiss, Relators respectfully request that the Court grant them leave to replead their allegations to overcome any pleading deficiency. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018).

Dated:  December 13, 2019

Respectfully submitted,

PLAINTIFF/RELATORS DEREK LEWIS
and JOEY NEIMAN

/s/ Jeffrey W. Dickstein
Jeffrey W. Dickstein (FL Bar No. 434892)
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, Florida 33131
Tel: (305) 372-5200
jdickstein@phillipsandcohen.com

Colette G. Matzzie*
Luke J. Diamond
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 833-4567
cmatzzie@phillipsandcohen.com
ldiamond@phillipsandcohen.com

Edward Arens*
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
earens@phillipsandcohen.com

David J. Chizewer*
David E. Morrison*
Harleen Kaur
Danielle K. Johnson
Juan C. Arguello
GOLDBERG KOHN LTD.
55 E. Monroe Street, Suite 3300
Chicago, IL 60565
Tel: (312) 201-4000
David.chizewer@goldbergkohn.com
David.morrison@goldbergkohn.com
Harleen.kaur@goldbergkohn.com
Danielle.johnsons@goldbergkohn.com
Juan.Arguello@goldbergkohn.com

*Admitted Pro Hac Vice