**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA,
MIAMI DIVISION**

Case NO. 18-20394-CIV-Scola/Torres

UNITED STATES OF AMERICA *ex rel.*　　)
DEREK LEWIS and JOEY NEIMAN,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs/Relators,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　vs.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
COMMUNITY HEALTH SYSTEMS,　　　　)
INC. *et al.*　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　)

**<u>DEFENDANT MEDHOST INC.'S CORRECTED REPLY IN SUPPORT OF ITS
MOTION TO DISMISS RELATORS' AMENDED COMPLAINT AND
INCORPORATED MEMORANDUM OF LAW</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.    Relators' Opposition Confirms That Their Claims About the Meaningful-Use
Program Should Be Dismissed ............................................................................... 2

    A.    Far From Satisfying Rule 9(b), Relators Take an Approach that Courts
Have Rejected ............................................................................................. 2

        1.    The Amended Complaint's Exhibit B Does Not Sufficiently
Identify How These Specific Attestations Were Supposedly False .......... 2

        2.    Relators Cite Only Impermissible General Allegations of
MEDHOST's Supposedly Fraudulent Conduct ........................................ 4

        3.    Relators Are Not Entitled to Any Relief From Rule 9(b)'s
Demands ..................................................................................................... 5

    B.    Relators Have Not Plausibly Alleged that Any Claims Were False ..................... 6

        1.    Relators Do Not Identify Anything False About CHS's
Meaningful-Use Attestations ..................................................................... 6

        2.    Relators Are Wrong to Suggest That MEDHOST's Software Fell
Short of the ONC Criteria .......................................................................... 7

    C.    Relators Offer No Basis to Conclude That the Alleged Software Problems
Would Have Led the Government to Refuse or Recoup Incentive
Payments ...................................................................................................... 9

    D.    Relators Have Not Plausibly Alleged That MEDHOST Knew Both About
the Purported Software Flaws and About Those Flaws' Materiality ................... 11

    E.    Relators Have Not Plausibly Alleged the Additional Requirements for
Their False Statements Claim. ..................................................................... 12

    F.    Relators Have Not Plausibly Alleged a Conspiracy to Violate the FCA ............. 13

    G.    Relators Have Not Plausibly Alleged a Reverse False Claim by
MEDHOST .................................................................................................. 13

II.    Relators' Kickback Theory Should Be Dismissed ......................................................... 14

CONCLUSION ..................................................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

Page

CASES

*Carlisle v. Daewon Kangup Co.*,
    No. 3:15-cv-565, 2018 WL 3199148 (M.D. Ala. Mar. 29, 2018) ............................................4

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) ...........................................................................................4

*Hopper v. Solvay Pharms., Inc.*,
    588 F.3d 1318 (11th Cir. 2009) .........................................................................................13

*McKally v. Perez*,
    87 F. Supp. 3d 1310 (S.D. Fla. 2015) ................................................................................9

*Omega Psi Phi Fraternity, Inc. v. HCE Group of Cos., Inc.*,
    No. 11-CV-80479, 2011 WL 13228098 (S.D. Fla. Oct. 19, 2011) ........................................9

*Rutledge v. Aveda*,
    No. 2:14-cv-00145-AKK, 2015 WL 2238786 (N.D. Ala. May 12, 2015) ...........................10

*United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*,
    No. 10-81634, 2014 WL 12284079 (S.D. Fla. June 23, 2014) ..............................................6

*United States ex rel. Fernandez v. Miami Cancer Inst.*,
    No.17-24051, 2019 WL 1993513 (S.D. Fla. May 6, 2019) (Scola, J.) ...................................6

*United States ex rel. Keeler v. Eisai, Inc.*,
    568 Fed. App'x 783 (11th Cir. 2014) ................................................................................15

*United States ex rel. Lockhart v. Gen. Dynamics Corp.*,
    529 F. Supp. 2d 1335 (N.D. Fla. 2007) ...............................................................................6

*United States ex rel. Mastej v. Health Mgmt Assocs.*,
    869 F. Supp. 2d 1336 (M.D. Fla. Feb. 16, 2012) ...............................................................15

*United States ex rel. McFarland v. Florida Pharmacy Sols.*,
    358 F. Supp. 3d 1316 (M.D. Fla. 2017) ............................................................................15

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
    No. 09-22253-CIV, 2012 WL 2871264 (S.D. Fla. July 12, 2012) ...........................................4

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
    857 F.3d 1148 (11th Cir. 2017) .................................................................................11, 12

*United States ex rel. Stepe v. RS Compounding LLC*,
    No. 8:13–cv–3150–T–33AEP, 2017 WL 5178183 (M.D. Fla. Nov. 8, 2017) .......................13

*United States ex rel. Streck v. Bristol-Myers Squibb Co.*,
    No. CV 13-7547, 2018 WL 6300578 (E.D. Pa. Nov. 29, 2018),
    *clarified on denial of reconsideration*, 370 F. Supp. 3d 491 (E.D. Pa. 2019) .........................11

*United States v. Choudhry*,
    262 F. Supp. 3d 1299 (M.D. Fla. 2017)..............................................................................14

*United States v. R&F Props. of Lake Cty., Inc.*,
    433 F.3d 1349 (11th Cir. 2005) ...........................................................................................6

*United States v. Strock*,
    No. 15-CV-0887-FPG, 2019 WL 4640687 (W.D.N.Y. Sept. 24, 2019) ...............................12

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016)........................................................................................................10

**STATUTES**

42 U.S.C. § 1320a-7b(b)(2) ......................................................................................................14

**FEDERAL REGULATIONS**

45 C.F.R. § 170.314(d) ..............................................................................................................9

45 C.F.R. § 495.20(*l*)(15)(ii)......................................................................................................9

45 C.F.R. § 170.314(a)(1) ..........................................................................................................8

75 Fed. Reg. 36,158, 36,188 (June 24, 2010) ...........................................................................8

81 Fed. Reg. 72404, 72411, 72414-72415 (Oct. 19, 2016) .......................................................8

**OTHER AUTHORITIES**

Drummond Group LLC, EHR Certification Guide 7 (Aug. 5, 2019),
    https://www.drummondgroup.com/pdfs/EHR-CB-048-EHR-Certification-
    Guide-Rev-05Aug2019.pdf .................................................................................................3

*EHR Productions Used for Meaningful Use Attestation*, HealthIT.gov: Health IT
  Dashboard (Jan. 10, 2019),
  https://dashboard.healthit.gov/datadashboard/documentation/ehr-products-mu-
  attestation-data-documentation.php ........................................................................................3

Federal Register, Vol. 81, No. 202 (Oct. 19, 2016) (to be codified at 45 C.F.R. pt.
  170), https://www.govinfo.gov/content/pkg/FR-2016-10-19/pdf/2016-
  24908.pdf ..............................................................................................................................8

*Frequently Asked Questions*, CMS.gov (Aug. 22, 2013),
  https://web.archive.org/web/20130827085958/https://questions.cms.gov/faq.p
  hp?faqId=8898 ......................................................................................................................3

*Meaningful Use Attestation*, HealthIT.gov: Health IT Dashboard (Jan. 10, 2019),
  https://dashboard.healthit.gov/datadashboard/documentation/ehr-products-mu-
  attestation-data-documentation.php ........................................................................................3

*Stages of Promoting Interoperability Programs*, CMS.gov,
  https://www.cms.gov/Regulations-and-
  Guidance/Legislation/EHRIncentivePrograms/Downloads/Stages_ofMeaningf
  ulUseTable.pdf (last visited Nov. 4, 2019) ...........................................................................4

MEDHOST files this reply brief in support of its Motion to Dismiss Relators' Amended Complaint. This brief incorporates all defined terms used in MEDHOST's opening brief in support of its motion. *See* ECF 129.

## INTRODUCTION

Relators have confirmed that their basic theory of liability is that MEDHOST defrauded Drummond into certifying its EHR software as satisfying the federal meaningful-use regulations, and that CHS then attested to the meaningful use of this software—which earned incentive payments that (as Relators see it) should have never been paid because MEDHOST's software should have never been certified. At virtually every step, this theory falls flat.

First, without even considering this misguided theory on the merits, this Court should dismiss it under Rule 9(b). Insisting otherwise, Relators cite their complaint's lengthy exhibit that lists nearly 600 attestations submitted by CHS hospitals. But Relators never specifically allege how any particular attestation was false, nor do they even specify which of the listed attestations was false (which, under the allegations, cannot be all of them). And regardless, Relators offer no particularity whatsoever for their claim that MEDHOST engaged in fraud that tainted the certification process—yet this bald assertion is the linchpin of their theory against MEDHOST. Rule 9(b) exists precisely to police against such empty accusations of fraud.

Relators also have not shown that CHS's attestations of meaningful use were false, when CHS did in fact meaningfully use MEDHOST software that had in fact been certified under the regulatory criteria. Relators argue that software developers like MEDHOST can be liable under the FCA even when their software has been certified. But even Relators appear to recognize that it would be unprecedented to take this step when the developer did not rig the certification process—as is the case here, where Drummond independently certified MEDHOST's software. Moreover, Relators are also wrong that MEDHOST's software should not have been certified.

Next, Relators fail to show materiality—specifically, that the alleged software defects would have led the government to refuse to pay the incentives at issue. Relators concede that the government handles EHR software defects through an administrative process that does not create financial exposure for software developers or users. Although Relators note that the government will sometimes seek to recoup payments, Relators' only examples of this involved a fraudulent certification process, which is a far cry from the routine defects that Relators have alleged here.

Relators' claims fail on scienter grounds also.  It was reasonable for MEDHOST to think that its software met the certification requirements—indeed, Drummond independently concluded this—and Relators' own case law confirms that this issue can and should be decided on a motion to dismiss.  Relators also have not alleged any facts suggesting that MEDHOST knew about the alleged software defects' purported materiality to the government's payment decisions.  With no history of government enforcement actions, and with a robust administrative process that typically manages software defects, there was never any reason for MEDHOST to suspect the materiality that Relators must prove (but fail to even allege).

Relators also do not overcome MEDHOST's claim-specific arguments for their four FCA claims.  And their throwaway kickback theory fails as well, both under the text of the AKS and under Rule 9(b).  The Amended Complaint should be dismissed in full, with prejudice, so that this meritless litigation that is hanging over MEDHOST's business can be brought to an end.

## ARGUMENT

**I.     Relators' Opposition Confirms That Their Claims About the Meaningful-Use Program Should Be Dismissed.**

### A.     Far From Satisfying Rule 9(b), Relators Take an Approach that Courts Have Rejected.

Relators do not (and could not) dispute that their claims about the meaningful-use program must satisfy Rule 9(b).  Nor do they dispute that, for purposes of their claims against MEDHOST, they need particularized allegations about *both* (1) the purportedly false attestations submitted by CHS and (2) how MEDHOST purportedly defrauded Drummond into certifying the software products at issue.  Relators insist that they have cleared this bar, but the Amended Complaint shows otherwise.

#### 1.     The Amended Complaint's Exhibit B Does Not Sufficiently Identify How These Specific Attestations Were Supposedly False.

In an effort to meet their Rule 9(b) obligations about the attestations submitted by CHS, Relators point to Exhibit B of their Amended Complaint.  *See* Opp'n, Dkt. 151, at 9.  They claim that this lengthy exhibit identifies (1) "each CHS hospital that claimed Meaningful Use subsidies," (2) "the date of each claim," (3) "the relevant certification criteria the hospital attested to for each claim," and (4) "the amount the Government paid the hospital from the claim."  *Id.*  But Relators do not disagree that Rule 9(b) requires them to also allege details on *how* these particular claims were false.  *See* Opening Br. at 9.

2

Recognizing the importance of this showing, Relators drill down on the third line-item in Exhibit B—claiming that the listed hospital "attested to Meaningful Use criteria for CPOE-Med using Medhost EDIS v4.4 SR2 CHP-022199" on February 4, 2016, even though MEDHOST's software "was ineligible for certification for CPOE." Opp'n at 10. They then say that Exhibit B provides "similar details . . . for scores of additional false claims." *Id.*

But the Amended Complaint never identifies *which versions* of MEDHOST's software fell short of the certification criteria. This is a critical omission, because certifications are version-specific.[1] More generally, Exhibit B lists 15 different versions of MEDHOST's Enterprise, and 6 different versions of MEDHOST's EDIS, as the subject of *nearly 600* different CHS attestations, yet the Amended Complaint never explains which alleged flaws pertain to which software versions. In addition, for virtually every attestation listed in Exhibit B, the hospital relied on multiple software products—a version of Enterprise, a version of EDIS, and/or a version of CHS's proprietary PULSE—but Exhibit B does not specify which attestations were made in reliance on which product. For example, the line-item they reference in their Opposition identifies both EDIS and CHS's proprietary PULSE product as being used for attestation, thus leaving unclear whether the hospital relied on EDIS, PULSE, or both for its CPOE certification. Moreover, the Amended Complaint alleges CPOE shortcomings only with *Enterprise* and its ability to communicate with EDIS, not with EDIS itself. Am. Compl. ¶ 143–190. Exhibit B is thus hardly a particularized allegation of a false claim involving MEDHOST software.

Similarly, over the course of the Meaningful Use program, hospitals have been able to receive incentive payments by satisfying Stage 1, Stage 2, or Stage 3 benchmarks for the meaningful use of certified software.[2] In Exhibit B, Relators list CHS attestations for all three

---

[1] *See EHR Productions Used for Meaningful Use Attestation*, HealthIT.gov: Health IT Dashboard (Jan. 10, 2019), https://dashboard.healthit.gov/datadashboard/documentation/ehr-products-mu-attestation-data-documentation.php (explaining that "[e]ach certified product may have more than one version," and each version has a unique identification code for attestation purposes). Whether new versions need to be retested and recertified is determined by the testing body, which assesses the modifications made to the previously certified version. *See* Drummond Group LLC, EHR Certification Guide 7 (Aug. 5, 2019), https://www.drummondgroup.com/pdfs/EHR-CB-048-EHR-Certification-Guide-Rev-05Aug2019.pdf; *Frequently Asked Questions*, CMS.gov (Aug. 22, 2013), https://web.archive.org/web/20130827085958/https://questions.cms.gov/faq.php?faqId=8898.

[2] *Stages of Promoting Interoperability Programs*, CMS.gov , https://www.cms.gov/Regulations-and-

stages.  Yet the Amended Complaint's allegations only ever address the Stage 1 and 2 benchmarks.  *See, e.g.*, Am. Compl. ¶ 220.

If Relators' theory is that *all* of the Exhibit B attestations were false, the Amended Complaint thus lacks the particularized allegations to back that up—and is not meaningfully different from the unacceptable allegation that "improper practices took place everywhere [the defendant] does business."  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005); *see also, e.g.*, *Carlisle v. Daewon Kangup Co.*, No. 3:15-cv-565, 2018 WL 3199148, at *5 (M.D. Ala. Mar. 29, 2018) (dismissing under Rule 9(b) when relators submitted lengthy exhibit of cars sold by defendants to government but did not specifically allege which vehicle(s) contained which part(s) falsely represented to be compliant with safety standards).  And if Relators' theory is that only *some* of the Exhibit B attestations were false, the Amended Complaint never says which ones—which is equally impermissible under Rule 9(b).

Nor can Relators find support in *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264 (S.D. Fla. July 12, 2012), which they highlight.  *See* Opp'n at 10–11.  There, the relator's theory was that the defendant improperly used favorable leases to induce doctors to refer government-insured patients to its hospitals.  To satisfy Rule 9(b), the relator offered "detail[ed] allegations of below market rental rates in two substantially similar buildings"—thus using particularized examples to illustrate *why* the resulting claims were fraudulent.  *Osheroff*, 2012 WL 2871264, at *1.  Relators have not done that here for any of the Exhibit B attestations, and the Amended Complaint thus does not satisfy Rule 9(b).

### 2.    Relators Cite Only Impermissible General Allegations of MEDHOST's Supposedly Fraudulent Conduct.

In any event, regardless of whether Relators have provided enough detail on CHS's purportedly false attestations, their claims against MEDHOST separately fail under Rule 9(b) because the Amended Complaint does not allege with particularity that MEDHOST engaged in any fraud.  Relators do not dispute that they need such details in order for their claims against MEDHOST to survive.  *See* Opening Br. at 9–10.  Instead, Relators claim that the Amended Complaint provides this particularity.  That is not remotely correct.

As the opening brief explained and Relators do not dispute, they must allege specific

---

Guidance/Legislation/EHRIncentivePrograms/Downloads/Stages_ofMeaningfulUseTable.pdf (last visited Nov. 4, 2019).

details about how MEDHOST supposedly tricked Drummond into certifying its software.  *See* Opening Br. at 10.  Recognizing this, Relators cite four paragraphs of the Amended Complaint for the critical proposition that MEDHOST misrepresented "to Drummond that its EHR technology was capable of performing th[e] functions" required for certification.  Opp'n at 13 (citing Am. Compl. ¶¶ 11, 50, 95, 290).  But none of these paragraphs have even a hint of the particularity that is required.  Instead, they just amount to the vague claim that MEDHOST "represented to Drummond that its products were capable of performing those functions."  Am. Compl. ¶ 95; *see also id.* ¶ 290.  Who made this misrepresentation?  When?  What specifically did they say or do to Drummond that was misleading?  How and why were they misleading? The Amended Complaint says nothing about any of this.  With none of these particulars about how MEDHOST supposedly corrupted the independent certification process, Relators' claims against MEDHOST fall well short of satisfying Rule 9(b).

On this point, the complaints filed by the United States in *United States ex rel. Delaney v. eClinical Works, LLC* (D. Vt. No. 15-cv-00095) and *United States v. Greenway Health, LLC* (D. Vt. No. 19-cv-00020) that Relators attach to their Opposition are instructive.  Relators trumpet both cases as exemplifying how "liability is not restricted to providers" like CHS, because "EHR vendors" can be liable "for causing providers to submit false claims" even when the software has been independently certified.  Opp'n at 34.  But in both complaints, the DOJ made detailed allegations about how the software companies had rigged the certification process.  Opp'n Ex. 2, ¶¶43–45, Ex. 3 ¶ 67–70.  That sort of particularity is utterly lacking here for Relators' theory that MEDHOST engaged in misconduct that taints Drummond's independent certification.  Relators' claims against MEDHOST should be dismissed under Rule 9(b) as a result.

### 3.   Relators Are Not Entitled to Any Relief From Rule 9(b)'s Demands.

Relators' alleged employment positions at CHS cannot excuse their failure to satisfy Rule 9(b).  Insisting otherwise, Relators argue that they had "direct and personal involvement in the implementation of CHS software and [a] resulting understanding of the systemic flaws in the EHR technology" that CHS used.  Opp'n at 12.  But this does not help Relators.

For one thing, Relators do not argue that their supposed insider status should give them any leeway with Rule 9(b) as applied to MEDHOST's purported fraud.  *See* Opp'n at 11–12. Indeed, Relators do not claim to have had any role in the process by which Drummond certified MEDHOST's software.  This gap requires dismissal regardless of the other deficiencies with

Relators' allegations.

Nor should Rule 9(b) be relaxed for Relators' allegations of false attestations submitted by CHS.   The Eleventh Circuit has sometimes loosened Rule 9(b) with respect to identifying specific false claims for relators who were "in a position to know that actual false claims were submitted to the government."  *United States ex rel. Fernandez v. Miami Cancer Inst.*, No.17-24051, 2019 WL 1993513, at *3 (S.D. Fla. May 6, 2019) (Scola, J.).  As the cases cited by Relators show, this reduced standard can apply when the relator was directly involved with and could describe with specificity the alleged fraudulent scheme.  *See* Opp'n at 11–12, citing *United States ex rel. Lockhart v. Gen. Dynamics Corp.*, 529 F. Supp. 2d 1335, 1341 (N.D. Fla. 2007) (relator involved in "the failure to test and the failure to disclose the failure to test"); *United States v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (relator involved in fraudulent billing).  But Relators do not claim to have had any involvement in CHS's attestations of meaningful use, which are the allegedly false claims that were submitted.  Relators cite no authority for a lighter Rule 9(b) burden under such circumstances.  *See, e.g.*, *United States ex rel. Bumbury v. Med-Care Diabetic & Med. Supplies, Inc.*, No. 10-81634, 2014 WL 12284079, at *4 (S.D. Fla. June 23, 2014) (granting defendants' motion to dismiss because of Relator's failure to allege "any firsthand knowledge of [d]efendants' billing practices").

## B.   Relators Have Not Plausibly Alleged that Any Claims Were False.

Even if Relators had alleged enough details about both CHS's attestations and MEDHOST's supposed misrepresentations to Drummond (they have done neither), they have not plausibly alleged that the government received claims for payment from CHS that were false.

### 1.   Relators Do Not Identify Anything False About CHS's Meaningful-Use Attestations.

As the opening brief explained, Relators' theory against MEDHOST cannot stand because Relators do not allege anything false about CHS's attestations.  Rather, the Amended Complaint alleges that MEDHOST's software was indeed certified by Drummond, and Relators do not allege that CHS lied when attesting to the meaningful use of this software.

In response, Relators dispute none of this.  Instead, they invoke the *Delaney* Complaint, and argue that "[s]imply passing a certifying test is not sufficient to prevent a false claim . . . ." Opp'n at 21–22.  As noted above, though, *Delaney* does not help Relators.  There, the software company allegedly defrauded the certification process—specifically, by "hardcod[ing]" into the software exactly what "it knew in advance that its certification body would test."  Opp'n Ex. 2 ¶

6

44.  Nothing remotely similar is present here.  The *Delaney* complaint was filed "for the limited purpose of settlement," *id.* ¶ 1,  so the court never addressed whether the fraudulently obtained certification turned the software users' subsequent attestations into false claims.[3]  But even if that theory has merit (which MEDHOST does not concede), it does not apply here, where there are no allegations that MEDHOST rigged the certification process.

Relators also try to draw support from *United States ex rel. Dye v. ATK Launch Systems, Inc.*, No. 1:06-cv-39 TS, 2008 WL 2074099 (D. Utah May 14, 2008).  *See* Opp'n at 22.  But *Dye* is inapposite.  There, the defendant sold flares to the government, and the defendant *itself* "certified that the flares it delivered conformed to contract requirements," when the complaint "allege[d] that the flares [were] not, in fact, capable of" meeting those requirements.  2008 WL 2074099 at *1.  Here, the certification came from Drummond (not MEDHOST) and was then relied upon by CHS (not MEDHOST) in an attestation of meaningful use.[4]  Even if MEDHOST's software had the problems that Relators allege, that cannot make CHS's attestations false, when CHS did not represent anything beyond the fact that the software was certified.

### 2. Relators Are Wrong to Suggest That MEDHOST's Software Fell Short of the ONC Criteria.

Lacking any factual allegations that MEDHOST rigged the certification process, Relators instead argue at length that MEDHOST's software simply did not meet the certification criteria.  *See* Opp'n at 24–32.  For all the ink that Relators spill on this issue, it is a red herring.  What matters is whether Drummond certified MEDHOST's software based on ONC testing processes and ONC-prescribed specifications.  As a result, there is no need for this Court to delve into the technical specifications that govern the ONC-prescribed certification process.

In any event, as the opening brief explained, the Amended Complaint's allegations about five different EHR functionalities—interoperability, CPOE, CDS, e-prescribing, and software security—do not plausibly suggest that MEDHOST's software fell short of any certification

---

[3] Similarly, no court addressed the theory of liability in the *Greenway Health* complaint, which similarly was filed concurrent with settlement.

[4] Relators repeatedly misstate MEDHOST's role in the certification process.  *See* Opp'n at 4, 5, 6, 10, 28, 42 (stating that "Medhost certified" or "Medhost falsely certified" its software).  As Relators elsewhere concede, though, developers like MEDHOST do not certify their own software, which is instead certified by ONC-authorized certification bodies like Drummond.

requirements.  *See* Opening Br. at 12–16.  Indeed, if Relators were correct that MEDHOST's software was riddled with "significant problems" (Opp'n at 1), one would expect some evidence of that—whether it be the government revoking MEDHOST's certifications, or customers suing MEDHOST over related software problems, or something similar.  But Relators allege nothing of the sort.  Instead, in their attempts to overcome the opening brief's arguments, Relators repeatedly misconstrue the complicated regulations at issue.  MEDHOST will not address all of the problems with Relators' arguments, but Relators' missteps include the following:

    *First*, regarding interoperability, Relators describe not a requirement for how MEDHOST's software should have been *designed* but instead an obligation on how the software is *deployed*—which is not something within MEDHOST's control.  *See* Am. Compl. ¶ 98; 75 Fed. Reg. 36,158, 36,188 (June 24, 2010) (to be codified at 45 C.F.R. pt. 170).  Relators cite no authority for the purported requirement that MEDHOST needed to ensure interoperability between a hospital's different modular EHR systems.

    *Second*, regarding the CPOE functionality, Relators argue that MEDHOST created ancillary functionalities that sometimes did not work—for example, weight-based dosing calculations were sometimes incorrect.  Am. Compl. ¶¶ 157–159.  But these functionalities were *not required* for certification, which they could affect only by interfering with functionalities that *were* required, and even then only if their use was mandatory.  45 C.F.R. § 170.314(a)(1); 81 Fed. Reg. 72404, 72411, 72414-72415 (Oct. 19, 2016).[5]  Here, Relators have not alleged that the ancillary functionalities at issue were mandatory, i.e., that the EHR required users to use weight-based dosing or any other ancillary functionality; physicians still had the option of entering orders using only the certified functionality.  As a result, the alleged problems with the ancillary functions do not suggest that MEDHOST's software should not have been certified.

    *Third*, regarding the CDS functionality, Relators allege that CHS improperly attested to the use of this functionality in Stages 1 and 2 of the Meaningful Use program.  Am. Compl. ¶¶ 221, 230.  But Stage 1 certifications occurred in 2013, and MEDHOST's alleged CDS problems began in 2014.  *See id.* ¶¶ 208–11.  And Relators specifically allege that CHS did *not*

---

[5] Federal Register, Vol. 81, No. 202 (Oct. 19, 2016) (to be codified at 45 C.F.R. pt. 170), https://www.govinfo.gov/content/pkg/FR-2016-10-19/pdf/2016-24908.pdf (ONC "consideration of uncertified capabilities [is] ancillary to [ONC] review of certified capabilities and [is] limited to the extent necessary to determine whether certified capabilities are functioning in a manner consistent with Program requirements.")

use MEDHOST software for the Stage 2 CDS certifications.  *See id.* ¶¶ 230–38.

*Fourth*, regarding e-prescribing, because CHS never used MEDHOST software for this functionality, Relators now argue that *other* hospitals did so.  But the Amended Complaint never alleges this, nor does it allege that these other hospitals submitted false claims or did anything else purportedly improper.  Relators cannot rely on new facts not included in their Amended Complaint.  *See, e.g.*, *Omega Psi Phi Fraternity, Inc. v. HCE Group of Cos., Inc.*, No. 11-CV-80479, 2011 WL 13228098, at *3 (S.D. Fla. Oct. 19, 2011).[6]

*Finally*, regarding software security, Relators attempt to clarify their impenetrable allegations as stating that MEDHOST's software permitted changes that "would not be captured by Medhost's audit logging."  Opp'n at 33.  But the Complaint alleges this purported problem only for users "us[ing] FTP, ODBC, or JDBC connections" which, as described by Relators, are user-figured connections and thus not part of MEDHOST's software.  Am. Compl. ¶ 253. System-level security is solely the user's responsibility.  45 C.F.R. § 495.20(*l*)(15)(ii) (requiring attesting hospitals to "[c]onduct or review a security risk analysis . . . , including addressing the encryption/security of data stored in Certified EHR Technology . . . , and implement security updates as necessary and correct identified security deficiencies as part of the eligible hospital's or CAH's risk management process").  Neither the Amended Complaint nor the applicable regulations impose any responsibility on software vendors like MEDHOST for the security of the user's overall system; they are responsible only for application-level security (i.e., *within* their products). 45 C.F.R. § 170.314(d).  The purported system-level defect alleged by Relators is thus not anything that would preclude the certification of MEDHOST's software.

Again, there is no need for this Court to address these matters, given the Amended Complaint's many fundamental defects.  But even at this granular level, Relators' theory that MEDHOST's software should not have been certified fails.

### C.    Relators Offer No Basis to Conclude That the Alleged Software Problems Would Have Led the Government to Refuse or Recoup Incentive Payments.

Next, Relators do not allege that the purported problems with MEDHOST's software were material to the government's decision to pay meaningful-use incentives to CHS.  Relators

---

[6] Elsewhere as well, Relators attempt to rely on new facts.  *See* Opp'n at 31 n.8.  But "a complaint may not be amended by briefs in opposition to a motion to dismiss," and these facts should be disregarded.  *McKally v. Perez*, 87 F. Supp. 3d 1310, 1317 (S.D. Fla. 2015).

concede (as they must) that "the Government has created an administrative process for software vendors" to fix problems (or "non-conformities") with certified EHR software.  Opp'n at 35.  Relators also do not dispute that the government will revoke a software certification only if the non-conformity is not fixed—and, even then, the government will not claw back incentive payments made to users of the problematic software.  *See* Opening Br. at 18 & n.14.  As the opening brief explained, this precludes a finding of materiality.  *See* Opening Br. at 16–18.

In response, Relators argue that these "administrative mechanisms" do not resolve materiality because false attestations "can result in provider liability for recoupment of federal payments."  Opp'n at 34, 35.  But the fact that the government *can* recoup payments does not establish materiality.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016) ("Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance.").  Similarly, materiality is absent "where noncompliance is minor or insubstantial."  *Id.*  Instead, a court must look at how the government *actually* responds to *similar* violations to assess whether a violation is material.  *See id.*

Here, Relators can cite only two examples of the government actually seeking "recoupment of Meaningful Use funds"—the same *Delaney* and *Greenway Health* cases cited above, which were brought under the FCA by the DOJ (either initially or by intervention).  Opp'n at 34–35.  But both cases involved allegations of blatant rigging of the certification process, which is a far cry from what Relators have alleged here.  Of course some egregious violations of the Meaningful Use regulations can be material.  MEDHOST has never suggested otherwise.  Relators do not and cannot allege any basis to believe that the software problems alleged *here* would have resulted in recoupment.  Indeed, the government has known about Relators' allegations since at least January 2018, when this suit was filed, and yet CMS has not sought to recoup any of the incentive payments at issue, and the DOJ has not intervened in this case.  To the extent Relators' complaints about MEDHOST's certified software have any merit, these purported software defects would be addressed administratively—without any financial penalties for the software's users or for MEDHOST—and Relators' claims against MEDHOST thus fail on materiality grounds as well.  *See, e.g.*, *Rutledge v. Aveda*, No. 2:14-cv-00145-AKK, 2015 WL 2238786, at *9 (N.D. Ala. May 12, 2015) (dismissing complaint where relator "never specifically alleges how and why noncompliance with the regulations allegedly violated would

10

prevent payment by the government.").

### D.     Relators Have Not Plausibly Alleged That MEDHOST Knew Both About the Purported Software Flaws and About Those Flaws' Materiality.

Relators fail to allege that MEDHOST acted with improper scienter—which requires that MEDHOST knew both (1) that CHS would submit false claims for payment based on its use of MEDHOST's certified software, and (2) that such falsity would be material to the government's payment decisions.  A failure to allege either component of scienter requires dismissal.

As set forth in the opening brief, MEDHOST cannot have known about the alleged falsity—as a matter of law—if it could have reasonably believed that its software complied with the certification regulations at issue.  Opening Br. at 19.  Relators respond that the Eleventh Circuit rejected this argument in *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017).  But Relators misread *Phalp*.  As even they recite, *Phalp* states merely that a defendant cannot use a regulation's ambiguity to avoid liability if defendant had "actual knowledge of a different *authoritative interpretation*."  Opp'n at 38 (quoting *Phalp*, 857 F.3d at 1155) (emphasis added).  Here, Relators do not invoke any "authoritative interpretation" of the certification regulations at issue (none exists), much less allege that MEDHOST had "actual knowledge" of such an interpretation.  If anything, the fact that Drummond independently certified MEDHOST's software confirms that it was reasonable to think that the software complied with the certification criteria.  As a result, even if Relators are correct that MEDHOST's software violated those specifications and that Drummond should not have certified the software, Relators do not allege a plausible basis to infer that MEDHOST *knew* this.

Moreover, Relators are wrong to suggest that this issue requires a factual record. Relators' own case law explains that scienter can be resolved in a defendant's favor *on a motion to dismiss* if the defendant (1) "reasonably interpreted [an] ambiguous statute" or regulation and (2) was not warned away from this interpretation by "contrary guidance."  *United States ex rel. Streck v. Bristol-Myers Squibb Co.*, No. CV 13-7547, 2018 WL 6300578, at *12 (E.D. Pa. Nov. 29, 2018), *clarified on denial of reconsideration*, 370 F. Supp. 3d 491 (E.D. Pa. 2019) (cited by Opp'n at 39.  With no "contrary guidance" that would have allegedly shown MEDHOST that Drummond's certification was improper (as Relators contend), *id.*, Relators' theory fails on the pleadings on scienter grounds.

Separately, Relators also have not plausibly alleged that MEDHOST knew the purported software flaws were material to the government's payment decisions.  Opening Br. at 19–20.

Relators' only response is to cross-reference their argument about materiality.  But that argument fails for the reasons explained above.  *See supra* Section C.  Moreover, even if Relators are correct that the alleged problems would have led the government to withold or recoup incentive payments, Relators allege nothing—no authoritative guidance, no enforcement history, no case law—from which MEDHOST could have reached this conclusion when CHS's attestations were submitted, which is the latest time at which MEDHOST's scienter could be relevant.  *See, e.g.*, *Phalp*, 857 F.3d at 1155 (explaining that a defendant must have scienter "at the time of the alleged violation").  Indeed, the *Delaney* and *Greenway Health* complaints that are the extent of Relators' materiality argument were filed in May 2017 and January 2019, respectively.  The allegedly false CHS attestations were *all submitted earlier*.  *See* Am. Compl. Ex. B (alleging attestations primarily in 2014 and 2015 and no later than March 2017).

For this reason as well, regardless of any other problems, Relators' claims against MEDHOST should be dismissed.  *See, e.g.*, *United States v. Strock*, No. 15-CV-0887-FPG, 2019 WL 4640687, at *6-8 (W.D.N.Y. Sept. 24, 2019) (granting motion to dismiss because the Government failed to allege that each of the Defendants knew that the allegedly false representations were "material to the Government's decision to pay [those] claims").

### E.    Relators Have Not Plausibly Alleged the Additional Requirements for Their False Statements Claim.

As the opening brief explained, Relators' false statements claim under 31 U.S.C. § 3729(a)(1)(B) should be dismissed not only for the above reasons—which are fatal to all of Relators' FCA claims for their meaningful-use theory—but also because Relators have not adequately alleged that MEDHOST made or used false records or statements that were material to CHS's purportedly false claims.  Opening Br. at 20.

In response, Relators contend "that Medhost fraudulently certified software that it knew it [sic] could not perform necessary functions, and then marketed its software" based on these certifications, and that providers then used this certified software to receive incentive payments.  Opp'n at 42.  But MEDHOST did *not* certify its software; Drummond did, as the Amended Complaint acknowledges.  *See* Am. Compl. ¶ 82 (recognizing that Drummond was the "authorized certification body").  And as explained above, there is not a whit of specificity to Relators' conclusory allegation that MEDHOST engaged in fraud during the certification process.  Nor is there any particularity to Relators' empty suggestion that MEDHOST falsely "marketed its software to health care providers."  Opp'n at 42.  Relators do not specifically

12

identify what MEDHOST's supposedly false statements or records were, much less why they were false or any other details that would be necessary to make this allegation stick. The false statements claim against MEDHOST should be dismissed as a result. *See, e.g.*, *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1330 (11th Cir. 2009).

### F.   Relators Have Not Plausibly Alleged a Conspiracy to Violate the FCA.

Relators' conspiracy claim should be dismissed as well. Not only have Relators failed to allege an underlying false claim (for the reasons explained above), but Relators also have not alleged with particularity that MEDHOST "entered a specific agreement to submit fraudulent claims to the Government." *United States ex rel. Stepe v. RS Compounding LLC*, No. 8:13–cv–3150–T–33AEP, 2017 WL 5178183, at *9 (M.D. Fla. Nov. 8, 2017).

Insisting otherwise, Relators argue that MEDHOST and CHS "worked closely together to attempt to address software" problems, and that both parties knew CHS was using flawed software. Opp'n at 43. But a shared awareness of purported software bugs—and a cooperative process to *fix* those bugs—does not suggest an agreement to *defraud* the federal government. *See, e.g.*, *Stepe*, 2017 WL 5178183, at *9 (holding that allegations that defendants "worked together" to "devise and implement" improper scheme were "insufficient to support that Defendants entered a specific agreement to submit fraudulent claims to the Government"). And even Relators do not argue that they have alleged such an agreement with specificity, as Rule 9(b) requires (which they do not dispute). *See* Opp'n at 42 (arguing only that one could "reasonably infer" that "Medhost and CHS had a plan"). Their FCA conspiracy claim should be dismissed as a result.

### G.   Relators Have Not Plausibly Alleged a Reverse False Claim by MEDHOST.

Finally for Relators' meaningful-use theory, their § 3729(a)(1)(G) claim for reverse false claims liability should also be dismissed. This claim (1) impermissibly duplicates Relators' presentment and false statement claims, (2) cannot even be a basis for liability against MEDHOST, when MEDHOST is not alleged to have owed any money to the government, and (3) is not alleged with the necessary particularity. *See* Opening Br. at 21–22. Relators never respond to these arguments, instead addressing their § 3729(a)(1)(G) claim in only a one-sentence footnote. *See* Opp'n at 41 n.13. For all the unrebutted reasons set forth in the opening brief, that claim cannot stand.

## II.     Relators' Kickback Theory Should Be Dismissed.

Relators also cannot save their AKS theory against MEDHOST, which contends that (1) "CHS purchased the Medhost [EHR software] in exchange for Medhost providing CHS with free financial software," and (2) MEDHOST offered equity to CHS to induce CHS "to purchase [MEDHOST's] PIMS software," which is not an EHR product.  Opp'n at 44, 46.  This theory fails, first, because MEDHOST's software is not an item "for which payment may be made . . . under a Federal health care program," as the AKS requires, 42 U.S.C. § 1320a-7b(b)(2), and second, because the purported schemes are not alleged with particularity.  Opening Br. at 23.

In response, Relators first argue that the government paid CHS "for purchasing and using" MEDHOST's EHR software, Opp'n at 44 such that the software is effectively paid for "under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2).  But Relators do not (and could not) claim that MEDHOST's PIMS software is covered "under a Federal health care program" this way, and there is thus no dispute that Relators' equity-offer theory is not cognizable under the AKS.  This theory of indirect reimbursability also misconstrues the AKS (and thus does not work for the EHR software either), but this Court need not resolve this question of statutory interpretation in light of Relators' Rule 9(b) problems.

To allege a kickback scheme, Relators must make particularized allegations that include "the names of the [people] who received the incentives, *the names of the [people] who negotiated the incentives* . . . , precisely what the incentives were, when they were provided, why they were provided, and why they were illegal."  *United States v. Choudhry*, 262 F. Supp. 3d 1299, 1307 (M.D. Fla. 2017) (emphasis added).  Relators allege three different types of improper kickbacks—free financial software, equity, and discounts—but fail to allege any with sufficient detail as required under 9(b).

For Relators' allegations that MEDHOST provided free financial software, the Amended Complaint alleges merely that this purported scheme "was commonly known and discussed among employees," and that a CHS employee named Steve Hernandez "was responsible for finalizing software pricing with Medhost."  Am. Compl. ¶ 284.  But a vague reference to "employees" does not suffice under Rule 9(b).  Nor does the reference to Mr. Hernandez, as Relators allege only that he was generally "responsible" for pricing—not that he arranged a kickback scheme.  Moreover, Relators do not identify anyone at MEDHOST who "negotiated the incentives."  *Choudhry*, 262 F. Supp. 3d at 1307.  Relators similarly do not allege the identity

14

of anyone at MEDHOST who was involved with the alleged equity offer and software discounts. *See* Am. Compl. ¶¶ 286–87. The only MEDHOST employee mentioned at all in Relators' kickback allegations is an individual who "frequently took CHS Chief Financial Officer Larry Cash to play golf where the PIMS software purchase . . . and other Medhost software purchases for CHS were negotiated." *Id.* ¶ 288. Such a vague allegation does not satisfy Rule 9(b) and, in any event, specifically mentions only the PIMS software, which (as noted) undisputedly falls outside the AKS for not being reimbursable through a federal health care program.

Separately, Relators also fail to specifically allege the timing of the purported kickbacks, as Rule 9(b) requires. Relators allege that these kickbacks occurred "at the same time" MEDHOST expanded its Enterprise software suite, but Relators do not specify when that time was. Am. Compl. ¶ 283. This does not satisfy Rule 9(b). *See, e.g.*, *United States ex rel. McFarland v. Florida Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1326 (M.D. Fla. 2017) (dismissing kickback claims when Complaint contained "no specific allegations of fact about any kickback [including] the amount and date of the kickback"); *United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed. App'x 783, 788 (11th Cir. 2014) (dismissing kickback allegations under Rule 9(b) when, *inter alia*, alleged kickback allegedly occurred only "at some point in 2007").

In short, Relators' failure to specify "the exact misconduct" that forms the basis for their AKS theory, *United States ex rel. Mastej v. Health Mgmt Assocs.*, 869 F. Supp. 2d 1336, 1340 (M.D. Fla. Feb. 16, 2012), or who at MEDHOST was involved or when the purported kickback schemes happened, is fatal to that theory.

## CONCLUSION

For the reasons discussed above and in the opening brief, Relators' claims against MEDHOST should be dismissed with prejudice.

Dated:  December 19, 2019                     Respectfully submitted,


                                              */s/ Erika Stephanie Whyte*  _____


                                              **Stephen G. Sozio**
                                              Jones Day
                                              901 Lakeside Avenue
                                              Cleveland, OH 44114
                                              (216) 586-3939
                                              Email: sgsozio@jonesday.com
                                              * admitted *pro hac vice*

                                              **Laura F. Laemmle-Weidenfeld**
                                              Jones Day
                                              51 Louisiana Avenue NW
                                              Washington, DC 20001
                                              (202) 879-3939
                                              Fax: 202-626-1700
                                              Email: lweidenfeld@jonesday.com
                                              * admitted *pro hac vice*

                                              **Erika Stephanie Whyte**
                                              Jones Day
                                              600 Brickell Avenue
                                              Suite 3300
                                              Miami, FL 33131
                                              (305) 714-9700
                                              Fax: (305) 714-9799
                                              Email: ewhyte@jonesday.com
                                              *LEAD ATTORNEY*

                                              **Jessica M. Sarkis**
                                              Jones Day
                                              901 Lakeside Avenue
                                              Cleveland, OH 44114
                                              (216) 586-3939
                                              Email: jsarkis@jonesday.com
                                              * admitted *pro hac vice*

                                              *Attorneys for Defendant MEDHOST, Inc.*

16

## **CERTIFICATE OF SERVICE**

I certify that on December 19, 2019, I caused to be electronically filed the foregoing with

the Clerk of Court for using the Court's CM/ECF system, which sent notice of such filing to all

counsel of record.

*/s/ Erika Stephanie Whyte*_____

Erika Stephanie Whyte
